IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) No.   3:26-cv-545 |
| | ) |
| THE COMMONWEALTH OF | ) |
| VIRGINIA, JAY JONES, in his official | ) |
| capacity as Attorney General of Virginia, | ) |
| and STEVE DESCANO, in his official | ) |
| capacity as Commonwealth Attorney for | ) |
| Fairfax, Virginia, | ) |
| | ) |
| *Defendants.* | ) |

## COMPLAINT

The United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## PRELIMINARY STATEMENT

1.      For over 200 years, the Supreme Court has repeatedly recognized that states have no authority to regulate the Federal Government's operations. *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (The Supremacy Clause "prohibit[s] state laws that either regulat[e] the United States directly or discriminat[e] against the Federal Government…."); *Mayo v. United States*, 319 U.S. 441, 445 (1943) (The Supremacy Clause renders "the activities of the Federal Government … free from regulation by any state."); *Tennessee v. Davis*, 100 U.S. 257, 262–63 (1879); *In re Neagle*, 135 U.S. 1, 75 (1890); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). A state law that directly regulates the Federal Government's operations is invalid. *E.g.*, *United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026) (enjoining state law attempting to regulate federal law enforcement because states are forbidden "from regulating the federal

1

government *qua* government and from controlling federal governmental functions in any manner and to any degree").

2.      Virginia's Governor and Legislature apparently disagree with that well-established precedent. Consistent with Governor Abigail Spanberger's February 24, 2026, response to President Donald J. Trump's State of the Union address, where she criticized "poorly trained federal agents" operating "with their faces masked from accountability,"[1] Virginia recently enacted a bill that purports to do exactly what constitutional law says it cannot: subject Federal officers to criminal laws that seek to regulate how those officers carry out their Federal duties.

3.      The Virginia Legislature passed Senate Bill 352/ House Bill 1482, adding Section 19.2-83.6:1, "*Prohibition on wearing of facial coverings; penalty*," to the Virginia Code, which Governor Spanberger signed into law on May 20, 2026 (hereinafter "SB 352"). The law takes effect on July 1, 2026, *see* Va. Code § 1-214, and criminalizes Federal law enforcement officers either (i) "wear[ing] a facial covering that conceals, obscures, or otherwise covers his face while … engaged in the performance of his official duties" or (ii) failing to wear identifying information such as the "officer's name or other individual identifier," except in limited circumstances. Va. Code § 19.2-83.6:1(B), (D). Officers that violate the law are guilty of a "Class 1 misdemeanor," which is punishable by up to a year in jail and/or a fine of up to $2,500. *Id.* at (E); Va. Code § 18.2-11. While the law specifically states that such penalties shall not apply to officers who work for law enforcement agencies with a written policy modeled after the Virginia Department of Criminal Justice Services Model Policy, the definition of law enforcement agencies does not include Federal

---

[1] Governor Spanberger's Full Remarks: Governor Abigail Spanberger Delivers Democratic Response to President Trump's State of the Union Address, *available at* https://www.wbaltv.com/article/spanberger-democratic-response-williamsburg/70489674 (last visited June 11, 2026).

2

agencies, thus precluding them from the exception. § 19.2-83.6:1(A), (B), (D), (E). Furthermore, it does not appear that any such model policy has been issued. *See* https://www.dcjs.virginia.gov/law-enforcement/model-policies-virginia-law-enforcement-agencies (last visited June 11, 2026).

4.      The Act is blatantly unconstitutional because it violates the principles of intergovernmental immunity that flow from the Supremacy Clause of the U.S. Constitution by regulating what Federal officers may and may not wear within the Commonwealth of Virginia when "engaged in the performance of their official duties," including face coverings and personal identifiers. § 19.2-83.6:1(B), (D).

5.      The Federal Government, not the Commonwealth of Virginia, has the authority to control its own agents and activities. Just last month, the Ninth Circuit unanimously granted an injunction against a materially similar California law requiring Federal law enforcement officers to "visibly display identification." *See California*, 173 F.4th at 1063. Because California's law "expressly applie[d] to federal officers," sought "to control their conduct in performing law enforcement operations," "purport[ed] to override the federal government's power to determine whether, how, and when to publicly identify its officers," and thereby "aim[ed] to regulate the manner and conditions under which federal agents can enforce federal law," the Ninth Circuit easily concluded that it was "barred by intergovernmental immunity" under the Supremacy Clause. *Id.* at 1067. Moreover, the district court held that California's mask law unlawfully regulated and discriminated against the Federal Government. *See United States v. California*, No. 2:25-cv-10999, 2026 WL 363346, at *11-12 (C.D. Cal. Feb. 9, 2026).

6.      SB 352 seeks to regulate the actions of Federal law enforcement officers within Virginia by subjecting those officers to criminal penalties for following the Federal laws and

3

policies that govern their Federal duties and actions. Laws such as SB 352 undermine the principles of federalism that underlie our constitutional order by seeking to prevent effective Federal law enforcement within the Commonwealth. Such actions are unconstitutional under the Supremacy Clause, U.S. Const. art. VI, cl. 2, and harms the citizens of both the United States as a whole and of Virginia as a "State".

7.    Virginia's unconstitutional actions do not stop there. On April 22, 2026, Virginia legislature passed Senate Bill 783/ House Bill 1441, adding Section 15.2-1726.1, *Immigration enforcement agreements with Federal authority; required provisions,* to the Virginia Code, which Governor Spanberger signed into law on the same day. The law takes effect on July 1, 2026. It states that no state or local law enforcement agency—which includes any sheriff's office, police department, local or regional correctional facility, the Department of State Police, the Department of Corrections, and the Department of Juvenile Justice—shall maintain, renew, or enter into any Federal immigration enforcement agreement unless such agreement includes 12 onerous provisions designed to regulate how U.S. Immigration and Customs Enforcement (ICE) operates in Virginia. Those restrictions include what agents must wear, how they must conduct enforcement operations, where they may conduct such operations, and what laws—specifically pursuant to Virginia State laws—they must comply with when operating in Virginia. *See* Virginia Code Section 15.2-1726.1(A), (C). It requires renegotiation of the contracts by September 1, 2026, to comply with the new law, or termination of the contracts. *Id.* at (D). It states that any agreement entered into or maintained in violation of the section is deemed "void and unenforceable." *Id.* at (E).

8.    Virginia seeks to override Congress's enactments that provide that ICE may enter into agreements with States and localities in which ICE trains local officers in immigration enforcement matters and provides them with the authority to conduct such matters under the color

of Federal law. 8 U.S.C. § 1357(g). Virginia law enforcement agencies, including at the state and local levels, have entered into valid agreements with ICE over the years pursuant to § 1357(g). Yet, the Virginia legislature now seeks to void those contracts unless, in exchange, Virginia can control the operations of Federal ICE agents within its borders. Such a bargain is no bargain at all, and the law demanding it is unconstitutional.

9. First, the law violates the Contracts Clause, art. I, § 10, cl. 1, which states "[n]o State shall … pass any … Law impairing the Obligation of Contracts[.]" States cannot pass laws that substantially impair contracts without a legitimate public purpose, *Balt. Teachers Union v. Mayor of Balt.*, 6 F.3d 1012, 1018-19 (4th Cir. 1993), and obstructing Federal immigration enforcement is not a legitimate public purpose.

10. Second, the law violates long-settled principles of intergovernmental immunity embodied in the Supremacy Clause, under which States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."). Dictating the content of agreements, how Federal agents must operate, where they may operate, and requiring them to be subject to state law when performing their Federal duties are blatant violations of intergovernmental immunity.

11. Third, the law also violates long-settled principles of preemption embodied by the Supremacy Clause including that a state law may not stand as an obstacle to the accomplishment of a Federal objective and may not conflict with a Federal law. *United States. v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013). Yet Virginia's law blatantly conflicts with the Federal immigration enforcement laws and seeks to block §287(g) agreements in the State.

5

12.     All of the United States' 287(g) agreements with Virginia state and local law enforcement entities will be "deemed void and unenforceable" under the new law. The United States cannot and will not renegotiate § 287(g) agreements in compliance with the new Virginia law because the Virginia law violates Federal law.

13.     Section 15.2-1726.1 is unconstitutional and the United States therefore brings this declaratory and injunctive action to enjoin the Commonwealth of Virginia and its officers, agents, servants, employees, and attorneys, and those in active concert with them, from enforcing Section 15.2-1726.1.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

15.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) because a state may be sued in any jurisdiction within it.

16.     The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

17.     Plaintiff, the United States of America, enforces Federal laws through its Executive agencies. Those agencies include but are not limited to the Department of Justice and its component law enforcement agencies—*e.g.*, the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA)— and the Department of Homeland Security (DHS) and its component law enforcement agencies—*e.g.*, ICE (which includes Homeland Security Investigations (HSI)), U.S. Customs and Border Protection (CBP), and the Federal Protective Service.

18.     Defendant Commonwealth of Virginia is a state of the United States.

6

19.     Defendant Jay Jones is the Attorney General of the Commonwealth of Virginia.

20.     Defendant Steve Descano is a Commonwealth Attorney for Virginia.

## **LEGAL AND FACTUAL BACKGROUND**

## **THE SUPREMACY CLAUSE**

21.     The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause incorporates principles of Intergovernmental Immunity, and thus, a state enactment is invalid if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted).

22.     The preemption doctrine provides that Federal interests trump state interests when Federal and state law "clash." *North Dakota*, 495 U.S. at 435; *Murphy*, 584 U.S. at 477–79. Preemption is typically categorized as express, field, or conflict preemption. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000). Express preemption occurs when Congress includes express language within the statute indicating its preemptive intent. *Id*. at 372. Field preemption occurs when Congress intends Federal law to "occupy the field," leaving no room for state law in the area. *Id*. State law is also naturally preempted to the extent of any conflict with a Federal statute. *Id.* That includes, for example, if it is impossible to comply with both state and Federal law, and where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 372-73.

23.     The President has a constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II § 3.

7

24.     Subordinate officers in various Federal agencies assist the President in discharging that duty. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020); *see also Davis*, 100 U.S. at 263 (stating that the Federal Government "can act only through its officers and agents").

25.     Federal law empowers the Executive to provide for and dictate the conduct of Federal law enforcement officers in carrying out their official duties. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (giving the Secretary of Homeland Security the power to "control, direct[], and supervis[e]" all DHS employees).

26.      Federal law similarly empowers the Executive to provide for and dictate Federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g., id.*; 5 U.S.C. § 5901 (directing the head of each Federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of Federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees).

27.     Because the authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," Federal officers and agents "must act within the States." *Davis*, 100 U.S. at 263. Accordingly, Federal law enforcement activities take place within the several states, including Virginia.

8

28.     For example, the DEA enforces our Nation's controlled substances laws. *See generally* The Controlled Substances Act (CSA), *codified as amended at* 21 U.S.C. §§ 801, *et seq.*

29.     In carrying out that mission, the DEA investigates and aids in the prosecution of major violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with Federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.100–0.101.[2]

30.     As another example, the FBI is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. It carries out this mission through numerous operations throughout the country and in partnership with state and local officials. *See id*. § 0.85.[3]

31.     And as another example, DHS, through ICE and CBP, is principally responsible for enforcing our Nation's immigration laws, including the Immigration and Nationality Act (INA) and others that, pursuant to Congress's power to "establish a uniform Rule of Naturalization," U.S. Const. art. I § 8, cl. 4, make up the framework for the "governance of immigration and alien status," *Arizona v. United States*, 567 U.S. 387, 395 (2012).

32.     The INA confers upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. As part of those enforcement efforts, DHS, through HSI, also investigates transnational crime and threats, including incidents of human smuggling and human trafficking. *See* 8 U.S.C. §§ 1324, 1232. The INA permits the Executive Branch to enter into agreements with state and local agencies pursuant to 8 U.S.C. § 1357(g) to permit authorized state

---

[2] *See also* DEA Mission Statement, DEA, https://perma.cc/99W4-98GL.
[3] *See also* FBI, About, Mission and Priorities, https://www.fbi.gov/about/mission (last visited June 11, 2026).

and local officers to act as immigration officers under the direction and supervision of the Executive Branch.

## THE CONTRACTS CLAUSE

33.    The Contracts Clause restricts the power of States to disrupt contractual arrangements, providing that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U. S. Const., Art. I, §10, cl. 1. The Clause "applies to any kind of contract." *Sveen v. Melin*, 584 U.S. 811, 818 (2018).

34.    A state law is invalid if it causes substantial contractual impairment without a significant and legitimate public purpose. *Sveen*, 584 U.S. at 819. Moreover, even if a State identifies a significant and legitimate public purpose for its law, it still must show that its law advances that purpose in an appropriate and reasonable way. *Id.*

## FEDERAL IMMIGRATION ENFORCEMENT

35.    The Constitution affords Congress the power to "establish a uniform Rule of Naturalization" and to "regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3, 4. The Constitution also authorizes the President of the United States to "take Care that the Laws be faithfully executed." *id*. art. II, § 3.

36.    Based on its enumerated constitutional and sovereign powers to control and conduct relations with foreign nations, the Federal Government has "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona v. United States*, 567 U.S. 387, 394 (2012), and an inherent obligation and broad authority to establish immigration laws, *see Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

37.    The States cannot obstruct or take discriminatory action against the execution of those laws, *see Arizona*, 567 U.S. at 394–95; *North Dakota v. United States*, 495 U.S. 423, 435

10

(1990) (plurality); *id*. at 444–47 (Scalia, J., concurring), as only the Federal Government maintains the authority to grant an alien the privilege to enter our Nation and controls the terms and conditions of such privilege, *see Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).

38.    Congress exercised its authority to make laws governing the entry, presence, status, and removal of aliens by enacting provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq. The INA confers upon Executive agencies extensive authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. *See* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. The INA also authorizes the Secretary of Homeland Security to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]." 8 U.S.C. § 1103(a)(3).

39.    Although the Federal Government possesses broad power over immigration, enforcing the immigration laws is a formidable challenge with significant complexities. To meet that challenge, the Federal Government regularly works with state and local governments. Indeed, "[c]onsultation between Federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411.

40.    Indeed, Congress has directed that a Federal, state, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, DHS "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see* 8 U.S.C. § 1644 (same); *see also* 8 U.S.C. § 1357(g)(10)(A) (providing for state and local "communicat[ion] with [DHS] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"). Similarly, Congress mandates that "no person or agency

11

may prohibit, or in any way restrict, a Federal, State, or local government entity from," among other things, "[m]aintaining" "information regarding the immigration status, lawful or unlawful, of any individual," or "[e]xchanging such information with any other Federal, State, or local government entity." 8 U.S.C. § 1373(b).

41.    Federal law also contemplates that DHS be able to inspect all applicants for admission and take appropriate action against inadmissible aliens, even ones who are transferred to State or local custody pending prosecution. *See* 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2. And 8 U.S.C. § 1357(a)(1) authorizes ICE "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." Any state law or policy that prevents Federal law enforcement from such inspection or interrogation stands as an obstacle to ICE's statutory and regulatory mandate.

42.    Furthermore, cooperative efforts between Federal officials and state and local officials are critical to enabling the Federal Government to identify, process for removal, and thereafter remove the hundreds of thousands of aliens who violate immigration laws (and other laws) each year.

43.    Cooperation is also a key component of the decision Congress made to permit states and localities to impose criminal punishment on an alien, and to have an alien serve that punishment, before the alien is removed from the country. *See* 8 U.S.C. § 1231(a)(1)(B)(iii) (providing that the removal period does not begin until an alien in state custody is "released from detention or confinement"). Cooperating allows ICE to take into custody aliens convicted of crimes after the completion of their criminal sentence and to detain other aliens pending removal proceedings. *Id*. §§ 1225(b)(2)(A), 1226(c); *see id*. § 1231. Federal law contemplates and authorizes these cooperative efforts in service of the interests of the Federal Government, states

12

and localities, and the public writ large. Because the Federal Government has a regulatory relationship with all aliens within the United States, its grant of permission to states and localities to pursue their criminal-enforcement interests does not affect the Federal Government's ultimate authority over criminal aliens. *Cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

44.     Federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens." 8 U.S.C. § 1226(d)(1)(A).

45.     Federal officials also must "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony." 8 U.S.C. § 1226(d)(1)(B); *see* 8 U.S.C. §§ 1226(c), 1231(a).

46.     Congress also authorized states and localities to "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B).

47.     In addition, "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," a "principal example" of which is "when the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona*, 567 U.S. at 408-09 (citing 8 U.S.C. § 1357(g)); *see also United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023). Section 1357(g)(1) of Title 8 provides that "the Attorney General may enter into a written agreement with a State, or any political subdivision of a State, pursuant to which an officer or employee of the State or subdivision, who is determined by the Attorney General to be qualified to perform a function of an immigration officer in relation

13

to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers), may carry out such function at the expense of the State or political subdivision and to the extent consistent with State and local law."

48.     Congress added Section 287(g) to the Immigration and Nationality Act (codified at 8 U.S.C. § 1357(g)) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Pub. L. No. 104-208, div. C, sec. 113, 110 Stat. 3009, 3009–546 (1996). The bill was designed to "strengthen[ ] the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system—without punishing those living in the United States legally." President William J. Clinton, Statement on Signing the Omnibus Appropriations Act, 1996 U.S.C.C.A.N. 3388, 3391 (Sept. 30, 1996); *see* H.R. Rep. 104-828 (Sept. 24, 1996) (Conf. Rep.) (describing IIRIRA as a bill "to improve deterrence of illegal immigration to the United States" and "to reform the legal immigration system").

49.     Pursuant to Section 287(g) agreements, qualified state and local officers designated by the Secretary of Homeland Security[4] may perform specified immigration-enforcement functions relating to investigating, apprehending, and detaining aliens. 8 U.S.C. § 1357(g)(1)–(9). Section 287(g) requires that the specified officers "have knowledge of, and adhere to, Federal law" relating to immigration enforcement and that they receive "adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2); *see also Alas*, 63 F.4th at 274; *Arizona*, 567 U.S. at 409 (citing § 1357(g)(2); 8 CFR §287.5(c) (arrest power contingent on training), *id*. § 287.1(g) (defining the training)). "In short, Section 287(g) 'permits ICE to

---

[4] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement,' and 'ICE trains the local law enforcement officers who participate.'" *Alas*, 63 F.4th at 274 (quoting *United States v. Sosa-Carabantes*, 561 F.3d 256, 257 (4th Cir. 2009)); *see id*. at 275 (describing § 287(g) agreement as "crafted to ensure that each HCSO officer or employee tasked with enforcing Federal immigration law is well-trained, tested, and certified.").

50.    Such cooperation thus occurs under color of Federal authority, not state authority: "An officer or employee of a State or political subdivision of a State acting under color of authority under this subsection, or any agreement entered into under this subsection, shall be considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8). Section 1357(g)(1) thus grants local officers the powers and immunities of Federal immigration officials.

51.    Federal law enforcement officers work throughout the entire country and are subject to the control of the Federal Government, not each individual state or locality. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (giving the Secretary of Homeland Security the power to "control, direct[], and supervis[e]" all DHS employees).[5] Likewise, when it comes to liability, Federal law enforcement officers are subject to Federal law, not state law. *See, e.g.*,

---

[5] *See also* 5 U.S.C. § 5901 (directing the head of each Federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of Federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees).

15

*Hernandez v. Mesa*, 589 U.S. 93, 101-102, 111 (2020) (explaining limited nature of *Bivens* and history leading to the Federal Tort Claims Act (FTCA) as the exclusive remedy for most claims against Government employees arising out of their official conduct).

## THE CHALLENGED VIRGINIA LAWS

### VIRGINIA CODE § 19.2-83.6:1

52.    On May 20, 2026, Governor Abigail Spanberger signed into law SB 352, which, among other things, added a new section to the Virginia Code, § 19.2-83.6:1, *Prohibition on wearing of facial coverings; penalties*. A true and correct copy of the law is attached hereto as **Exhibit A**.

53.    Section § 19.2-83.6:1 takes effect July 1, 2026. *See* Va. Code § 1-214.

54.    Section 19.2-83.6:1 subjects Federal law enforcement agents and officers to its provisions by defining "law-enforcement officer" to mean "(i) the same as that term is defined in § 9.1-101 and (ii) any full-time or part-time employee of a federal law-enforcement agency."[6] § 19.2-83.6:1(A).

55.    Section 19.2-83.6:1(A) defines "Law-enforcement agency" as "any agency or department responsible for the prevention and detection of crime and the enforcement of the penal, traffic, or highway laws of the Commonwealth." That definition of "law-enforcement agency" *excludes* Federal law enforcement agencies, as confirmed by the Act's other uses of "*federal* law-enforcement agency" when defining "Law-enforcement officer" and "agency" when describing the motorcycle helmet exception to the facial covering ban. § 19.2-83.6:1(A), (C)(5).

---

[6] Section 9.1-101 encompasses law-enforcement officers employed by the Commonwealth of Virginia and subdivisions thereof.

56.     Section 19.2-83.6:1(B) prohibits Federal officers from wearing facial coverings: "Except as provided in subsection C, no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while such law-enforcement officer is engaged in the performance of his official duties."

57.     Section 19.2-83.6:1(A) defines "Facial covering" as "any opaque mask, garment, helmet, headgear, or other item or device whereby a substantial portion of the face is hidden or covered to conceal the identity of the wearer, including a balaclava, tactical mask, gator, ski mask, or other similar face-shielding item or device. 'Facial covering' does not include sunglasses or prescription eyewear, provided that such sunglasses or eyewear does not otherwise conceal a substantial portion of the wearer's face."

58.     Section 19.2-83.6:1(C)(1)-(7) contain seven limited exceptions to subsection (B)'s general prohibition that relate to health and safety, such as face coverings to protect against diseases, toxins, gas, smoke, severe weather conditions (such as extreme cold), helmets, protective eyewear, or tactical team (SWAT) facial coverings.

59.     Section 19.2-83.6:1(C)(8) contains a different exception to subsection (B)'s general prohibition, stating: "A facial covering worn by a law-enforcement officer who is assigned to an undercover, drug, gang, or surveillance unit where the protection of such law-enforcement officer's identity is necessary as determined by the law-enforcement agency overseeing such unit or other responsible law-enforcement agency." As discussed above, "Law-enforcement agency" is limited to state and local law enforcement agencies only. *See supra* ¶ 55; § 19.2-83.6:1(A) (definitions). Thus, unlike subsection (C)(5)'s exception, which allows any agency (state or Federal) to decide whether a helmet is required for safety, the Act permits only state and local

17

officers to wear masks if assigned to an undercover, drug, gang, or surveillance unit, and not Federal officers and agents who also engage in such work.

60.     Additionally, § 19.2-83.6:1(D) contains an identification requirement for Federal officers: "Except as otherwise provided by this section, a law-enforcement officer, while engaged in the performance of his official duties, shall visibly display (i) a badge or insignia bearing such law-enforcement officer's name or other individual identifier unique to that particular law-enforcement officer and (ii) the name of the law-enforcement agency that employs such law-enforcement officer."

61.     As with the undercover drug, gang, or surveillance exception discussed above, it is unclear whether paragraph (D)(ii) applies to Federal officers, because it uses the defined term "law-enforcement agency" that does not include Federal agencies. *See supra* ¶ 55.

62.     Section 19.2-83.6:1(E) contains the penalties for violating § 19.2-83.6:1(B) and (D): "A law-enforcement officer who violates the provisions of this section is guilty of a Class 1 misdemeanor unless the law-enforcement agency that employs such law-enforcement officer has adopted and established a written policy for the use of facial coverings, using as guidance the model policy established by the Department of Criminal Justice Services under § 9.1-102." The penalty for a Class 1 misdemeanor is defined by Virginia Code § 18.2-11, which provides that a Class 1 misdemeanor is punishable by confinement in jail for not more than twelve months and/or a fine of not more than $2,500. *See* Va. Code § 18.2-11. A commonwealth attorney, such as Defendant Steve Descano, may prosecute a Class 1 misdemeanor. Va. Code § 15.2-1627(B).

63.     Federal officers appear unable to qualify for § 19.2-83.6:1(E)'s narrow exception based on "a written policy for the use of facial coverings" for a couple reasons. First, the exception is limited to state and local "law-enforcement agenc[ies]," as the Act defines that term. *See supra*

18

¶ 55. Second, the Department of Criminal Justice Services has not "established" any "model policy" against which to compare a "law-enforcement agency['s]," so no agency's policy could qualify.[7] And third, it is unclear how or why "a written policy for the use of facial coverings" would relate to § 19.2-83.6:1(D)'s requirement regarding officer identification.

64.    The United States has standing to bring this lawsuit in accordance with the pre-enforcement standing principles articulated by the Fourth Circuit in *Mobil Oil Corp. v. Attorney General of Virginia*, 940 F.2d 73 (4th Cir. 1991). The law explicitly applies to and targets Federal law enforcement, Federal agencies will not require Federal officers and agents to comply with the law, and the law is newly issued and therefore likely to be enforced. Indeed, upon signing, Governor Spanberger issued a statement that "Law enforcement officers wearing masks on American streets undercut basic expectations of accountability, sow fear and confusion, and erode the public trust" and "[w]ith this law, Virginia is reaffirming that transparency, accountability, and a commitment to earning the public's trust are prerequisite to enforcing the law in our Commonwealth."        https://www.wbaltv.com/article/spanberger-democratic-response-williamsburg/70489674 (last visited June 11, 2026). Governor Spanberger specifically referenced ICE agents in her comments about masks. *Id.* Virginia has not disclaimed enforcement of Section § 19.2-83.6:1 against Federal officers and agents. As a result, individual officers face the risk of criminal prosecution by the Commonwealth's Attorneys.

65.    In short, § 19.2-83.6:1 dictates when Federal law enforcement officers may wear facial coverings and identification when performing official duties in Virginia, even though Federal officers are controlled by Federal agencies, not the Commonwealth of Virginia. Under § 19.2-

---

[7] *See* https://www.dcjs.virginia.gov/law-enforcement/model-policies-virginia-law-enforcement-agencies (most recent policies dated April 4, 2026, and pertaining to crowd control and security at nonprofits) (last visited June 11, 2026).

83.6:1, *state* officers can wear facial coverings when assigned to an undercover, drug, gang, or surveillance unit, but *Federal* officers cannot. And *state* officers can be exempted from criminal charges under the law, but Federal officers cannot. The law thus violates principles of intergovernmental immunity contained within the Supremacy Clause of the U.S. Constitution by regulating the Federal Government, and by discriminating against the Federal Government. *Washington*, 596 U.S. at 838.

66. Indeed, the Ninth Circuit recently determined that the United States was likely to prevail on its challenge to a similar identification requirement in California because it unlawfully regulated the Federal Government. *See California*, 2026 WL 1088674. There, the Ninth Circuit unanimously held that "if a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to Federal functions or operations, and irrespective of the degree to which the state law interferes with Federal functions or operations." *Id.* at *5. It held that the challenged law attempted "to directly regulate the Federal government in its performance of law enforcement operations" by seeking "to control [its] conduct in performing law enforcement operations" and purporting to "override the federal government's power to determine whether, how, and when to publicly identify its officers" thus seeking to "regulate the manner and conditions under which federal agents can enforce federal law." *Id.* In that same litigation, the district court enjoined California's similar law regulating facial coverings for Federal officers. *See United States v. California*, No. 2:25-cv-10999, 2026 WL 363346, at *11-12 (C.D. Cal. Feb. 9, 2026) (holding that mask laws were an unlawful direct regulation of the Federal Government that also unlawfully discriminated against the Federal Government).

**VIRGINIA CODE § 15.2-1726.1**

67.    On April 22, 2026, the Virginia legislature passed identical bills SB783 and HB1441, and Governor Spanberger signed them into law, adding Section 15.2-1726.1 to the Virginia Code, entitled "Immigration enforcement agreements with Federal authority; required provisions." A true and correct copy is attached hereto as **Exhibit B**. Although "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts," U. S. Const., Art. I, §10, cl. 1, the new law unabashedly seeks not just to impair, but to nullify, existing § 287(g) agreements between the Federal Government and local entities in Virginia.

68.    Section 15.2-1726.1(A) provides two definitions for the new section: "Federal immigration enforcement agreement" and "Law-enforcement agency."

69.    It defines "Federal immigration enforcement agreement" as "an agreement with a Federal agency authorizing a law-enforcement officer or employee of the Commonwealth or any of its localities to perform a function of a Federal immigration officer or an intergovernmental service agreement with a Federal agency authorizing the civil immigration detention of a person in a local, regional, or state correctional facility if such facility also detains or incarcerates persons for violations of the criminal laws of the Commonwealth."

70.    It defines "law-enforcement agency" as "any state or local agency that employs law-enforcement officers and that has as its principal function the enforcement of the laws of the Commonwealth and its localities." It explicitly includes "any sheriff's office, any police department, any local or regional correctional facility, the Department of State Police, the Department of Corrections, the Department of Juvenile Justice, or any other local or state agency or department that performs law-enforcement functions or that was created to enforce the laws of the Commonwealth and its localities."

21

71. Section 15.2-1726.1(C) states that "No law-enforcement agency shall maintain, renew, or enter into any Federal immigration enforcement agreement unless such agreement includes the following provisions:" and then lists twelve provisions that any such agreement must include. Section 15.2-1726.1(C) (emphasis added). Thus, the provision targets both current and future agreements with DHS.

72. The twelve provisions seek to regulate Federal immigration enforcement in the State, including what ICE agents must wear, where they may enforce the immigration laws, which laws ICE agents must comply with, what jurisdiction ICE agents are subject to, what legal process ICE agents may use for immigration enforcement, and what technology ICE may or may not use in Virginia.

73. Subsection (C) requires every § 287(g) agreement to include provisions that agree that Federal agents will be bound by Virginia state law, including for liability purposes, rather than Federal law:

> (C)(2). That any federal agent operating pursuant to the federal immigration enforcement agreement shall comply with all applicable laws of the Commonwealth while conducting any immigration enforcement activity within the Commonwealth;

> (C)(5). That, by entering into such federal immigration enforcement agreement, U.S. Immigration and Customs Enforcement and its agents consent to the jurisdiction of the courts of the Commonwealth for any civil or criminal proceedings arising from any violation of the provisions of this section or for any violation of the laws of the Commonwealth committed while acting in the performance of their official duties pursuant to such federal immigration enforcement agreement;

> (C)(11). That, by entering into such federal immigration enforcement agreement, U.S. Immigration and Customs Enforcement and its agents shall adhere to the provisions of Chapter 7.1 (§ 19.2-83.3 et seq.) of Title 19.2 [use of force] when conducting an arrest or detention related to immigration enforcement;

> (C)(12). That, in addition to the provisions of subdivision 5, by entering into such federal immigration enforcement agreement, U.S. Immigration and Customs Enforcement and its agents agree that any shooting involving any agent while such agent is in the performance of his official duties shall be investigated by the Virginia

State Police and shall be subject to prosecution by the attorney for the Commonwealth or the Attorney General in the local jurisdiction where such shooting occurred or as otherwise provided by state law.

74.    Subsection (C) also limits the investigative techniques and legal process Federal agents may use for immigration enforcement matters:

(C)(6). That neither U.S. Immigration and Customs Enforcement nor its agents shall make general requests or demands for information from any agency or entity of the Commonwealth or its localities that are not related to the investigation of a specific person;

(C)(7). That neither U.S. Immigration and Customs Enforcement nor any of its agents shall request information from any locality within the Commonwealth regarding the immigration or citizenship status of any person unless such request is made pursuant to a valid judicial warrant or judicial subpoena;

(C)(9). That neither U.S. Immigration and Customs Enforcement nor its agents shall use any surveillance technology to conduct immigration enforcement within the Commonwealth or otherwise monitor residents of the Commonwealth. Such surveillance technology includes (i) biometric and identification technologies, such as facial recognition systems or fingerprint scanning; (ii) license plate readers; (iii) mobile telephone surveillance, such as cell-site simulators or phone location databases; (iv) digital forensics and hacking tools; and (v) drones or other aerial surveillance. The prohibition under this subdivision shall not apply to the use of surveillance technology to investigate, detain, or arrest any person who (a) is not lawfully present in the United States and (b) has been convicted of any offense set forth in § 17.1-805, 19.2-297.1, or 53.1-40.02 [violent felonies].

(C)(10). That no federal agent, for the purpose of conducting any immigration enforcement activity, shall enter a home within the Commonwealth without a valid judicial warrant;

75.    Finally, Subsection (C) places restrictions on what Federal officers may wear and where they may operate, and requires ICE to provide advanced notice of immigration enforcement efforts to localities, including the identity of the agents who will be involved:

(C)(3). That any federal agent operating pursuant to the federal immigration enforcement agreement shall be clearly identified as an agent of U.S. Immigration and Customs Enforcement. No such clear identification shall include wearing any uniform or displaying the word 'police' on any uniform, vehicle, or equipment while conducting any immigration enforcement activity within the Commonwealth;

23

(C)( 4). That no agent of U.S. Immigration and Customs Enforcement shall conduct any immigration enforcement activity on the property of any …, faith-based organization, or courthouse within the Commonwealth;

(C)(8). That no federal agent, during the times the polls are open and ballots are being counted, or within one hour of opening and after closing, shall conduct any immigration enforcement activity within 500 yards of any polling place;

(C)(1). 1. That U.S. Immigration and Customs Enforcement shall provide to the law-enforcement agency the names and ranks of all federal agents involved in any immigration enforcement activity within the Commonwealth at least seven days prior to engaging in such immigration enforcement activity;

76.     Section 15.2-1726.1(D) provides that, "Any law-enforcement agency that has ***an existing Federal immigration enforcement agreement*** that is in effect on July 1, 2026, shall obtain in writing no later than September 1, 2026, a modified Federal immigration enforcement agreement that complies with the conditions provided in subsection C. ***Any Federal immigration enforcement agreement that is not modified in accordance with the provisions of this subsection shall be deemed void and unenforceable***." Section 15.2-1726.1(D) (emphasis added).

77.     Section 15.2-1726.1(D) thus targets existing agreements with the Federal Government that are in effect as of the date the law takes effect. It requires agencies to obtain a modified agreement with the Federal Government, and it requires that the modified agreement must include all of the provisions of Section (C). And it voids any agreement that is not modified in accordance with Section 15.2-1726.1(D).

78.     Section 15.2-1726.1(E) states that, "Any Federal immigration enforcement agreement entered into or maintained in violation of this section shall be void and unenforceable." It thus acts as a catchall for all agreements entered into prior to the effective date and "maintained" after the effective date, without modification, and it encompasses all new agreements entered into after the date of the section. Any such agreements that do not comply with the requirements of

subsection (C) are "void and unenforceable." The Virginia Attorney General can enforce the law through injunctive relief.

79.     The Federal Government cannot and will not amend its agreements to comply with Subsection (C). Those requirements are onerous, would impede Federal immigration enforcement, and are unconstitutional attempts to regulate the operations of Federal law enforcement. As a result, all §287(g) agreements in Virginia will be deemed "void and unenforceable" by the law. Sections 15.2 (C), (D) and (E) thus interfere with and substantially impair all § 287(g) agreements between the Federal Government and any state or local entity in Virginia. In purpose and effect, this is a ban on 287(g)s in Virginia.

80.     Nor can Virginia point to a significant and legitimate public purpose behind the law. Section 287(g) agreements are authorized by Federal law. See 8 U.S.C. § 1357(g). Such agreements have existed without issue for decades. For law enforcement entities, the agreements are voluntary.

81.     Furthermore, if localities viewed the agreements as causing a problem, they could refuse to enter them in the first instance or terminate them at will. This is true if the agency has resource concerns or policy concerns. Indeed, Governor Spanberger already directed state agencies to terminate such agreements, which they did. There is no significant or legitimate public purpose in passing a law that binds, and essentially bans, all future § 287(g) agreements for the entire Commonwealth of Virginia and  local law enforcement agencies that wish to enter them.

82.     Nor can Virginia cite to state funding as a basis for a legitimate public purpose because while Virginia does provide some police funding to some counties, towns, and cities under its 599 grant program, not all counties, towns, or cities receive such funding. Compare https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/law-

25

enforcement/fy26599allocationsupdated.pdf (599 grants) with *https://vasheriff.org/va-sheriffs-directory/* (all Sheriffs in Virginia by county). Most funding comes from local taxes.

83.    If a local law enforcement agency has resource concerns or their constituents do not approve the arrangement, they do not have to enter them or can terminate the agreements. Indeed, Governor Spanberger already directed state agencies to terminate such agreements, which they did. There is no significant or legitimate public purpose in passing a law that binds, and essentially bans, all future § 287(g) agreements for the entire Commonwealth of Virginia. Thus, the only basis for Virginia to effectively ban all existing 287(g)s is because of disagreements with the Federal government's immigration policies. Immigration, however, is a purely federal function. Those disagreements are not a basis to void preexisting contracts or to obstruct a congressional scheme. Under the principles of Federalism that undergird our country and constitutional order, Federal agents enforcing Federal law in Virginia are not beholden to state law, and there can be no significant or legitimate public purpose in undermining Federal law or Federal immigration enforcement.

84.    Section 15.2-1726.1 is also preempted by Federal law in multiple ways. First, it stands as an obstacle to Congressional purposes and is preempted. As explained *supra*, Congress envisioned and intended a cooperative model of immigration enforcement in which states and localities could choose to work with Federal immigration enforcement efforts, and at the very least did not prevent Federal immigration enforcement efforts, including information sharing.

85.    Part of that model envisioned Section 287(g) agreements with states and localities so that state and local officers may assist with immigration enforcement, under the direction of ICE, such as by transferring detainees, serving warrants, determining immigration status, or working as part of a task force. *See* 8 U.S.C. § 1357(g). Indeed, that model was discussed in

*Arizona*, in which the Supreme Court rejected the State's attempt to provide greater immigration enforcement authorities to its officers than Congress envisioned, without Federal oversight. The Court explained that "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer" and one such circumstance is when "the Attorney General has granted that authority to specific officers in a formal agreement with a state or local government." *Arizona*, 567 U.S. at 408 (citing § 1357(g)). Section 15.2-1726.1, because of its onerous terms, blocks all such current and future agreements in the Commonwealth of Virginia, despite Congressional intent that States and localities should have the ability and option to enter into such agreements.

86.    Section 15.2-1726.1 also conflicts with Federal law because it imposes requirements on §287(g) agreements which are entirely in conflict with the requirements of 8 U.S.C. § 1357(g), including, for example, that any officer authorized under an agreement may carry out the functions of an immigration officer, are subject to the direction and supervision of the Secretary of Homeland Security, and are subject to Federal laws regarding liability and immunity from suit. *See* 8 U.S.C. § 1357(g)(1), (3), (5), (8).

87.    Section 15.2-1726.1(B) obstructs and conflicts with Federal law by barring Virginia law enforcement from complying with validly-issued administrative subpoenas or warrants. In particular, that subsection bans law-enforcement officers (which is undefined) from cooperating with, assisting in, or using "any law-enforcement resources to facilitate" an operation that seeks to "identify, arrest, or otherwise impose a penalty upon an individual for any violation of Federal civil immigration law" unless "presented with a judicial warrant or judicial subpoena." Section 15.2-1726.1(B).

27

88.    Federal immigration law permits immigration authorities (including state authorities authorized under § 287(g)) to use administrative warrants and subpoenas in immigration enforcement. *See* 8 U.S.C. § 1225(d)(4) (administrative subpoenas); 8 C.F.R. 287.5(e)(2) (administrative warrants); 8 U.S.C. § 1226(a) (administrative warrants). By preventing law enforcement officers from cooperating with or assisting ICE in any way if ICE is relying on administrative warrants or subpoenas, Section 15.2-1726.1(B) obstructs civil immigration enforcement and conflicts with Federal laws permitting the use of such warrants and subpoenas. It also conflicts with Federal laws requiring information sharing amongst Federal and state officials, such as 8 U.S.C. §§ 1373 and 1644.

89.    Finally, Section 15.2-1726.1 (D), and (E) obstruct and conflict with Federal law authorizing § 287(g) agreements by requiring any existing agreement to be amended in accordance with subsection (C) or be deemed void and unenforceable.

90.    Section 15.2-1726.1 violates principles of intergovernmental immunity because it discriminates against and seeks to regulate the Federal Government. Through that Section, Virginia seeks to impose onerous conditions on the contents of Section 287(g) agreements, which are statutorily authorized by Congress.

91.    In creating that authorization, Congress set forth certain parameters of the agreements, including but not limited to: state officers working under such agreements must adhere to Federal law, are subject to the direction and supervision of the Secretary of Homeland Security, and are acting under color of Federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law. 8 U.S.C. § 1357(g).

92.     With Section 15.2-1726.1, Virginia seeks to alter the statutory terms imposed by Congress by limiting what Federal laws may be complied with, requiring compliance with Virginia law instead, and imposing liability pursuant to Virginia law.

93.     Section 15.2-1726.1 goes even further. Nearly all of the restrictions and regulations it imposes apply to all ICE agents operating within Virginia if even a single § 287(g) agreement is entered into. *See* Section 15.2-1726.1(C)(1), (4)-(7), (9), (11), (12). The limitation on immigration enforcement near a polling place applies to all Federal agents, as does the limitation on warrantless entries for immigration enforcement. *See id.*, (C)(8), (10). Indeed, the only restrictions tied to the agreements are what agents must wear and that agents must comply with all applicable laws of Virginia. *Id.*, (C)(2), (3). Other restrictions apply across the board if any 287(g) agreement is executed, such as the restrictions of (C)(1) (disclosing identity of ICE agents prior to enforcement efforts), (C)(4) (restricting where ICE may conduct enforcement), (C)(5) (ICE and its agents consent to jurisdiction of Commonwealth), (C)(6) (ICE shall not make general requests for information), (C)(7) (ICE requests for information must include a judicial warrant or subpoena), (C)(8) (no Federal agent shall conduct immigration enforcement near polling places), (C)(9) (restrictions on ICE use of surveillance technology), (C)(10) (warrantless home entry by any Federal agent for immigration enforcement), (C)(11) (ICE bound by Virginia use of force laws). Likewise, the restriction in (B) that state officers cannot assist absence a judicial warrant applies regardless of whether any § 287(g) agreements are executed. *Id.*, (B).

94.     By seeking to impose contractual terms on the Federal Government and further seeking to impose regulations on how the Federal Government may operate within Virginia, Virginia's law seeks to regulate the Federal Government and violates the Supremacy Clause.

29

95.    Further, the onerous terms imposed by Virginia go far beyond what is required by Virginia law for other agreements with law enforcement agencies. *See, e.g.,* Virginia Code §§ 15.2-1727 (Reciprocal agreements with localities outside the Commonwealth); 15.2-1728 (Mutual aid agreements between police departments and Federal authorities); 15.2-1730.1 (Authority and immunity of sheriffs and deputies). By imposing onerous terms on ICE agreements alone, Virginia discriminates against the Federal Government in violation of the Supremacy Clause and the principles of intergovernmental immunity therein.

96.    As noted, as of March 30, 2026, ICE had 28 Section 287(g) agreements with entities in Virginia. Given that Virginia just passed this new law and has not disclaimed enforcing it, Virginia has every intention of enforcing it. *Mobil Oil Corp. v. Virginia Attorney General*, 940 F.2d 73, 76 (4th Cir. 1991). Such enforcement will mean that by September 1, 2026, all 28 of those agreements will be voided by operation of Section 15.2-1726.1. Further, if any Virginia entity continues to maintain such an agreement with ICE in violation of Section 15.2-1726.1, the Attorney General or the Commonwealth Attorneys have the authority to seek an injunction to enforce the law. 15.2-1726.1(F).

97.    Congress created a comprehensive immigration system that contemplated cooperation between the Federal Government and states and localities to ensure uniform enforcement of Federal law. *See, e.g.*, 8 U.S.C. § 1226; § 1373; 1357(g)(10)(B). Such cooperation enables ICE to take criminal aliens into custody after they complete their sentences, and to detain aliens pending removal. *Id.* § §1225(b)(2)(A), 1226(c), 1231. Congress authorized agreements with state and local governments for immigration enforcement. *See id.* § 1357(g). Congress also authorized the formation of agreements with localities to facilitate the detention of violators of civil immigration law. *See id.* §§ 1103(a)(11)(B); 1231(g). While states and localities are permitted

30

to choose to work with Federal immigration enforcement authorities under this scheme, states are not permitted to hamper Federal immigration enforcement efforts.

98.    Despite Congress's comprehensive Federal immigration enforcement scheme and stated intent that states and localities have the ability to enter into such agreements, Section 15.2-1726.1 in effect voids all current agreements that facilitate immigration enforcement and bans all future agreements. Thus, Section 15.2-1726.1 has the purpose and effect of impeding Federal immigration enforcement in the Commonwealth of Virginia.

99.    Congress wanted local law enforcements to voluntarily cooperate with DHS in the enforcement of immigration laws through 287(g) agreements. By terminating the existing agreement in Virginia and preventing future ones, Virginia has made it impossible to deputize local law enforcement to help enforce Federal law in their communities where they are most trusted. This adds a significant strain on resources and the ability to enforce the law while effectively destroying Congress cooperative scheme.

100.    The United States is irreparably harmed by laws that seek to void contracts with Federal agencies in violation of the Contracts Clause, by laws that seek to control and regulate Federal functions carried out through the Executive agencies of the United States, in violation of the Supremacy Clause, and by laws that conflict with and stand as an obstacle to Federal laws. These laws disrupt important coordination between state and local officials and purposefully make the enforcement of Federal law more difficult and dangerous. States may not adopt laws that violate the Constitution, including those that dictate how and where Federal agents will perform their official functions. That is particularly true in the context of sovereign functions such as immigration enforcement. The United States is further irreparably harmed absent an injunction

because a failure to enjoin this law will encourage other states to enact similar unconstitutional laws. Nor is there any adequate remedy at law for such violations.

101.    The public interest favors maintaining our system of Federalism and the Constitutional lines drawn between Federal and State power and enabling the Federal Government to carry out its functions as mandated by the Constitution and Congress.

**SECTION 287(g) AGREEMENTS WITH VIRGINIA**

102.    The Federal Government has been entering into § 287(g) agreements with Virginia law enforcement for many years. *See, e.g.*, *McClary v. Jenkins*, 102 Va. Cir. 187, 187 (Cir. Ct. 2019) (sustaining demurrer because sheriff was permitted by Federal law to enter into § 287(g) agreement); *United States v. Patlan*, No. 1:09cr214 (JCC), 2009 U.S. Dist. LEXIS 53099, at *1 (E.D. Va. June 22, 2009) (noting defendant was arrested in Manassas, Virginia, and interviewed by a law enforcement officer authorized under § 1357(g)).

103.    DHS has relied on such agreements over the years to assist its immigration enforcement efforts in the State, and continues to do so.

104.    On February 27, 2025, then-governor of Virginia Glenn Youngkin issued executive Order 47, "Keeping Virginia Safe from Dangerous Criminal Illegal Immigrants," which directed the Virginia State Police and Department of Corrections to enter § 287(g) agreements with ICE and encouraging counties and municipalities to do the same. The Executive Order recounted violent crimes committed by illegal aliens in Virginia and elsewhere as the impetus for requiring cooperation with Federal enforcement efforts.

105.    On February 4, 2026, Governor Spanberger issued Executive Directive 1, rescinding Youngkin's prior Executive Order 47 and ordered State agencies to terminate §287(g) agreements with ICE. DHS received termination notices from numerous state agencies. As a result

of the Executive Directive and subsequent termination notices, as of March 30, 2026, DHS had no § 287(g) agreements with State entities in Virginia. But, it still had 28 Section 287(g) agreements with localities in Virginia because they had not been ordered to terminate the agreements.

106.    The current Section 287(g) agreements with Virginia localities fall into three categories. The great majority are Task Force Officer agreements, in which trained officers may identify and report suspected aliens not charged with crimes (under ICE oversight) and exercise limited immigration authority on ICE-led task forces. Five are for Warrant Service Officers which permit trained officers to serve and execute administrative warrants on aliens in local custody. One is a Jail Enforcement Model, which allows local officers to identify and process removable aliens who have pending or active criminal charges.

107.    Consistent with 8 U.S.C. § 1357(g), officers governed by the Task Force Model agreements are subject to ICE direction and supervision as to immigration enforcement functions. Prior to executing any immigration enforcement functions, officers must be selected, successfully complete training, pass examinations, and be certified and authorized by ICE. The agreements set forth the particular immigration enforcement powers a certified and authorized officer may perform, and specify that those functions can only be performed under ICE's direction.

108.    Officers governed by the Jail Enforcement Model agreements are nominated, trained, certified, and authorized to identify and process removable aliens who are booked into local jail facilities, subject to ICE supervision and direction. Such officers may, for example, serve and execute warrants for immigration violations or removal, question suspected aliens about their right to remain in the United States, process aliens including fingerprinting, photographing, and interviewing them, issue immigration detainers, draft immigration charging documents for ICE review and signature, and transport aliens to ICE detention facilities.

109.    Officers governed by the Warrant Service Officer agreements are nominated trained, certified, and authorized to perform limited functions within the local jail including serving warrants for immigration violations or removal, and detaining and transporting aliens to an ICE facility at ICE's request.

110.    All § 287(g) agreements require specified officers who are trained and authorized by ICE to then work under the direction of ICE when performing immigration-related functions. All agreements may be terminated by either party only on notice.

## THE UNITED STATES HAS STANDING AND IS IRREPARABLY INJURED BY VIRGINIA'S LAWS

111.    The United States has standing to bring this lawsuit where it "inten[ds] to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [state] statute[,]" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014), and the acts violate the Supremacy Clause and principles of intergovernmental immunity, and thus imposes a sovereign and irreparable injury on the United States, *cf. Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). The United States has sovereign authority to manage Federal law enforcement activities and, under the Supremacy Clause, need not cede that authority to Virginia (or any state) by complying with Virginia's purported requirements for Federal law enforcement officers or for Section 287(g) agreements. A favorable ruling would redress these harms. Likewise, SB 783 violates the Contracts Clause of the U.S. Constitution and thus also imposes a sovereign and irreparable injury on the United States. *Cf. id.*; *see also Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020); *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012).

112.    Even beyond the sovereign injury, which itself is sufficient for standing to seek an injunction, compliance with the challenged Virginia laws would endanger officers and reduce operational effectiveness.

113.    Federal law enforcement agencies cannot and will not comply with the challenged laws, which are unconstitutional. SB 352 recklessly disregards officers' safety, public safety, and Federal operational needs. SB 783 invalidates valid, existing contracts, and seeks to impose onerous, illegal conditions on Federal officers operating in Virginia, which the United States cannot agree to because such conditions conflict with Federal law and put officer safety at risk.

114.    Virginia's law seeking to regulate what federal officers may wear in terms of facial coverings and identification harms Federal law enforcement. Law enforcement is always a dangerous job, but now is an extraordinarily dangerous time to serve in Federal law enforcement in particular. Protecting the personal identities of Federal officers and by extension their families is necessary in part due to the increasing threats of targeted harassment and retaliation against Federal officers and agents for simply doing their jobs. While such threats have always existed, the volatile political environment has increased such threats exponentially, requiring new tactics to mitigate the harms to officer safety and operational effectiveness.

115.    Increasingly, members of the public photograph, film, and publish Federal enforcement actions online and include the personal identities of Federal officers for the sole purpose of intimidation and harassment. This content is directly used by members of organized crime and transnational criminal organizations in serious and potentially deadly ways.

116.    For example, some individuals photograph officers' faces and run them through facial recognition applications that search social media and doxxing sites such as ICESpy.org, ICEList.is, and ICEList.info. Once a match is made, they often search for family members,

including children, and disseminate this information online, allowing people to track, harass, and obstruct law enforcement.

117. This opens officers up to harassment, tracking, intimidation, and assaults in the performance of their duties in the field. These threats are coming from rioters, illegal aliens, as well as highly sophisticated gangs like Tren de Aragua and MS-13, criminal rings, murderers, and rapists.

118. Facial coverings are a necessity in preventing agitators from identifying and tracking officers, especially those using facial recognition or other tools. And while officers almost always wear tags identifying them as Federal officers only (with the exception of, for example, undercover or plainclothes operations), personal identifiers are similar in that they allow agitators to identify and harass individual officers in their official and personal capacities. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal history, gang affiliations, transnational criminal organizations, and known or suspected terrorists.

119. Facial coverings and removal of personal identifiers also prevent suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, flexibility is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. The existence of databases with individual officers' identities can also undermine undercover operations and plainclothes missions.

120. Due to the nature of law enforcement operations, officers require flexibility to determine when to announce their identities. To this end, CBP and ICE have discretion on when they permit their officers and agents to wear facial coverings and remove individual identifiers.

36

They also allow officers discretion as to when they announce themselves. Federal regulations provide that "an immigration officer who is authorized to execute an arrest" announce themselves and the purpose of the arrest "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii). That is up to the officers in particular circumstances and cannot be subjected to bright-line or conflicting rules. Removing this flexibility undermines officer safety and operational effectiveness.

121.    The threat of state enforcement for noncompliance will only further exacerbate the chilling effects of these laws. Officers face a choice of whether to wear facial coverings or identify themselves when it may be dangerous to themselves, others, and the operation, or face the threat of criminal enforcement. Either option presents serious risks and harms and purposefully works to chill the enforcement of Federal law. *Davis*, 100 U.S. 262–63 (1879); *In re Neagle*, 135 U.S. at 75.

122.    Furthermore, Federal agents engage in undercover and surveillance work as part of their official law enforcement duties and investigate gangs and drugs pursuant to Federal statutes. Indeed, in July of 2025, the U.S. Attorney's Office for the Eastern District of Virginia announced an indictment of 20 gang members for crimes including drug conspiracy, murder in aid of racketeering, firearms offenses, and racketeering conspiracy involving murder, attempted murder, armed robbery, conspiring to distribute large quantities of pressed fentanyl pills, narcotics trafficking, identity fraud, and the illegal use and straw purchasing of firearms.[8] Virginia would have the Federal officers conducting such investigations go unmasked and fully identified at all times when building their cases, even if those officers, in their training and experience, believed being masked and unidentified is necessary at times to further the investigation.

---

[8] https://www.justice.gov/usao-edva/pr/eastside-rollin-20s-crips-members-and-associates-indicted-including-murder-robbery (last visited June 11, 2026).

37

123.    Given the personal threats and violence that agents face, Federal law enforcement agencies allow their officers to choose whether to wear masks to protect their identities and provide an extra layer of security.

124.    Many Federal officers choose to wear masks, and have done so prior to the passage of the challenged law.

125.    Denying Federal agencies and officers discretion in these areas chills Federal law enforcement and deter applicants for law enforcement positions.

126.    SB 352 compromises Federal agencies' operational effectiveness.

127.    Finally, the threat of state enforcement for noncompliance will only further exacerbate the chilling effects of these laws. Officers face a choice of whether to wear facial coverings or identify themselves when it may be dangerous to themselves, others, and the operation, or face the threat of criminal enforcement. Either option presents serious risks and harms and purposefully works to chill the enforcement of Federal law. *Davis*, 100 U.S. 262–63 (1879); *In re Neagle*, 135 U.S. at 75.

128.    SB 783 also compromises DHS's operational effectiveness.  Congress designed a cooperative system in which local law enforcement could be deputized, pursuant to § 287(g) agreements, to enforce Federal immigration laws under the color of Federal authority. Local law enforcement in Virginia entered into such agreements with DHS. However, SB 783 requires termination of those agreements if DHS will not agree to onerous terms that conflict with Federal law, and as a result will result in termination of all such agreements in Virginia, removing the option for local law enforcement to participate in the program and removing a key piece of cooperation between local and Federal authorities. Section 287(g) agreements like these also serve

important and valuable purposes, including burden-sharing and cost-savings that will be lost if terminated.

129. Those agreements are essential tools for enforcement, allowing local law enforcement to identify, detain, and transfer illegal aliens. This helps preserve DHS resources and allow for safe and predictable arrests outside of public locations. Losing these valuable agreements will make it much more difficult for DHS to effectively and safely enforce immigration laws in Virginia. As a result, DHS will have to expend more resources conducting public at-large arrests in order to detain the dangerous aliens. That is a substantial harm to DHS's operations.

130. Defendant Virginia Attorney General Jay Jones, an employee of the Commonwealth of Virginia, has the authority to enforce SB 783 through injunctive relief. He has not disavowed using such authority to enforce the law and void existing 287(g) agreements or prevent future ones.

131. Defendant Steve Descano is the Commonwealth Attorney for Fairfax County and is also an employee of the Commonwealth of Virginia. The Commonwealth Attorneys have authority to enforce SB 352 through criminal prosecutions. Defendant Descano has not disavowed enforcing the law against Federal officers. Fairfax County is the center of significant immigration operations due to the high number of illegal aliens.[9] Indeed, Fairfax County has been the scene of egregious crimes committed by illegal aliens.[10] Yet the Country, including Defendant Descano,

---

[9] https://www.migrationpolicy.org/data/unauthorized-immigrant-population/county/51059 (over 100,000 residents of Fairfax are illegal aliens).

[10] https://www.dhs.gov/news/2026/05/05/sanctuary-calamity-ice-arrests-illegal-alien-child-rapist-after-governor-spanberger (illegal aliens charged with raping a child was released without notifying ICE); https://www.fairus.org/opinion/flawed-sanctuary-logic-behind-fairfax-county-violence-epidemic (75% of murders in Fairfax are by illegal aliens); https://www.foxnews.com/politics/mullin-rips-spanberger-criminalizing-dhs-ice-arrests-illegal-alien-felon-sanctuary-state (at least 50% of murder are and sanctuary policies protect them).

have been extraordinary lenient on such aliens, resulting in Congressional hearings into Defendant Descano's policies.[11] There is thus a real risk that Defendant Descano would charge Federal officers for violating SB 352 given his positions and the significant amount of immigration enforcement in Fairfax County. Defendant Descano has not disavowed doing so. That very threat chills officers from performing their duties.

132.    Indeed, rather than disavow prosecution of Federal agents, Defendant Descano, as well as other Commonwealth Attorneys in Virginia, are members of the FAFO Coalition of state prosecutors which seeks to prosecute Federal agents.[12] Descano reportedly said that "Unfortunately for those guys, we're in the finding out business. I want all of those agents to hear me when I say, 'You do not have total immunity for your actions. If you break state law, you'll have to answer to state authorities.'"[13] Consistent with that statement, Commonwealth Attorney Ramin Fatehi reportedly said, "Just because you have a gun and a badge issued by a particular agency does not make you immune to prosecution for crimes under the Virginia code."[14]

133.    There is no adequate remedy at law.

---

[11] https://cis.org/Arthur/Takeaways-House-Judiciary-Hearing-Sanctuary-Policies-Fairfax-County-Va (Descano ran on being lenient to illegals and appears to be implementing such policies); https://judiciary.house.gov/media/in-the-news/house-investigation-continues-fairfax-da-steve-descanos-immigration-crime (similar from Congressional investigation).

[12] https://www.ffxnow.com/2026/01/29/fairfax-ca-steve-descano-helps-launch-fafo-team-weighing-charges-against-feds/

[13] *Supra* n. 11.

[14] https://www.wtkr.com/news/norfolks-fatehi-joins-group-to-prosecute-federal-agents-that-break-state-laws

134.    The public interest favors maintaining our system of federalism and the Constitutional lines drawn between Federal and State power and enabling the Federal Government to carry out its functions as mandated by the Constitution and Congress.

135.    The harms to the United States alleged herein would be redressed by this Court's judgment that the laws are invalid, unconstitutional, and unenforceable, and an injunction preventing the enforcement of the laws.

**CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF THE SUPREMACY CLAUSE**
**(§ 19.2-83.6:1 (SB 352) UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT AGAINST DEFENDANTS VIRGINIA AND DESCANO)**

136.    Plaintiff hereby incorporates paragraphs 1 through 135 of the Complaint as if fully stated herein.

137.    Virginia's enforcement of § 19.2-83.6:1 against law-enforcement officers from federal agencies constitutes unlawful regulation of the Federal Government.

138.    Section 19.2-83.6:1 bans Federal agents from wearing facial coverings while performing their duties in Virginia and subjects those agents to state enforcement for noncompliance, including criminal penalties.

139.    Section 19.2-83.6:1 requires Federal agents to display visible identification while performing their duties in Virginia and subjects those agents to state enforcement for noncompliance, including criminal penalties.

140.    Section 19.2-83.6:1 therefore directly regulates the Federal Government in violation of the intergovernmental immunity doctrine.

141.    Accordingly, Section 19.2-83.6:1 is invalid under the Supremacy Clause.

41

142.    Defendant Virginia and its employees and agents, including Defendant Descano, must be enjoined from enforcing this unconstitutional law.

**COUNT II**
**VIOLATION OF THE SUPREMACY CLAUSE**
**(§ 19.2-83.6:1 (SB 352) UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT AGAINST DEFENDANTS VIRGINIA AND DESCANO)**

143.    Plaintiff hereby incorporates paragraphs 1 through 135 of the Complaint as if fully stated herein.

144.    Subsections 19.2-83.6:1(C)(8) and (E) unlawfully discriminate against the Federal Government.

145.    Section 19.2-83.6:1(C)(8) provides an exception to subsection (B)'s prohibition on wearing a facial covering for state and local law enforcement officers who are assigned to an undercover, drug, gang, or surveillance units. It contains no similar exception for Federal law enforcement officers.

146.    Section 19.2-83.6:1(E) provides that violations of the law are a Class 1 misdemeanor. However, under that subsection, state and local law enforcement officers have an avenue to be exempted from the penalties of the law if their agencies adopt masking policies. Federal officers have no means to obtain an exemption from the law's penalties.

147.    The challenged provisions therefore subject Federal officers to unfavorable and uncooperative treatment as compared to their state counterparts in Virginia.

148.    Sections 19.2-83.6:1(C)(8) and (E) thereby constitute unlawful discrimination against the Federal Government in violation of the intergovernmental immunity doctrine.

149.    Accordingly, subsections 19.2-83.6:1(C)(8) and (E) are invalid under the Supremacy Clause.

42

150.    Defendant Virginia and its employees and agents, including Defendant Descano, must be enjoined from enforcing this unconstitutional law.

## COUNT III
### (§15.2-1726.1 (SB 783) VIOLATION OF THE CONTRACT CLAUSE OF THE CONSTITUTION AGAINST DEFENDANTS VIRGINIA AND JONES)

151.    Plaintiff hereby incorporates paragraphs 1 through 135 of the Complaint as if fully stated herein.

152.    The Contracts Clause of the U.S. Constitution provides that, "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U. S. Const., Art. I, §10, cl. 1.

153.    Section 15.2-1726.1 of the Virginia Code substantially impairs existing § 287(g) contracts between entities in Virginia and the Federal Government by voiding those agreements as written and requiring revisions that are inconsistent with Federal law.

154.    There is no significant and legitimate public purpose behind voiding agreements entered into voluntarily and pursuant to Federal law.

155.    There is no significant and legitimate public purpose behind requiring amendments to agreements with the Federal Government when such amendments are inconsistent with Federal law.

156.    The changes to § 287(g) agreements mandated by Section 15.2-1726.1 are neither reasonable nor necessary.

157.    Section 15.2-1726.1 is not a legitimate exercise of State power.

158.    Accordingly, Section 15.2-1726.1 is invalid under the Contract Clause.

159.    Defendant Virginia and its employees and agents, including Defendant Jones, must be enjoined from enforcing this unconstitutional law.

**COUNT IV**
**((§15.2-1726.1 (SB 783) PREEMPTION AGAINST DEFENDANTS VIRGINIA AND JONES)**

160.    Plaintiff hereby incorporates paragraphs 1 through 135 of the Complaint as if fully stated herein.

161.    The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

162.    By requiring provisions in § 287(g) agreements that are inconsistent with Federal law, Section 15.2-1726.1 of the Virginia Code conflicts with and stands as an obstacle to the cooperation envisioned by Congress through the INA, including the provisions of 8 U.S.C. § 1357(g).

163.    By prohibiting law enforcement from honoring administrative warrants or subpoenas in immigration enforcement matters, Section 15.2-1726.1(B) of the Virginia Code conflicts with and stands as an obstacle to the immigration enforcement scheme articulated by Congress in the INA, including in 8 U.S.C. § 1357(a), 8 U.S.C. § 1357(g), 8 U.S.C. § 1225(d)(4), 8 U.S.C. § 1226(a), the duly-enacted regulations at 8 C.F.R. 287.5(e)(2), and the information-sharing scheme contained in 8 U.S.C. § 1373 and 8 U.S.C. § 1644.

164.    Section 15.2-1726.1 of the Virginia Code is thus preempted by Federal law and invalid.

165.    Defendant Virginia and its employees and agents, including Defendant Jones, must be enjoined from enforcing this unconstitutional law.

**COUNT V**
**((§15.2-1726.1 (SB 783) VIOLATION OF THE SUPREMACY CLAUSE -**
**INTERGOVERNMENTAL IMMUNITY – REGULATION AGAINST DEFENDANTS**
**VIRGINIA AND JONES)**

166.    Plaintiff hereby incorporates paragraphs 1 through 135 of the Complaint as if fully stated herein.

167.    Section 15.2-1726.1 of the Virginia Code unlawfully regulates the Federal Government by imposing conditions on the contents of § 287(g) agreements, including conditions that violate Federal law.

168.     Section 15.2-1726.1 of the Virginia Code unlawfully regulates the Federal Government by imposing conditions on how and where Federal officers may enforce the immigration laws of the United States within the Commonwealth of Virginia, including the technology they may use, what they must wear, what legal process is required, and what laws they must obey, and specifying who must investigate incidents of use of force.

169.    Section 15.2-1726.1 therefore purports to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine and is invalid under the Supremacy Clause.

170.    Defendant Virginia and its employees and agents, including Defendant Jones, must be enjoined from enforcing this unconstitutional law.

**COUNT VI**

**(((§15.2-1726.1 (SB 783) VIOLATION OF THE SUPREMACY CLAUSE -**
**INTERGOVERNMENTAL IMMUNITY – DISCRIMINATION AGAINST**
**DEFENDANTS VIRGINIA AND JONES)**

171.    Plaintiff hereby incorporates paragraphs 1 through 135 of the Complaint as if fully stated herein.

45

172.    Section 15.2-1726.1 of the Virginia Code contains restrictions and requirements that are not required for other law enforcement agencies who enter agreements with Virginia.

173.    Section 15.2-1726.1 of the Virginia Code unlawfully discriminates against the Federal Government by singling it out expressly and impliedly for unfavorable and uncooperative treatment when other law enforcement agencies who enter agreements with Virginia are not so treated.

174.    Accordingly, Section 15.2-1726.1 of the Virginia Code violates the Supremacy Clause and principles of intergovernmental immunity, and is invalid.

175.    Defendant Virginia and its employees and agents, including Defendant Jones, must be enjoined from enforcing this unconstitutional law.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

A.    That this Court enter a judgment declaring that § 19.2-83.6:1 of the Virginia Code violates the Supremacy Clause and is therefore invalid as to Federal agencies and employees;

B.    That this Court preliminarily and permanently enjoin Defendants, as well as their successors, agents, servants, employees and attorneys, and all those working in concert with them, from enforcing § 19.2-83.6:1 of the Virginia Code against Federal agencies and employees;

C.    That this Court enter a judgment declaring that Section 15.2-1726.1 of the Virginia Code violates the Contracts Clause and is therefore invalid;

D.    That this Court enter a judgment declaring that Section 15.2-1726.1 of the Virginia Code is preempted by Federal law and therefore invalid;

46

E.    That this Court enter a judgment declaring that Section 15.2-1726.1 of the Virginia

Code violates the Supremacy Clause and principles of intergovernmental immunity by unlawfully

discriminating against and regulating the Federal Government and is therefore invalid;

F.    That this Court preliminarily and permanently enjoin Defendants, as well as their

successors, agents, servants, employees and attorneys, and all those working in concert with them,

from enforcing Section 15.2-1726.1 of the Virginia Code against Federal agencies and employees;

G.    That this Court award the United States its costs and fees in this action; and

H.    That this Court award any other relief it deems just and proper.

DATED: June 11, 2026

TODD BLANCHE                                        STANLEY E. WOODWARD, JR.
Acting Attorney General                             Associate Attorney General

*/s/ Gerard Mene*                                   BRETT A. SHUMATE
GERARD MENE                                         Assistant Attorney General
Assistant United States Attorney                    Civil Division
Eastern District of Virginia
Counsel for the United States                       TIBERIUS DAVIS
2100 Jamieson Avenue                                CHARLES E.T. ROBERTS
Alexandria, Virginia 22314                          SEAN SKEDZIELEWSKI
Telephone: (703) 299-3777                           Counsel to the Assistant Attorney General
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov                               ALESSANDRA FASO
                                                    Senior Litigation Counsel

                                                    By: s/ *Alexandra Schulte*
                                                    ALEXANDRA MCTAGUE SCHULTE
                                                    Senior Litigation Counsel
                                                    U.S. Department of Justice Civil Division
                                                    Enforcement & Affirmative Litigation Branch
                                                    P.O. Box 386
                                                    Washington, DC 20044
                                                    202-718-0483
                                                    Alexandra.Schulte@usdoj.gov

47