## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

THE UNITED STATES OF AMERICA,

        Plaintiff,

    v.

THE COMMONWEALTH OF VIRGINIA,
JAY JONES, in his official capacity as
Attorney General of Virginia, and STEVE
DESCANO, in his official capacity as
Commonwealth Attorney for Fairfax,
Virginia,

        Defendants.

No. 3:26-cv-00545-REP

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

INTRODUCTION..............................................................................................................1

BACKGROUND ..............................................................................................................2

    I.      **Governing Principles** ......................................................................................2

          A.  Federal Law Enforcement...............................................................................2

          B.  Cooperative-Enforcement Agreements Under 8 U.S.C. § 1357(g) ........................3

    II.     **Factual Background**......................................................................................4

    III.    **The Challenged Virginia Laws** ......................................................................5

          A.  The Mask Ban: Virginia Code § 19.2-83.6:1 ............................................5

          B.  The 287(g) Restriction: Virginia Code § 15.2-1726.1 ............................7

LEGAL STANDARDS.....................................................................................................9

ARGUMENT..................................................................................................................10

    I.      **The United States Has Pre-Enforcement Standing**..................................10

    II.     **The United States is Likely to Succeed on the Merits of its Claims** ......................14

          A.  Virginia's New Laws Violate Principles of Intergovernmental Immunity.............14

               1.  Virginia's New Laws Impermissibly Regulate the Federal Government ..................................................................................14

                   i.    The Mask Ban ...............................................................15

                   ii.    The 287(g) Restriction ...................................................16

               2.  The 287(g) Restriction Discriminates Against the Federal Government18

          B.  The 287(g) Restriction is Preempted by Federal Law and Invalid ........................20

          C.  The 287(g) Restriction is Invalid under the Contract Clause ..............................22

**III.**    **The United States Faces Irreparable Harm Absent Preliminary Relief** ...............25

**IV.**    **The Balance of Equities and the Public Interest Weigh in the United States'**
**Favor** .................................................................................................................28

**CONCLUSION** .................................................................................................................30

ii

# TABLE OF AUTHORITIES

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978)..................................................................................................... 23

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*,
172 F.4th 361 (4th Cir. 2026)...................................................................................... 9

*Arizona v. United States*,
567 U.S. 387 (2012).................................................................................................. 1, 3

*Arizona v. Yellen*,
34 F.4th 841 (9th Cir. 2022)......................................................................................11

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979).................................................................................................. 10

*Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340, AFL-CIO v. Mayor & City Council of
Baltimore*,
6 F.3d 1012 (4th Cir. 1993)....................................................................................... 22

*Cal. Pharmacists Ass'n v. Maxwell–Jolly*,
563 F.3d 847 (9th Cir. 2009)..................................................................................... 30

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018)...................................................................................... 21

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) ........................................................................................ 21

*Clark v. Suarez Martinez*,
543 U.S. 371 (2005)..................................................................................................... 3

*Conn. State Police Union v. Rovella*,
494 F. Supp. 3d 210 (D. Conn. 2020) ....................................................................... 25

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025)......................................................................... 14, 17, 18

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)................................................................................................... 22

*Dawson v. Steager*,
586 U.S. 171 (2019).................................................................................................... 19

*Donohue v. Mangano*,
 886 F. Supp. 2d 126 (E.D.N.Y. 2012) ................................................................. 25

*Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*,
 459 U.S. 400 (1983) ................................................................... 22, 24, 25

*Giovani Carandola, Ltd. v. Bason*,
 303 F.3d 507 (4th Cir. 2002) ................................................................. 28

*Glidedowan, LLC v. New York State Dep't of Health*,
 768 F. Supp. 3d 503 (W.D.N.Y. 2025) ................................................................. 29

*Hines v. Davidowitz*,
 312 U.S. 52 (1941) ................................................................. 20

*Int'l Paper Co. v. Ouellette*,
 479 U.S. 481 (1987) ................................................................. 21

*Jensen v. Lane Cnty.*,
 222 F.3d 570 (9th Cir. 2000) ................................................................. 12

*League of Women Voters of N. Carolina v. North Carolina*,
 769 F.3d 224 (4th Cir. 2014) ................................................................. 9

*Maryland Shall Issue, Inc. v. Hogan*,
 963 F.3d 356 (4th Cir. 2020) ................................................................. 10

*Mayo v. United States*,
 319 U.S. 441 (1943) ................................................................. 14

*McClary v. Jenkins*,
 102 Va. Cir. 187 (Cir. Ct. 2019) ................................................................. 4

*McCulloch v. Maryland*,
 17 U.S. (4 Wheat.) 316 (1819) ................................................................. 14, 18, 28

*Mobil Oil Corp. v. Attorney General*,
 940 F.2d 73 (4th Cir.1991) ................................................................. 13

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*,
 491 U.S. 350 (1989) ................................................................. 25

*New York v. Tanella*,
 374 F.3d 141 (2d Cir. 2004) ................................................................. 27

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................................. 9

*Richmond Med. Ctr. for Women v. Gilmore*,
   55 F. Supp. 2d 441 (E.D. Va. 1999), *aff'd, 224F*.3d 337 (4th Cir. 2000) ................................. 12

*Rowe v. New Hampshire Motor Transp. Ass'n*,
   552 U.S. 364 (2008) ................................................................................................. 28

*Silva v. United States*,
   866 F.3d 938 (8th Cir. 2017) ..................................................................................... 21

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................................................. 10

*Steffel v. Thompson*,
   415 U.S. 452 (1974) ................................................................................................. 10

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ............................................................................................. 10, 11

*Sveen v. Melin*,
   584 U.S. 811 (2018) ................................................................................................. 22

*Tennessee v. Davis*,
   100 U.S. 257 (1879) ............................................................................................... 2, 15

*U.S. Tr. Co. of New York v. New Jersey*,
   431 U.S. 1 (1977) ............................................................................................. 23, 24, 25

*United Healthcare Ins. Co. v. Davis*,
   602 F.3d 618 (5th Cir. 2010) ..................................................................................... 23

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) .................................................................................. 29

*United States v. Alas*,
   63 F.4th 269 (4th Cir. 2023) ..................................................................................... 3, 20

*United States v. California*,
   173 F.4th 1060 (9th Cir. 2026) ............................................................................. passim

*United States v. California*,
   819 F. Supp. 3d 1109 (2026) ..................................................................................... 28

*United States v. City of Arcata*,
  629 F.3d 986 (9th Cir. 2010) ............................................................................................ 18

*United States v. Fresno Cnty.*,
  429 U.S. 452 (1977) ................................................................................................... 27, 28

*United States v. Patlan*,
  No. 1:09CR214 (JCC), 2009 WL 1795368 (E.D. Va. June 22, 2009) ......................................... 4

*United States v. Sosa-Carabantes*,
  561 F.3d 256 (4th Cir. 2009) ........................................................................................... 3, 4

*United States v. Washington*,
  596 U.S. 832 (2022) ............................................................................................. 18, 19, 20

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
  529 U.S. 765 (2000) ........................................................................................................ 11

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................................. 9

**Constitution and Statutes**

U.S. Const. art. I, § 10, cl. 1 ................................................................................................ 22

U.S. Const. art. II § 3 ........................................................................................................... 2

5 U.S.C. §
  301 ............................................................................................................................... 2
  5901 ............................................................................................................................. 2

6 U.S.C. §
  211 ............................................................................................................................... 2
  252 ............................................................................................................................... 2

8 U.S.C. §
  1103(a)(2) ...................................................................................................................... 2
  1226(a) ......................................................................................................................... 17
  1357(g) ............................................................................................................. 1, 3, 16, 23
  1357(g)(1) ................................................................................................................. 3, 29
  1357(g)(2) ................................................................................................................. 3, 17
  1357(g)(3) ................................................................................................................. 3, 17
  1357(g)(8) ................................................................................................................ 17, 21

28 U.S.C. §
  509 ............................................................................................................................... 2
  531 ............................................................................................................................... 2

561.................................................................................................................................... 2
599A................................................................................................................................. 2

29 U.S.C. § 668(a)(2)........................................................................................................ 3

Va. Code § 1-214............................................................................................................. 5, 7

Va. Code §
15.2-1726.1(A)................................................................................................................. 7
15.2-1726.1(C)................................................................................................................. 8
15.2-1726.1(C)(1) .......................................................................................................... 17
15.2-1726.1(C)(2) .......................................................................................................... 17
15.2-1726.1(C)(3) .......................................................................................................... 17
15.2-1726.1(C)(4) .......................................................................................................... 17
15.2-1726.1(C)(5) .......................................................................................................... 17
15.2-1726.1(C)(6) .......................................................................................................... 17
15.2-1726.1(C)(7) .......................................................................................................... 17
15.2-1726.1(C)(8) .......................................................................................................... 17
15.2-1726.1(C)(9) .......................................................................................................... 17
15.2-1726.1(C)(10) ........................................................................................................ 17
15.2-1726.1(C)(11) ........................................................................................................ 17
15.2-1726.1(C)(12) ........................................................................................................ 17
15.2-1726.1(D)........................................................................................................... 9, 18
15.2-1726.1(E) ...................................................................................................... 9, 18, 23

Va. Code §
19.2-83.6:1(B)................................................................................................................ 15
19.2-83.6:1(D)............................................................................................................. 7, 15

## Regulations

8 C.F.R. § 287.5 ............................................................................................................. 20

## Other Authorities

38 F.R. 15932 ................................................................................................................... 2

2 J. Story, Commentaries on the Constitution § 1099 (3d ed. 1858) ........................................... 28

House Bill 1441 ............................................................................................................... 7

https://vasheriff.org/va-sheriffs-directory/ ...................................................................... 24

https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/law-
enforcement/fy26599allocationsupdated.pdf........................................................................ 24

https://www.governor.virginia.gov/newsroom/news-releases/2026/may-releases/name-1118176-en.html (last visited June 17, 2026). ...................................................................................11

https://www.police1.com/federal-law-enforcement/va-governor-dissolves-287g-agreements-between-state-le-agencies-ice (last visited June 17, 2026) ................................................. 12, 24

Pub. L. No. 104-208............................................................................................................... 3

Senate Bill 352..................................................................................................................... 5

Senate Bill 783..................................................................................................................... 7

**INTRODUCTION**

On July 1, 2026, two new provisions of the Virginia Code will go into effect that run afoul of the Constitution and seek to trample on the Federal Government's congressionally mandated authority to establish and enforce the immigration laws, as well as engage in criminal law enforcement. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 394 (2012). Section 19.2-83.6:1 (hereinafter "Mask Ban") dictates when federal law enforcement officers may wear facial coverings and identification when performing official duties in Virginia. Section 15.2-1726.1 (hereinafter "287(g) Restriction") invalidates existing agreements pursuant to Immigration and Nationality Act ("INA") Section 287(g), 8 U.S.C. § 1357(g) (hereinafter "287(g) agreements") and imposes onerous requirements for any new 287(g) agreements. Both laws violate principles of intergovernmental immunity and are invalid under the Supremacy Clause. Moreover, the 287(g) Restriction violates the Contract Clause and is preempted by federal law. The United States therefore moves this Court for a preliminary injunction prohibiting Virginia and its officials from enforcing these laws against the Federal Government.

These constitutional violations and injuries to federal sovereignty alone establish irreparable harm, but the harm here is greater. If forced to comply with these laws, federal agents will be placed at risk and law enforcement operations will be compromised. Meanwhile, if agents do not comply, they risk criminal prosecution. Moreover, the United States will be prohibited from engaging in cooperative agreements with local entities as expressly intended by Congress, and Virginia will invalidate existing agreements that greatly assist federal law enforcement. Finally, the balance of equities favors an injunction: Defendants have no interest in unconstitutional laws that endanger federal officers, impede law enforcement, undermine public safety, and vitiate voluntary agreements. The United States is therefore entitled to a preliminary injunction.

1

**BACKGROUND**

I.      **Governing Principles**

A.  Federal Law Enforcement

The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. The authority to discharge that duty "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Federal law enforcement agencies, including those within the Departments of Justice ("DOJ") and Homeland Security ("DHS"), are created by federal law. *See, e.g.*, 28 U.S.C. §§ 531 (Federal Bureau of Investigation ("FBI")), 561 (U.S. Marshal Service), 599A (Bureau of Alcohol Tobacco Firearms and Explosives); 6 U.S.C. § 252 (U.S. Immigration and Customs Enforcement ("ICE")); 6 U.S.C. § 211 (U.S. Customs and Border Protection ("CBP")); Reorganization Plan No. 2 of 1973, 38 F.R. 15932, 87 Stat. 1091, as amended Pub. L. 93-253, § 1, Mar. 16, 1974, 88 Stat. 50 (Drug Enforcement Administration ("DEA")).

To achieve their respective goals, the heads of each agency have the power to govern the agency's affairs and direct their agents' activities. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (authorizing the DHS Secretary to "control, direct[], and supervis[e]" all DHS employees). Included within that power to govern the agencies is the power to determine how agents must conduct themselves when engaged in official duties in accordance with federal law. Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g.*, 5 U.S.C. § 5901 (head of each federal agency must furnish employees a uniform or an allowance for same); 29

2

U.S.C. § 668(a)(2) (heads of federal agencies must "acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices [] necessary to protect employees").

B.  Cooperative-Enforcement Agreements Under 8 U.S.C. § 1357(g)

Congress recognized that cooperation with state and local law enforcement is essential. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). Congress added Section 287(g) to the INA (codified at 8 U.S.C. § 1357(g)) as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) to help further that cooperation in the immigration sphere. Pub. L. No. 104-208, div. C, sec. 113, 110 Stat. 3009, 3009–546 (1996). Under Section 287(g), qualified state and local officers designated by the Secretary of Homeland Security[1] may perform specified immigration-enforcement functions relating to investigating, apprehending, and detaining aliens. 8 U.S.C. § 1357(g)(1)–(9); *see also Arizona*, 567 U.S. at 408-09. Section 287(g) requires that the specified officers "have knowledge of, and adhere to, Federal law" relating to immigration enforcement and that they receive "adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g)(2); *see also United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023); *Arizona*, 567 U.S. at 409 (internal citations omitted). This provision specifies that in enforcing immigration laws, the state or local officer "shall be subject to the direction and supervision of the [Secretary]." 8 U.S.C. § 1357(g)(3); *see United States v. Sosa-Carabantes*, 561 F.3d 256, 257–58 (4th Cir. 2009). "In short, Section 287(g) 'permits ICE to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement,' and 'ICE trains the local law enforcement officers who participate.'" *Alas*, 63 F.4th at 274 (quoting *Sosa-*

---

[1] Following the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005).

3

*Carabantes*, 561 F.3d at 257). Congress thus expressly approved the use of voluntary agreements with local law enforcement to implement federal immigration enforcement operations.

## II.     Factual Background

The Federal Government has been entering into 287(g) agreements with Virginia law enforcement for many years. *See, e.g.*, *McClary v. Jenkins*, 102 Va. Cir. 187, 187 (Cir. Ct. 2019) (sustaining demurrer because sheriff was permitted by Federal law to enter into § 287(g) agreement); *United States v. Patlan*, No. 1:09CR214 (JCC), 2009 WL 1795368, at *1 (E.D. Va. June 22, 2009) (defendant arrested in Virginia, and interviewed by a law enforcement officer authorized under § 287(g)). DHS has relied on such agreements over the years to assist its immigration enforcement efforts in the Commonwealth and continues to do so. ICE presently has 28 active agreements with entities in Virginia. *See* Weiss Decl. ¶ 22.

On February 27, 2025, then-governor of Virginia Glenn Youngkin issued Executive Order 47, "Keeping Virginia Safe from Dangerous Criminal Illegal Immigrants," directing the Virginia State Police and Department of Corrections to enter into 287(g) agreements with ICE and encouraged counties and municipalities to do the same. On February 4, 2026, Governor Spanberger issued Executive Directive 1, rescinding Youngkin's prior Executive Order 47 and ordering State agencies to terminate 287(g) agreements with ICE. DHS received termination notices from numerous state agencies. For example, the Institutional Hearing and Removal Program (IHRP) with the Virginia Department of Corrections was terminated as a result of this order. Weiss Decl. ¶ 55. This agreement was particularly significant because it enabled ICE to initiate removal proceedings for noncitizen inmates during their sentences, facilitating swift removal upon release from state custody. *Id.* ¶ 56. The invalidation of this agreement has caused longer detention times, increased resource demands on ICE, and a greater likelihood that criminal noncitizens will remain

4

in the United States after serving their sentences. *Id.*

DHS still has 28 287(g) agreements with localities in Virginia, as localities had not been ordered to terminate the agreements under Executive Directive 1. *Id.* ¶ 22. Most active 287(g) agreements are Task Force Model agreements, in which trained officers may identify and report suspected aliens under ICE oversight and exercise limited immigration authority on ICE-led task forces. *Id.* Five are Warrant Service Officer agreements, which permit trained officers to serve and execute administrative warrants on aliens in local custody. *Id.* All officers working under these 287(g) agreements are trained by and work under the direction of ICE. All agreements may be terminated by either party on notice.

### III.    The Challenged Virginia Laws

A.  The Mask Ban: Virginia Code § 19.2-83.6:1

On May 20, 2026, Governor Spanberger signed SB 352, which added a new section to the Virginia Code, § 19.2-83.6:1, *Prohibition on wearing of facial coverings; penalties*. *See* ECF 1-1, Compl. Exh. A. Section 19.2-83.6:1. This new law, which goes into effect on July 1, 2026, *see* Va. Code § 1-214, defines "law-enforcement officer" to include "(ii) any full-time or part-time employee of a federal law-enforcement agency." *Id.* § 19.2-83.6:1(A). "Law-enforcement agency" is defined as "any agency or department responsible for the prevention and detection of crime and the enforcement of the penal, traffic, or highway laws of the Commonwealth." *Id.* This definition of "law-enforcement agency" appears to *exclude* federal law enforcement agencies, as confirmed by the law's other uses of "*federal* law-enforcement agency" when defining "Law-enforcement officer" and "agency" when describing the motorcycle helmet exception to the facial covering ban. *Id.* § 19.2-83.6:1(A), (C)(5).

Section 19.2-83.6:1(B) prohibits federal officers from wearing facial coverings: "Except as provided in subsection C, no law-enforcement officer shall wear a facial covering that conceals,

obscures, or otherwise covers his face while such law-enforcement officer is engaged in the performance of his official duties." Section 19.2-83.6:1(A) defines "Facial covering" as "any opaque mask, garment, helmet, headgear, or other item or device whereby a substantial portion of the face is hidden or covered to conceal the identity of the wearer, including a balaclava, tactical mask, gator, ski mask, or other similar face-shielding item or device. 'Facial covering' does not include sunglasses or prescription eyewear, provided that such sunglasses or eyewear does not otherwise conceal a substantial portion of the wearer's face."

The Mask Ban contains limited exceptions related to health and safety, such as face coverings to protect against diseases, toxins, gas, smoke, severe weather conditions, helmets, protective eyewear, or tactical team (SWAT) facial coverings. Va. Code § 19.2-83.6:1(C)(1)-(7). Section 19.2-83.6:1(C)(8) contains a different exception that relates to "a law-enforcement officer who is assigned to an undercover, drug, gang, or surveillance unit where the protection of such law-enforcement officer's identity is necessary as determined by the law-enforcement agency overseeing such unit or other responsible law-enforcement agency." As previously noted, "Law-enforcement agency" appears to be limited to state and local law enforcement agencies only. *Id.* § 19.2-83.6:1(A). Thus, unlike the exception in subsection (C)(5), which allows any agency (state or federal) to decide whether a helmet is required for safety, the law apparently permits only state and local officers to wear masks if assigned to an undercover, drug, gang, or surveillance unit, and not federal officers and agents who also engage in such work.

The Mask Ban also contains an identification requirement for federal officers: "Except as otherwise provided by this section, a law-enforcement officer, while engaged in the performance of his official duties, shall visibly display (i) a badge or insignia bearing such law-enforcement officer's name or other individual identifier unique to that particular law-enforcement officer and

6

(ii) the name of the law-enforcement agency that employs such law-enforcement officer." *Id.* § 19.2-83.6:1(D).

Violating Sections 19.2-83.6:1(B) and (D) constitutes "a Class 1 misdemeanor unless the law-enforcement agency that employs such law-enforcement officer has adopted and established a written policy for the use of facial coverings, using as guidance the model policy established by the Department of Criminal Justice Services under § 9.1-102." *Id.* § 19.2-83.6:1(D). In Virginia, a Class 1 misdemeanor is punishable by confinement in jail for not more than twelve months and/or a fine of not more than $2,500. *See id.* § 18.2-11(a). Each Commonwealth Attorney can enforce the law. *Id.* § 15.2-1627(B). While the law provides a narrow exception based on "a written policy for the use of facial coverings," federal agents and officers do not appear to qualify because the exception is limited to state and local "law-enforcement agenc[ies]," as defined in the law. *See id.* § 19.2-83.6:1(A).

B.    The 287(g) Restriction: Virginia Code § 15.2-1726.1

On April 22, 2026, Governor Spanberger also signed SB 783 and HB 1441, adding Section 15.2-1726.1, *Immigration enforcement agreements with Federal authority; required provisions*, to the Virginia Code. *See* ECF 1-2, Compl. Exh. B. The law takes effect on July 1, 2026. *See* Va. Code § 1-214. This new section defines "Federal immigration enforcement agreement" as "an agreement with a federal agency authorizing a law-enforcement officer or employee of the Commonwealth or any of its localities to perform a function of a Federal immigration officer or an intergovernmental service agreement with a Federal agency authorizing the civil immigration detention of a person in a local, regional, or state correctional facility if such facility also detains or incarcerates persons for violations of the criminal laws of the Commonwealth." Va. Code § 15.2-1726.1(A). It also defines "law-enforcement agency" as "any state or local agency that employs law-enforcement officers and that has as its principal function the enforcement of the

7

laws of the Commonwealth and its localities." *Id.* The law explicitly includes "any sheriff's office, any police department, any local or regional correctional facility, the Department of State Police, the Department of Corrections, the Department of Juvenile Justice, or any other local or state agency or department that performs law-enforcement functions or that was created to enforce the laws of the Commonwealth and its localities." *Id.*

The 287(g) Restriction targets both current and future agreements with DHS, providing that "[n]o law-enforcement agency shall maintain, renew, or enter into any federal immigration enforcement agreement unless such agreement includes" twelve specific provisions. Va. Code § 15.2-1726.1(C). Those provisions seek to regulate Federal immigration enforcement in the State, including what ICE agents must wear, where they may enforce the immigration laws, which laws they must comply with, what jurisdiction ICE agents are subject to, what legal process ICE agents may use for immigration enforcement, and what technology ICE may or may not use in Virginia.

Subsection (C) requires every 287(g) agreement to include provisions that agree that federal agents will be bound by Virginia state law, including for liability purposes, rather than federal law, and limits the investigative techniques and legal process federal agents may use for immigration enforcement matters. *See* Va. Code § 15.2-1726.1(C). This provision also places restrictions on what federal officers may wear and where they may operate, and requires ICE to provide advanced notice of immigration enforcement efforts to localities, including the identity of the agents who will be involved. *See id.*

Section 15.2-1726.1(D) provides that, "Any law-enforcement agency that has ***an existing Federal immigration enforcement agreement*** that is in effect on July 1, 2026, shall obtain in writing no later than September 1, 2026, a modified federal immigration enforcement agreement that complies with the conditions provided in subsection C. ***Any Federal immigration***

8

*enforcement agreement that is not modified in accordance with the provisions of this subsection shall be deemed void and unenforceable*." Va. Code § 15.2-1726.1(D) (emphasis added). This provision thus targets existing agreements with the Federal Government that are in effect as of the date the law takes effect. It requires modified agreements that must include all of the provisions of Section (C) and voids any agreement not modified in accordance with Section 15.2-1726.1(D).

Section 15.2-1726.1(E) states that, "Any Federal immigration enforcement agreement entered into or maintained in violation of this section shall be void and unenforceable." Any such agreements that do not comply with the requirements of subsection (C) are "void and unenforceable." Va. Code § 15.2-1726.1(E). The Attorney General of Virginia can seek injunctions to enforce the law. *Id.* § 15.2-1726.1(F).

## LEGAL STANDARDS

A preliminary injunction may be granted if the plaintiff establishes (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 366 (4th Cir. 2026) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Where, as here, the government is a party to the suit, the harm to the government and public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

A prohibitory preliminary injunction is designed to maintain the status quo ante until a final decision on the merits of the litigation can be entered. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). The status quo ante is "the last uncontested status between the parties which preceded the controversy." *Id.* (citation omitted).

9

**ARGUMENT**

## I. The United States Has Pre-Enforcement Standing

The United States possesses standing to bring this challenge before the laws go into effect on July 1, 2026. Article III standing requires a plaintiff to demonstrate a concrete injury that is fairly traceable to the conduct of the defendant and judicially redressable. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy this requirement based on the threatened enforcement of a law, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Rather, that requirement is satisfied where the plaintiff alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 363 (4th Cir. 2020) (citations omitted).

Here, the United States clearly satisfies these requirements. First, the United States asserts "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a [state] statute[.]" *Driehaus*, 573 U.S. at 159 (citation omitted). The United States has sovereign authority to manage federal law enforcement activities and, under the Supremacy Clause, need not cede that authority by complying with Virginia's requirements for federal law enforcement officers or for 287(g) agreements. Indeed, the very fact that a state is attempting to regulate the conduct of the Federal Government inflicts a "sovereign injury" on the United States. *United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026) ("irreparable harm necessarily results from allowing California to enforce a law invalid under the doctrine of intergovernmental

10

immunity."); *cf. Arizona v. Yellen*, 34 F.4th 841, 851-53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000).

To be clear, the United States will not direct its law enforcement agencies to adopt the policies that Virginia demands or require its officers to comply with these new laws. *See* Allen Decl. ¶ 20; Weiss Decl. ¶ 62; Kaufmann Decl. ¶ 17. In consequence, federal officers are threatened with criminal prosecution. Moreover, the United States will not amend its 287(g) agreements to comply with Virginia's draconian scheme. Weiss Decl. ¶ 62. In consequence, all 287(g) agreements between the Federal Government and entities in Virginia will be nullified. That poses a serious and concrete injury that the Federal Government is entitled to address through this pre-enforcement challenge.

Furthermore, there is a substantial threat of enforcement of the new laws. *Driehaus*, 573 U.S. at 159. Both laws take effect on July 1, 2026. Compl ¶¶ 3, 7. Not only has Virginia not disclaimed enforcement of the Mask Ban, it has affirmatively proclaimed its intent to enforce it against federal agents. Upon signing the Mask Ban into law, Governor Spanberger issued a statement that "Law enforcement officers wearing masks on American streets undercut basic expectations of accountability, sow fear and confusion, and erode the public trust" and "[w]ith this law, Virginia is reaffirming that transparency, accountability, and a commitment to earning the public's trust are prerequisite to enforcing the law in our Commonwealth." https://www.governor.virginia.gov/newsroom/news-releases/2026/may-releases/name-1118176-en.html (last visited June 17, 2026). Governor Spanberger specifically referenced ICE agents in her comments about masks. *Id.* Federal officers face the risk of criminal prosecution by the Commonwealth's Attorneys, including Defendant Descano, who has not disavowed enforcement despite being the Commonwealth Attorney for a county with over 100,000 illegal aliens. *See*

11

*Richmond Med. Ctr. for Women v. Gilmore*, 55 F. Supp. 2d 441, 463 (E.D. Va. 1999), *aff'd*, 224 F.3d 337 (4th Cir. 2000) (refusal to disavow enforcement favored pre-enforcement standing); *see also* https://phillyda.org/news/district-attorney-larry-krasner-reformed-city-prosecutors-announce-the-launch-of-the-f-a-f-o-coalition-to-support-prosecution-against-federal-agents-who-violate-state-laws/ (discussing "the launch of a coalition to assist in prosecuting federal law enforcement officers who violate state laws[,]" including Defendant Descano) (last visited June 17, 2026). Moreover, Governor Spanberger characterized the enactment of the 287(g) Restriction as a "line in the sand," stating that "[t]aking personnel, and basically giving them over to ICE, is something that ends today." https://www.police1.com/federal-law-enforcement/va-governor-dissolves-287g-agreements-between-state-le-agencies-ice (last visited June 17, 2026).

The Mask Ban further threatens immediate harm to the United States, because it will also likely deter officers from taking safety measures necessary to protect their health, well-being, identities, and families, which can chill federal law enforcement operations. *See* Allen Decl. ¶ 19-20; Weiss Decl. ¶ 47; Hargis Decl. ¶ 16. The Mask Ban thus threatens the strong federal interest in "serv[ing] the public good by zealous enforcement of the law and the avoidance of deterring talented candidates from entering government employment for fear of liability." *Jensen v. Lane Cnty.*, 222 F.3d 570, 576 (9th Cir. 2000).

Moreover, the 287(g) Restriction threatens immediate harm to the United States by impeding its enforcement operations. The 287(g) Restriction limits where ICE may conduct enforcement operations, requires ICE officers to submit to the jurisdiction of state courts for civil and criminal proceedings, and restricts information sharing unless ICE obtains a judicial warrant or subpoena. Weiss Decl. ¶ 53. These onerous requirements complicate operations, delay enforcement, and functionally eliminate cooperation between federal and local authorities. *Id.* ¶

54. Moreover, the termination of existing 287(g) agreements in Virginia will impact ICE's ability to protect communities within the Commonwealth and will undermine federal immigration enforcement therein. *Id.* ¶ 63. This is illustrated by the termination of 287(g) agreements earlier this year through Governor Spanberger's Executive Directive, including the termination of the IHRP with the Virginia Department of Corrections, which has caused an increase in detention times and resource demands on ICE. *See id.* ¶ 56.

There are 28 active 287(g) agreements in Virginia, five under the Warrant Servicer Officer program and 23 under the Task Force Model. *See* Weiss Decl. ¶ 22. These agreements are critical to DHS operations in the Commonwealth, and the invalidation of these 28 agreements will force ICE to conduct more at-large arrests, which pose a danger to officers, aliens, and the public. *Id.* ¶ 51. They are also more likely to attract outside agitators and will result in the use of more resources to locate and apprehend targets. *Id.*

In short, the Mask Ban imposes concrete and immediate harms on the Federal Government and its interests by threatening federal agents with prosecution and, in turn, chilling their protected conduct and endangering their safety and the integrity of federal operations. *See, e.g.*, Allen Decl. ¶ 19-20; Weiss Decl. ¶ 47; Hargis Decl. ¶ 16; Kaufmann Decl. ¶ 14. Moreover, the 287(g) Restriction works as a *de facto* ban on all 287(g) agreements within the state of Virginia, which poses a direct impediment to federal law that is contrary to the intent of Congress. The law allows Virginia Attorney General Jay Jones to enforce it through lawsuits, which he has not disavowed. The threat of losing these valuable cooperative agreements is thus imminent and substantial. At bottom, there is "no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced." *Mobil Oil Corp. v. Attorney General*, 940 F.2d 73, 76 (4th Cir.1991). That enforcement would clearly injure the United States. Accordingly, the United States has

standing to challenge these laws.

## II.     The United States is Likely to Succeed on the Merits of its Claims

The United States is likely to succeed on the merits of its claims where the challenged laws violate principles of intergovernmental immunity and the 287(g) Restriction is preempted by federal law and invalid under the Contract Clause.

### A.     Virginia's New Laws Violate Principles of Intergovernmental Immunity

#### 1.   Virginia's New Laws Impermissibly Regulate the Federal Government

The United States is likely to succeed on its intergovernmental immunity claim where the challenged Virginia laws impermissibly regulate the Federal Government. Under the Supremacy Clause, States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). "[I]ntergovernmental immunity … forbids States from regulating the federal government *qua* government and from controlling federal governmental functions in any manner and to any degree." *United States v. California*, 173 F.4th at 1068. A law that "applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal law enforcement officers…. directly regulates conduct reserved to sovereigns" and is impermissible under the Supremacy Clause. *Id.*; *see CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025) (A state law unlawfully regulates the United States when it "'places [either] a prohibition' or mandate on the federal government." (internal citation omitted). The Supreme Court has long held that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Indeed, "[i]f when ... acting ... within the scope of their authority, [federal] officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State ... the operations of the general government may at any time be arrested at the

14

will of one of its members." *Davis*, 100 U.S. at 262-63.

### i. The Mask Ban

Through its enactment and imminent enforcement of the Mask Ban, Virginia seeks to regulate the actions of federal law enforcement officers within Virginia. The new law imposes criminal penalties for either (i) "wear[ing] a facial covering that conceals, obscures, or otherwise covers [one's] face while … engaged in the performance of his official duties" or (ii) failing to wear identifying information such as the "officer's name or other individual identifier," except in limited circumstances. Va. Code §§ 19.2-83.6:1(B), (D). This direct attempt to regulate federal agents runs afoul of the Supremacy Clause.

As the Ninth Circuit observed in granting the United States' motion for a preliminary injunction against a similar California law that sought to require federal law enforcement officers to "visibly display identification" when "performing their enforcement duties," the Mask Ban here "seeks to control [federal officers'] conduct in performing law enforcement operations." *United States v. California*, 173 F.4th at 1067. The Ninth Circuit held that the challenged identification requirement "purports to override the federal government's power to determine whether, how, and when to publicly identify its officers," "[a]nd in so doing, it aims to regulate the manner and conditions under which federal agents can enforce federal law." *Id.* That reasoning applies directly to the Virginia identification requirement in Section 19.2-83.6:1(D), and applies with equal force to the facial coverings ban in Section 19.2-83.6:1(B). The Mask Ban seeks to regulate the manner and conditions by which federal officers must operate when conducting their official duties and enforcing the law. *See id.* States have no power to impose such regulations.

By dictating if and when federal agents may wear facial coverings and what identification they must display while carrying out their official duties, the Mask Ban improperly seeks to

15

regulate how the Federal Government carries out its criminal and immigration law enforcement functions. Accordingly, the Mask Ban is facially invalid and unconstitutional as it pertains to federal law enforcement officers, and its enforcement against federal law enforcement officers should be enjoined.

To the extent that Virginia may argue that the United States must show that enforcement of the new laws would hinder Federal Government operations, the Ninth Circuit recently explained that such a showing is not required when the law on its face purports to regulate the Federal Government directly. *United States v. California*, 173 F.4th at 1067 ("if a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations.").

### ii.   The 287(g) Restriction

Similarly, the 287(g) Restriction unlawfully regulates the Federal Government by imposing onerous conditions on the contents of 287(g) agreements, including conditions that violate Federal law. Such agreements are statutorily authorized by Congress. In creating that authorization, Congress set forth certain parameters of the agreements, including that state officers working under such agreements must adhere to federal law, are subject to the direction and supervision of the Secretary of Homeland Security, and are acting under color of federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under federal or State law. 8 U.S.C. § 1357(g). Through its enactment of the 287(g) Restriction, Virginia is attempting to alter these express terms imposed by Congress by limiting what federal laws may be complied with, requiring compliance with Virginia law instead, and imposing liability pursuant to Virginia law. This is a textbook example of an unlawful attempt to

16

regulate the Federal Government. *CoreCivic, Inc.*, 145 F.4th at 321.

Subsection (C) requires that every § 287(g) agreement include a provision that agrees to bind federal agents to Virginia state law, including for liability purposes, rather than federal law. *See* Va. Code §§ 15.2-1726.1(C)(2), (5), (11), (12). This is directly contrary to Congressional intent. *See* 8 U.S.C. § 1357(g)(2) ("An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law …"); *see also id.* § (g)(8). This subsection also limits the investigative techniques and processes federal agents may employ when executing federal immigration enforcement. Va. Code §§ 15.2-1726.1(C)(6), (7), (9), (10). For example, the law prohibits ICE from "request[ing] information from any locality within the Commonwealth regarding the immigration or citizenship status of any person unless such request is made pursuant to a valid judicial warrant or judicial subpoena," or "us[ing] any surveillance technology to conduct immigration enforcement within the Commonwealth[.]" *Id.* §§ (C)(7), (9). Moreover, subsection (C) specifies how federal officers must identify themselves, *id.* § (C)(3), limits where they may operate, *id.* §§ (C)(4), (8), and requires ICE to provide advanced notice of immigration enforcement efforts to localities, including the identities of the agents who will be involved. *Id.* § (C)(1). Those requirements unconstitutionally regulate the federal government for the reasons just explained. In addition, the law restricts the use of administrative warrants even though federal law explicitly provides for their use. 8 U.S.C. § 1226(a). Virginia attempts to impose such regulations upon federal officers when Congress expressly designated that "[i]n performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the [Secretary of Homeland Security]." 8 U.S.C. § 1357(g)(3).

Not only does the law impose these unreasonable demands on all future agreements within

17

the Commonwealth, but it also mandates that any agreement in effect on July 1, 2026, obtain a modified agreement by September 1, 2025. Va. Code § 15.2-1726.1(D). Should the Federal Government not comply with this demand, all existing agreements "shall be deemed void and unenforceable." *Id.*; *see also id.* § (E) (providing that "[a]ny Federal immigration enforcement agreement entered into or maintained in violation of this section shall be void and unenforceable."). The law thus regulates what agreements the Federal Government may enter into, requires modifications of existing agreements, and requires compliance with onerous state laws to permit the agreements to continue. That is, by definition, a regulation of the Federal Government.

The conditions imposed by the 287(g) Restriction are precisely the type of impermissible regulation contemplated by the doctrine of intergovernmental immunity. *McCulloch*, 17 U.S. (4 Wheat.) at 436 ("states have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government"). "By constraining the conduct of federal agents and employees, the [law] seek[s] to regulate the government directly." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010). Virginia's law "substantially interferes with federal immigration policy." *CoreCivic*, 145 F.4th at 327. Indeed, "if every state enacted such [laws], they would destroy the federal function." *Id.* at 328 (internal quotation marks and citation omitted). The 287(g) Restriction is therefore invalid under the Supremacy Clause.

### 2. The 287(g) Restriction Discriminates Against the Federal Government

The United States is likely to succeed on its intergovernmental immunity claim because the 287(g) Restriction discriminates against the Federal Government. *See United States v. Washington*, 596 U.S. 832, 841 (2022). Discrimination occurs when a state "treats someone else better than" the federal government, "singles out the Federal Government for unfavorable

18

treatment," *id.* at 840, or imposes a discriminatory burden on the Federal Government, *see Dawson v. Steager*, 586 U.S. 171, 175 (2019).

The 287(g) Restriction impermissibly discriminates against the Federal Government because it imposes a series of unreasonable (and unlawful) requirements on agreements between the Commonwealth and the Federal Government that are not required for agreements between the Commonwealth and other state and local entities. *See Washington*, 596 U.S. at 839 (deeming law discriminatory because "[o]n its face" it "explicitly treats federal workers differently than state or private workers"); *United States v. King County*, 122 F.4th 740, 757 (9th Cir. 2024) (ban on servicing ICE charter flights was unlawful because it "burden[ed] federal operation, and only federal operation."). Such discrimination is made clear in comparing Virginia's requirements for agreements between the Commonwealth and other entities. For example, Section 15.2-1727 of the Virginia Code discusses reciprocal agreements between the Commonwealth and external localities. Unlike the 287(g) Restriction's strict requirements for 287(g) agreements, Section 15.2-1727 provides that any Commonwealth officers or agents "serving in a jurisdiction outside the Commonwealth under a reciprocal agreement entered into pursuant hereto are authorized to carry out the duties and functions provided for in the agreement under the command and supervision of the chief law-enforcement officer of the jurisdiction outside the Commonwealth." Moreover, Section 15.2-1730.1 allows the sheriff of a county where no police department has been established to "enter into agreements with any other governmental entity providing law-enforcement services in the Commonwealth, and may furnish and receive interjurisdictional law-enforcement assistance for all law-enforcement purposes[.]" These general and flexible provisions for non-federal law enforcement entities stand in stark contrast to the onerous restrictions placed on federal agencies attempting to carry out Congress's mandate in Section 287(g). In treating state and local law

19

enforcement entities better than the Federal Government, Virginia discriminates against the United States. Preventing this sort of "discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Washington*, 596 U.S. at 841.

### B.     The 287(g) Restriction is Preempted by Federal Law and Invalid

The 287(g) Restriction is also conflict preempted by Federal law. Section 287(g)(1) reflects Congress's considered judgment that DHS may enter into written agreements with states and localities under which qualified state or local officers may perform specified "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States" under federal supervision. 287(g) agreements were intended "to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement," namely to assist in arrests, issue detainers, detain and transport aliens, gather evidence, and prepare Notices to Appear. *Alas*, 63 F.4th at 274 (quotation omitted); *see* 8 C.F.R. § 287.5. Congress thus created a cooperative enforcement framework designed to expand federal immigration enforcement capacity through voluntary state and local participation, while ensuring that the scope of delegated authority would be defined by federal law.

By passing a law that precludes entry of 287(g) agreements because of its onerous conditions, and by requiring termination of all such existing agreements, Virginia obstructs the ability of the federal government to "deputize" willing local law enforcement, thereby frustrating Congress's objectives. *Alas*, 63 F.4th at 274. Indeed, conflict preemption asks whether state law, as authoritatively construed and applied, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Here, Virginia's law is a complete obstacle to the possibility of 287(g) agreements within the state, for as long as the law is on the books. That is because the law imposes onerous and illegal conditions on federal agents, including requirements that dictate what a federal agent must wear,

20

where they may operate, what laws they must comply with, what legal jurisdiction they are subject to, and how they may conduct investigations. Such provisions regulate federal officers in performance of their official duties, which is impermissible, and discriminate against such officers and against federal immigration enforcement generally. By requiring such impossible conditions, the Virginia law in essence bars 287(g) agreements.

A state rule need not compel action to conflict with federal law; a sufficient conflict exists if it "interferes with the methods by which the federal statute was designed to reach [its] goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). While state law has some role in regulating local law-enforcement agencies that enter 287(g) agreements, it cannot functionally ban such agreements by prohibiting all of the underlying conduct that such agreements authorize. 287(g) agreements deputize local law enforcement to "become de facto immigration officers, competent to act on their own initiative." *City of El Cenizo v. Texas*, 890 F.3d 164, 180 (5th Cir. 2018). In doing so, local law enforcement gains new authority to assist in federal immigration enforcement. And they "shall be considered to be acting under color of *Federal authority* for purposes of *determining the liability, and immunity from suit*, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8) (emphasis added); *Silva v. United States*, 866 F.3d 938, 942 (8th Cir. 2017). So 287(g) agreements amount to the federal government deputizing local law enforcement and granting them new authorities and immunities. States cannot completely obstruct that mechanism by effectively banning all the functions that Congress intended the agreements to confer.

The voluntariness of 287(g) agreements makes no difference to the analysis. Virginia may not disable the very custodial authority that Congress made available if local law-enforcement agencies choose to participate. *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

21

As the Supreme Court has made clear, even if federal law does not compel participation, state measures are preempted when they threaten to frustrate federal statutory objectives or undermine the operation of a federal scheme. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 366, 373-74 (2000).

**C.      The 287(g) Restriction is Invalid under the Contract Clause**

The United States is likely to succeed on the merits of its Contract Clause claim because the 287(g) Restriction impairs all 287(g) agreements in the state of Virginia and lacks a significant or legitimate purpose. The Contract Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1. State legislation like the 287(g) Restriction violates the Contract Clause if it substantially impairs a contractual relationship and is not an appropriate or reasonable way to advance a significant and legitimate public purpose. *See Sveen v. Melin*, 584 U.S. 811, 819 (2018). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). Where a state is a party to the contract at issue, "the State's self-interest is at stake," and as such, "these contracts occupy what the Court has termed a special status for Contract Clause purposes," "and must be more scrupulously examined[.]" *Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340, AFL-CIO v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993) (internal quotations and citations omitted).

As a threshold matter, 287(g) agreements, which are written agreements to perform certain immigration-related functions, are protected from impairment by the Contract Clause. *See Sveen*, 584 U.S. at 818 (the Contract Clause "applies to any kind of contract"). The 287(g) Restriction substantially impairs existing 287(g) contracts between entities in Virginia and the Federal Government by voiding those agreements as written and requiring revisions that impose

22

unreasonable conditions that are inconsistent with Federal law. Va. Code 15.2-1726.1 §§ (D), (E). Indeed, if any entity continues to maintain such an agreement with ICE in violation of the 287(g) Restriction, the Virginia Attorney General or the Commonwealth Attorneys have the authority to seek an injunction to enforce the law. *Id.* § 15.2-1726.1(F). As of March 30, 2026, ICE had 28 287(g) agreements with entities in Virginia. The Federal Government will not abide by Virginia's unconstitutional limitations on 287(g) agreements, so by September 1, 2026, each of those agreements will be considered void under Section 15.2-1726.1(D). This is a clear example of substantial impairment. *See, e.g.*, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247 (1978) (finding impairment where "the statute in question here nullifies express terms of the company's contractual obligations"); *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 630 (5th Cir. 2010).

The new law's invalidation of all 287(g) agreements with entities in Virginia is also unsupported by any significant or legitimate public purpose. 287(g) agreements are expressly authorized by federal law, 8 U.S.C. § 1357(g), and have existed for decades without issue. Moreover, the agreements are voluntary. Should a locality be dissatisfied with a 287(g) agreement for whatever reason, it could terminate the agreement at will or refuse to enter into the agreement in the first place. A law regulating and effectively acting as an outright ban on 287(g) agreements serves no significant or legitimate public purpose for the entire Commonwealth of Virginia, even for local law enforcement agencies that wish to enter into them. Prohibiting public entities from continuing to perform under longstanding voluntary agreements specifically authorized by federal law harms the public interest and people of Virginia. *See* 8 U.S.C. § 1357(g); *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 29–32 (1977).

Nor can Virginia cite funding as its purported legitimate public purpose the 287(g) Restriction. While the Commonwealth provides some police funding to some counties, towns, and

23

cities under its 599 grant program, not all counties, towns, or cities receive such funding. *Compare* https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/law-enforcement/fy26599allocationsupdated.pdf *with* https://vasheriff.org/va-sheriffs-directory/. Most funding comes from local taxes. Again, should a local entity have concerns regarding resources or funding, that entity need not enter into a 287(g) agreement.

It appears that the only purpose behind the 287(g) Restriction is a disagreement with the Federal Government's immigration policies. Indeed, Governor Spanberger characterized the 287(g) Restriction as a "line in the sand," stating that the Commonwealth's previous cooperation with the Federal Government on immigration "is something that ends today." https://www.police1.com/federal-law-enforcement/va-governor-dissolves-287g-agreements-between-state-le-agencies-ice (last visited June 17, 2026). Immigration, however, is a purely federal function. Because the 287(g) Restriction impedes upon federal immigration enforcement, an area that is not historically subject to legislation by Virginia, the public purpose requiring its impairment must be extremely significant to pass constitutional muster. *See Energy Rsrvs.*, 459 U.S. at 411. Virginia's political disagreements are not a basis to void preexisting contracts or to obstruct a congressional scheme. And because state entities are parties to the agreements, the Court may not simply defer to the legislature's purported public purpose. *See U.S. Tr. Co.*, 431 U.S. at 26. Given that the 287(g) Restriction lacks a valid public purpose in the first instance, it certainly lacks a sufficient legitimate or significant public purpose to justify the wholesale invalidation of longstanding agreements expressly contemplated by Congress.

Finally, even assuming that the 287(g) Restriction had a legitimate and significant purpose sufficient to warrant the termination of all 287(g) agreements in Virginia, the 287(g) Restriction must be tailored to meet that purpose based on reasonable, limited conditions. *See Energy Rsrvs.*,

24

459 U.S. at 412 ("the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'") (quoting *U.S. Tr. Co.*, 431 U.S. at 22). The 287(g) Restriction's invalidation of all existing agreements absent the imposition of onerous conditions is far from reasonable and appropriate to address the supposed public purpose justifying its enactment. *Cf. U.S. Tr. Co.*, 431 U.S. at 29–30 ("it cannot be said that total repeal . . . was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the . . . limitations . . ."). There is no justification for such an extreme measure. The 287(g) Restriction therefore violates the Contract Clause and is invalid.

**III.    The United States Faces Irreparable Harm Absent Preliminary Relief**

The United States will suffer irreparable harm if the challenged Virginia laws are enforced against the Federal Government. Irreparable harm necessarily results from the enforcement of a state law that violates the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 366-67 (1989) (irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of ... the express constitutional prescription of the Supremacy Clause" (citation omitted)); *United States v. California*, 173 F.4th at 1069 (finding irreparable harm based on a Supremacy Clause violation). The same is true of the Contract Clause. *See, e.g., Conn. State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020); *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012). The automatic nature of the irreparable injury stems both from the constitutional violation and the sovereign injuries that result. *United States v. California*, 173 F.4th at 1069.

In addition, the challenged laws pose several additional irreparable harms, including endangering federal officers and agents, impeding their functions, and chilling federal activities.

25

The Mask Ban, by design, endangers federal officers and agents because it seeks to publicly expose their personal identities at a time of already escalating instances of violence against federal officers. *See, e.g.,* Hargis Decl. ¶ 6, 9a-m, 10-11. The exposure would facilitate escalating instances of harassment against those officers by agitators seeking to disrupt their operations. *See* Allen Decl. ¶ 14-17; Weiss Decl. ¶ 39-40; Hargis Decl. ¶ 6; Kaufmann Decl. ¶ 12, 15. ICE officers are facing an astounding increase in death threats and assaults, which are facilitated by doxxing websites that broadcast the identities and home addresses of officers and their families, encouraging retaliation against them. *See, e.g.,* Weiss Decl. ¶ 35-40 (describing threats against DHS officers); Hargis Decl. ¶ 6, 9a-m, 10-11 (statistics and threats).

The Mask Ban impedes federal functions because it fails to sufficiently account for instances in which agents may interact with the public when performing their official duties, but disclosure of their identity could place them or others at risk, including, for example, surveillance or protection assignments, which will jeopardize such operations. *See* Weiss Decl. ¶ 44-45; Allen Decl. ¶ 14, 17, 19; Hargis Decl. ¶ 13, 17; Kaufmann Decl. ¶ 12, 14, 15. Agents in such situations face a risk of prosecution for merely doing their jobs in an inconspicuous manner as is called for by such circumstances. Further, the Mask Ban would enable suspects to identify officers who may be involved in future enforcement actions, including undercover operations. *See, e.g.*, Weiss Decl. ¶ 46; Allen Decl. ¶ 14, 17; Hargis Decl. ¶ 17; Kaufmann Decl. ¶ 15. Should a suspect recognize an officer, there is a risk of flight and obstruction; accordingly, facial coverings or the removal of identifiers are critical to maintaining operational effectiveness, especially when dealing with repeat offenders or organized criminal networks. *See, e.g.*, Weiss Decl. ¶ 46; Allen Decl. ¶ 17; Hargis Decl. ¶ 17; Kaufmann Decl. ¶ 15, 16. And while there are limited exceptions to the Mask Ban, they do not appear to be available to the Federal Government at all.

The Mask Ban and the danger it poses will deter federal agents and officers from effectively engaging in important federal enforcement operations. *See* Allen Decl. ¶ 19-20; Hargis Decl. ¶ 16. Moreover, because the Mask Ban carries criminal penalties, that threat of state investigation and prosecution can chill officers from engaging in lawful conduct in the performance of their federal duties. *See New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) (stating that the federal immunity defense provides "immunity from suit rather than a mere shield against liability," to "protect[] federal operations from the chilling effect of state prosecution").

The 287(g) Restriction also impedes federal operations by terminating 287(g) agreements relied upon for federal immigration enforcement. Indeed, such agreements are vital to DHS's mission and ensure preservation of DHS resources, the safe and timely transfer of dangerous individuals, and prompt removal of such individuals upon release from state custody. *See* Weiss Decl. ¶ 50. If the 287(g) Restriction were to be enforced, 23 Task Force Model agreements would be invalidated. ICE would therefore lose its cooperation with several counties in the Commonwealth whose officers are trained to exercise immigration authority on ICE-led task forces during their routine police duties. *Id.* ¶ 21. This would create a strain on ICE resources and limit its ability to operate effectively. *Id.* ¶ 50. Moreover, the new law would invalidate the five Warrant Service Officer agreements, which enable local officers to serve and execute administrative warrants on aliens in local custody. *Id.* ¶ 21. Stripping ICE of this cooperation would lead to more at-large arrests and increased resource-needs in order to safely apprehend criminal aliens. *Id.* ¶ 51. For example, the inability to effectuate custodial transfers from local custody have been devastating, resulting in violence and death across the Commonwealth. *See id.* ¶ 58-60.

For these reasons, the challenged laws threaten to "destroy the federal function" of law enforcement and immigration enforcement in the Commonwealth of Virginia. *United States v.*

27

*Fresno Cnty.*, 429 U.S. 452, 463 n.11, 464 (1977). Because the Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments," *McCulloch*, 17 U.S. (4 Wheat.) at 327, 362, Virginia cannot unilaterally impose its policy preferences on the Federal Government. A "concurrent power in the [S]tates" to regulate federal operations "would bring back all the evils and embarrassments, which the uniform rule of the [C]onstitution was designed to remedy." 2 J. Story, Commentaries on the Constitution § 1099 (3d ed. 1858).

Finally, if Virginia's new laws were not enjoined, there is nothing stopping other states from imposing further unconstitutional restraints on the Federal Government. *See Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (allowing a state to act unconstitutionally "would allow other States to do the same"). This could in turn create a "patchwork" system of laws, *id.*, under which federal agents would be subject to different regulations in each state, severely undermining the Federal Government's ability to uniformly enforce federal law. Indeed, Virginia is not the only state to have passed such laws. *See, e.g.*, *United States v. California*, 819 F. Supp. 3d 1109, 1137 (C.D. Cal. 2026) (granting preliminary injunction against provision of California law imposing facial covering ban). The United States thus faces irreparable harm from the challenged Virginia laws.

## IV.    The Balance of Equities and the Public Interest Weigh in the United States' Favor

The balance of equities and the public interest likewise favor the United States. To start, as the Ninth Circuit held, a violation of the Supremacy Clause necessarily means that "both the public interest and balance of the equities tip 'decisively in ... favor' of a preliminary injunction" because there is no public interest in enforcing an unconstitutional law. *United States v. California*, 173 F.4th at 1069; s*ee also Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)

("upholding constitutional rights surely serves the public interest"). Here, the public interest favors an injunction of both unconstitutional laws.

It is well within the public interest to protect federal officers' safety and remove unlawful impediments to federal law enforcement as posed by the Mask Ban's ban on facial coverings and affiliation and identification display requirements. Indeed, "[f]rustration of federal statutes and prerogatives are not in the public interest[.]" *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see Glidedowan, LLC v. New York State Dep't of Health*, 768 F. Supp. 3d 503, 525 (W.D.N.Y. 2025) (noting "public interest considerations associated with the performance of government functions possess a high value when balancing the equities."). Likewise, it is not in the public interest to subject federal agents to increased harassment, doxxing, and violence. When federal agents' identities are revealed, the resulting harm is not always limited to their official duties; it can impact their families as well. The law also undermines the public interest by setting federal officers and state officers on a collision course, as the federal government will not comply. At bottom, the aim of the Mask Ban is to hinder federal agents from participating in crucial law enforcement operations in the state and to chill effective enforcement of federal law. Such objectives are not in the public interest.

The 287(g) Restriction's invalidation of all 287(g) agreements in Virginia and the onerous requirements it imposes on any future agreements is also not in the public interest. Congress expressly provided for cooperation between the Federal Government and local governmental entities for the purpose of "investigation, apprehension, or detention of aliens in the United States[.]" 8 U.S.C. § 1357(g)(1). Such cooperation makes law enforcement more effective and safer for the public. Yet, the 287(g) Restriction seeks to categorically bar this cooperation in an unconstitutional manner despite the tremendous burdens that would be imposed on the Federal

Government and its enforcement of federal immigration law. The 287(g) Restriction is also contrary to the public interest because it would impair ICE's ability to effectively identify, detain, and remove individuals who are a threat to public safety. *See, e.g.*, Weiss Decl. ¶ 51; *see also id.* ¶ 57-60. Accordingly, an injunction would serve the public interest. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)

Conversely, it is unclear what, if any, burden Virginia would suffer should these laws be enjoined. Defendants suffer no injury from an injunction preventing the enforcement of an unconstitutional law. *See Cal. Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009) (explaining that "it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law"). Nor is it clear why Defendants need to be able to criminally charge federal officers for wearing masks to protect themselves, something that has never been done previously. Similarly, 287(g) agreements have been in place in Virginia for decades without any grievances by state authorities, much to the benefit of both the Federal Government and the Commonwealth. *See, e.g.*, Weiss Decl. ¶ 22. Virginia cannot possibly contend that an injunction against invalidating voluntary cooperative law enforcement agreements harms them. While Virginia may disagree with the United States' priorities, it has no legitimate interest in interfering with the enforcement of federal law and preventing voluntary cooperation. Thus, the balance of equities supports entry of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court preliminarily enjoin Defendants, their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with any of the Defendants, from enforcing Sections 19.2-83.6:1 and 15.2-1726.1 of the Virginia Code against the Federal Government.

DATED: June 17, 2026

TODD BLANCHE
Acting Attorney General

/s/ Gerard Mene
GERARD MENE
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
CHARLES E.T. ROBERTS
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

ALEXANDRA MCTAGUE SCHULTE
Senior Litigation Counsel

By: s/ Alessandra Faso
ALESSANDRA FASO
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
202-451-7728
Alessandra.faso@usdoj.gov

31