# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>THE COMMONWEALTH OF VIRGINIA, JAY JONES, in his official capacity as Attorney General of Virginia, and STEVE DESCANO, in his official capacity as Commonwealth Attorney for Fairfax, Virginia,<br><br>       Defendants. | Case No.<br><br>**DECLARATION OF JUSTIN HARGIS** |

## DECLARATION OF JUSTIN HARGIS

I, Justin Hargis, based upon my personal knowledge and information made known to me in the course of my employment, hereby declare as follows:

1. I am employed by U.S. Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). CBP's central mission is to keep terrorists and their weapons out of the United States while facilitating lawful international travel and trade.

2. CBP's Office of Professional Responsibility (OPR) supports CBP's mission by ensuring compliance with agency-wide programs and policies relating to corruption, investigating allegations of criminal and other misconduct, and executing CBP's internal security and integrity awareness programs. OPR's work includes identifying suspicious activity through data analysis, investigating criminal or serious misconduct allegations, ensuring employees maintain the highest standards of integrity and professionalism, and taking measures to protect CBP employees, facilities, and sensitive information from security threats.

3. I am the acting Executive Director for the Investigative Operations Directorate (IOD) within OPR located in Washington, D.C. In this role, I oversee over 500 criminal investigators

1

who are charged with investigating criminal and administrative misconduct of CBP employees and contractors, reviewing use of force incidents, and investigating reported threats to employees, doxxings involving employees, and related crimes.

4.  Prior to entering on duty with OPR, I was a United States Border Patrol (USBP) Agent for twelve years, serving in various agent/management positions. I entered on duty with OPR on May 30, 2018, as a Special Agent. In this position, I performed the functions of a criminal investigator to include reviewing completed investigations to ensure investigative sufficiency and mentoring subordinates. In January of 2021, I was promoted to the Resident Agent in Charge of the Del Rio OPR Office. In this position, I oversaw all OPR operations within the Del Rio, Texas area of responsibility. In July of 2022, I was promoted to the position of Special Agent in Charge of the Washington D.C. Field Office. I have been acting as the Executive Director of IOD since June 1, 2026.

5.  I submit this declaration in support of Plaintiffs' Complaint and motion for preliminary injunction in the above-captioned case and to describe documented threats against CBP personnel. This declaration is based upon my personal knowledge and information made available to me in my official capacity. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry into the above-captioned case.

**CBP Officers and Agents Face Heightened Risk of Doxxing and Other Threats**

6.  CBP, including OPR, has received a marked increase in reports of threats against law enforcement agents and officers and other CBP employees since January 2025 associated with increased operations and the public's perception of CBP's involvement in ongoing DHS enforcement initiatives. Publicly available data shows that there was a significant increase in reported assaults on CBP officers and agents within the past fiscal year (FY), with 856 officers/agents assaulted in FY2025 compared to 457 in FY2024, and 1,164 officers/agents assaulted as of April 2026, only part-way through FY2026.[1] Threats against CBP employees have

---

[1] CBP Assault and Use of Force Dashboards, available at: https://www.cbp.gov/newsroom/stats/assaults-use-force (last viewed June 4, 2026).

also increasingly taken the form of posts and messages on social media, in group chats, and elsewhere that reveal personally identifiable information (PII) of CBP employees such as home addresses and personal phone numbers. This public disclosure of PII, known as doxxing, itself constitutes a threat to employee safety and is often coupled with language conveying express or implied threats of harm to that employee or their family. Doxxing can lead to harassment, intimidation, and other harms, and is considered a serious violation of privacy, particularly when targeting government employees whose jobs necessarily place them in the public arena, and who often do not have a choice about when and where they must perform job-related duties.

7. Modern technology and the current political environment have made it easier for bad actors to find and widely distribute personal information about officers, agents, and other CBP employees conducting their assigned duties and to use this information or encourage others to use it to target CBP employees. These actors seek to intimidate CBP employees and interfere with their ability to carry out CBP's mission. Across the country, there are social media sites dedicated to posting pictures of USBP agents seeking to identify them and obtain their personal information. Likewise, I am aware through both media and agency reporting that CBP personnel have had their photos posted online without their consent, some accompanied by the individuals' PII including names or license plate numbers. Photos and information of CBP personnel have been posted to websites like ICEList.is.

8. To address the serious safety concerns posed by these threats, and in particular doxxing of CBP employees, CBP has conducted an internal analysis on how to best protect its workforce, issued messaging on cyber hygiene, and realigned resources to address recent upticks in doxxing and other threat-related incidents.

9. CBP, and OPR specifically, are aware of numerous doxxing incidents across the nation that support the need to protect CBP employee identities from disclosure, particularly where these employees are involved in DHS enforcement initiatives such as interior operations. Since December 2025, OPR's central clearinghouse for reporting, CBP Intake, has received reports of

over 200 instances of threats and doxxings targeting CBP employees. Examples of recent, substantiated doxxing events from across CBP include the following.

a.    In January 2025, an off-duty agent received a chat application message containing a photo of his own home accompanied by the following threatening message: "Ese ya agarró la mayoría le toca Descanso" (which roughly translates to "He already got the majority, it's his turn to rest").

b.    In June 2025, a USBP agent supporting the Los Angeles-based Operation At Large had his personal phone number, current address and his parents' address published online, and his family received several threats alluding to his official position. Text messages sent to the agent included: "I'm going to kill you when I see you bitch" and "Your family and everyone is gonna be targeted ! Be ready [sic]".

c.    In June 2025, an unknown individual posted the social media profile of an Office of Public Affairs (OPA) employee to Reddit with the caption, "Agent Identified." Subsequent commentors replied, "Is that his phone number next to his name?" and "Where are his videos?". The employee subsequently received an email from an anonymous email account to his official CBP email address with the subject, "You're a piece of shit." In October 2025, the OPA employee's information was added to the website, ICElist.is. The OPA employee is not a law enforcement officer.

d.    In June 2025, outside of Los Angeles, California, violent extremists posted on Instagram the address of a hotel where USBP agents were staying, prompting another user to respond: "Burn them" and another to reply, "Got a match".

e.    In July 2025, an individual posted a picture of a Chief Patrol Agent (CPA) to social media accompanied by the statement "Assignment time: What can we find out about this mfr?", to which another individual responded with the CPA's home address. Replies included, "Gonna end up like your boy on the news" and "Who's car are we taking?????? [sic]". In response to these and other threats, OPR determined it

was necessary to provide a 24-hour security presence for the CPA and members of his family.

f.      In July 2025, USBP's Miami Sector reported that an agent was surrounded by six to eight civilians while assisting with a vehicle stop. The agent asked the civilians to step back and all but one did. The remaining subject shouted the agent's name and threatened to dox him. After the subject was arrested and while in transit, the subject made statements indicating his familiarity with the agent's schedule and mentioned the names and personal information of other agents.

g.      In August 2025, an Instagram page posted photos of a USBP agent operating in Los Angeles with the bold heading: "WARNING: SUSPECTED KIDNAPPER/TERRORIST" and personal details about the agent, including his full name, and the purported town of his residence and his hometown. In October 2025, in similar fashion, the same Instagram page posted several images of a USBP agent working in California—including pictures of his face when conducting his official duties, his nameplate, and his purported town of residence and hometown, again with the bold header: "WARNING: SUSPECTED KIDNAPPER/TERRORIST".

h.      In October 2025, the online hacking group known as "SCATTERED LAPSUS$ HUNTERS" released the personal and official information of 680 DHS employees (including 212 current or former CBP employees), approximately 190 Department of Justice employees, and 170 FBI employees. The release included names, office locations, email addresses, phone numbers, and, in some cases, home addresses or personal phone numbers. Following the release, members posted on the group's Telegram channel derogatory comments such as "I want my MONEY MEXICO" and "Mexican Cartels hmu [hit me up] we dropping all the doxes wheres my 1m [1 million dollars] [*sic*]", referring to widely reported instances of criminal organizations offering bounties for the release of personal information of, or escalating attacks on, DHS personnel.

i.          In October 2025, in Houlton, Maine, a USBP Acting Division Chief's service vehicle was photographed and the photo was posted on Facebook with the caption: "UNMARKED ICE VEHICLE, Be on the lookout for this unmarked car or personal vehicle of this ICE agent" with the license plate number included.

j.          In November 2025, a video of a USBP Agent in uniform supporting Operation at Large was posted on social media. Subsequently, the agent received a message saying that he was a "dead man." Additionally, he received threatening messages claiming that his information was all over the internet, his family was in danger, and he would be hung with the other "[N]azi scum".

k.          In January 2026, a USBP Agent who supported Operation at Large received threatening social media messages along with an image of his child. Another USBP Agent reported individuals driving by his house and taking photos.

l.          In March 2026, names and official email addresses for an estimated over 14,000 CBP and ICE employees were posted on a blog. Some of these entries contained personal phone numbers and home addresses.

m.          In May 2026, suspected ANTIFA members trespassed into the secured employee parking at a CBP facility to photograph employee vehicles. Federal Protective Services responded to the incident and the individuals left.

10. In addition to the above, DHS has previously reported that criminal organizations have placed targeted bounties on ICE and CBP personnel in a tiered bounty system. Cartels offered payouts to criminals based on rank of the targeted personnel and action taken: $2,000 for gathering intelligence or doxxing officers/agents (including photos and family details), $5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE/CBP officers/agents; and up to $50,000 for the assassination of high-ranking officials, including a CPA.[2]

---

[2] *See* DHS, *Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago* (available at https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago, last updated November 20, 2025).

11. Additionally, CBP is aware of a website called "ICElist.is". This site, hosted on foreign servers, claimed to be "an open journalistic project … aimed at collecting and sharing information that can hold ICE members legally accountable" and referred to authorized law enforcement activity as "kidnapping" and "racist abduction". The website published personal information of DHS law enforcement officials. Currently, when CBP attempts to access "ICElist.is", the request is redirected to a website named "theICElist.org". This website contains personal information and photos of CBP employees as well as employees of other DHS components.

12. In sum, CBP employees are facing significant and pervasive threats as they perform their assigned duties. While CBP has taken, and continues to take, concrete steps to mitigate these threats, a critical element to avoiding harm to CBP employees is to ensure their identities are protected from public release—particularly in the context of ongoing enforcement operations that are the subject of controversy among members of the public. It has been my experience that doxxing events have significantly increased since January 2025. It is important to note that threats have been directed towards all levels of CBP employees, to include the level of CPA.

### Virginia's Law Prohibiting the Use of Facial Coverings and Requiring Visible Identification for Law Enforcement Officers Inhibits CBP's Operations

13. Consistent with federal law, in certain circumstances, CBP permits its officers or agents, in limited and specific circumstances, to wear facial coverings and remove visible identifying information from their uniforms. CBP leadership has authorized its personnel to wear facial coverings, which may include eye protection, facial masks, or a combination of both. Such uniform modifications have been authorized when the risk of doxxing to officers and agents is likely. Additionally, CBP has permitted officers and agents to remove nameplates, badges, and unique identifiers from their uniforms, both in response to similar concerns for safety and as part of day-to-day operations, including but not limited to undercover, plainclothes, and surveillance operations. These modifications have been authorized for officers and agents throughout CBP's history when operationally appropriate and necessary.

7

14. CBP personnel are accustomed to performing their assigned duties in a public setting, which sometimes means facing public scrutiny. However, the rise of doxxing, the advancement of facial recognition technologies, and the proliferation of bad actors on social media, has created an unprecedented operational risk for federal law enforcement officers. I am aware that officers and agents express concerns about being doxxed when performing their assigned duties and worry about their personal safety and the safety of their families. Permitting officers and agents to cover their faces or remove visible identifying information from their uniforms helps to reduce the risk of doxxing by limiting the ability of facial recognition technology to identify the officer or agent and by reducing the likelihood that the officer or agent's full name and other identifying information will be discovered by those seeking to dox CBP personnel.

15. I am aware that Virginia Senate Bill 352, signed by the Governor on May 20, 2026, prohibits any law-enforcement officer, including any federal law enforcement officer, from wearing a facial covering that obscures his or her identity and requires him or her to display identification, while engaged in the performance of his official duties, subject to certain exceptions and provisions. Violators can face Class 1 misdemeanor liability.

16. This Virginia law interferes with CBP's discretion to authorize such uniform modifications and plainclothes operations, thereby undermining the safety of CBP officers and agents. Subjecting officers and agents to potential criminal liability for making these uniform modifications will also disincentivize them from taking these critical measures to protect themselves against an unprecedented threat. This, in turn, creates a strain on CBP's already stretched manpower. When personnel are doxxed, the agency sometimes must expend valuable resources responding to threats or providing additional protection for its personnel. These resources could otherwise be used to fulfill CBP's primary mission.

17. Removing these flexibilities will also harm CBP operations and its ability to perform the mission effectively. Such uniform modifications may be operationally necessary when conducting investigative or protective activities, for example. If images of a CBP officer or agent's face become widely distributed, then that officer or agent will be less safe and effective when conducting surveillance, plainclothes operations, or undercover operations. Revealing an

8

officer's personal identity and/or agency affiliation could also enable subjects under investigation to circumvent detection, which is precisely what many surveillance and plainclothes operations are intended to avoid.

18. Although the Virginia law appears to provide certain exceptions where the wearing of facial coverings is permitted for law enforcement officers, these determinations should be made by CBP, not by the Commonwealth of Virginia. CBP is the only authority equipped with the information and expertise to decide whether and when these significant and widespread safety and operational considerations warrant allowing uniform modifications for its personnel.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief. Executed on June 17, 2026.

Justin W. Hargis
Acting Executive Director, Investigative Operations Directorate
Office of Professional Responsibility
U.S. Customs and Border Protection