**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> THE COMMONWEALTH OF VIRGINIA, JAY JONES, in his official capacity as Attorney General of Virginia, and STEVE DESCANO, in his official capacity as Commonwealth Attorney for Fairfax, Virginia, *Defendants*. | Case Number: 3:26-cv-00545-REP |

**DEFENDANTS COMMONWEALTH OF VIRGINIA**
**AND JAY JONES' MEMORANDUM IN OPPOSITION TO**
<u>**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................... 1

BACKGROUND ................................................................................................................................. 2

   I.   The Enactment of the Mask Law ............................................................................................. 2

   II.  Plaintiff's Lawsuit ................................................................................................................... 5

LEGAL STANDARD ......................................................................................................................... 6

   I.   Preliminary Injunction Standard ............................................................................................. 6

   II.  Intergovernmental and Supremacy-Clause Immunity Standard ............................................ 6

ARGUMENT ....................................................................................................................................... 8

   I.   Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits Because the Mask Law Complies Fully with the Supremacy Clause and the Contract Clause .............. 8

      A.  The Mask Law Falls Squarely Within the Commonwealth's Traditional Police Powers ................................................................................................................................. 8

      B.  The Mask Law Does Not Violate Intergovernmental Immunity ...................................... 9

         1.  The Mask Law Does Not Impermissibly Regulate the Federal Government, Its Agencies or Its Officers ............................................................................................... 9

         2.  The Mask Law Does Not Discriminate Against Federal Officers ............................. 13

   II.  Plaintiff Cannot Demonstrate Immediate Irreparable Harm ................................................ 15

   III. The Balance of Equities Weighs Heavily Against a Preliminary Injunction and in Favor of the Commonwealth ............................................................................................. 19

   IV. The Public Interest Strongly Supports Enforcement of the Mask Law .............................. 19

CONCLUSION .................................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aghayeva v. Genalo*,
  No. 1:26-cv-01602 (S.D.N.Y.) ................................................................................. 4

*Clifton v. Cox*,
  549 F.2d 722 (9th Cir. 1977) ............................................................................... 7, 9

*Davis v. Mich. Treasury*,
  489 U.S. 803 (1989) .............................................................................................. 6

*Dawson v. Steager*,
  586 U.S. 171 (2019) ............................................................................................ 13

*Di Biase v. SPX Corp.*,
  872 F.3d 224 (4th Cir. 2017) .................................................................... 15, 19, 20

*Drury v. Lewis*,
  200 U.S. 1 (1906) .................................................................................................. 7

*GEO Group v. Inslee*,
  151 F.4th 1107 (9th Cir. 2025) ........................................................................ 7, 13

*Geo Grp. v. Newsom*,
  50 F.4th 745 (9th Cir. 2022) .................................................................................. 7

*In re Neagle*,
  135 U.S. 1 (1890) .................................................................................................. 9

*Johnson v. Maryland*,
  254 U.S. 51 (1920) ................................................................................................ 7

*Kelley v. Johnson*,
  425 U.S. 238 (1976) ........................................................................................ 8, 11

*Kidd v. Noem*,
  No. 2:20-cv-03512 (C.D. Cal.) ............................................................................. 4

*McHenry Cty. v. Raoul*,
  44 F.4th 581 (7th Cir. 2022) .................................................................................. 7

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977) ............................................................................................ 6

*North Dakota v. United States*,
  495 U.S. 423 (1990) .............................................................................................. 6

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
  872 F.2d 75 (4th Cir. 1989) ............................................................................ 15, 18

*Reich v. Muth*,
   34 F.3d 240 (4th Cir. 1994).................................................................................................. 12

*State v. Ivory*,
   906 F.2d 999 (4th Cir. 1990)............................................................................................. 7, 9

*Texas v. DHS*,
   123 F.4th 186 (5th Cir. 2024)............................................................................................ 6, 9

*Texas v. Kleinert*,
   855 F.3d 305 (5th Cir. 2017)................................................................................................. 7

*United States v. California*,
    173 F.4th 1060 (9th Cir. 2026)........................................................................................... 14

*United States v. Morrison*,
   529 U.S. 598 (2000)........................................................................................................... 6, 8

*United States v. Washington*,
   596 U.S. 832 (2022)....................................................................................................... 6, 10, 1

*USA v. Virginia et al.*,
   No. 3:26-cv-00545 (E.D. Va. June 17, 2026)....................................................................... 13

*Washington v. United States*,
   460 U.S. 536 (1983)......................................................................................................... 7, 13

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008)................................................................................................................... 6

*Winter v. NRDC*,
   555 U.S. 7 (2008)............................................................................................................. 18, 20

*Wreal, LLC v. Amazon.com*,
   840 F.3d 1244 (11th Cir. 2016) ..................................................................................... 15, 18

## Statutes

29 U.S.C. Section 668.................................................................................................................. 12

5 U.S.C. Section 5901............................................................................................................. 11, 12

8 C.F.R. Section 287.8(c)............................................................................................................. 11

California Government Code, Section 7288................................................................................. 14

California Penal Code, Section 13654......................................................................................... 14

Section 19.2-83.6:1, Code of Virginia .................................................................................... 3, 10

Section 9.1-101, Code of Virginia ............................................................................................... 3

**INTRODUCTION**

Across the country, communities have experienced a deepening mistrust of law enforcement as reports have proliferated of masked, unidentified individuals conducting immigration-related operations—often in ways indistinguishable from criminal activity. At the same time, many community members, including U.S. citizens, have been swept into these masked enforcement actions, further heightening fear and eroding confidence in legitimate police activity. These concerns were further intensified by the widely reported killings of U.S. citizens Alex Pretti and Renee Good, incidents that underscored the risks associated with aggressive enforcement tactics and the lack of accountability surrounding them. *See* Rose, Andy, *Calls for Accountability over Feds' Deadly Use of Force in Minneapolis Have Not Relented. Here's Why That's Complicated*, CNN (Feb. 7, 2026), https://www.cnn.com/2026/02/07/us/minneapolis-shootings-federal-officers-accountability.

In the Commonwealth of Virginia, these developments were particularly destabilizing in immigrant neighborhoods, where residents increasingly struggled to distinguish legitimate law enforcement from impersonators and became less willing to report crimes or cooperate with investigations. *See* Schmidt, Markus, *In Newly Democratic Virginia, Immigration Enforcement Becomes Early Test for Spanberger*, Fauquier Now, January 26, 2026, https://www.fauquiernow.com/news/government_politics/in-newly-democratic-virginia-immigration-enforcement-becomes-early-test-for-spanberger/article_0de69c23-e3fc-459b-89e6-56e07bbddf91.html; *see also* Mejia, Freddy, *Safety, Trust, and Affordability: The Real Costs of Federal Immigration Enforcement in Virginia*, The Commonwealth Inst. for Fiscal Analysis (Feb. 18, 2026), https://thecommonwealthinstitute.org/tci_blog/real-costs-federal-immigration-enforcement-virginia/; Dan Herman, Allie Preston, Gréta Bedekovics, Ben Olinsky, Ben Greenho,

1

Rosa Barrientos-Ferrer, Silva Mathema, Debu Gandhi, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025), https://www.americanprogress.org/article/masked-and-unidentifiable-the-risks-of-federal-law-enforcement-operating-without-identification/.

Confronted with these escalating public safety concerns, the General Assembly acted. Virginia Code § 19.2-83.6:1 (the "Mask Law") was enacted to restore clarity, accountability, and public confidence in policing—fundamental responsibilities of state government.  Without developing a factual record, identifying any concrete dispute with a Virginia locality, or presenting evidence of irreparable harm to its immigration enforcement efforts in the Commonwealth—the United States now seeks the extraordinary remedy of a preliminary injunction.  It asks this Court to halt the Commonwealth from exercising core police power functions that belong to the states in our federal system.  Because Plaintiff cannot demonstrate a likelihood of success on the merits, cannot show irreparable harm, and cannot establish that the equities or public interest favor overriding the Commonwealth's considered public safety judgments, its motion should be denied.

**BACKGROUND**

I.    **The Enactment of the Mask Law**

In 2026, the Virginia General Assembly enacted the Mask Law in response to growing public concern about the use of facial coverings and the lack of visible identification by law-enforcement officers operating within the Commonwealth.  *See* S.B. 352, 2024 Gen. Assemb., Reg. Sess. (Va.), Bill Details, Virginia Legislative Information System, https://lis.virginia.gov/bill-details/20261/SB352; *see also* Woolsey, Angela, *JUST IN: Spanberger Signs One Bill to Rein in ICE, Vetoes Another*, FFXnow, May 20, 2026, https://www.ffxnow.com/2026/05/20/just-in-spanberger-signs-one-bill-to-rein-in-ice-vetoes-another/.  The Mask Law provides that "no law-

2

enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while such law enforcement officer is engaged in the performance of his official duties." *See* Va. Code § 19.2-83.6:1(B).  Under the Mask Law, "law enforcement officer" expressly includes federal as well as state and local officers for purposes of the statute's requirements and its exceptions. *See* Va. Code § 19.2-83.6:1(A) ("'Law-enforcement officer' means (i) the same as that term is defined in § 9.1-101 and (ii) any full-time or part-time employee of a federal law-enforcement agency.").  A violation of the Mask Law constitutes a Class 1 misdemeanor unless the agency has adopted the required written policy.  The law takes effect on July 1, 2026.

The General Assembly acted against a national backdrop in which several high-profile federal immigration-enforcement operations drew widespread attention for the use of masked or unidentified officers in civilian settings.  In Portland, Oregon for example, federal personnel wearing tactical gear and face coverings detained individuals in unmarked vans during the 2020 protests, prompting national scrutiny.  *See* Eisner, Chiara, *Trump Administration Relying on Unmarked Vehicles in Immigration Enforcement*, NPR (Oct. 28, 2025), https://www.npr.org/2025/10/28/nx-s1-5587653/trump-administration-relying-on-unmarked-vehicles-in-immigration-enforcement.  In several major cities—including Philadelphia and New York—similar concerns emerged as federal officers conducted street-level arrests while masked or without visible identification.  *See* Leila Fadel, Adam Bearne, Barry Gordemer, H.J. Mai, Masked Immigration Agents Are Spurring Fear and Confusion Across the U.S, NPR (July 10, 2025), https://www.npr.org/2025/07/09/nx-s1-5440311/ice-raids-masked-agents.  At the same time, unrelated impersonators used masks to pose as law-enforcement officers for the purpose of committing crimes, further eroding public trust and creating confusion about who was a legitimate officer.  *Id.*  These widely publicized incidents heightened public unease about the deployment of

unidentifiable federal officers in civilian environments and underscored the risks of confusion, escalation, and lack of accountability during such encounters.

ICE has faced litigation over deceptive arrest tactics, including the use of misleading attire and verbal misrepresentation of agency affiliation. *See* Exhibit A, Expert Rep. and Decl. of Scott Shuchart. In early 2025, ICE settled a class action in *Kidd v. Noem*, No. 2:20-cv-03512 (C.D. Cal.), agreeing that officers in the Central District of California would no longer identify themselves simply as "police" or wear jackets labeled "POLICE" unless "ICE" appeared with equal prominence. *Id*.; *see also* Exhibit B, Class Settlement Agreement and Release. Outside the Central District of California, ICE officers have continued to rely on deceptive tactics to effectuate civil immigration arrests. *See id*. ¶ 17. For example, according to a habeas petition and contemporaneous reporting, ICE officers conducting an arrest operation at Columbia University in February 2026 posed as local police searching for a missing child to gain entry to a university-owned apartment building without a judicial warrant. *See Aghayeva v. Genalo*, No. 1:26-cv-01602 (S.D.N.Y.); *see also* Otterman, Sharon, *Columbia Student Is Released from ICE After Mamdani-Trump Meeting*, N.Y Times, February 26, 2026, https://www.nytimes.com/2026/02/26/nyregion/columbia-university-ice-student.html.

Public concern was further shaped by nationally reported incidents involving ICE enforcement operations that resulted in civilian deaths, including the fatal shooting of Renée Good and Alex Pretti during an ICE-led operation in Minnesota. *See* Michael Biesecker, Jim Mustian, and Sarah Raza, *Minneapolis Mourns ICU Nurse Killed by a Boarder Patrol Agent as a Warmhearted Neighbor and Caregiver*, AP News, January 25, 2026, https://apnews.com/article/shooting-minneapolis-protests-ice-immigration-41437baa4b349279cf8abfaf1076162c.

Although these events occurred outside the Commonwealth, they contributed to a broader climate of mistrust surrounding masked or unidentified federal officers and reinforced legislative concerns about transparency and public safety.  The Mask Law was designed to address those concerns by ensuring that all officers operating in the Commonwealth—including federal personnel—are identifiable and subject to uniform transparency requirements intended to promote safety, accountability, and public confidence.

## II.    Plaintiff's Lawsuit

On June 11, 2026, nearly a month after the Mask Law was signed, Plaintiff filed this action asserting six counts against the Commonwealth of Virginia, the Attorney General of Virginia, Jay Jones, and Fairfax County Commonwealth's Attorney, Steve Descano (collectively, the "Virginia Defendants").  Count I alleges that the Mask Law constitutes an unlawful regulation of the federal government in violation of the Supremacy Clause, and Count II alleges that the Mask Law unlawfully discriminates against the federal government based on the statute's mask-identification provisions.

Counts III through VI concern Plaintiff's challenges to SB 783, raising Contract Clause, preemption, and intergovernmental immunity theories unrelated to the Mask Law and the identification requirements at issue here.  Shortly thereafter—on June 17, 2026, the eve of a federal and state holiday—Plaintiff filed a motion for a preliminary injunction seeking to enjoin enforcement of both statutes pending resolution of this case.  On June 22, 2026, the Court entered an order bifurcating the preliminary injunction briefing and directing that the parties first address only the Mask Law.  Accordingly, this brief addresses solely the Mask Law enacted through SB 352.

**LEGAL STANDARD**

## I.    Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.* 555 U.S. 7, 22 (2008) (citation omitted).  The Court may not grant a preliminary injunction unless a plaintiff establishes that (1) it is likely to succeed on the merits of its claim; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest.  *Id.* at 20.  A plaintiff's burden is particularly heavy in cases seeking to enjoin state statutes because a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined.  *See New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

## II.    Intergovernmental and Supremacy-Clause Immunity Standard

A state regulation violates intergovernmental immunity only if it directly regulates the United States or discriminates against the federal government or its contractors.  *See North Dakota v. United States*, 495 U.S. 423, 435 (1990).  The doctrine protects each sovereign's operations from undue interference, *Davis v. Mich. Treasury*, 489 U.S. 803, 814 (1989), while preserving the States' authority to exercise their own police powers—including core public safety functions the Constitution reserves to them.  *See United States v. Morrison*, 529 U.S. 598, 617 (2000).  States may not control federal operations, *see United States v. Washington*, 596 U.S. 832, 838 (2022), but they may enact neutral laws that incidentally affect federal activity.  *See Texas*, 123 F.4th 186, 205 .

Intergovernmental immunity is violated only when a state law forces the federal government to fundamentally alter or abandon its operations, not when it merely affects the manner in which federal employees carry out their duties. *Compare*, *Geo Grp. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (invalidating law that required federal agency to "entirely transform" its detention operations), with *Geo Grp. v. Inslee*, 151 F.4th 1107, 1118 (9th Cir. 2025) (upholding law that did not prevent federal detention operations); *see also McHenry Cty. v. Raoul*, 44 F.4th 581, 591–92 (7th Cir. 2022) (states may withhold their own resources from federal civil immigration enforcement). Where discrimination is alleged, the doctrine is violated only if the state treats a comparable federal entity less favorably than similarly situated state actors. *See Washington v. United States*, 460 U.S. 536, 544–45 (1983); *Inslee*, 151 F.4th at 1118.

The Mask Law presents a straightforward question: whether a State may apply regulatory and criminal laws to federal officers when they are generally applicable to all law enforcement officers—state, local, and federal. In such cases, courts apply Supremacy Clause immunity—not to exempt federal officers from all state regulation, but to determine whether a specific prosecution is barred because the officer acted within the scope of federal authority. A federal employee "does not secure a general immunity from state law while acting in the course of his employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920); *see also Clifton v. Cox*, 549 F.2d 722, 728–30 (9th Cir. 1977); *Texas v. Kleinert*, 855 F.3d 305, 309 (5th Cir. 2017). Federal officers remain subject to neutral state criminal laws unless their conduct was justified by federal duty. *State v. Ivory*, 906 F.2d 999, 1002–03 (4th Cir. 1990) (rejecting immunity for traffic law violations and reaffirming that routine federal orders cannot create blanket immunity); *Drury v. Lewis*, 200 U.S. 1, 8 (1906).

## ARGUMENT

I. **Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits Because the Mask Law Complies Fully with the Supremacy Clause and the Contract Clause**

A. **The Mask Law Falls Squarely Within the Commonwealth's Traditional Police Powers**

Plaintiff's challenge to the Mask Law is unlikely to succeed on the merits because it falls squarely within the Commonwealth's core police powers to protect public safety, ensure transparent law enforcement practices, and regulate the conduct of officers policing within the Commonwealth. The Supreme Court has long recognized that the States retain primary responsibility for protecting public safety and responding to violent crime. *See Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). The Commonwealth's authority to ensure uniformity, recognizability, and consistency in the appearance of law enforcement officers—core elements of public safety, public trust, and accountability—falls squarely within its traditional police powers. *See Kelley v. Johnson*, 425 U.S. 238, 247–48 (1976) (upholding state authority to regulate officers' appearance and recognizing that uniform, readily identifiable attire is rationally related to legitimate public safety objectives and the public's need to recognize law enforcement personnel). The Commonwealth cannot fulfill those core functions if it cannot identify officers who may commit another crime or otherwise endanger the public safety.

Here, the Mask Law represents precisely the kind of state authority the Tenth Amendment preserves. Regulating how law enforcement officers present themselves to the public and determining when and how state personnel and resources may be used in cooperation with federal immigration enforcement, are classic exercises of the Commonwealth's police power to protect

8

public safety, maintain community trust, and manage its own institutions.  The Mask Law does not intrude on federal prerogatives; they reflect the Commonwealth's sovereign responsibility to structure its own law enforcement apparatus, safeguard its limited resources, and ensure that policing within its borders occurs in a manner that promotes safety, accountability, and public confidence.

Moreover, A federal officer is immune from state prosecution only if he acted within the scope of federal authority and "did no more than what was necessary and proper" to perform his duties, *Ivory*, 906 F.2d at 1002 (citing *In re Neagle*, 135 U.S. 1, 75 (1890)), and only if he held an honest and objectively reasonable belief that his conduct was required by federal law.  *Clifton*, 549 F.2d at 729–30.  The inquiry is therefore twofold: whether the officer honestly believed his conduct was necessary to carry out his federal duties, and whether that belief was objectively reasonable. It is also fact-specific and renders a pre-enforcement challenge unsupportable here.

### B.  The Mask Law Does Not Violate Intergovernmental Immunity

#### 1.  The Mask Law Does Not Impermissibly Regulate the Federal Government, Its Agencies or Its Officers

The Mask Law does not violate the intergovernmental immunity doctrine because it is a legitimate exercise of the Commonwealth's police power that, "at most, only incidentally affects" federal immigration and law enforcement operations. *Texas v. DHS*, 123 F.4th 186, 205 (5th Cir. 2024).  Plaintiff's claim that the Mask Law "controls" federal law enforcement activity is overstated to say the least.

Until very recently, ICE officers in the Commonwealth routinely conducted enforcement operations without masks and with visible identification, fully consistent with what are now the Mask Law's requirements.  And critically, nothing in federal law requires ICE agents to wear masks, nor has Congress enacted any statute that occupies or controls the field of officer attire with

respect to face coverings.  The federal government's own regulations leave mask wearing entirely discretionary, confirming that this is not a federally protected operational necessity but merely a policy preference.

In response to widespread public criticism of the manner in which federal immigration enforcement has been carried out throughout the country—often perceived as unnecessarily aggressive, reckless, and destabilizing to communities—the United States now seeks to conceal its officers' identities.  But a federal agency's desire to shield its personnel from public scrutiny cannot override a neutral state law that falls squarely within the Commonwealth's police power to ensure public safety, promote transparency in law enforcement encounters, and protect residents from unidentifiable armed officers operating in their neighborhoods.

The statute regulates face coverings and identification practices that are merely incidental to federal officers' duties—not core operational functions.  *See* Va. Code §§ 19.2-83.6:1(B). Because the Mask Law does not "interfer[e] with or control[] the operations of the Federal Government," *Washington*, 596 U.S. at 838, but instead imposes neutral, generally applicable safety and accountability rules, it does not amount to an unconstitutional direct regulation.

The Mask Law's requirement that officers identify themselves during law enforcement encounters likewise does not regulate federal operations.  *See* Va. Code §§ 19.2-83.6:1(B). Identification is a standard feature of policing, and requiring officers to identify themselves does not "prevent" federal enforcement.  The Mask Law applies uniformly to all law-enforcement officers operating within the Commonwealth, regardless of whether they are state, local, or federal. Thus, the statute is not discriminatory; it imposes the same requirements on all law-enforcement officers and agencies operating within the Commonwealth.

It does not dictate how federal officers conduct arrests, detentions, or tactical operations, and it does not impede ICE operations in any way.  Nor does it override federal standards or impose conflicting obligations.  The Mask Law simply ensures that officers interacting with Virginians are identifiable and accountable—an interest firmly within the Commonwealth's police powers.  *See, e.g., Kelley*, 425 U.S. at 247–48 (recognizing that uniformity and similarity in officers' appearance serve the legitimate state interest of making law-enforcement personnel "readily recognizable to the public," and holding that such appearance-based regulations are rationally related to public-safety objectives).  Ensuring that officers are visibly identifiable to the public promotes the very accountability and transparency that *Kelley* recognized as essential to legitimate law enforcement authority.  And that visibility, in turn, strengthens public trust—an indispensable component of maintaining law and order, encouraging community cooperation, and ensuring that residents feel safe reporting crimes and engaging with law enforcement.

The widespread use of masks and the removal of identifiers by ICE and CBP officers is a recent, ad hoc departure from longstanding federal practice, beginning only in 2025, *see* Expert Rep. and Decl. of Scott Shuchart ¶¶ 24–25, unsupported by any written federal policy, *id*. ¶ 37, and inconsistent with the historical requirement that officers display visible credentials and clearly marked attire, *id*. ¶ 18, as well as the uniform and identifier rules used by CBP and virtually every state and local law-enforcement agency, *id*. ¶¶ 18–20.  Federal regulations already require immigration officers to identify themselves "as soon as it is practical and safe to do so," 8 C.F.R. § 287.8(c), leaving no basis for DOJ's claim that officers have broad discretion to conceal their identities.  The Mask Law therefore does not impose a new qualification on federal officers; it simply restores the transparency and identifiability that federal agencies themselves historically required.

11

Plaintiff's fallback argument—that federal statutes governing "uniforms" preempt the Mask Law—fares no better.  In its Complaint, Plaintiff cites 5 U.S.C. § 5901, but that statute is a uniform allowance provision.  Its title says so.  Its text confirms it.  Section 5901 authorizes agencies to *furnish* a uniform or *pay* a uniform allowance up to a capped amount.  *See* 5 U.S.C. § 5901(a)(1)–(2) "Uniform Allowances" (permitting agency heads, "on a showing of necessity or desirability," to provide uniforms or pay employees "an allowance … not to exceed $400 a year").  It is a budgeting statute, not a preemptive regulation dictating what federal law-enforcement officers must wear when conducting policing activities within a State.  There is no conflict preemption.  Nothing in § 5901 defines a uniform, prescribes its components, or mandates the use of masks. Nor is there field preemption because nowhere does the statute indicate that Congress intended to occupy the field of how officers must present themselves while performing enforcement duties, or to make any judgment about identity-concealing attire.  Section 5901 does not address what federal officers must wear in a manner that would displace the Commonwealth's traditional authority to ensure that officers engaged in public-facing duties within its borders are visibly identifiable.

Plaintiff's reliance on 29 U.S.C. § 668 is even farther afield.  Section 668 is an OSHA related workplace safety statute.  As the Fourth Circuit explained in *Reich v. Muth*, 34 F.3d 240, 245 (4th Cir. 1994), § 668 authorizes the Secretary of Labor to coordinate federal agencies' occupational safety programs and investigate unsafe, hazardous, or unhealthy workplace conditions.  It regulates employer programs designed to address workplace hazards, not uniforms, masks, identification, or public facing attire.  Nothing in § 668 suggests that identity concealing masks qualify as "personal protective equipment," and the statute's focus on hazardous working conditions confirms that it does not grant federal agencies exclusive authority over how officers

12

present themselves to the public.  The Mask Law does not regulate workplace safety; it regulates only the public facing conduct of law enforcement encounters.  And there is no evidence—none— that ICE officers in the Commonwealth face any workplace hazard that would require identity concealing masks while carrying out their immigration enforcement efforts.

Plaintiff's own declarations describe incidents in other states, under different circumstances, none tied to the Mask Law or to any hazard present in the Commonwealth.  The Mask Law does not intrude into any field Congress has occupied; it simply governs the public facing conduct of all officers operating within the Commonwealth.

### 2.  The Mask Law Does Not Discriminate Against Federal Officers

Intergovernmental immunity prohibits discrimination when a state "treats someone else better than it treats [the federal government]." *Washington v. United States*, 460 U.S. 536, 544–45 (1983).  And discrimination exists only when a state treats a state entity more favorably than a comparable federal entity.  *Inslee*, 151 F.4th 1107, 1118 (citing *Dawson v. Steager*, 586 U.S. 171, 175–76 (2019)).

Plaintiff argues that the Mask Law discriminates against federal officers because, in its view, the statute's drug enforcement exception does not include federal officers and agencies.  *See* Pl.'s Compl. ¶¶ 59-63, *USA v. Virginia et al.*, No. 3:26-cv-00545 (E.D. Va. June 17, 2026).  As the federal government put it, "[the statute's] definition of 'law-enforcement agency' appears to exclude federal law enforcement agencies, as confirmed by the law's other uses of 'federal law-enforcement agency' when defining 'Law-enforcement officer' and 'agency' when describing the motorcycle helmet exception to the facial covering ban." Pl.'s Mem. in Supp. of Prelim. Inj. at 5, *USA v. Virginia et al.*, No. 3:26-cv-00545 (E.D. Va. June 17, 2026).

That reading is incorrect.  The Mask Law expressly applies to "any officer acting under color of federal, state, or local law" and prohibits "any such officer" from engaging in the regulated

13

conduct. By its plain terms, the statute regulates all officers—federal, state, and local—whenever they act under color of law. Because the Mask Law imposes identical obligations on every category of officer, it does not single out, disadvantage, or discriminate against federal personnel in any way. Thus, to the extent the federal government's declarants "understand" they are not subject to the same exceptions as state and local officers, *see* Decl. of Matthew Allen ¶ 18 (ECF 9-2), they are plain wrong.

The federal government relies exclusively on one case to establish its likelihood of success, but that case is distinguishable. The California laws at issue in *United States v. California*, 173 F.4th 1060 (9th Cir. 2026), on which Plaintiff mistakenly relies, were nothing like the Mask Law. There, California enacted S.B. 805 (the No Vigilantes Act), which expressly targeted federal officers, treated them differently, and directly regulated federal law-enforcement operations. *Id.* at 1064 (determining that the statute's definition of "law enforcement officer" applied *exclusively* to federal law-enforcement officers). Section 10 of that Act, codified at Cal. Penal Code § 13654, required any non-uniformed "federal law enforcement officer" operating in the State to "visibly display identification" including "their agency and either a name or badge number," and made a "willful and knowing violation" a state misdemeanor. *See California*, 173 F.4th at 1064–65. Section 2, codified at Cal. Gov't Code § 7288, went further by compelling every federal law-enforcement agency to "maintain and publicly post a written policy" mandating visible identification for "all sworn personnel," subject only to "narrowly tailored exemptions." *Id*. at 1065–66. The court held that these provisions "*purport*[] to override the federal government's power to determine whether, how, and when to publicly identify its officers," and therefore "attempt[] to directly regulate the United States in its performance of governmental functions." *Id*. at 1063, 1067.

14

The Mask Law bears no resemblance to that regime.  Unlike the law in California, it does not single out federal officers; it applies equally to all law-enforcement personnel operating in the Commonwealth, regardless of employer.  It does not compel any federal agency to adopt a policy, impose any qualification unique to federal personnel, or dictate how the United States must structure or carry out its law-enforcement operations. Federal agencies certainly *may* adopt compliant policies that comport with the Mask Law—on which the Department of Criminal Justice Services soon will provide a model, but that is not a requirement.  Instead, the Mask Law regulates only the public-facing conduct of officers during encounters with civilians—ensuring that any person exercising police authority in the Commonwealth is identifiable and accountable.

## II.    Plaintiff Cannot Demonstrate Immediate Irreparable Harm

A preliminary injunction requires a "clear showing" of immediate and irreparable harm—not speculation or self-inflicted injury.  *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 79–80 (4th Cir. 1989) (affirming denial of preliminary injunction where plaintiffs waited months before seeking relief, and their delay—creating avoidable disruption and cost—showed no "immediate" irreparable harm warranting extraordinary equitable intervention); *see also Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm.  A preliminary injunction requires showing 'imminent' irreparable harm."); *Di Biase v. SPX Corp.*, 872 F.3d 224, 235-36 (4th Cir. 2017) (denying preliminary injunction and finding no irreparable harm where the "moving parties have not shown that they availed themselves of opportunities to avoid the injuries of which they now complain").  The Court evaluates delay in seeking a preliminary injunction by examining how the movant's lack of prompt action undermines any claim of immediate irreparable harm, and by weighing that prejudice

against the harm or disruption an injunction would impose on the defendants. *Hodel*, 872 F.2d at 79.

Plaintiff cannot meet that standard here. It identifies no concrete, imminent harm arising from the Mask Law. As explained above, nothing in the Mask Law's identification requirements creates a demonstrated safety risk to federal officers. Federal immigration authorities remain fully able to enforce federal law in the Commonwealth, and the Mask Law does not prevent them from doing so.

Unable to show actual harm, the federal government relies on a set of last-minute declarations that are conclusory, speculative, and untested. For example, although ICE official Erik S. Weiss cites Virginia specific incidents—such as protesters photographing officers outside the Richmond field office or Fairfax County's past decisions not to honor detainers—those episodes do not show that the Mask Law will cause *immediate* or *irreparable* harm. *See* Decl. of Erik S. Weiss (ECF 9-1). The federal government has not cited a single safety issue arising from the photographs and it has given absolutely no connection between failure to honor detainers and the need to conceal the identities of law enforcement officers. Thus, they are either unrelated to the challenged statutes, speculative predictions about future enforcement choices, or discretionary actions by local officials, and therefore cannot satisfy the requirement of demonstrating a certain, imminent, and non-remediable injury.

Additionally, Matthew W. Allen of the Drug Enforcement Administration asserts that the Mask Law would endanger agents, but identifies no instance in the Commonwealth where an officer was harmed because they were required to display identification or refrain from wearing a mask, relying instead on generalized concerns and a single unrelated social-media incident in Minnesota. *See* Decl. of Matthew W. Allen (ECF 9-2). Similarly, Ian Kaufmann, from the Federal

Bureau of Investigation, claims that showing an agent's face or name "could" lead to threats, yet cited no Virginia examples and ignores the Mask Law's explicit exceptions for undercover and surveillance operations.  *See* Decl. of Ian Kaufmann (ECF 9-3).

The declaration submitted by Justin Hargis provides the most detailed account of doxxing incidents identified by DHS, but every example occurred outside the Commonwealth and none involved the Mask Law's identification requirement.  *See* Decl. of Justin Hargis (ECF 9-4).  DHS also cited a purported "1000% increase" in assaults on ICE officers as evidence of rising threats, yet available data shows that referrals for prosecution in 2025 were approximately twice as high as the previous peak in 2019—reflecting an internal push to increase referrals rather than a documented surge in violent incidents.  *See* Expert Rep. and Decl. of Scott Shuchart ¶ 27.  There is no known instance of a federal officer being physically attacked due to doxxing, *id*. ¶ 28, and subsequent case outcomes indicate that many referrals categorized as "assaults" were later dismissed, declined by grand juries, or resulted in acquittals after video evidence or witness accounts did not support the initial allegations.  *See* W. Sytsma & N. Schwellenbach, "DHS Assault Cases Spiked to a Record High," Project on Government Oversight (Feb. 24, 2026), https://www.pogo.org/investigates/dhs-assault-cases-spiked-to-a-record-high-experts-and-judges-have-raised-alarms.  Judges in multiple districts have noted unusually high dismissal rates in these matters and have described several Section 111 referrals as premature or unsupported by sufficient evidence, underscoring that the numerical increases cited by DHS do not reflect a corresponding rise in verified assaults on federal officers.  *Id.*

Across all four declarations, the same flaw persists: even where they reference isolated events in the Commonwealth, none connects those incidents to the Mask Law or shows that the law will imminently impede federal operations.  Instead, they rely on generalized perceived risks,

17

past or out-of-state episodes, and speculative predictions—not the certain, immediate, and non-remediable injury required for a preliminary injunction. *See Winter v. NRDC*, 555 U.S. 7, 22 (2008) ("possibility" of harm is insufficient).   Taken together, the declarations describe speculative, generalized risks and out-of-state events—not concrete, imminent harm tied to the Mask Law.

The federal government's delay further undermines any claim of urgency.  The Mask Law was enacted more than a month ago. The General Assembly passed it and sent it to the Governor over two months ago. Yet the federal government waited until the eve of its effective date to file suit—timing that ensured the Commonwealth would have only days, interrupted by a federal and state holiday weekend, to respond.  When a party waits until the last minute before seeking emergency relief, that delay "undercuts any presumption of irreparable injury." *Hodel*, 872 F.2d at 80; *Wreal*, 840 F.3d at 1248.

In addition to undermining any claim of immediacy, the federal government's delay has materially prejudiced the Virginia Defendants.  By waiting until the eve of the statutes' effective dates to seek emergency relief, the federal government required the Commonwealth to respond on an exceptionally compressed schedule—over a holiday weekend and without a practical opportunity to develop a fuller evidentiary record or meaningfully test the federal government's assertions.  This is precisely the type of prejudice courts consider when evaluating delay, as the movant's lack of prompt action not only weakens any showing of irreparable harm but also increases the burden and disruption an injunction would impose on the defendants.  *See, e.g.*, *Hodel*, 872 F.2d at 79–80 (explaining that delay in seeking a preliminary injunction—especially where it prejudices defendants—must be weighed in assessing irreparable harm and can undermine any showing of immediacy).

18

Plaintiff's own conduct demonstrates that no immediate irreparable harm exists.  Its delay, its reliance on conclusory and speculative declarations, and its strategic timing all confirm that the claimed harms are neither imminent nor irreparable.  The extraordinary remedy of a preliminary injunction is therefore unwarranted.

**III.   The Balance of Equities Weighs Heavily Against a Preliminary Injunction and in Favor of the Commonwealth**

A preliminary injunction is unwarranted where the balance of equities favors the nonmovant and weighs against disrupting the status quo.  *See Di Biase*, 872 F.3d at 235–36 (affirming denial of preliminary injunction where the balance of equities favored the nonmovant and weighed against disrupting the status quo).   Here, the equities strongly favor allowing the Mask Law to take effect.  Enjoining the Mask Law would undermine core public safety interests by permitting unidentified, masked individuals to conduct enforcement actions in communities throughout the Commonwealth—creating confusion, facilitating impersonation, and eroding the transparency essential to effective policing.  For decades, federal immigration authorities and other federal law enforcement agents operated in the Commonwealth without masks, anonymity, or any claim that officer safety required concealing identities; the United States' recent, unexplained shift toward masked civil immigration enforcement does not strengthen its position.   The Commonwealth's interest in restoring accountability and maintaining community trust outweighs Plaintiff's speculative and unsubstantiated assertions of harm.

The balance of equities therefore weighs decisively against the extraordinary remedy of a preliminary injunction.

19

**IV.    The Public Interest Strongly Supports Enforcement of the Mask Law**

A preliminary injunction should be denied where the public interest favors allowing the dispute to proceed to a full merits determination rather than disrupting the status quo through emergency relief.  *Di Biase*, 872 F.3d at 224, 235–36 (concluding that the public interest favored denying preliminary injunctive relief and allowing the case to proceed to a merits determination). The public interest strongly supports that outcome here.  The Mask Law advances core state interests in public safety, transparency, and accountability by ensuring that individuals exercising police authority can be readily identified—interests squarely within the Commonwealth's police power.  It also safeguards the integrity of the Commonwealth's criminal justice system by reducing confusion about the respective roles of state and federal officers and by preventing the erosion of community trust that can result when law enforcement personnel operate anonymously.

The Mask Law is in the public interest because the shift to masked, unidentifiable officers has produced real, documented risks: heightened hostility and confusion during encounters, *see* Expert Rep. and Decl. of Scott Shuchart ¶¶ 11, 16, 34, a "paramilitary" atmosphere that erodes public trust, *id*. ¶ 35, and a 600% increase in impersonation crimes by individuals posing as immigration agents *id*. ¶ 41.  Masks also impede nonverbal communication, facial expression, and clarity of speech—critical tools for de-escalation and for calming already tense encounters, especially when interacting with hearing-impaired or limited-English-proficient individuals *id*. ¶ 38.  Masking further increases the risk that federal officers will be mistaken for criminal actors by civilians or other law enforcement agencies *id*. ¶ 42.  These facts demonstrate that the Mask Law enhances, rather than threatens, public and officer safety.  Because the harms DOJ asserts are neither imminent nor irreparable, and because the Mask Law aligns with longstanding norms rather than regulating federal functions, enforcement of the Mask Law is in the public interest, and this *Winter* factor weighs in favor of the Virginia Defendants.

20

When weighed against the Commonwealth's substantial public-safety and governance interests, Plaintiff's conjectural concerns cannot justify the extraordinary remedy of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be denied.

Respectfully Submitted,

Dated: June 24, 2026

**RESPECTFULLY SUBMITTED,**

**THE COMMONWEALTH OF VIRGINIA** and **JAY JONES**, in his official capacity as Attorney General of Virginia

By: */s/ Triston Chase O'Savio*
Triston Chase O'Savio (VSB # 100111)
*Assistant Solicitor General*

Jay Jones
  *Attorney General*

Tillman J. Breckenridge (VSB #84657)
    *Solicitor General*
Gretchen Ellen Nygaard (VSB No. 82475)
    *Deputy Attorney General*
Triston Chase O'Savio (VSB #100111)
    *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

21

## CERTIFICATE OF SERVICE

I, Triston Chase O'Savio,  hereby certify that on June 24, 2026, I electronically filed the

foregoing Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction with the

Clerk of Court using the CM/ECF system.

GERARD MENE
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov

ALESSANDRA FASO
Senior Litigation Counsel
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Telephone: 202-451-7728
Alessandra.faso@usdoj.gov

/s/ Triston Chase O'Savio
Triston Chase O'Savio, Esq.