# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

THE UNITED STATES OF AMERICA,

 *Plaintiff*,

  v.

THE COMMONWEALTH OF VIRGINIA,
JAY JONES, in his official capacity as
Attorney General of Virginia, and STEVE
DESCANO, in his official capacity as
Commonwealth Attorney for Fairfax, Virginia,
 *Defendants*.

Case Number: 3:26-cv-00545-REP

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO STAY ORDER GRANTING THE UNITED STATES' MOTION
FOR PRELIMINARY INJUNCTION AND ENJOINING ATTORNEY
<u>GENERAL JAY JONES FROM ENFORCING SB 352 PENDING APPEAL</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ....................................................................................................... 1

BACKGROUND .......................................................................................................... 3

    I.   The Enactment of the Mask Law ................................................................... 3

    II.  Plaintiff's Lawsuit.......................................................................................... 5

LEGAL STANDARD ................................................................................................... 6

ARGUMENT ................................................................................................................ 6

    I.   Virginia is Likely to Succeed on the Merits on Appeal ..................................... 7

       A.  The Mask Law Falls Squarely Within the Commonwealth's Traditional Police Powers.................................................................................................. 7

       B.  The Mask Law Does Not Violate Intergovernmental Immunity ..................................... 8

          1.  The Mask Law Does Not Impermissibly Regulate the Federal Government, Its Agencies or Its Officers ................................................................................. 8

    II.  Virginia Will Suffer Irreparable Harm If A Stay is Not Granted .......................................11

       A.  Irreparable Injury Caused by Enjoining Enforcement of the Mask Law..........................11

       B.  Uneven Evidentiary Treatment Inflicts Irreparable Harm on the Commonwealth .................................................................................................. 13

    III.  The Federal Government Will Not Be Substantially Harmed by the Stay ....................... 14

    IV.  The Public Interest Strongly Favors Staying the Injunction Pending Appeal .................. 16

CONCLUSION............................................................................................................... 18

CERTIFICATE OF SERVICE....................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Aghayeva v. Genalo*,
No. 1:26-cv-01602 (S.D.N.Y.) ................................................................. 5

*Coler v. Draper,*
No. WDQ-12-2020, 2012 U.S. Dist. LEXIS 152476, 2012 WL 5267436 (D.
Md. Oct. 23, 2012) ................................................................. 6

*Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship,*
188 B.R. 205 (W.D.Va. 1995) ................................................................. 6

*De Buono v. Nysa-Ila Med. & Clinical Servs. Fund*,
520 U.S. 806 (1997) ................................................................. 11, 13

*Johnson v. Maryland*,
254 U.S. 51 (1920) ................................................................. 10

*Kelley v. Johnson*,
425 U.S. 238 (1976) ................................................................. 7, 9, 10

*Long v. Robinson,*
432 F.2d 977 (4th Cir. 1970) ................................................................. 6

*McCulloch v. Maryland*,
17 U.S. 316 (1819) ................................................................. 8

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) ................................................................. 11, 13

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) ................................................................. 8

*United States Morrison*,
529 U.S. 598 (2000) ................................................................. 7

*United States v. Virginia*,
139 F.3d 984 (4th Cir. 1998) ................................................................. 2, 11

*United States v. Washington*,
596 U.S. 832 (2022) ................................................................. 8, 9

**Statutes**

Section 19.2-83.6:1, Code of Virginia ................................................................. 1, 4, 10

Section 9.1-101, Code of Virginia ................................................................. 3

## INTRODUCTION

Virginia Attorney General Jay Jones respectfully requests that this Court issue a stay pending appeal of its Order granting the United States' Motion for a Preliminary Injunction enjoining the Commonwealth from enforcing SB 352. *See* ECF No. 8; *see* Fed. R. Civ. P. 62(d). Enacted on March 31, 2026, SB 352 (the "Mask Law") requires all law-enforcement officers to remove face coverings during encounters and to provide identifying information—including name and badge number—whenever they engage in policing or other public-facing law-enforcement activities within the Commonwealth. *See* Virginia Code § 19.2-83.6:1. The law would have gone into effect on July 1, 2026.

This Court should exercise its discretion to stay the preliminary injunction pending appeal. The Attorney General is likely to show that a preliminary injunction was unwarranted, and without a stay the Commonwealth will face immediate and irreparable harm. Enjoining enforcement of the Mask Law would allow officers to continue concealing their identities in ways that create confusion, prevent accountability for violations of law, enable impersonation, and erode public trust, while preventing Virginia from promoting accountability in its policing activities. A stay therefore serves the Commonwealth's best interests. This case presents difficult and genuinely novel questions at the intersection of intergovernmental immunity and traditional state police powers, and reasonable minds could—and already have—differed on how those principles apply.

The procedural posture leading to the injunction further underscores the need for a stay. The federal government had months to prepare its evidentiary submissions and, by its own account, three weeks to obtain declarations from federal employees. The Commonwealth, by contrast, was afforded only three business days to respond. The Court nonetheless credited the federal declarations while finding Virginia's counter-declaration insufficient, and it noted that Virginia

1

could have obtained additional time by agreeing not to enforce its own statute. Respectfully, that left the Commonwealth with no meaningful choice: either suspend enforcement of a duly enacted law or proceed on an undeveloped record.

Substantively, the district court construed the Mask Law as regulating federal operations, yet the statute does not regulate the federal government, intrude into any federal domain, or conflict with any existing federal mandate. It is a neutral, evenhanded exercise of Virginia's core police authority governing how all law-enforcement officers—state, local, and federal—present themselves during public-facing encounters within the Commonwealth. By establishing uniform identification practices that reduce confusion, prevent impersonation, and promote accountability, the Mask Law supports the Commonwealth's ability to oversee policing practices conducted within Virginia without imposing any burden on federal prerogatives or federally protected operations.

Virginia has a compelling and well-recognized interest in promoting transparency, accountability, and public trust in policing. Requiring officers to refrain from concealing their faces during public-facing enforcement is a neutral, evenhanded measure directed at the conduct of *all* officers operating in Virginia, whether state, local, or federal. And unlike the statutes at issue in *United States v. Washington*, *United States v. California*, *United States v. Alabama*, or *United States v. Virginia*, there is no federal mandate, qualification, entitlement, or authorization governing the use of masks by federal officers in routine enforcement operations. Because federal law does not grant federal officers any right to conceal their faces during ordinary enforcement activity, the Mask Law does not regulate federal operations—it simply applies a uniform public-facing rule to everyone acting as law enforcement within the Commonwealth.

For these reasons, the Commonwealth respectfully requests that this Court stay its order enjoining the Attorney General from enforcing the Mask Law.

**<u>BACKGROUND</u>**

Across the country, communities have experienced a deepening mistrust of law enforcement as reports have proliferated of masked, unidentified individuals conducting immigration-related operations—often in ways indistinguishable from criminal activity. At the same time, many community members, including U.S. citizens, have been swept into these masked enforcement actions, further heightening fear and eroding confidence in legitimate police activity. These concerns were further intensified by the widely reported killings of U.S. citizens Alex Pretti and Renée Good, incidents that underscored the risks associated with aggressive enforcement tactics and the lack of accountability surrounding them. *See* Exhibit A.

In the Commonwealth of Virginia, these developments were particularly destabilizing in immigrant neighborhoods, where residents increasingly struggled to distinguish legitimate law enforcement from impersonators and became less willing to report crimes or cooperate with investigations. *See* Exhibit B; *see also* Exhibit C and Exhibit D.

I. **The Enactment of the Mask Law**

In 2026, the Virginia General Assembly enacted the Mask Law in response to growing public concern about the use of facial coverings and the lack of visible identification by law-enforcement officers operating within the Commonwealth. *See* Exhibit E.; *see also* Exhibit F. The Mask Law provides that "no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while such law enforcement officer is engaged in the performance of his official duties." *See* Va. Code § 19.2-83.6:1(B). Under the Mask Law, "law enforcement officer" expressly includes federal as well as state and local officers for purposes of the statute's requirements and its exceptions. *See* Va. Code § 19.2-83.6:1(A) ("'Law-

enforcement officer' means (i) the same as that term is defined in § 9.1-101 and (ii) any full-time or part-time employee of a federal law-enforcement agency."). A violation of the Mask Law constitutes a Class 1 misdemeanor unless the agency has adopted the required written policy. The law takes effect on July 1, 2026.

The General Assembly acted against a national backdrop in which several high-profile federal immigration-enforcement operations drew widespread attention for the use of masked or unidentified officers in civilian settings. In Portland, Oregon for example, federal personnel wearing tactical gear and face coverings detained individuals in unmarked vans during the 2020 protests, prompting national scrutiny. *See* Exhibit G. In several major cities—including Philadelphia and New York—similar concerns emerged as federal officers conducted street-level arrests while masked or without visible identification. *See* Exhibit H. At the same time, unrelated impersonators used masks to pose as law-enforcement officers for the purpose of committing crimes, further eroding public trust and creating confusion about who was a legitimate officer. *Id.* These widely publicized incidents heightened public unease about the deployment of unidentifiable officers in civilian environments and underscored the risks of confusion, escalation, and lack of accountability during such encounters.

ICE has faced litigation over deceptive arrest tactics, including the use of misleading attire and verbal misrepresentation of agency affiliation. *See* Exhibit I, Expert Rep. and Decl. of Scott Shuchart. In early 2025, ICE settled a class action in *Kidd v. Noem*, No. 2:20-cv-03512 (C.D. Cal.), agreeing that officers in the Central District of California would no longer identify themselves simply as "police" or wear jackets labeled "POLICE" unless "ICE" appeared with equal prominence. *Id.*; *see also* Exhibit B, Class Settlement Agreement and Release. Outside the Central District of California, ICE officers have continued to rely on deceptive tactics to effectuate

4

civil immigration arrests. *See id*. ¶ 17. For example, according to a habeas petition and contemporaneous reporting, ICE officers conducting an arrest operation at Columbia University in February 2026 posed as local police searching for a missing child to gain entry to a university-owned apartment building without a judicial warrant. *See Aghayeva v. Genalo*, No. 1:26-cv-01602 (S.D.N.Y.); *see also* Exhibit J.

Public concern was further shaped by nationally reported incidents involving ICE enforcement operations that resulted in civilian deaths, including the fatal shooting of Renée Good and Alex Pretti during an ICE-led operation in Minnesota. *See* Exhibit K.

Although these events occurred outside the Commonwealth, they contributed to a broader climate of mistrust surrounding masked or unidentified officers and reinforced legislative concerns about transparency and public safety. The Mask Law was designed to address those concerns by ensuring that all officers operating in the Commonwealth are identifiable and subject to uniform transparency requirements intended to promote safety, accountability, and public confidence.

## II. Plaintiff's Lawsuit

On June 11, 2026, nearly a month after the Mask Law was signed, Plaintiff filed this action asserting six counts against the Commonwealth of Virginia, the Attorney General of Virginia, Jay Jones, and Fairfax County Commonwealth's Attorney, Steve Descano (collectively, the "Virginia Defendants"). Count I alleges that the Mask Law constitutes an unlawful regulation of the federal government in violation of the Supremacy Clause and Count II alleges that the Mask Law unlawfully discriminates against the federal government based on the statute's mask-identification provisions.

Counts III through VI concern Plaintiff's challenges to SB 783, raising Contract Clause, preemption, and intergovernmental immunity theories unrelated to the Mask Law and the

identification requirements at issue here. Shortly thereafter—on June 17, 2026, the eve of a federal and state holiday—Plaintiff filed a motion for a preliminary injunction seeking to enjoin enforcement of both statutes pending resolution of this case. On June 22, 2026, the Court entered an order bifurcating the preliminary injunction briefing and directing that the parties first address only the Mask Law with any evidence and briefing due the following day.

On June 29, 2026, the Court had a hearing to hear argument regarding the Preliminary Injunction pertaining to the Mask Law. On June 30, 2026, the Court granted Plaintiff's preliminary injunction enjoining the Attorney General from enforcing the mask law on federal officers while they conduct policing and public-facing law enforcement activities within the Commonwealth.

## **LEGAL STANDARD**

The Court applies the same standard for a stay pending appeal as for a preliminary injunction. *Coler v. Draper,* No. WDQ-12-2020, 2012 U.S. Dist. LEXIS 152476, 2012 WL 5267436, at *3 (D. Md. Oct. 23, 2012); *Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship,* 188 B.R. 205, 208 (W.D.Va. 1995) (quoting *Long v. Robinson,* 432 F.2d 977 (4th Cir. 1970)). The Fourth Circuit applies a straightforward four-part standard for a stay pending appeal: the movant must demonstrate "(1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).

## **ARGUMENT**

The preliminary injunction should be stayed pending appeal. The equities strongly favor the Commonwealth, and Virginia is at least reasonably likely to succeed on the merits—indeed, this is precisely the kind of case where reasonable jurists can disagree. The dispute presents a

6

novel and unsettled federalism question: how far the federal government may go in displacing a neutral, traditional state public-safety regulation governing policing practices within the Commonwealth. The Mask Law should be permitted to take effect while that important constitutional question is resolved on appeal, rather than suspended through an extraordinary remedy that rests on contested legal premises.

## I. Virginia is Likely to Succeed on the Merits on Appeal

### A. The Mask Law Falls Squarely Within the Commonwealth's Traditional Police Powers

Virginia's Mask Law is a core police power that is designed to protect public safety, ensure transparent law enforcement practices, and regulate the conduct of officers policing within the Commonwealth. The Supreme Court has long recognized that the States retain primary responsibility for protecting public safety and responding to violent crime. *See United States Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). The Commonwealth's authority to ensure uniformity, recognizability, and consistency in the appearance of law enforcement officers—core elements of public safety, public trust, and accountability—falls squarely within its traditional police powers. *See Kelley v. Johnson*, 425 U.S. 238, 247–48 (1976) (upholding state authority to regulate officers' appearance and recognizing that uniform, readily identifiable attire is rationally related to legitimate public safety objectives and the public's need to recognize law enforcement personnel). The Commonwealth cannot fulfill those core functions if it cannot identify officers who may commit another crime or otherwise endanger the public safety.

Here, the Mask Law represents precisely the kind of state authority the Tenth Amendment preserves. Regulating how law enforcement officers present themselves to the public and

determining when and how state personnel and resources may be used in cooperation with federal immigration enforcement, are classic exercises of the Commonwealth's police power to protect public safety, maintain community trust, and manage its own institutions. The Mask Law does not intrude on federal prerogatives; they reflect the Commonwealth's sovereign responsibility to structure its own law enforcement apparatus and ensure that policing within its borders occurs in a manner that promotes safety, accountability, and public confidence.

**B. The Mask Law Does Not Violate Intergovernmental Immunity**

**1. The Mask Law Does Not Impermissibly Regulate the Federal Government, Its Agencies or Its Officers**

Under the Supremacy Clause, States may not control the operations of the federal government, a principle long recognized as the foundation of the intergovernmental-immunity doctrine. *McCulloch v. Maryland*, 17 U.S. 316, 435 (1819). That doctrine prohibits States from either directly regulating the federal government or discriminating against it. *United States v. Washington*, 596 U.S. 832, 838–39 (2022). The United States contends that Virginia's Mask Law directly regulates ICE's enforcement of federal immigration laws. But this is simply not the case.

Nothing in federal law requires ICE agents to wear masks, nor has Congress enacted any statute that occupies or controls the field of officer attire with respect to face coverings. The federal government's own regulations leave mask wearing entirely discretionary, confirming that this is not a federally protected operational necessity but merely a policy preference. The Mask Law does not violate the intergovernmental immunity doctrine because it is a legitimate exercise of the Commonwealth's police power that, "at most, only incidentally affects" federal immigration and law enforcement operations. *Texas v. DHS*, 123 F.4th 186, 205 (5th Cir. 2024).

In response to widespread public criticism of the manner in which federal immigration enforcement has been carried out throughout the country—often perceived as unnecessarily

aggressive, reckless, and destabilizing to communities—the United States now seeks to conceal its officers' identities. But a federal agency's desire to shield its personnel from public scrutiny cannot override a neutral state law that falls squarely within the Commonwealth's police power to ensure public safety, promote transparency in law enforcement encounters, and protect residents from unidentifiable armed officers operating in their neighborhoods.

The statute regulates face coverings and identification practices that are merely incidental to federal officers' duties—not core operational functions. *See* Va. Code §§ 19.2-83.6:1(B). Because the Mask Law does not "interfer[e] with or control[] the operations of the Federal Government," *Washington*, 596 U.S. at 838, but instead imposes neutral, generally applicable safety and accountability rules, it does not amount to an unconstitutional direct regulation.

The statute's requirement that officers identify themselves during law enforcement encounters likewise does not regulate federal operations. *See* Va. Code §§ 19.2-83.6:1(B). Identification is a standard feature of policing, and requiring officers to identify themselves does not "prevent" federal enforcement.

The Mask Law does not dictate how federal officers conduct arrests, detentions, or tactical operations, and it does not impede ICE operations in any way. Nor does it override federal standards or impose conflicting obligations. The Mask Law simply ensures that officers interacting with Virginians are identifiable and accountable—an interest firmly within the Commonwealth's police powers. *See, e.g., Kelley*, 425 U.S. at 247–48 (recognizing that uniformity and similarity in officers' appearance serve the legitimate state interest of making law-enforcement personnel "readily recognizable to the public," and holding that such appearance-based regulations are rationally related to public-safety objectives). Ensuring that officers are visibly identifiable to the public promotes the very accountability and transparency

that *Kelley* recognized as essential to legitimate law enforcement authority. And that visibility, in turn, strengthens public trust—an indispensable component of maintaining law and order, encouraging community cooperation, and ensuring that residents feel safe reporting crimes and engaging with law enforcement.

As the Court explained on pages 25–27 of its opinion, it viewed the Mask Law as imposing "additional requirements" on federal immigration officers—identification and mask-removal obligations—"in addition to those that the [federal] Government has pronounced sufficient." *Case No. 3:26-cv-00545-REP, ECF No. 34, at 26* (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)). But that premise presupposes the existence of a federal baseline governing mask use or public-facing identification for ICE officers engaged in routine enforcement.

No such federal mandate, entitlement, or regulatory scheme exists. The federal government has not "pronounced sufficient" any standard for face coverings or identification in ordinary policing. In the absence of a federal requirement, Virginia is not adding to or contradicting federal qualifications; it is exercising its traditional police authority to regulate the manner in which *all* officers—state, local, and federal—present themselves during public-facing enforcement activities within the Commonwealth. The "in addition to" language the Court relied upon only applies where a state adds requirements to an existing federal qualification. Here, there is no federal qualification to add to. That is precisely why the Mask Law fits within the category of permissible, generally applicable rules—akin to traffic-control laws or other neutral public-safety measures—that incidentally affect how federal officers carry out their duties without regulating federal employment or federal prerogatives.

Nor does the Mask Law "lay hold of" federal officers in their specific attempt to obey federal orders, as the Court suggested. *See* ECF No. 34 at 26–27. The statute does not dictate who

10

federal officers may arrest, how they conduct immigration investigations, or what federal policies they must follow. It regulates only the *public-facing manner* in which any officer interacts with civilians in Virginia—a core state function tied to transparency, accountability, and preventing impersonation.

The decision in *United States v. Virginia* does not alter this conclusion. This case involved a state licensing scheme that conflicted with a comprehensive set of federal qualifications already established for Background Investigation Contract Services with the FBI. *See United States v. Virginia*, 139 F.3d 984, 986-87 (4th Cir. 1998). The Mask Law presents the opposite situation: there is no federal qualification or entitlement to wear a mask that Virginia is attempting to override or supplement. Because federal law does not grant federal officers any right to conceal their faces during ordinary enforcement activity, the Mask Law does not regulate federal operations; it simply applies a uniform public-facing rule to everyone acting as law enforcement within the Commonwealth.

## II. Virginia Will Suffer Irreparable Harm If A Stay is Not Granted

### A. Irreparable Injury Caused by Enjoining Enforcement of the Mask Law

Virginia will suffer irreparable injury if the Mask Law cannot be enforced during the appeal because policing, public-facing law-enforcement conduct, and the rules governing officer identification are core state functions rooted in the Commonwealth's traditional police powers. *De Buono* makes clear that when "federal law is said to bar state action in fields of traditional state regulation," courts must operate on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *De Buono v. Nysa-Ila Med. & Clinical Servs. Fund*, 520 U.S. 806, 813 n.8 (1997) (quoting *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). The Mask Law—an evenhanded public-safety measure requiring officers

exercising coercive authority in public to display visible identification—falls squarely within those traditional police powers. And because Congress has articulated no "clear and manifest" purpose to displace state regulation of how officers present themselves during public-facing encounters, the Commonwealth's enactment of the Mask Law cannot be understood as directly regulating the federal government for purposes of intergovernmental immunity.

If the stay is denied, Virginia will be irreparably harmed because the Commonwealth will be prevented from enforcing a statute—rooted in its police powers—designed to promote transparency, accountability, and public trust in law-enforcement activities conducted within the state. Routine masking and removal of visible identifiers in ordinary public-facing enforcement creates confusion, escalates encounters, impedes oversight, and increases impersonation risks. *See* Expert Rep. & Decl. of Scott Shuchart ¶¶ 11, 34, 38, 41. There have been multiple reported instances of serious impersonation crimes nationwide, including a Philadelphia robbery committed by a man carrying a gun and a fake ICE badge and a North Carolina assault where a man posed as an ICE agent to coerce a woman into sex. *See* Exhibit H. Once residents experience encounters with masked individuals claiming to be officers—whether real agents or criminals—the mistrust and fear that follow cannot be undone. That erosion of trust itself is an irreparable injury to the Commonwealth's ability to maintain safe, effective policing.

Enjoining the Mask Law during the pendency of the appeal would likewise heighten the risk of escalation and conflict in everyday interactions between Virginians and law-enforcement officers. Masks impede facial expression, clarity of speech, and nonverbal communication—critical tools for de-escalation, especially for hearing-impaired or limited-English-proficient individuals. *See* Expert Rep. & Decl. of Scott Shuchart ¶ 38. Masked, unbadged officers are more likely to be mistaken for criminal actors by civilians or other law-enforcement agencies, increasing

the likelihood of unnecessary tension, resistance, or violence. *See id.* at ¶ 42. These harms fall directly on the public and on Virginia's own officers, and they cannot be remedied after the fact.

Finally, denying the stay would mark the beginning of a broader dismantling of core state police powers through federal overreach. Preventing Virginia from enforcing a neutral, public-safety rule governing officer identification would effectively allow federal agencies to displace traditional state regulation of policing without any "clear and manifest" congressional authorization, contrary to *De Buono* and *Travelers*. The resulting harm to Virginia's sovereignty, its ability to regulate law-enforcement conduct within its borders, and its relationship with its residents is irreparable.

### B. Uneven Evidentiary Treatment Inflicts Irreparable Harm on the Commonwealth

The Commonwealth will suffer irreparable harm if a stay is not granted because the preliminary injunction rests on a record the Commonwealth had no meaningful opportunity to develop. The court relied heavily on the record before it, but that record was the product of a stark procedural imbalance: the federal government had months to prepare its evidentiary submissions and, by its own admission, three weeks to obtain declarations from federal employees, while the Commonwealth was afforded only three business days to respond. The Court nonetheless credited the federal declarations and discounted Virginia's, concluding that the Commonwealth's evidence was insufficient. And when Virginia explained that it could not produce additional declarations on such compressed notice, the Court stated that Virginia "was offered the opportunity to slightly delay enforcement and have the PI MOTION consolidated with a merits determination under Rule 65." ECF 34 at 38. In practical effect, the Commonwealth was presented with a Hobson's choice: suspend enforcement of a duly enacted statute or proceed on an undeveloped record. That procedural posture deprived Virginia of a fair opportunity to defend its law and now threatens to prevent the Commonwealth from exercising core police powers during the pendency of the appeal.

The resulting harm is irreparable. The Mask Law regulates public-facing law-enforcement conduct—an area at the heart of the Commonwealth's traditional police powers. Preventing Virginia from enforcing a neutral, generally applicable identification rule based on a one-sided record undermines the Commonwealth's ability to maintain transparency, accountability, and public trust in policing. The federal declarations the district court credited assert speculative harms and a newly claimed need for federal agents to operate without visible identification, while Virginia's evidence showed concrete risks of impersonation, confusion, and escalation when officers conceal their faces or identifying information. Once the injunction prevents enforcement of the Mask Law, those harms cannot be undone: encounters with masked, unidentifiable individuals claiming to be officers—whether genuine agents or criminals—erode trust in ways that cannot be remedied after the fact.

The Court grounded its assessment of irreparable harm and the public interest in its conclusion that the United States was likely to succeed on the merits. Because that conclusion rested on an incomplete and asymmetrical record, the injunction imposes an immediate and irreparable injury on the Commonwealth's sovereign ability to regulate policing within its borders. A stay is therefore necessary to preserve Virginia's authority and protect the public while the appeal proceeds.

## III. The Federal Government Will Not Be Substantially Harmed by the Stay

The federal government will not be substantially harmed by staying the Court's June 30, 2026 order enjoining the Commonwealth and Attorney General Jay Jones from enforcing the Mask Law because the statute does not conflict with any federal mandate, does not impede federal immigration enforcement, and imposes only neutral, evenhanded public-safety requirements that apply equally to state and federal officers. There is no federal statute, regulation, or policy requiring federal immigration officers to conceal their identities during ordinary public-facing

enforcement, and routine masking and removal of identifiers were not standard ICE or CBP practice before 2025. *See* Expert Rep. & Decl. of Scott Shuchart ¶¶ 11, 24–26. Because no federal law requires anonymity, there is no Supremacy Clause conflict and no federal interest that would be harmed by allowing the Mask Law to remain enforceable during the appeal.

Federal officers likewise will not suffer substantial harm because the Mask Law contains broad exceptions and safe harbors that apply equally to state and federal personnel. The circumstances in which masking may be operationally justified—undercover work, surveillance, gang or drug investigations, tactical operations, or specific medical or environmental hazards— are well-defined and can be addressed through written policy rather than ad hoc anonymity. *See* Expert Rep. & Decl. of Scott Shuchart ¶ 37. The Mask Law expressly accommodates those circumstances. And where officers have legitimate safety concerns, agencies can issue temporary, anonymized identification numbers that change regularly and cannot be used to track or dox officers, while still allowing oversight bodies to identify personnel if a complaint or use-of-force review arises. *See id.* ¶¶ 30–31. These tools eliminate any meaningful risk of officer harm while preserving the transparency necessary for safe public-facing enforcement.

The federal government will not be harmed by a stay because the district court's conclusions about potential risks to federal officers rested on speculative assertions rather than evidence of actual conditions in Virginia. The Court heavily credited conclusory statements describing high rates of assault and doxxing of federal officers in other states and then reasoned that similar harms *could* hypothetically occur here. *See* ECF No. 34 at 6-20. But the record shows only one isolated incident in Richmond over the many years ICE has operated in the Commonwealth—an operation otherwise marked by the absence of widespread assaults, doxxing, or targeted harassment of federal immigration officers. *See id.* at 12. The federal government's

own submissions identified no pattern of such harm in Virginia, and nothing suggests that enforcing a neutral identification rule would suddenly create them. Indeed, ICE conducted enforcement activities unmasked in Virginia for decades without experiencing the kinds of dangers the United States now speculates about. Because those harms have not materialized despite long-standing, unmasked federal operations—and because the recent shift toward masking is precisely what the Commonwealth seeks to regulate under its traditional police powers—the federal government will not suffer injury from complying with SB 352 during the appeal. A stay would simply preserve the status quo in Virginia, where no evidence shows that federal officers face the heightened risks the district court assumed.

## IV. The Public Interest Strongly Favors Staying the Injunction Pending Appeal

Allowing the Mask Law to take effect during appellate review advances core state interests in public safety, transparency, and accountability by ensuring that individuals exercising police authority can be readily identified—interests squarely within the Commonwealth's police power. The statute protects communities by reducing confusion about the respective roles of state and federal officers and by preventing the erosion of trust that occurs when law-enforcement personnel operate anonymously. Masked-officer incidents reported across the country underscore the public-safety risks SB 352 is designed to prevent. Recent examples include masked men in tactical gear marked "Police" violently detaining a man in the street, masked plainclothes officers leading away a woman and her child outside a San Antonio courthouse, and multiple impersonation crimes—such as a Philadelphia robbery committed by a man with a gun and a fake ICE badge, and a North Carolina assault by a man posing as an immigration agent. *See* Exhibit H. These incidents show how masked enforcement activity creates confusion about whether an individual is a legitimate officer or a criminal actor, fueling mistrust and fear in affected communities.

The public interest is served because masked, unidentifiable officers increase the risk of confusion, hostility, and escalation during encounters between law-enforcement officers and members of the public within the Commonwealth. Anonymity in public-facing enforcement "heighten[s] hostility and confusion during encounters," contributes to a "paramilitary" atmosphere that erodes trust, and has coincided with a 600% increase in impersonation crimes by individuals posing as immigration agents. *See* Expert Rep. & Decl. of Scott Shuchart ¶¶ 11, 16, 34–35, 41. Masking also impedes nonverbal communication, facial expression, and clarity of speech—critical tools for de-escalation, especially when interacting with hearing-impaired or limited-English-proficient individuals. *Id*. ¶ 38. These communication barriers increase the risk that civilians will misinterpret officers' intentions, escalate unnecessarily, or mistake federal officers for criminal actors. *Id*. ¶ 42. The Mask Law directly addresses these dangers by ensuring that officers interacting with the public are identifiable and accountable, while still preserving exceptions and policy-based safe harbors for situations where masking is genuinely justified.

Although impersonation may already be illegal, after-the-fact prosecution does not solve the public-safety problem at the moment of an encounter—particularly if the impersonator cannot be identified. Once a civilian is confronted by a masked individual claiming to be law enforcement, the resulting mistrust, fear, and confusion cannot be undone; those perceptions persist and shape future interactions between the public and all officers who police within the Commonwealth. That erosion of trust not only undermines effective policing but also creates a broader public-safety concern for communities across Virginia. The Mask Law is designed to prevent that confusion before it occurs, and allow for accountability afterward. Public-facing identification helps civilians, local officers, and federal officers know who is exercising lawful authority, reducing the risk of unnecessary escalation and protecting everyone involved.

Nor does the government's doxxing argument justify eliminating identification altogether. Accountability requires that investigators be able to determine which officers were involved in an incident, and a visible identifier—whether a name tag or an anonymized numerical identifier—serves that function. *Id.* ¶ 28. There is no officer-safety reason to prohibit displaying a badge number or similar identifier, and agencies can issue short-term identification numbers that change regularly to prevent tracking or misuse. *Id.* ¶ 29. These anonymized identifiers preserve officer safety while ensuring the public can file meaningful complaints and oversight bodies can conduct investigations. *Id.* ¶¶ 28–30. The Mask Law thus promotes accountability and officer safety, and the public interest strongly favors staying the Court's June 30 order.

## CONCLUSION

For the foregoing reasons, Defendants request this Court to stay its order granting Plaintiff's Motion for a Preliminary Injunction and preliminarily enjoining the Attorney General from enforcing the Mask Law, *see* ECF No. 30, pending appeal.

Respectfully Submitted,

Dated: July 6, 2026

**THE COMMONWEALTH OF VIRGINIA** and **JAY JONES**, in his official capacity as Attorney General of Virginia

By: _/s/ Triston Chase O'Savio_
Triston Chase O'Savio (VSB # 100111)
_Assistant Solicitor General_

Jay Jones
   _Attorney General_

Tillman J. Breckenridge (VSB #84657)
   _Solicitor General_
Gretchen Ellen Nygaard (VSB No. 82475)
   _Deputy Attorney General_
Triston Chase O'Savio (VSB #100111)
   _Assistant Solicitor General_

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

<u>**CERTIFICATE OF SERVICE**</u>

I, Triston Chase O'Savio, hereby certify that on July 6, 2026, I electronically filed the foregoing was served on all registered counsel of record via Notice of Electronic Filing through the Court's CM/ECF system.

GERARD MENE
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov

ALESSANDRA FASO
Senior Litigation Counsel
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Telephone: 202-451-7728
Alessandra.faso@usdoj.gov

*/s/ Triston Chase O'Savio*
Triston Chase O'Savio, Esq.

# EXHIBIT A

ADVERTISEMENT

 **US**

Subscribe

**HAPPENING NOW**

For Subscribers: Court hearing underway for man accused of fatally shooting Charlie Kirk

US • 8 MIN READ

# Calls for accountability over feds' deadly use of force in Minneapolis have not relented. Here's why that's complicated

UPDATED FEB 7, 2026

By  Andy Rose

ADVERTISEMENT



People attend a vigil for Alex Pretti, who was fatally shot by a federal agent, at the Minneapolis …

The killings of anti-ICE protesters Renee Good and Alex Pretti prompted outrage in Minneapolis, both for their deaths and the immediate response of federal officials to call both terrorists.

The political backlash that resulted lowered the temperature from the Trump administration – with even the president himself saying, "Maybe we could use a little bit of a softer touch" – along with seesawing promises from federal officials over how they would investigate the deaths.

But looming is the question of whether the federal immigration officers who pulled the triggers in both cases actually broke the law, a question that will come down to complicated issues that are much harder to define than the outrage that prompted calls

ADVERTISEMENT

around use of force and what was in those officers' minds as they pulled the trigger.

"Whenever we're talking about use of force, it's not like there's a single rule that we apply," said Seth Stoughton, a criminal justice professor at the University of South Carolina School of Law and former police officer. "There are a number of different rules."



Two women hug as they visit a makeshift memorial for Alex Pretti next to window panels a business owner says were broken by gunshots during Pretti's fatal shooting. *Roberto Schmidt/AFP/Getty Images*

ADVERTISEMENT



A picture of Pretti is left at a makeshift memorial in the area where Pretti was shot dead a day earlier by federal immigration agents in Minneapolis, Minnesota, on January 25. *Octavio Jones/AFP/Getty Images*

## Courts must determine what an officer thought when pulling the trigger

Under a standard established by the Supreme Court nearly four decades ago, shooting a suspect – even one who is unarmed – does not violate the Constitution if the officer reasonably thought the actions of the suspect <u>presented</u> "imminent danger of death or serious physical injury."

ADVERTISEMENT

ADVERTISEMENT

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Justice William Rehnquist wrote in the Graham v. Connor decision in 1989.

To figure out how much danger the officer perceived at the time of a shooting requires evidence, says Alex Reinert, director of the Center for Rights and Justice at the Cardozo School of Law.

"You're going to need as much evidence as you can about what was happening in that space and time," Reinert told CNN. "You're going to need videos, any eyewitness statements, anything that could best illustrate the officer's perspective in the moment."

While that is the standard that would be considered in a civil case, local investigators are also looking into whether any state laws were violated.

ADVERTISEMENT

ADVERTISEMENT

Criminal Apprehension said being cut off from that kind of information could be fatal to its own investigation of Jonathan Ross, the ICE officer who shot her.

"Full access to evidence, witnesses and information is necessary to meet the investigative standard that Minnesota law and the public demands; without it, we cannot do so," said BCA Superintendent Drew Evans.



A picture of Renee Good is covered with flowers at a memorial on January 29 in Minneapolis. Anger in the city continues to grow over the Trump administration's immigration policy after the shooting deaths of Good on January 7 and Alex Pretti on January 24 at the hands of federal agents. *(Scott Olson/Getty Images)*

But by the time of Pretti's killing – and with public anger rising – the tone of state officials hardened, promising a serious inquiry, whatever the challenges.

ADVERTISEMENT

24. "It must have the last word."

ADVERTISEMENT

Local investigators and prosecutors have not said what state charges they might consider in these cases. Vice President JD Vance appeared to argue there could be no state prosecution of a federal agent.

"You have a federal law enforcement official engaging in federal law enforcement action – that's a federal issue. That guy is protected by absolute immunity," Vance said in a January 8 news conference at the White House shortly after Good's shooting.

Legal experts scoffed at the claim, and Reinert said any suspect who gets charged with a crime in Minnesota would normally be extradited to face the allegations there.

"I would expect the same to happen here if we are a nation governed by the rule of law," Reinert said. "If that doesn't happen, then that will be a different challenge to overcome."

ADVERTISEMENT



A woman visits a makeshift memorial for Renee Good on January 14 in Minneapolis. *John Locher/AP*

ADVERTISEMENT



A cross and flowers sit at a memorial at the scene of the fatal shooting of Renee Nicole Good by a US Immigration and Customs Enforcement agent. *Tim Evans/Reuters*

ADVERTISEMENT

Last year in the case Barnes v. Felix, the Supreme Court said unanimously that in a civil lawsuit alleging excessive force, all the circumstances leading up to a law enforcement shooting must be considered, not just how the officer felt at the moment the trigger was pulled, and there is no time limit.

ADVERTISEMENT

That means in the Pretti shooting, the defense could point out he had been involved in a violent clash with immigration officers 11 days before he was killed.

It also means in the Good shooting, a judge could consider whether Ross' assessment of the threat may have been affected by his vehicle stop of a suspect six months earlier, where video showed he was dragged down the street and injured.

"If the officers could step out of the way of the car and that would be just as safe and effective as shooting, or maybe even safer and more effective than shooting, then that could play into this determination of whether the use of force was reasonable," said Stoughton.

ADVERTISEMENT



Members of ICE stand guard after Renee Good was fatally shot in Minneapolis on January 7. *(Tim Evans/Reuters)*

The Barnes case, which involved an officer who climbed onto the running board of a suspect's vehicle and fatally shot him as he tried to drive away, has some parallels to the death of Good, where video shows Ross firing into the vehicle.

It also shows the tough audience which may be faced if a case ever gets to the conservative-dominated Supreme Court.

ADVERTISEMENT

ADVERTISEMENT

A concurring opinion written by Justice Brett Kavanaugh and cosigned by three other justices showed sympathy toward officers confronting a suspect inside a vehicle who is driving away.

"The point here is that when a driver abruptly pulls away during a traffic stop, an officer has no particularly good or safe options," Kavanaugh wrote.

"The Supreme Court's doctrine with respect to officer use of force is, in general, very sympathetic," said Reinert.



The Supreme Court of the United States is seen through a window from the US Capitol on January 22. *(Maansi Srivastava/CNN)*

ADVERTISEMENT

## departments, but not ICE

Past killings of people by law enforcement in the Minneapolis area – including George Floyd, Daunte Wright and Philando Castile – prompted the most fervent calls for reform in use of force training in the past 25 years.

ADVERTISEMENT

The city of Minneapolis agreed to a court-supervised slate of reforms as part of a deal with the Justice Department in the waning days of the Biden administration. Five months later, it was scuttled by the Trump administration, although the city has promised to continue reforms.

"We will implement every reform outlined in the consent decree because accountability isn't optional," Mayor Jacob Frey said in May.

The Minneapolis police chief says the difference between their policies on dealing with protesters and what federal officers have been doing is immediately clear.

"Some of the things that are happening are not right," Chief Brian O'Hara told CNN's Shimon Prokupecz. "And then you see, you see these videos over and over again … it's certainly not the way we train police."

ADVERTISEMENT

Border czar Tom Homan, the new leader of Operation Metro Surge in Minnesota, promised last week to focus their attention away from protesters and back onto immigrants – especially those with criminal records.

"We are not surrendering the president's mission in immigration enforcement," Homan said. "Let's make that clear. Prioritization of criminal aliens doesn't mean that we forget about everybody else."

ADVERTISEMENT



White House border czar Tom Homan holds a news conference at the Bishop Whipple Federal building near Minneapolis on January 29. *(Julia Demaree Nikhinson/AP)*

While the Supreme Court has established its own standard of "reasonableness" for use of force, that doesn't prevent state and local governments from making tougher rules.

In Washington state, some of the most sweeping police reforms were passed in the wake of George Floyd's murder, including requiring recruits in all departments across the state to get the same standard use of force training. The man in charge of the program says it is critical that law enforcement not see the people they encounter as the enemy.

ADVERTISEMENT

ADVERTISEMENT

"Officers must remain mindful that they derive their authority from the community, and unreasonable force degrades the legitimacy of that authority," said Richard Peterson, use of force training manager for the state's Criminal Justice Training Commission.

Before there was consistent training across more than 300 law enforcement agencies in Washington, it was hard to hold officers to a consistent "reasonable" standard when many of them had very different training programs, Peterson told CNN.

"In the past, people would just teach you tactics or moves but wouldn't really understand their legal authority. So, we had to switch that way of thinking," he said.

ADVERTISEMENT



People attend a vigil for Alex Pretti in New York on January 29. *(Angela Weiss/AFP/Getty Images)*

Critics of actions taken by immigration officers – particularly Border Patrol agents – have argued they're not trained for what they now face in major US cities compared to regular police officers.

"The Border Patrol is absolutely, without question, the wrong fit to police in an urban area," said former Customs and Border Protection commissioner Gil Kerlikowske, who served during the Obama administration.

ADVERTISEMENT

ADVERTISEMENT

The Trump administration insists its immigration forces are well prepared for its task – now armed with $75 billion in funding, through 2029.

"Many of our agents have backgrounds in the military or law enforcement, and Border Patrol agents receive extensive federal law enforcement training at (Federal Law Enforcement Training Centers) just as ICE officers do," a DHS spokesperson said. "The disgusting attempts by the media to say these agents are not trained to enforce the law is shameful and laughable."

It is unclear if use of force training at the Federal Law Enforcement Training Centers has changed since President Trump's second inauguration, but the division has confirmed reprioritizing a "surge" of training for more than 10,000 new immigration personnel, compressing training time – cutting it in half from 16 down to eight weeks.

ADVERTISEMENT



Two masked federal agents drive by a vigil on January 14 near where Renee Good was killed.
*(Stephen Maturen/Getty Images)*

No matter what is in the training sessions or policy manual, Stoughton said the most powerful message officers receive is from the top. Homan's promise to operate in a way that is "safer, more efficient, by the book" contrasts with a president who has said agents "are allowed to do whatever the hell they want" to belligerent protesters and an ICE director who bragged the administration has "taken the handcuffs off the cops."

"It doesn't really matter what the policy says on the books. What matters is the policy that is enforced by supervisors," Stoughton said. "What matters is the message that agents and officers get from their supervisors about whether trained behavior is going to be rewarded or whether it's going to be disparaged on the street in the field."

    

ADVERTISEMENT

 **ICE officers warned a New York man after he sent a critical email to the agency's chief. Now he's suing**

4 MIN READ

 **Fourth suspect arrested after Mississippi killings of toddler, mother and aunt, police say**

5 MIN READ

 **US service member arrested at Capitol after calling for Trump's impeachment**

3 MIN READ

 **Judge for Charlie Kirk shooting case holds prosecutor in contempt but keeps death penalty on the table**

4 MIN READ

# Most popular

**1**  Trump's red card call stirs political storm around World Cup

**2**  He was Trump's boyhood friend. Now he's pushing Trump to declare a 'national emergency' and seize control of the midterms

**3**  Speaker Johnson says House will pass Trump's voter ID bill through arduous process after GOP revolt

Search CNN...

Subscribe

Sign in

Listen

Watch

ADVERTISEMENT

World

Politics

Business

Markets

Health

CNN Underscored

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

World Cup 2026

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

Games

About CNN

US

FOLLOW CNN

ADVERTISEMENT

**DOWNLOAD THE CNN APP**

 

Terms of Use       Privacy Policy       Do Not Sell Or Share My Personal Information       Ad Choices       Accessibility & CC       About

Subscribe       Newsletters       Transcripts       Help Center       Sitemap

© 2026 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

# EXHIBIT B

https://www.fauquiernow.com/news/government_politics/in-newly-democratic-virginia-immigration-enforcement-becomes-early-test-for-spanberger/article_0de69c23-e3fc-459b-89e6-56e07bbddf91.html

# In newly Democratic Virginia, immigration enforcement becomes early test for Spanberger

By Markus Schmidt | Virginia Mercury

Jan 26, 2026



Richmond resident Violeta Vega holds a sign at a rally in Richmond on Jan. 23, 2026 to protest President Donald Trump's ramp up of U.S. Customs and Immigration Enforcement. (Photo by Charlotte Rene Woods/Virginia Mercury)

As federal immigration enforcement activity increases in Democratic-led states across the country, immigrant advocates and civil rights groups are warning that Virginia — which recently <u>flipped full control</u> of state government to Democrats — could be next.

Gov. Abigail Spanberger, sworn in earlier this month as Virginia's 75th governor, has moved quickly to draw a line between state law enforcement and federal immigration enforcement, while acknowledging that much of the authority still rests outside her control.

Just hours after taking the oath of office on Jan. 17, Spanberger fulfilled a promise she made in an <u>August interview</u> with The Mercury, <u>rescinding</u> former Gov. Glenn Youngkin's Executive Order 47.

The order had directed Virginia State Police and the Department of Corrections to enter into so-called <u>287(g) agreements</u> with U.S. Immigration and Customs Enforcement, effectively deputizing state officers to assist with federal immigration enforcement and encouraging local cooperation with ICE to identify and remove noncitizens accused or convicted of crimes.

Spanberger's executive action marked a sharp policy reversal after years of Republican leadership in Richmond and came as immigration enforcement has intensified in blue states under President Donald Trump's renewed push for large-scale deportations.

"My executive order, repealing Executive Order 47, was an important first step in ensuring that we are not moving or reallocating state and local resources away from the first-responder duties, whether it is investigating crimes or being ready to support a community in need," Spanberger said last week.



She emphasized the prior order "had created some real challenges."

"Ultimately, I am looking to every step forward that we can take as a commonwealth to ensure that our communities are safe and protected," Spanberger continued, adding that confusion around law enforcement authority has fueled fear in immigrant communities.

"Frankly, the fear and concern that we've seen in other places where people without any sort of designation — unannounced, wearing masks — are taking people off the streets, the level of fear that that's created and the level of distrust and confusion is certainly not contributing to any strengthening of our communities, let alone keeping our communities safer."

On Friday, members of Virginia's Service Employees International Union chapters gathered outside a U.S. federal courthouse in Richmond to protest ICE enforcement, underscoring growing opposition from labor and immigrant advocates.

About 50 people attended the demonstration, where speakers criticized federal detention practices and read aloud the names of individuals who have been killed during ICE operations over the past year.

"We're seeing the ICE escalate everywhere from from Minneapolis all the way here to Richmond," said Violeta Vega, an SEIU member serving as an emcee for the gathering.

## State action, limited reach

While Spanberger's order ends the requirement that state agencies enter into 287(g) agreements, it does not terminate existing contracts between ICE, state and local governments, regional jails or sheriffs' offices. Nor does it prohibit new agreements at the local level.

All state and local agreements "remain in force until terminated" by one or both parties, a new Legal Aid Justice Center analysis found. There has been no evidence to date that any existing contracts between ICE and state or local law enforcement have been ended as a result of the governor's action.

The report details how dozens of agencies across Virginia — including state agencies and regional jails — have contracted with ICE to perform duties that may exceed their authority or conflict with state law and the Virginia Constitution.

The analysis further found that at least 223 state and local personnel have been nominated to participate in 287(g) agreements, including two school resource officers and a behavioral health advocate. One facility — the Riverside Regional Jail in Prince George County — receives more than half of its revenue from holding people for ICE.

"Those local law enforcement agencies with 287(g) agreements now have a massive financial incentive to abandon their mission to protect communities in favor of terrorizing immigrant populations," said Alex Kornya, LAJC's director of litigation.

"Contracts with ICE, often shrouded in secrecy, are not only a misuse of time and resources, but they also open these agencies up to significant liability, liability that Virginia taxpayers will ultimately pay."

LAJC said many of the agreements were negotiated quietly, with agencies declining to provide information in response to public records requests — in some cases saying ICE instructed them not to respond.

According to ICE's own website, there are currently at least 32 active 287(g) agreements in Virginia involving the state and local governments, and correctional facilities. Five are with state agencies, while the remainder involve local law enforcement.

ICE did not respond to a request for comment from The Mercury.

## Fear, trust and public safety

Civil rights groups, including LAJC, say the impact of these agreements extends beyond immigration enforcement, undermining trust between immigrant communities and local law enforcement.

"Governor Spanberger's action to rescind EO 47 on her first day was an important step, as these contracts do nothing to make people safer," said Rohmah Javed, legal director of LAJC's Immigrant Justice Program, adding that immigrant communities across the state are terrified.

"These agreements erode trust, making it much less likely immigrants will seek out needed services, report crimes witnessed or crimes they have experienced as victims, or participate in their communities," Javed said. "But we need to see immediate action at both the state and local levels to officially end these abusive agreements."

The ACLU of Virginia called the order a first step toward ensuring state law enforcement is not used for federal immigration enforcement, while cautioning that existing contracts and federal authority remain unchanged.

"Governor Spanberger's executive order recognizes that blurring the line between Virginia law enforcement and federal immigration agents not only diverts Virginia resources away from public safety priorities, but erodes public trust by terrorizing communities and breaking apart families," ACLU of Virginia Executive Director Mary Bauer said.

## Republicans warn repeal of ICE order threatens public safety

Virginia GOP leaders, meanwhile, sharply criticized Spanberger's decision, arguing that rescinding Youngkin's order weakens cooperation with federal authorities and threatens public safety.

Youngkin himself told The Mercury in an interview earlier this month that rescinding his Executive Order 47 would be "a huge mistake," calling it a necessary tool for combating violent crime and gang activity, particularly in Northern Virginia.

"That partnership has made Virginia safer. We arrested the number-three guy in MS-13; the number three guy in MS-13 was just living in Virginia that otherwise would have never been arrested," Youngkin said.

In a post on X, formerly Twitter, former Attorney General Jason Miyares called Spanberger's move "a disaster for the public safety" of the commonwealth. "Mark my words, there will be Virginians who will be robbed, raped and murdered as a result of this anti public safety executive order. No one should be surprised."

House Minority Leader Terry Kilgore, R-Scott, also warned that ending mandated cooperation with ICE could lead to increased crime.

"Folks need to be able to walk their street at night without fear of being either shot or kidnapped or raped. It's the wrong way to move with public safety in Virginia," Kilgore said. "When Governor Youngkin had the agreement, we were able to catch all those MS-13 gang members up in Northern Virginia. If we're not cooperating with ICE, folks are going to get harmed in Virginia."

However, federal data show that immigrants without criminal records now make up the largest share of people held in U.S. Immigration and Customs Enforcement detention, despite repeated assertions by some political leaders that enforcement is focused primarily on violent offenders.

According to ICE's own figures, roughly 73% of those in detention as of late 2025 had no criminal conviction, and only a small fraction were held for violent offenses — many others had only minor or civil immigration offenses.

In Virginia, too, officials have not substantiated claims about the criminal histories of people rounded up by the state's task force. Last summer, Youngkin claimed his administration had arrested more than 2,500 immigrants who were "violent criminals," but Miyares at the time declined to provide evidence that those individuals were in fact violent offenders when pressed by The Mercury.

## Local leaders respond

In Richmond, Mayor Danny Avula — the city's first immigrant mayor — issued a statement addressing community concerns following reports of ICE activity in the region, including recent activity in Chesterfield County and Petersburg.

"I understand there is tremendous fear in the community right now," Avula said. "Fear in completing everyday tasks, such as showing up for work, taking your children to school, or buying groceries, and I want you to know I hear you."

Avula emphasized that Richmond does not coordinate with ICE on deportation activities and that the Richmond Police Department has not entered into a 287(g) agreement.

"Our officers are here to focus on their core mission: community policing, protecting all neighborhoods, and reducing crime," Avula said, urging residents to call 911 if they need law enforcement assistance.

"I reject any approach that creates fear, confusion, or division," he added. "Those tactics undermine public safety and erode trust, making our communities less safe, not more secure."

Meanwhile, immigration enforcement concerns intensified last week after Hanover County officials confirmed receiving a letter from the U.S. Department of Homeland Security outlining plans to purchase and operate an ICE processing facility in a warehouse on Lakeridge Parkway.

County officials said the project was not initiated by Hanover and that the county has 30 days to respond. The Board of Supervisors had not convened to discuss the proposal as of Thursday and is expected to address the matter at its Jan. 28 meeting.

Virginia currently has two major long-term ICE detention centers — the Farmville Detention Center and the Caroline Detention Facility — along with regional jails that hold detainees under contract, including the Virginia Peninsula Regional Jail.

Advocacy groups say any expansion of processing or detention capacity could deepen fear in surrounding communities.

## A broader political test

The debate over federal immigration enforcement underscores a broader challenge for Democratic governors in states where ICE activity remains governed largely by federal authority and locally negotiated contracts.

In Minnesota, Gov. Tim Walz publicly condemned a federal immigration operation in Minneapolis that sparked widespread protest after a federal agent fatally shot a 37-year old woman through her car window earlier this month. Following the killing, Walz demanded that the state must play a role in the investigation of the incident.

Coverage of the fallout has highlighted the limited tools Democratic governors have to rein in enforcement carried out independently by ICE or through local arrangements.

Similar tensions have surfaced in Illinois and Massachusetts, where Democratic governors back sanctuary-style policies but continue to face criticism when ICE makes arrests in jails and courthouses governed by local practices rather than state law.

In Illinois, confusion over the state's TRUST Act has left sheriffs and the governor <u>caught between</u> immigrant advocates and federal officials. In Massachusetts, renewed attention to ICE courthouse arrests has put Gov. Maura Healey <u>under pressure</u> to respond to enforcement decisions she does not control.

Against that backdrop, Spanberger has emphasized that the stakes in Virginia are about trust — particularly whether immigration enforcement policies discourage people from calling police when they need help.

"Ultimately, how we will determine how Virginia proceeds is that — and I say this as someone who grew up in a law enforcement family and began my career in law enforcement — the idea that any community member would be afraid of calling police in a time of need, if there's an emergency in their home, is a tragedy in and of itself," Spanberger said.

_____

*Virginia Mercury reporter Charlotte Rene Woods contributed to this story. Visit <u>VirginiaMercury.com for more.</u>*



# EXHIBIT C

**TIMELY. CREDIBLE. ACCESSIBLE.**

   

**FEBRUARY 18, 2026**

# Safety, Trust, and Affordability: The Real Costs of Federal Immigration Enforcement in Virginia

Families across Virginia should be able to go to work, study, and seek medical care without fear or intimidation. These basic freedoms are increasingly at risk as a result of more frequent encounters with federal law enforcement officials, who may often be masked and unidentifiable. Recent national and local incidents have shown that this very low bar and expectation of safety is harder to count on, particularly for immigrant families, people of color, and concerned bystanders.

While the federal government has pumped billions of dollars into federal law enforcement through H.R. 1, states are expected to backfill massive amounts of federal cuts to Medicaid and SNAP. The resulting rapid expansion of federal immigration enforcement — often involving undertrained personnel — increases the risk of harmful encounters for families and bystanders. These choices also shift costs onto local communities. State and local resources, including funding, law enforcement officers, and facilities, should remain focused on serving communities rather than assisting an already overfunded federal immigration enforcement operation whose practices have created dangerous encounters and violated people's rights.

## Cutting Health and Food Assistance, Splashing Cash on DHS

On July 4, 2025, President Trump signed H.R. 1 into law. This bill made sweeping cuts to the nation's safety net programs: slashing $911 billion from Medicaid and $187 billion from SNAP food assistance, among other cuts. Some of these cuts directly target people lawfully residing in the U.S. because they sought safety or because returning to their native country was dangerous (refugees, asylees, and humanitarian parolees), removing their access to Medicaid, Medicare, subsidized ACA marketplace coverage, and SNAP. This is despite the fact that immigrants contribute to these systems through taxes and economic activity.



**Federal Choices Erode Safety and Trust, Cut Critical Help for Food**

Increased funding to federal immigration enforcement, whose practices have created dangerous situations, amounts to over 90% of cuts to food assistance through SNAP

*Funding changes in H.R. 1*

Increase in DHS funding
$170 billion

Cuts to SNAP food assistance
$187 billion

Source: American Immigration Council and Center on Budget and Policy Priorities

In contrast, H.R. 1 included $568 billion in tax cuts primarily benefiting wealthy individuals and corporations and over $170 billion in new funding for the Department of Homeland Security (DHS).

When considering the $170 billion increase in funding for border and immigration enforcement:

- $47 billion went to reinforcing and expanding the border wall

- $45 billion was allocated for family and adult detention

- $30 billion went to Immigration and Customs Enforcement (ICE)

# What These Changes Mean For Virginia's Budget and Communities

Federal decisions are expected to have direct consequences for Virginia's budget and for the people and families who call the state home. Provisions in H.R. 1 increase state SNAP costs, which could amount to $311.4 million over the next two years. Medicaid changes will reduce support for Virginia hospitals and health facilities by $26 billion over the next fourteen years, including state-supported hospital systems run by VCU and UVA.

According to KFF, provisions in H.R. 1 are expected to increase the number of uninsured people in Virginia — taking away:

- Medicaid coverage from 260,000 people

- ACA Marketplace coverage from 38,000 people

- Medicare coverage from 12,000 people

When combined with the expiration of enhanced ACA subsidies, an estimated 350,000 people in Virginia will become newly uninsured due to federal decisions.

Changes to SNAP could reduce or eliminate food assistance for about 850,000 people and 445,000 families. When people can't rely on these critical services, increased community need for free or affordable health services and food assistance rises, putting pressure on non-profits and localities already struggling to meet today's needs.

At the same time, more than $30 billion in additional ICE funding allowed DHS to significantly expand the number of ICE officers available for surges across the country. On January 3, 2026, DHS announced that ICE had more than doubled its total number of officers and agents from 10,000 in 2025 to 22,000 in January 2026.

Across the nation, media reports have described ICE raids at or near previously protected locations like schools, hospitals, child care centers, and courthouses. There have also been documented incidents of masked and unidentified ICE agents apprehending individuals and escalating situations, including at least eight instances in 2026 that culminated in the loss of life at the hands of federal ICE agents or while in ICE custody. Such practices can discourage victims and witnesses from reporting crimes or seeking help, weakening community trust and public safety.



# Local and State Agreements Erode Resources and Community Trust

An executive order from former Governor Youngkin entered several state agencies, including Virginia State Police and the Virginia Department of Corrections, into agreements with federal immigration enforcement agencies known as 287(g) agreements. Youngkin also encouraged localities to enter these agreements, which extend cooperation with ICE

and allow certain state and local personnel to further civil immigration enforcement, and exist in several forms: Warrant Service Model, Jail Enforcement Model, and Task Force Model.

Under the Task Force Model, local and state employees act as independent federal immigration officers, applying immigration laws to their everyday interactions, with just 40 hours of online training. According to documents obtained by the Legal Aid Justice Center, as of the end of 2025, at least 223 state and local personnel were nominated to act as immigration enforcement, including two security resource officers embedded in public schools in Buckingham and Washington Counties and a behavioral health advocate in Washington County.

Thankfully, Governor Spanberger moved quickly to rescind Gov. Youngkin's executive order and issued a directive to end any existing state-level 287(g) agreements. This decision is critical to beginning to repair trust in our communities.

Unfortunately, 27 local agreements remain in 25 Virginia localities as of February 9, 2025. These agreements divert local resources and officials from local community policing. The agreements erode community trust with law enforcement, making some immigrant communities less likely to report crimes and more vulnerable to being targeted by potential offenders.

Arrests at Virginia courthouses while individuals attempt to respond to minor traffic-related offenses, like charges related to vehicle inspection, registration, or tags, further erode trust. Notably, in the first seven months of the Trump administration's immigration enforcement efforts, less than half (45%) of people arrested in Virginia by ICE officials had ever been convicted or accused of a crime.

At the same time, communities across the country have shown a different response: neighbors showing up for one another. In Minnesota, neighbors and communities organize monitoring networks, accompany each other to schools and courts, and provide mutual aid to families affected by enforcement activity. These examples show how community safety is strengthened — not by fear, but by collective trust and prioritizing community needs.

## Next Steps for Virginia

Virginia lawmakers already face new budget challenges from federal cuts to safety net programs alongside increased federal spending on immigration enforcement. The Commonwealth should not respond by diverting resources away from essential services or weakening trust between communities and public institutions. Virginia families deserve to be able to work, study, and travel freely without fear of unnecessary interactions with masked and unidentified federal law enforcement officials

Gov. Spanberger took a strong and decisive step to remove state agencies from agreements that supported civil immigration enforcement. Legislation being considered in Virginia's General Assembly would restrict or provide new guardrails on existing and any future local and state ICE agreements (HB1441 & SB783). Additional proposals aim to reduce civil immigration enforcement in sensitive locations (HB650), and would require state and federal law enforcement to clearly identify themselves and not be masked while working (HB1482 & SB352).

Virginia lawmakers can follow Gov. Spanberger's lead by taking steps to prioritize safe and stable communities. A stronger future is one where families remain together, public institutions are trusted, and safety doesn't depend on where you were born or the color of your skin.

**Category:**
**Immigration**



**Freddy Mejia**

freddy@thecommonwealthinstitute.org

Former staff

**Freddy Mejia**

freddy@thecommonwealthinstitute.org

Former staff

# EXHIBIT D



REPORT    AUG 28, 2025

# Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification

Since taking office, the Trump administration has undermined public safety and law enforcement accountability by supporting the dangerous practice of obscuring the identity of ICE and other federal officers.

AUTHOR



Allie Preston

**Advancing Racial Equity and Justice,** Domestic Policy, Immigration,   +3 More

Federal agents working for U.S. Immigration and Customs Enforcement are seen in the Jacob K. Javits Federal Building in New York, New York, July 24, 2025. (Getty/Dominic Gwinn)

In recent months, federal U.S. Immigration and Customs Enforcement (ICE) and other federal law enforcement officers—roaming the streets in plainclothes, masked, and sometimes armed—have stoked fear in communities nationwide. These federal agents have been seen swinging batons, smashing car windows, using explosives to blow the door off of a home with children inside, emerging from unmarked vehicles with weapons drawn, shooting into a family vehicle, and grabbing people off of the street and putting them into unmarked vehicles. In cities such as Los Angeles, Minneapolis, Phoenix, and Miami, officers donning face coverings without an agency designation and driving unmarked vehicles have conducted immigration enforcement actions at schools, courthouses, religious institutions, and work sites. Meanwhile, in Washington, D.C., hundreds of officers from nearly 20 federal agencies, D.C. National Guard troops, and National Guard troops from six other states have been deployed to the streets, with masked U.S. Department of Homeland Security (DHS) agents manning checkpoints for drivers. This is the new, frightening image of U.S. immigration enforcement under President Donald Trump: violence, covered faces, and unknown agency affiliations. These images signal a troubling move "away from democratic controls," where officers are visible and accountable to the communities they serve, and toward militarization that serves to instill fear and stifle dissent.

Enforcement actions by masked or unidentifiable officers, which have even included the arrests of elected officials and other U.S. citizens, are part of a broader effort to keep up with arbitrary and cruel immigration arrest quotas set by the Trump administration. As a result, today, ICE is operating in ways akin to the actions of secret police forces, tasked with carrying out Trump's political

agenda. These practices have stoked fear in communities across the country and raised serious questions about the safety and legitimacy of their operations under the Trump administration.

---



## This is the new, frightening image of U.S. immigration enforcement under the Trump administration: violence, covered faces, and unknown agency affiliations.

Amid public outcry, attorneys general, members of Congress, and former military and law enforcement officers have joined in to amplify concerns about the rise of these dangerous practices. Recently, attorneys general from 21 different states called on Congress to pass legislation that both prohibits federal agents from wearing face coverings to conceal identity and implements requirements for showing identification and agency designation. In addition to potentially violating federal law, officers operating without providing their agency or personal identifiers make everyone less safe—from law enforcement to civilians to entire communities. The presence of unidentifiable officers makes policing more challenging and dangerous, as community members or fellow officers may mistake them for a lawbreaker. Moreover, this practice spurs dangerous impersonations, impedes accountability for officers who are engaged in misconduct, and undermines trust in law enforcement.

Actions must be taken by legislators and other policymakers at the federal and state levels to curtail these dangerous practices and ensure that all law enforcement officers are properly identifiable as they go about their jobs, unless there is a legitimate reason not to be.

## ICE officers are using multiple tactics to obscure their identity from the public

Since President Trump took office, ICE officers have been seen making immigration arrests wearing plainclothes and without a personal identifier and have refused to identify themselves upon request from community members. While there is no standard uniform for ICE agents, recent months have seen an increase in ICE and federal law enforcement officers assisting in immigration enforcement using tactics to obscure their faces and designation. ICE and other accompanying federal law enforcement have begun regularly wearing ski masks, balaclavas, and gaiters as a way to prevent themselves from being identified and, by extension, limit transparency and accountability. In Arizona, for example, officers allegedly posed as utility workers to gain access to someone's home. In many of these and other instances, officers' tactics during arrests, including the use of force, have instilled fear among immigrant and nonimmigrant communities alike, while also raising serious public concerns more broadly.

It is true that there are times when it may be appropriate, even necessary, for law enforcement officers to wear plainclothes, don a face covering, or hide their identity. For example, there are instances when someone may be working undercover, protecting themself from illness or an environmental condition such as a fire or chemical spill, or working on a case related to an organized

crime entity where there is a credible threat of retaliation. However, these concerns typically do not arise in the types of immigration enforcement actions that many ICE officers are now engaged in, which often involve apprehending parents, college students, and community members with no criminal convictions or connections to criminal organizations. In fact, the practice of masking and hiding identifiers can jeopardize the safety of ICE and other federal law enforcement officers by making it harder for other officers or community members to identify them as law enforcement and interact with them accordingly.

 

# Federal law enforcement should be held to the same standard of good policing as local officers to ensure that policing is safe, transparent, and accountable.

Some claim that masks are used by officers to protect against doxxing, a practice whereby people's personal information is shared, often online, as a precursor to harassment. While any real threats to officer safety should be taken seriously, there are thankfully already mechanisms at the federal and state levels aimed at protecting officers from these harmful acts.

Every day, law enforcement officers across the country get dressed in their uniforms to fulfil their duties and serve their communities. This includes state and local law enforcement officers, who are participating in work that may have greater risks than immigration enforcement. Federal law enforcement should be held to the same standard of good policing as local officers to ensure that policing is safe, transparent, and accountable.

## Legal requirements related to the identification of ICE and other federal law enforcement

Depending on the circumstances of the arrest, federal law enforcement officers may be in violation of federal law if they fail to properly identify themselves. According to Title 8 § 287.8, "only designated immigration officers are authorized to make an arrest," and they are required to identify themselves as an immigration officer as soon as it is "practical and safe." Recent reporting has noted that officers making arrests have failed to identify themselves or their agency in instances when it was "practical and safe" even when asked directly, potentially violating this provision.

Additionally, in an unusual move, the Trump administration deployed ICE agents and other federal law enforcement officers in response to protests in cities such as Los Angeles and to arrest protestors in cities such as Omaha, Nebraska. Under 10 USC 723, federal agents responding to "civil disturbances" must, likewise, "visibly display" IDs and agency affiliation, unless exempted. With the recent federal enforcement activities at protests, it is possible that officers who concealed their identity or agency may have violated this provision.

## Safety concerns raised by masked and undesignated law enforcement

In addition to potentially violating the legal requirements stated above, federal law enforcement officers who carry out their jobs with their faces covered or without properly identifying themselves can create serious safety concerns for law enforcement and community members alike.

## Unidentified officers face significant risk of friendly fire and other violent escalations, while also hindering accountability and eroding community trust

Law enforcement uniforms were created, in part, to keep officers safe. Uniforms are a visual representation of officers' authority and help to influence the ways in which others interact with them. Unidentified officers conducting enforcement actions in plainclothes can increase the chances of tragic "blue-on-blue," friendly fire incidents, where one officer accidentally shoots another. Since federal agents typically do not notify local law enforcement when federal officers are operating in their community, the risk to officers is exacerbated.

A lack of proper identification can also lead to unnecessary escalations in the community. Without seeing an officer's agency designation or identification, people may refuse directives, since they, reasonably, may not believe that a group of strangers in masks and plainclothes are actually the officers they claim to be. Neighbors, loved ones, or other bystanders who witness an enforcement action may believe that someone is being harmed, causing them to intervene or call the police. The inability to determine whether individuals grabbing people off of the street and throwing them into unmarked cars are legitimate officers or lawbreakers has already led many community members to call on state and local enforcement for help during events that they believe to be kidnappings. Masking instills fear in communities, undermines trust between residents and law enforcement and hinders accountability. It limits the cooperation between law enforcement and communities that officers rely on to do their jobs. These types of intimidation tactics are also a common tool of authoritarians who seek to stifle dissenting voices and quell opposition to their agenda.

## Widespread masking and obscuring of officer agency and identity encourages dangerous impersonations

One of the most troubling trends that has followed this wave of unidentifiable law enforcement is the rise of vigilantes and dangerous impersonations. People with insidious motives have taken advantage of the widespread deployment of masked immigration officers as cover to allegedly harass civilians or commit violent crimes such as kidnapping, robbery, and sexual assault:

- In North Carolina, a man was arrested for sexual assault and impersonating an officer after he allegedly threatened to deport a woman if she did not have sex with him.

- In Pennsylvania, an impersonator with gear to make him look like law enforcement went to an auto repair shop, where he allegedly threatened to arrest employees; zip-tied the hands of one of the employees; and ultimately left, stealing almost $1,000.

- In California, an investigation into an illegally parked car revealed a stash of "law enforcement-style equipment," multiple passports, and documents with Homeland Security Investigations and U.S. Customs and Border Patrol (CBP) letterhead in a car belonging to someone with a prior arrest for human smuggling.

The rise in impersonations has been so alarming that it has led California Attorney General Rob Bonta and a college campus to put a notice out to their communities. It has also spurred the introduction of state-level bills to clarify laws related to impersonation or increase penalties for impersonating an officer in particular instances. Ensuring that officers are identifiable protects communities by making it easier to distinguish between legitimate officers and impersonators.

### Deploying unidentified officers impedes accountability

Community members must be aware of an officer's identity and agency affiliation in order to know their rights and understand the authority that the officer has to engage with them. Different law enforcement officers have different levels of authority to make arrests and enter certain spaces. Knowing the agency is also important for families and friends who are working to find their loved ones after an arrest.

This is a serious concern now that the Trump administration has ordered agents from other federal agencies not usually engaged in immigration—including from the FBI, the U.S. Marshals Service, the U.S. Drug Enforcement Agency, and the Bureau of Alcohol, Tobacco, and Firearms—to participate in enforcement activities. Without knowledge of the agency or individual officers who are engaging in enforcement in their communities, there is no way for people to report or hold officers accountable for unprofessional behavior or misconduct, even in instances that may involve violence or illegal activity.

## Key components of legislation to curb widespread masking and require identification of ICE and other federal officers

Accountability and oversight are needed to protect communities from the wave of masked, unidentifiable federal law enforcement officers who are violently arresting residents across the country—as well as from the opportunistic impersonators who have taken advantage of this new trend to commit violence and other crimes. Congress should heed the calls of 21 attorneys general to pass legislation that both prohibits the wearing of face coverings to conceal officers' identities and implements requirements for visible personal identification and agency designation. As Congress and state legislatures work to curtail these harmful practices, they should consider key components of proposed laws or existing legislation.

### Restricting the use of nonmedical masks and facial coverings

Legislators should seek to create clear guidelines to limit the use of masks and other face coverings to clearly defined circumstances. While the circumstances are limited, proposals to prohibit law enforcement from wearing face coverings should include narrow exceptions that allow officers to wear masks to protect the integrity of an undercover operation, prevent the spread of illness, or guard against environment hazards.

**Examples** ⌄

- Under the proposed Visible Identification Standards for Immigration-based Law Enforcement (VISIBLE) Act, officers are prevented from wearing nonmedical face coverings unless they are "operationally necessary" for a covert operation or to protect against an environmental hazard.

- Legislators in California, New York, Massachusetts, and Tennessee have introduced legislation to create appropriate restrictions on masks and face coverings, while legislators in Pennsylvania have signaled their plans to put forth a similar proposal.

## Requiring officers to clearly display agency designation and identification

Requiring officers to have visible identification that includes both an agency designation and a name or badge number as a personal identifier helps to protect against impersonations, allows residents to assess their rights and responsibilities when engaging with officers, and ensures that residents have the information they need to report misconduct and seek accountability.

### Examples ⌄

- Legislators have included these requirements in multiple federal bills, as well as bills in California and New York.

- DHS should implement a standard uniform for ICE Enforcement Removal Operations officers, who are primarily responsible for immigration enforcement operations.

## Implementing a duty to intervene or mandatory reporting related to mask use and identification

Like the existing duty to intervene and report excessive use of force, legislation should create a duty to intervene and reporting requirements when officers are using prohibited face coverings or failing to identify. Legislation should include requirements for training on this duty to ensure that it is properly followed.

### Examples ⌄

- In New York, the Mandating End of Lawless Tactics (MELT) Act would create a state requirement for ICE to report mask use, among

other things.

■ In the absence of a federal requirement, states could pass laws creating a duty for their officers to intervene when interacting with federal law enforcement.

## Creating accountability and enforcement mechanisms

To ensure that new policies are enforced and that officers are held accountable, legislators can create requirements that agencies have written policies related to masking and identification. In the event that these policies are violated, procedures should be established for accountability.

### Examples ⌄

■ The No Vigilantes Act in California requires agencies to have written policies related to masking and identification, with any violation of its provisions amounting to a misdemeanor.

■ The federally proposed VISIBLE Act requires DHS to create disciplinary procedures for violations of its identification provisions, investigate complaints, and report violations to Congress.

## Ensuring that laws related to identification apply to all necessary contexts

Some legislation related to masking and identification only applies in certain circumstances. Legislators should ensure that the scope of these requirements is broad enough to cover all the situations in which officers are being deployed.

### Examples ⌄

■ For example, Congress should expand the parameters of 10 USC 723, requiring officers to visibly display personal identifiers and agency affiliation. Currently, 10 USC 723 only applies to instances where federal agents are responding to a "civil disturbance." The scope of this requirement should be expanded to include what is now a more common task across federal agencies: immigration enforcement.

■ H.R. 3172 creates requirements for CBP and ICE agents and other officers deputized by DHS to have "bold and visible identification."

### Nonlegislative state-level actions to guard against harmful masking and identification practices by ICE and other federal law enforcement

States are already exploring nonlegislative tactics to prevent and guard against the harms of unidentifiable federal law enforcement. A coalition of 21 state attorneys general wrote to Congress, urging it to pass legislation that would prohibit the use of masks and require federal officers to display their agency. Attorneys general from other states can join this movement and put additional pressure on Congress to act. State attorneys general can also issue legal guidance to both their residents and law enforcement. Earlier this year, New York Attorney General Letitia James issued guidance to "clarify the rights and obligations of employers and workers" during workplace immigration enforcement actions, including advising employers of their ability to request identification of ICE officers. In Baltimore, Maryland, the chief judge issued an administrative order requiring that any law enforcement coming into the court first check in with the Baltimore City Sheriff's Office onsite and wear their agency uniform or "prominently display" their identification or badge.

## Conclusion

The rise of masked and unidentifiable federal law enforcement conducting immigration enforcement is dangerous for officers and communities alike. This trend instills fear and breaks down trust between law enforcement and the community. These tactics also reduce the government's accountability to the public and serve to instill fear and stifle dissenting voices from speaking out in opposition.

Across the country, state and local law enforcement officers respond to calls, including those related to crime and violence, in communities every day. Most of these officers are unmasked and in uniform and display information related to their agency affiliation and personal identity. Federal agents engaged in immigration enforcement should be held to the same standards. Action at the federal, state, and local levels is both urgent and necessary to ensure that federal law enforcement is identifiable and accountable to communities.

## Acknowledgments

The author would like to acknowledge Dan Herman and Rachael Eisenberg of the Center for American Progress for their consultation on this issue brief. The author would also like to acknowledge Devon Ombres, Hayley Durudogan, Debu Gandhi, and Silva Mathema from the Center for American Progress as well as Tahir Duckett from the Georgetown University Center for Innovations in Community Safety for their advice and feedback during the development of this issue brief.

The positions of American Progress, and our policy experts, are independent, and the findings and conclusions presented are those of American Progress alone. American Progress would like to acknowledge the many generous supporters who make our work possible.

**AUTHOR**

## Allie Preston

Former Senior Policy Analyst, Public Safety

**TEAM**

## Public Safety

Protecting people from crime is one of the government's most fundamental and urgent responsibilities. However, the current reality is that too many crimes go unsolved and too many victims lack justice. The Center for American Progress is committed to advancing evidence-based policies that keep individuals safe by solving crime when it happens, ensuring swift and certain accountability for those who harm others, and preventing crime in the first place.

## ALSO FROM CAP

ARTICLE

**June Jobs Numbers Are Not the Boost for Workers That Was Expected**

Jul 2, 2026
Kennedy Andara, Aurelia Glass

ARTICLE

**Censored: Erasing 250 Years of American History on Public Lands**

Jun 30, 2026
Angelo Villagomez, Mariam Rashid, Kendra Hughes

REPORT

**The SAVE Act May Be Stalled in Congress, But State Versions Are Being Advanced All Across the Country**

Jun 29, 2026
Gréta Bedekovics, Devon Ombres

REPORT

**Making Workforce Pell Deliver: 9 Options for States To Improve Outcomes for Students and Employers**

Jul 6, 2026
Madison Weiss



The Center for American Progress is an independent nonpartisan policy institute that is dedicated to improving the lives of all Americans through bold, progressive ideas, as well as strong leadership and concerted action. Our aim is not just to change the conversation, but to change the country.

## nProgress
## Stay informed on the most pressing issues of our time.

Email Address                    **SUBMIT**

Learn about our sister organization, the Center for American Progress Action Fund, an advocacy organization dedicated to improving the lives of all Americans.

©2026 Center for American Progress

Terms of Use

Privacy Policy

CAP - En Español

Our Supporters

Cookie Preferences

# EXHIBIT E

Get acquainted with our new Virginia State Legislative Information System! LIS Learning Center  ✕

VIRGINIA GENERAL ASSEMBLY  /  LIS LEARNING CENTER  /

PRIVACY POLICY  /  LIS HOME  /  REGISTER ACCOUNT  /  LOGIN

**Session Information     Bills & Resolutions     State Budget     Virginia Law     Reports to the General Assembly**

BILLS & RESOLUTIONS

Search for keyword, chapt

Find a Bill

2026 Regular Session

Create Report

SB352                                                                    Status: Acts of Assembly Chapter

Law-enforcement officers; restrictions on wearing of facial coverings, exceptions, penalty.

Patrons  |  All Patrons
Introduced by: Saddam Azlan Salim (Chief Patron)

Summary As Passed  |  All Summaries

**Law-enforcement officers; restrictions on wearing of facial coverings; exceptions; penalty.**
Prohibits any law-enforcement officer, defined in the bill, from wearing a facial covering, defined in the bill, while engaged in the performance of his official duties. The bill sets out several exceptions to such prohibition, including protective facial coverings to protect against disease, infection, and exposure to toxic substances and facial coverings worn by any law-enforcement officer assigned to a special weapons and tactics team while engaged in the performance of his official duties with such team. The bill subjects the law-enforcement officer to disciplinary action, including dismissal, demotion, suspension, transfer, or decertification, and creates a Class 1 misdemeanor for any law-enforcement officer who wears a facial covering in violation of the provisions of the bill unless the law-enforcement agency that employs such law-enforcement officer has adopted and established a written policy for and restrictions on the use of facial coverings. The bill also directs the Department of Criminal Justice Services to develop a model policy for and restrictions on the use of facial coverings by law-enforcement officers. This bill is identical to HB 1482.

History

| Date | | | Collapse All |
|---|---|---|---|
| 5/20/2026 | Governor | Acts of Assembly Chapter text (CHAP1132) Chaptered | PDF | |
| 5/20/2026 | Governor | Acts of Assembly Chapter text (CHAP1132) Chaptered | PDF | |
| 5/20/2026 | Governor | Acts of Assembly Chapter text (CHAP1132) | |

| | | |
|---|---|---|
| 5/20/2026 | Governor | Approved by Governor-Chapter 1132 (effective 7/1/2026) |
| 4/22/2026 | Governor | Governor's Action Deadline 11:59 p.m., May 23, 2026 |
| 4/22/2026 | Senate | Communicated to Governor<br>Enrolled \| PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 4/22/2026 | Senate | Passed by for the day Block Vote (21-Y 18-N 0-A)<br>Vote |
| 4/12/2026 | Governor | Governor's recommendation received by Senate<br>Governor's Recommendation \| S-Governor Substitute (26110350D) |
| 4/1/2026 | Senate | Fiscal Impact Statement from Department of Planning and Budget (SB352)<br>Enrolled \| PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 3/31/2026 | Governor | Governor's Action Deadline 11:59 p.m., April 13, 2026 |
| 3/31/2026 | Senate | Enrolled Bill communicated to Governor on March 31, 2026<br>Enrolled \| PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 3/31/2026 | House | Signed by Speaker |
| 3/30/2026 | Senate | Signed by President |
| 3/30/2026 | Senate | Bill text as passed Senate and House (SB352ER)<br>Enrolled \| PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 3/30/2026 | Senate | Enrolled |
| 3/20/2026 | Senate | Fiscal Impact Statement from Department of Planning and Budget (SB352)<br>Conference Report \| Conference Report Substitute (26109868D) |
| 3/14/2026 | House | Conference report agreed to by House (62-Y 35-N 0-A)<br>Vote \| Conference Report \| Conference Report Substitute (26109868D) |
| 3/13/2026 | Senate | Conference report agreed to by Senate (21-Y 18-N 0-A)<br>Vote \| Conference Report |

| | | |
|---|---|---|
| 3/13/2026 | Conference | Conference Report released |
| | | Conference Report ⎪ Conference Report Substitute (26109868D) |
| 3/12/2026 | House | House Conferees: Schmidt, Simon, Wilt |
| 3/12/2026 | House | Conferees appointed by House |
| 3/10/2026 | Senate | Senate Conferees: Salim, Carroll Foy, Peake |
| 3/10/2026 | Senate | Conferees appointed by Senate |
| 3/10/2026 | Senate | Senate acceded to request Block Vote (40-Y 0-N 0-A) |
| | | Vote |
| 3/9/2026 | House | House requested conference committee |
| 3/9/2026 | House | House insisted on substitute |
| 3/6/2026 | Senate | House substitute rejected by Senate (0-Y 40-N 0-A) |
| | | Vote ⎪ H-Public Safety Substitute (26108862D) ⎪ PDF |
| | | Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 3/4/2026 | House | Passed House with substitute (64-Y 35-N 0-A) |
| | | Vote ⎪ H-Public Safety Substitute (26108862D) ⎪ PDF |
| | | Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 3/4/2026 | House | Engrossed by House - H-Public Safety committee substitute |
| | | H-Public Safety Substitute (26108862D) ⎪ PDF |
| | | Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 3/4/2026 | House | H-Public Safety committee substitute agreed to |
| | | H-Public Safety Substitute (26108862D) ⎪ PDF |
| | | Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 3/4/2026 | House | Read third time |
| 3/3/2026 | House | Read second time |
| 3/2/2026 | Senate | Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| | | H-Public Safety Substitute (26108862D) ⎪ PDF |
| | | Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 2/27/2026 | House | H-Public Safety committee substitute printed 26108862D-H1 |
| | | H-Public Safety Substitute (26108862D) ⎪ PDF |

Fiscal Impact Statement from Department of Planning and Budget (SB352)

| | | |
|---|---|---|
| 2/27/2026 | House | Reported from H-Public Safety committee with substitute (15-Y 7-N)<br>Vote ｜ H-Public Safety Substitute (26108862D) ｜ PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 2/12/2026 | House | Referred to Committee on H-Public Safety |
| 2/12/2026 | House | Read first time |
| 2/12/2026 | House | Placed on Calendar |
| 2/9/2026 | Senate | Fiscal Impact Statement from Department of Planning and Budget (SB352)<br>S-Finance and Appropriations Substitute (26107147D) ｜ PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 2/9/2026 | Senate | Read third time and passed Senate (21-Y 19-N 0-A)<br>Vote ｜ S-Finance and Appropriations Substitute (26107147D) ｜ PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 2/6/2026 | Senate | Engrossed by Senate - S-Finance and Appropriations committee substitute (Voice Vote)<br>S-Finance and Appropriations Substitute (26107147D) ｜ PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 2/6/2026 | Senate | S-Finance and Appropriations committee Substitute agreed to<br>S-Finance and Appropriations Substitute (26107147D) ｜ PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 2/6/2026 | Senate | S-Courts of Justice committee Amendments rejected<br>S-Courts of Justice Amendment ｜ Introduced |
| 2/6/2026 | Senate | Read second time |
| 2/5/2026 | Senate | Passed by for the day Block Vote (Voice Vote) |
| 2/5/2026 | Senate | Constitutional reading dispensed Block Vote (on 1st reading) (40-Y 0-N 0-A)<br>Vote |
| 2/5/2026 | Senate | Rules suspended |

| | | |
|---|---|---|
| 2/5/2026 | Senate | S-Finance and Appropriations committee substitute printed 26107147D-S1<br>S-Finance and Appropriations Substitute (26107147D) &#124; PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 2/4/2026 | Senate | Reported from S-Finance and Appropriations committee with substitute (10-Y 5-N)<br>Vote &#124; S-Finance and Appropriations Substitute (26107147D) &#124; PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 1/28/2026 | Senate | Reported from S-Courts of Justice committee with amendments and rereferred to Finance and Appropriations (9-Y 5-N)<br>Vote &#124; S-Courts of Justice Amendment &#124; Introduced |
| 1/28/2026 | Senate | S-Courts of Justice committee amendment offered<br>S-Courts of Justice Amendment |
| 1/20/2026 | Senate | Fiscal Impact Statement from Department of Planning and Budget (SB352)<br>Introduced &#124; PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |
| 1/13/2026 | Senate | Referred to Committee for S-Courts of Justice |
| 1/13/2026 | Senate | Prefiled and ordered printed; Offered 01-14-2026 26100635D<br>Introduced &#124; PDF<br>Fiscal Impact Statement from Department of Planning and Budget (SB352) |

LIS Home   Website Feedback   For Developers   Privacy Policy   Data Files

© Copyright Commonwealth of Virginia 2026. All rights reserved. Site developed by the Division of Legislative Automated Systems (DLAS)

# EXHIBIT F



Get Newsletter



Fairfax County local news



SCHAR SCHOOL OF POLICY AND GOVERNMENT
George Mason University.

**Biodefense: Where Science Meets Security**

Advance your career. Protect global health and security.

LEARN MORE

## Countywide

# JUST IN: Spanberger signs one bill to rein in ICE, vetoes another

By **Angela Woolsey**

Published May 20, 2026 at 12:45PM  |  Updated May 20, 2026 at 2:52PM



Scenes from a Jan. 11, 2026 ICE Out for Good protest on Maple Avenue in Vienna (staff photo by Angela Woolsey)

Virginia Gov. Abigail Spanberger has taken a mixed approach to bills from Fairfax state Sen. Saddam Azlan Salim (D-37) intended to counter the Trump administration's draconian approach to immigration enforcement.

The governor announced today (Wednesday) that she has signed SB 352 and its House of Delegates companion HB 1482, which ban law enforcement officers from covering their faces, while vetoing legislation (SB 351 and HB 650) that would restrict federal immigration agents from conducting civil arrests in certain public places, including courthouses, schools and health care facilities.

The legislative actions were accompanied by an executive order directing state agencies to prohibit the federal government from accessing state property or using it as a staging

site for civil immigration enforcement unless officers have a "valid warrant or order."

The state government must also develop guidance for local prosecutors, hospitals, schools and elections workers for handling interactions with federal immigration officers. A website will be established "to help Virginians understand their rights and report alleged legally prohibited practices by federal agents."

"Law enforcement officers wearing masks on American streets undercut basic expectations of accountability, sow fear and confusion, and erode the public trust," Spanberger said. "Americans have witnessed the horrors of what can occur when masked federal immigration enforcement agents engage in fear-based policing and enforcement theatre on American streets — like in Minnesota where Renee Good and Alex Pretti were murdered."

Spanberger's office noted that Virginia has seen a "significant increase in immigration-related detentions" since President Donald Trump took office for a second term in January 2025.

Though Trump's administration has touted its mass detentions and deportations as an anti-crime campaign targeting "worst of the worst," only about 30% of the approximately 14,687 people detained in Virginia between January 2025 and March 2026 have been convicted of a crime, and in over 200 of those cases, the most serious offense was a traffic violation, WRIC reported based on information collected by the Data Deportation Project.

The governor presented her executive order directing state entities to develop protocols for handling encounters with U.S. Immigration and Customs Enforcement and other federal immigration agencies as an alternative to the bills restricting civil arrests in courthouses and other facilities passed by the General Assembly.

"I appreciate the goal and intended purpose of this bill, but in practice, this legislation would not achieve the intended goals," Spanberger said in a statement explaining her veto. "It would effectively require security guards and, in some cases, local law enforcement be placed in the untenable position of choosing between violating state law or federal law, rendering this proposal unworkable."

# Amendments were rejected

At a reconvened session last month, the General Assembly rejected amendments proposed by Spanberger to both the masking and civil arrests bills that Salim said would've rendered them "toothless."

SB 352 and its House companion include exceptions to the face covering ban for cases where a mask is necessary to protect against infection or exposure to toxic substances, or the officer is carrying out official duties as part of a SWAT team. Violations could be punished as a Class 1 misdemeanor, which carries a maximum possible sentence of a year in jail and a $2,500 fine.

In a substitute bill, Spanberger had proposed removing the misdemeanor designation and a requirement that law enforcement officers wear clothes or a badge identifying them and their agency when performing their duties.

As passed by the General Assembly, SB 351 and its House companion would've:

- Designated health care facilities, schools, commonwealth's attorney offices, polling places and courthouses as "protected areas" where federal civil immigration activities are prohibited
- Required federal immigration officers to present identification, a judicial warrant authorized by a court or judge and a justification to enter courthouses for an arrest
- Prohibited police or other security personnel assigned to the courthouse from letting someone in without meeting those requirements
- Defined a violation of the ban on civil arrests without a warrant in courthouses as contempt of court, which can be punished in Virginia with a fine of $250 or up to 10 days in jail
- Allowed Virginia's attorney general to bring civil charges against violators

Spanberger's substitute removed the additional requirements around civil arrests at state and local courthouses and provisions specifying how violations would be punished. She

also specified that the legislation "shall [not] be construed" to nullify claims of qualified immunity and set a two-year limit for filing civil lawsuits over violations.

## Legislators react to governor's actions

Salim said he was "glad to see" Spanberger sign his bill prohibiting face coverings for law enforcement, calling the legislation "an important step toward strengthening transparency and accountability."

"By prohibiting masked law enforcement officers in most public-facing situations, the bill ensures that public employees are clearly identifiable while interacting with the people they serve, which supports trust, visibility, and responsible policing," Salim said in a statement. "At a time when Virginians expect both safety and accountability from their institutions, this legislation reinforces the principle that law enforcement should operate openly and with the public's confidence."

Del. Charlie Schmidt (D-77), who represents parts of Richmond and Chesterfield County and sponsored the House version of the bill, described the restriction as a reflection of the state legislature's commitment "to protecting Virginians from the unprecedented, dangerous and lawless actions by ICE and the federal government."

Salim and Del. Katrina Callsen (D-54), who represents parts of Charlottesville and Albemarle County and filed the House bill limiting civil immigration arrests without warrants, argued that Spanberger's veto of their legislation "undermines public safety and accountability."

"This veto was a choice not to stand up to the Trump administration's persecution of marginalized communities and protect our immigrant neighbors, but it is not the end," they said. "We will continue to work with the administration and fight for policies that keep our communities safe, protect the rights of Virginians, and stand up for public safety and the rule of law, not retreat from them."

In her veto explanation, Spanberger said she understood the desire to "send an important signal" reassuring immigrants in Virginia that they can access courts, schools

and other services without fearing detention, but the message would've been misleading.

"Communicating that immigrant families are protected from immigration action in places they are not by virtue of federal law would put families at risk," she wrote.

Salim, whose district includes Tysons, Vienna, Oakton and the cities of Falls Church and Fairfax, also filed SB 783 prohibiting state and local law enforcement agencies from entering into cooperative agreements with ICE or using their resources to assist with enforcing federal civil immigration laws.

The General Assembly accepted an amendment that expanded an exception for transferring adults convicted of violent felonies from prisons and jails to include any adult facing a judicial warrant, and the bill was signed into law on April 22. The bill will take effect on July 1.

## About the Author



### Angela Woolsey

Angela Woolsey is the site editor for FFXnow. A graduate of George Mason University, she worked as a general assignment reporter for the Fairfax County Times before joining Local News Now as the Tysons Reporter editor in 2020.

#Abigail Spanberger   #federal government   #General Assembly   #ICE

#immigration   #public safety   #Reston   #Saddam Salim   #Tysons

   

# Featured Event



## Food Truck Friday Summer Series

September 25, 2026
12:00 pm–2:00 pm

Read More →



**ALSO ON FFXNOW**

**Not Your Average Joe's in Reston to close ...**

12 days ago · 8 comments

Previous Image 1/2 Next Image A decade of business in Reston will come to an ...

**County board approves sweeping ...**

12 days ago · 1 comment

The Fairfax County Board of Supervisors voted unanimously yesterday ...

**Centreville High School renovation ...**

5 days ago · 2 comments

Fairfax County Public Schools has long planned to renovate and expand the ...

**New trai McLean**

14 days ag

Previous Image A celebratic

## FFXnow Comment Policy

Please read our Comment Policy before commenting.

Got it

1 Comment                                                               1   Login ▼

G          Join the discussion…

LOG IN WITH                          OR SIGN UP WITH DISQUS   ?

                                     Name

♡        **Share**                                Best   Newest   Oldest

**Dear Prudence**                                                   —   ⚑
2 months ago

Where are they getting the stats on that 30%? I dont think that is accurate

0         0      Reply   ⎘

Subscribe          Privacy          Do Not Sell My Data

# Featured Event



## McLean VFD-Inova Blood Drive

July 10, 2026
1:30 pm-6:30 pm

Read More →



FAIRFAX COUNTY, VA

     

Advertise

Contact Newsroom

Email Newsletter

Event Calendar

Readers' Choice

Privacy & Other Policies

Public Notices on FFXnow

Site Navigation

ARLnow (Arlington)

ALXnow (Alexandria)

FFXnow (Fairfax Co.)

MoCoShow (Montgomery Co., Md.)

PoPville (Washington, D.C.)

Potomac Local (Pr. Wm. & Stafford)

RunWashington

WSHnow (D.C. area)

©2026 Copyright Local News Now LLC. All Rights Reserved.

# EXHIBIT G



VPM
On-Air Now

                                    ❤ DONATE

LAW

# Trump administration relying on unmarked vehicles in immigration enforcement

OCTOBER 28, 2025 · 4:57 AM ET

HEARD ON MORNING EDITION

 Chiara Eisner

▶   **4-Minute Listen**                          **+** PLAYLIST      TRANSCRIPT      ⋯

Some federal immigration agents have been using masks to cover their faces when arresting migrants. But an NPR investigation found agents are also disguising their vehicles.

☰ **Transcript**

STEVE INSKEEP, HOST:

In this country, federal immigration agents are using masks to cover their faces when arresting people. Agents are also masking their vehicles by operating cars without license plates or by switching plates. The evidence for this includes videos reviewed by NPR. NPR's Ximena Bustillo and Chiara Eisner investigated. And here's Chiara.

CHIARA EISNER, BYLINE: The founder of the Eyes Up application, an app to share videos of federal agents arresting migrants, has reviewed hundreds of videos over the past few months. He said he's noticed some patterns in the cars federal agents are driving when they detain people across the country.

UNIDENTIFIED PERSON: So we're not only seeing a wide range of vehicles, but we're seeing older vehicles and we're seeing disguised vehicles.

EISNER: During arrests, cars that the agents are using don't typically have the agency name on the side of the car. And they sometimes have no license plates on the back either.

UNIDENTIFIED PERSON: I would say roughly 5%. Five to 10% of these videos have vehicles with no plates.

EISNER: The founder of the application asked NPR not to use his name. He fears retribution for making a platform that tracks activity of the U.S. Immigration and Customs Enforcement, or ICE. But he's not the only one who has noticed this kind of disguise. In a video that appears to be in Chicago, a car that appears to be used by a Border Patrol agent had a Mexican flag painted on the hood. That video was uploaded to social media. Activists in Los Angeles have also photographed federal agents leaving a staging area with different license plates on the cars than those cars had on previous days.

A man who appeared to be a federal agent said something similar is happening in Illinois, too. In a video posted to social media in October, he told a bystander filming his car's plate that he needn't bother because they, quote, "change the plates out every day." ICE declined to confirm that the men who appeared in those photographs and videos were federal agents, and NPR didn't independently verify the video's authenticity. But the Illinois Secretary of State Alexi Giannoulias said swapping plates is not allowed.

(SOUNDBITE OF ARCHIVED RECORDING)

ALEXI GIANNOULIAS: Flipping license plates or altering them in any way to avoid detection is strictly prohibited in Illinois.

EISNER: An ICE spokesperson, Mike Alvarez, said federal law enforcement agency cars are exempt from displaying plates when that interferes with their duties. ICE's own guidelines indicate agents are required to submit paperwork when they want to drive vehicles without plates. But NPR asked for that paperwork to see if employees have been filing those waivers, and ICE hasn't provided reporters with the records yet. Catherine Crump is a professor at the UC Berkeley School of Law, who focuses on cases at the intersection of technology and civil liberties. She said concealing the identity of vehicles is risky for the public.

CATHERINE CRUMP: You have to be able to identify officers so you can vindicate your constitutional rights when they're violated. And to the extent, this is yet another step ICE agents are taking to conceal their identities and avoid accountability.

EISNER: Police officers do go undercover sometimes.

DANIEL HODGES: Unmarked cars are good for some things.

EISNER: That was Daniel Hodges, an officer with the Metropolitan Police Department in Washington, D.C., who was attacked on January 6 at the riot on the U.S. Capitol. Since August, ICE has increased activity in D.C. and has arrested more than 900 migrants in the city. But Hodges says it's unclear what benefit unmarked cars have for immigration arrests. And masking vehicles could make it harder for police to do their jobs.

HODGES: I think that's causing a great deal of erosion of trust that we've worked to build up over the last few years. We've got to live with that destruction of trust after the feds go away.

EISNER: But the federal agents and their cars might not be going away anytime soon. ICE received $70 billion from Congress over the summer to expand its operations, including adding vehicles to its fleet and hiring thousands of new deportation officers.

Chiara Eisner, NPR News.

(SOUNDBITE OF DAVID HOLMES' "THE TRUNK SCENE")

*Copyright © 2025 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*Accuracy and availability of NPR transcripts may vary. Transcript text may be revised to correct errors or match updates to audio. Audio on npr.org may be edited after its original broadcast or publication. The authoritative record of NPR's programming is the audio record.*

  

## The free press is powered by people like you.

The NPR Network will never bend to special interests. Our editorial independence means our coverage is never bought. We work for you.

Sustain this public service today by taking action to support this free press.

**DONATE NOW →**

## More Stories From NPR

IMMIGRATION
### ICE is spending millions of dollars on iris scanners, expanding its arsenal of tech tools

IMMIGRATION
### Minneapolis grapples with the impact of Trump's largest immigration crackdown yet

THE NPR POLITICS PODCAST
### Trump approval is worst ever in new poll : The NPR Politics Podcast

NATIONAL
### Suspect dead after opening fire near White House security checkpoint, Secret Service says

IMMIGRATION
### Under Trump, spouses of U.S. citizens face policy changes in the immigration system

IMMIGRATION
### Stuck in limbo: millions of professionals risk losing legal status under Trump pause

## Popular on NPR.org

SOCCER EDITION
### The U.S. faces Belgium in the World Cup on the heels of Trump-Infantino red card call

SOCCER EDITION

## Historic World Cup furor at 'incomprehensible' FIFA decision to let U.S. forward Balogun play

NATIONAL

## Despite stiff political headwinds, tribe in Colorado brings utility scale solar project online

LIVING BETTER

## Fast walkers in their 80s cut their risk of cognitive decline by half, a study finds

HEALTH

## These Medicare beneficiaries thought their drug plan was free. Then they lost it

NEWS

## Paul Pelosi in hit-and-run in California, car left with major damage, authorities say

## NPR Editors' Picks

THE PICTURE SHOW

## Militant LGBTQ+ rights group 'the Lavender Panthers' was founded on this day in 1973

LIFE KIT

## Hate food waste? 7 creative ways to turn your leftovers into a new meal

CULTURE

## Philip Glass' new symphony premieres at Tanglewood after Kennedy Center cancellation

MIDDLE EAST CONFLICT

## Huge crowds of mourners join a funeral procession for Iran's Ayatollah Ali Khamenei

WORLD

## Russian missile and drone attack on Ukraine's capital kills at least 12

WORLD

## Trump won spending promises from NATO last year. This week, he'll try to enforce them

READ & LISTEN

**Home**

**News**

CONNECT

**Newsletters**

**Facebook**

**Culture**

**Music**

**Podcasts & Shows**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Transcripts**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

**Accessibility**

**Ethics**

**Finances**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2026 npr

# EXHIBIT H



HOURLY NEWS
LISTEN LIVE
MY PLAYLIST

VPM
On-Air Now

  

♥ DONATE

## IMMIGRATION

# Masked immigration agents are spurring fear and confusion across the U.S.

UPDATED JULY 10, 2025 · 5:00 AM ET

HEARD ON MORNING EDITION

By Leila Fadel, Adam Bearne, Barry Gordemer, H.J. Mai

▶ 7-Minute Listen          + PLAYLIST          TRANSCRIPT          ⋯



Federal agents wearing masks patrol the halls of the immigration court at the Ted Weiss Federal Building in New York City on July 9.

*Michael M. Santiago/Getty Images*

*Editor's note: Some of the video descriptions in this story depict violent arrests.*

A man lies pinned in the middle of the road, groaning in pain. He's surrounded by men in tactical gear marked "Police," their faces covered by masks and dark sunglasses. One officer punches him repeatedly in the head.

Outside a courthouse in San Antonio, a woman and her 3-year-old son are led away by men in plainclothes with their faces obscured. Her husband calls out, "My wife, my son," in Spanish.

These scenes have been captured in various videos posted online by firsthand witnesses of the Trump administration's aggressive crackdown on illegal immigration across several U.S. cities.



**NATIONAL**

**Masked officers in Tufts student arrest raise fears among immigrants and bystanders**



**NATIONAL**

**ICE raids grow tense as protesters confront immigration agents**

The arrests follow a pattern: masked agents, including Immigration and Customs Enforcement and other federal officers assigned to work with ICE, wearing plainclothes and sometimes arriving in unmarked vehicles. Department of Homeland Security (DHS) Assistant Secretary for Public Affairs Tricia McLaughlin told NPR that agents are covering their faces to protect themselves from doxing and increasing threats. But civil rights groups and legal advocates say it's creating fear and undermining public trust.



**IMMIGRATION**

**'Antagonized for being Hispanic': Growing claims of racial profiling in LA raids**

"It may well be a reason for masking if you are engaged in a clandestine operation against an organized drug ring or a well-armed gang of some sort," said Stephen Kass, a member of the New York City Bar Association, which last month criticized agents for obscuring their identities through masking. "But that's not what's happening here."

Kass is referring to arrests like the one that Job Garcia witnessed at a Home Depot in Hollywood, Calif.

Garcia, a 37-year-old photographer and Ph.D. student at Claremont Graduate University, had just left the store when he saw men surround a box truck with a Latino man in the driver's seat. Some wore vests that read "POLICE — U.S. BORDER PATROL," and their faces were covered.

Then, one smashed the truck's window.

"Hey, no les abra! Yo, are you f\*\*\*ing serious, bro?" Garcia is heard yelling in the video he recorded, in which he warns the driver in Spanish to not open his door.

When he stepped closer to film, Garcia says, agents shoved him to the ground.

"Get down! Get him down!" one shouted.

Garcia was detained for more than 24 hours. He said he was never told why, despite repeatedly stating he was born and raised in Los Angeles.

"They never said what I was being detained for," he said.

Garcia said he recorded agents because he "knew what these supposed ICE agents were doing was wrong, was unlawful," adding that he wanted them held accountable for how they were going about their arrests.

"When you have masks on, you will look a little bit more terrifying. And I think what they were trying to do is inflict terror in the community," he said.

Garcia believes the agents appeared to single him out because he's Latino.

"They saw my appearance as a threat because there were also other white bystanders who were yelling at them. And they didn't go after them."

He's now suing DHS and seeking $1 million in recompense, alleging he was targeted for speaking up.

"What they're doing is actual terror, and the pain they're inflicting on the community is huge. Stripping people from their families — this is beyond politics. This is harming actual human beings."

Garcia is being represented by the Mexican American Legal Defense and Educational Fund (MALDEF).

"There weren't warrants presented by these Border Patrol or ICE agents to the individuals in the parking lot," said MALDEF's Ernest Herrera. "A place where

predominantly Latino workers or workers of Latin American origin were seeking work. And they were, we believe, profiled because of that."

Herrera believes Garcia was also being profiled.

McLaughlin of DHS pushed back on those claims.

"It's disgusting that he's going to charge these men and women as if there is some sort of profiling going on," McLaughlin said.

She said Garcia was arrested because "he assaulted a Border Patrol officer and was actively, verbally harassing them. So it had nothing to do with his citizenship. It's the fact that he's actually going forth and assaulting [a] law enforcement officer."

When asked why Garcia says he was not given an explanation for his arrest or release, McLaughlin said, "He was arrested — I'm happy to share this specific information with you."

She added, "We have evidence that he did" allegedly assault agents. DHS did not provide NPR with evidence upon request.

McLaughlin also denied reports that ICE agents who wear masks are failing to identify themselves.

"I've been on a number of these operations," she said. "They are wearing vests that say ICE or ERO, which is the enforcement arm of ICE or Homeland Security Investigations. They clearly verbally identify themselves. And they also are flanked by vehicles that also say 'Homeland Security.'"

When asked about federal regulations that require officers to identify themselves, McLaughlin said masking is about safety.

"These are men and women who [are] being doxed online. We know that people take video of the operations as they're ongoing. Law enforcement. Their families have been targeted. Their personal addresses and information have been put on sites like Reddit and other online chat forums for people to target them," McLaughlin said.

Democratic Sens. Alex Padilla of California and Cory Booker of New Jersey have introduced legislation that would ban federal immigration agents from wearing masks during arrests. In June, Padilla was forcefully removed by federal agents from a news conference in Los Angeles while attempting to question DHS Secretary Kristi Noem about the Trump administration's decision to send in the National Guard to the city.

Kass, of the New York City Bar Association, said his group has other safety concerns.

"It also encourages violence," he said. "In many states, people are allowed to carry guns. They're also allowed to stand their ground when they're accosted by threatening strangers. This is an invitation for somebody to shoot back."

And, he added, it risks abuse.

"Once they are masked, they do not feel accountable because they do not feel they will be identified."

There have been scattered reports of people impersonating immigration agents. In Philadelphia, police said a man with a gun and a fake badge robbed an auto shop while claiming to be with ICE. In North Carolina, another man allegedly posed as an agent and forced a woman to have sex under threat of deportation. DHS says it is investigating those reports.

As for Garcia, he says life hasn't been the same since the arrest. He worries most about his mother, a U.S. citizen who has lived in the United States for four decades and doesn't speak English well.

"We don't allow her to go out anymore by herself. Not without one of us with her." He says fear has taken hold in his community, especially among the most vulnerable. "People are just staying home altogether and not coming out." He describes feeling othered in his own country.

Speaking out and suing, he says, is his way of taking back some power.

*The digital version was adapted and produced by Majd Al-Waheidi, and edited by Obed Manuel.*

immigration crackdown     ice detention     masking

  

# EXHIBIT I

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.

THE COMMONWEALTH OF
VIRGINIA, *et al.*,

    Defendants.

No. 3:26-cv-00545-REP

**EXPERT DECLARATION
OF SCOTT SHUCHART**

I, Scott Shuchart, declare under penalty of perjury that the following is true

and correct:

**Qualifications**

1. My name is Scott Shuchart. I am over 18 years old and a resident of

Maryland. I make this declaration based on my own knowledge and general

expertise in the field of immigration enforcement and law enforcement policy. I

have also reviewed the United States' Complaint, Motion for a Preliminary

Injunction, and several supporting Declarations filed in this matter. I have personal

knowledge of the facts stated herein, and if called as a witness, I could and would

testify competently to the matters set forth below.

2. I began my legal career as a law clerk on the U.S. Court of Appeals for

the Ninth Circuit in San Francisco.

1

3.      From 2010 to 2018, I served as the Senior Advisor to the Officer for Civil Rights and Civil Liberties in the Office for Civil Rights and Civil Liberties (CRCL) within the Department of Homeland Security (DHS). In that role, I consulted on policy and provided civil rights oversight for all of DHS's component agencies, including U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and the U.S. Secret Service (USSS).

4.      Outside of government, I have litigated complex cases against federal agencies. For example, I served on the litigation team that prevailed in *Negusie v. Holder*, 555 U.S. 511 (2009). From 2019 to 2022, I was the Senior Director for Legal Strategy at Kids in Need of Defense (KIND), leading impact litigation on behalf of unaccompanied minors. I was also a Senior Fellow at the Center for American Progress from 2018 to 2019.

5.      From 2022 to 2025, I served as a senior official at ICE. From May 2022 to November 2023, I was Counselor to the Director of ICE, as well as for some of that time the Acting Assistant Director for External Affairs. From November 2023 to January 2025, I was the Assistant Director for Regulatory Affairs and Policy. In that role, I had senior responsibility for ICE's written policies and regulations, including for example ICE's policy on body-worn cameras.

6.      When I worked at ICE, it had approximately 21,000 personnel, largely divided between the two principal operational directorates, Enforcement and Removal Operations (ERO) and Homeland Security Investigations (HSI), as well as a large legal department and other service units. Policy that applied to all of ICE

2

was made in the policy office I headed, while policies applicable only to ERO or HSI might be made by the Executive Assistant Director of the specific directorate, often in consultation with my office.

7. Since leaving government service, I have maintained a private law practice and have also consulted for corporations and nonprofit institutions on public policy, including immigration, law enforcement, and privacy policy. I filed an expert declaration on law enforcement policy issues similar to those at issue here in *United States v. California*, No. 2:25-cv-10999 (C.D. Cal.).

8. Through this experience inside and outside of government, I have both personal knowledge and a thorough understanding of many of the policies and practices of ICE's two directorates, including those applicable to uniform appearance, use of force, and wearing of indicia, and a more general understanding of policies applicable in CBP and across federal law enforcement.

9. Since early 2025, there has been considerable public attention on changes in ICE's practices with respect to officers wearing face-covering masks and hiding personal identifiers (name tags or indicia). Some of these practices have also been undertaken by the many federal agencies that have been delegated immigration enforcement authority or have otherwise been detailed or seconded to support ICE's immigration enforcement mission.

10. Several states have considered or enacted legislation in the last six months to address the rise in law enforcement officers wearing face-disguising masks and removing personal identifiers. In addition to the Virginia enactment at

issue here, which adds Va. Code § 19.2-83.6:1 and amends Va. Code § 18.2-422, I have reviewed similar statutes including California SB 627 (No Secret Police Act) and SB 805 (No Vigilantes Act); Connecticut's S.B. 397, Pub. Act No. 26-14 (An Act Concerning Democracy and Government Accountability and the Use and Retention of Data Derived from Automated License Plate Reader Systems); and New Jersey's S.B. S3114 and 3216/A1743 (Law Enforcement Officer Protection Act).[1]

**Summary of Conclusions**

11.     Based on my experience and review, my principal opinions are as follows: *First*, routine use of identity-concealing masks and removal of visible individual identifiers during ordinary public-facing immigration enforcement was not standard ICE practice before 2025. *Second*, officer-safety concerns can be addressed through written policies, supervisory risk assessments, officially issued equipment, and limited exceptions for undercover, surveillance, tactical, medical, and other sensitive circumstances, rather than ad hoc disguises left to officer discretion. *Third*, the United States' declarations do not show that routine masking or withholding of unique identifiers is necessary across ordinary public-facing enforcement operations. And, *fourth*, ad hoc masking and lack of visible agency or individual identifiers can increase public-safety risks by creating confusion,

---

[1] I understand that the present motion concerns only the masks and identifiers issue and not the changes to Va. Code § 15.2-1726.1 regarding intergovernmental immigration enforcement agreements. This Declaration therefore does not address any expert opinion I may have or later provide regarding such agreements.

increasing the risk of impersonation, impeding oversight, and escalating encounters.

<h2 style="text-align:center">Background</h2>

12. Federal statutory law regulating law enforcement officer uniforms and indicia is limited. The area is largely governed by policies created by individual federal departments and agencies pursuant to their general authorizing statutes. The principal applicable federal statutes, to my knowledge, are (a) 5 U.S.C. § 5901, concerning who pays for law enforcement uniforms, and (b) 10 U.S.C. § 723, which was first enacted in 2021. Under that provision, "Whenever . . . Federal law enforcement personnel provide support to Federal authorities to respond to a civil disturbance, each individual employed in the capacity of providing such support shall visibly display . . . the individual's name or other individual identifier that is unique to that individual" and the name of the entity employing the individual. However, this requirement is not applicable to plain-clothes or undercover personnel. *Id.* § 723(c). I understand that by policy and practice ICE assures compliance with § 723 by special response teams (SRT) fielded by HSI—teams similar to SWAT units—but that § 723 has not been understood to apply to routine civil law enforcement by its personnel, who are generally not uniformed.[2] Section 723 is more broadly applicable to CBP, whose three operational units (Air & Marine

---

[2] A heavily redacted memorandum reflecting this policy is available on ICE's website. Memorandum Re: Special Response Team Uniform Standards (June 1, 2021), *redacted version available at* https://www.ice.gov/doclib/foia/policy/memo_SRT_UniformStandards_06.01.2021.pdf .

Operations (AMO), Office of Field Operations (OFO), and the U.S. Border Patrol (USBP)) are generally uniformed.

13.     I understand the United States also cites general agency-management and employee-safety statutes, including 5 U.S.C. § 301, 8 U.S.C. § 1103, and 29 U.S.C. § 668, as authority for its practices. While the text of those provisions speaks for itself, in my experience, those are broad provisions understood in the Executive Branch to authorize agencies to manage personnel, issue regulations, and provide safety equipment. They do not themselves prescribe a masking rule, require routine anonymity, or establish standards for withholding visible individual identifiers during ordinary public-facing enforcement.

14.     Certain policies that have been made available for public inspection have bearing on ICE's use of masks and displays of indicia. However, no public policy directly addresses use of masks for anonymity or hiding of personal identifiers. These broadly relevant policies include:

a.   The ICE Employee Code of Conduct,[3] effective 2012, which provides as paragraph 5.15, "Standard of Attire," that "ICE Employees must present a professional and positive image to the public and our colleagues both within and outside of ICE. While on official duty, employees must adhere to any applicable dress code policy where they are stationed";

_____

[3] U.S. Immigration and Customs Enforcement, Employee Code of Conduct, Directive No. 1033.1 (Aug. 7, 2012), available at https://tinyurl.com/3wv2298v.

b. The ICE Body Armor Policy,[4] effective 2005, which provides in part that "All ICE armed officers are strongly encouraged to wear their issued body armor while performing law enforcement duties," and that ERO officers "*shall* wear their issued body armor while in performance of their law enforcement duties" (emphasis added). That policy also provides that "ICE does not authorize the use of personally owned body armor for armed officers while functioning as ICE employees"; and

c. The dress code policy for ICE's Health Service Corps (IHSC) unit,[5] effective 2020, which reiterates the principles in the Employee Code of Conduct.

15. ICE ERO officers also receive a uniform allowance to cover "at least one branded polo shirt, one branded ball cap, and one branded raid jacket." As of January 2025, ICE ERO had "transitioned from a uniformed agency to one that only provides branded items . . . that are required to be worn during enforcement actions."[6]

---

[4] U.S. Immigration and Customs Enforcement, ICE Body Armor Policy, Directive No. 5-1.0 (Feb. 4, 2005), *redacted version available at* https://tinyurl.com/4rza89mu (also identified as Directive 19001.1). Note that this older policy refers to the ICE directorate now called ERO as "DRO."

[5] U.S. Immigration and Customs Enforcement, IHSC Dress Code, IHSC Directive No. 01-26, ERO Directive No. 11770.2 (Feb. 3, 2020), available at https://tinyurl.com/6tptvcfk.

[6] Department of Homeland Security, Homeland Procurement Reform Act Uniform Allowance Adequacy Study (Jan. 17, 2025), at 10, 12, available at https://www.govinfo.gov/content/pkg/CMR-HS1-00193169/pdf/CMR-HS1-00193169.pdf.

16.     These policies exist in part because clear identification of officers is important in civil immigration enforcement. That importance is further underscored by controversies over ICE's use of deceptive-entry tactics. When officers use ambiguous clothing, unmarked vehicles, or generic "police" identifiers, members of the public may reasonably be confused about which agency is exercising authority and whether the encounter is lawful. Indeed, ICE has been subject to litigation over deceptive arrest tactics, including deceptive attire. In particular, litigation has challenged ICE officers identifying themselves, verbally and in appearance, as working for any other law enforcement agency, or simply as "police." In early 2025, ICE settled one class action in *Kidd v. Noem*, No. 2:20-cv-03512 (C.D. Cal.), agreeing that officers in the Central District of California will not engage in the ruse of identifying themselves as police, including by not wearing jackets that say "POLICE" unless they also say "ICE" with equal prominence.[7]

17.     Outside of the Central District of California, it appears that ICE officers continue to rely on deception about their parent agency to effectuate civil immigration arrests. For example, according to a habeas petition and news reports, an arrest operation at Columbia University in February 2026 involved ICE officers posing as local police and pretending to look for a missing child in order to gain entrance to a university-owned apartment building without a judicial warrant.[8]

---

[7] The settlement agreement is available at https://tinyurl.com/5n6pnbr4.

[8] https://www.nytimes.com/2026/02/26/nyregion/columbia-university-ice-student.html; *see also Aghayeva v. Genalo*, No. 1:26-cv-01602 (S.D.N.Y.) (habeas petition filed Feb. 26, 2026, ECF No. 1, *dismissed as moot*, ECF No. 7 (March 2, 2026).

18.     CBP officers and agents are generally uniformed. They receive a uniform allowance of $1,100. Some of CBP's dress and uniform policies have been made publicly available. Border Patrol's policy clearly states that "*Only* uniform items obtained through the official uniform vendor(s) should be worn, and may not be altered or modified" apart from tailoring.[9] The policy further indicates that personnel must have official credentials at all times except when undercover, with nameplates or unique identifiers "worn on the outermost uniform garment and visible to the public when practicable."[10] While the public document has redactions, the only circumstance in which it appears to provide for a mask is a "Cloth face covering (free of designs and dark in color) as dictated by current guidelines as recommended by CBP, Centers for Disease Control and Prevention (CDC), Occupational Health and Safety Administration (OSHA), and other public health resources."[11] That is, the policy appears to contemplate only medical, not identity-concealing, masks.

19.     I understand from the *California* litigation and the Declaration of Justin Hargis filed in support of Plaintiff's motion that CBP may also now have a policy allowing officers "modification" of its uniform policy to wear face coverings or remove name plates from daily use uniforms when there is an assessment that the

---

[9] U.S. Border Patrol, USBP Uniform and Grooming Standards 2025, available at https://www.cbp.gov/sites/default/files/2025-11/usbp_uniform_and_grooming_standards_2025.pdf, p.3.

[10] *Id.* at 4.

[11] *Id.* at 22, 23, 24.

risk of doxxing is high; but the policy, if it exists in written form at all, does not appear to have been publicly released.

20.     As far as I know, ICE has no formal or written policy on wearing masks or removing identification, and no public policy setting forth the purpose, standards, or manner in which officers or agents may wear masks or hide nameplates. ICE maintains on its website the body armor policy, noted above, that generally prohibits ad hoc additions. While the Declaration of Erik S. Weiss says that "ICE policy permits personnel to use any facial covering they feel is appropriate to meet operational needs and to protect them from health hazards" (¶ 42), I am unaware of any public, written policy that says so. If there is such a policy, it would apparently modify or supersede the public policies prohibiting personally-supplied armor and requiring adherence to dress code.

21.     As a general matter, large state and local law enforcement agencies often do have uniform policies that address masking and badging, along the lines of the "model policy" required by the Virginia enactment, § 9.1-102.73. For example, the New York Police Department's public policy addresses the need to wear a nameplate and authorizes only balaclavas that do not cover the face,[12] and the Chicago Police Department's standards, even for riot control uniforms, authorize balaclavas only when "worn in such a manner that the face is not covered."[13]

---

[12] New York Police Dep't, Admin. Guide #305-04 (June 4, 2025), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/public-adminguide1.pdf.

[13] Chicago Police Dep't, Uniform and Appearance Standards, U04-01 (Jan. 15, 2026), http://directives.chicagopolice.org/#directive/public/6169.

22.     I am unaware of any law enforcement agency that, as a matter of course, authorizes individual officers to decide when to remove their name badges as a matter of ad hoc discretion, as ICE apparently does, as opposed to requiring a supervisory assessment of risk, which is apparently the CBP policy. Nor am I aware of any agency that allowed officers to add personally obtained, non-medical face masks to an on-duty uniform as a matter of ad hoc discretion, before federal agents conducting immigration enforcement began to do so in 2025.

23.     Like ICE, the FBI, and the DEA, many law enforcement agencies engage in plain-clothes surveillance, plain-clothes meetings with confidential informants, and other plainclothes work. I am not aware of any state or local law enforcement agency that, as a matter of policy, allows officers to routinely wear masks when in other duty status simply to reduce the chance the officers are identified when in plain clothes. I am aware that some agencies allow officers who are or may be doing undercover work to cover their faces when in uniform to avoid being so identified.

**Recent Changes**

24.     Since January 2025, ICE, CBP, and other federal law enforcement officers have increasingly appeared in public conducting civil immigration enforcement (a) with their faces covered with masks, bandanas, or gaiters; and (b) without uniforms, agency name identifiers, or individual identifiers like badge numbers. Notably, no agency appears to have issued a mask as a piece of official uniform, armor, or equipment. Rather, officers and agents appear to have been

11

allowed to source their own face coverings, which frequently bear images of the "Punisher" comic-book villain logo, skulls and other gang-related insignia, the "thin blue line" flag, and images taken from horror and genre films.[14]

25. These were extremely uncommon practices for federal officers and agents prior to 2025. Rather, in a typical ICE ERO enforcement action, officers would wear body armor and a jacket or vest clearly marked as "ICE" or "ICE POLICE" and would generally have a credential, bearing their badge and number, visible on their person, without an identity-concealing face mask.[15]

26. I am aware that, since January 2025, ICE leadership has stated publicly that it supports officers wearing masks and failing to display agency or individual identifiers due to fears of "doxxing" and other concerns for individual officer safety. Prior to 2025, I am not aware of the agency making any effort to conceal officer appearances with masks or hide badges, although the concerns for officer safety are long-standing and predated 2025, as noted in several of Plaintiff's supporting declarations.

27. I am aware that the United States has alleged an escalating set of numbers purporting to show a massive increase in assaults on law enforcement

---

[14] *See, e.g.*, https://www.reddit.com/r/ICE_Watch/comments/1qv0qmx/ while_abducting_someone_from_the_middle_of_a_busy/ (full face mask with half-skull); https://www.ksla.com/2025/11/02/homeland-security-official-responds-images-ice-agents-wearing-halloween-masks/ ("Chucky" and other Halloween masks); https://www.instagram.com/p/DOTl1ifjdBY/?hl=en (skull mask on ICE officer at detention facility).

[15] *See, e.g.*, https://www.youtube.com/watch?v=wcCZhs7Ijw4; https://www.foxnews.com/video/6366233990112 ("ride-along" videos showing typical ICE gear in late 2024).

personnel. I am not clear what is being considered a "death threat" in these statistics, but my understanding from my familiarity with DHS statistics is that the publicized increase in "assault" numbers do not differentiate between serious assaults and routine forms of unwanted touching that are inherent risks of conducting hands-on law enforcement work. Media reports attempting to understand DHS's claims of 1000% or more increases in assaults have found no objective basis for those claims.[16] By one objective measure—actual referrals for prosecution for assaults on DHS officers—in 2025, DHS only referred about twice as many individuals for prosecution for assaulting its officers as in its previous highest year, 2019, following a push to increase referrals for prosecution.[17]

28. Even if one grants a substantial increase in threats and assaults against federal law enforcement since January 2025, it is much harder to identify cases where physical attacks have actually been facilitated by "doxxing." Indeed, it is not clear there has been even a single episode of a federal agent being assaulted when out of uniform, outside of an operation, as a result of "doxxing," and the

---

[16] *See* "ICE Officers Face an 8,000% Increase in Death Threats Against Them and Their Families," https://www.dhs.gov/news/2026/01/26/ice-officers-face-8000-increase-death-threats-against-them-and-their-families (Jan. 26, 2026) (claiming 1,300% increase in assaults, inconsistent with the 1,000% figure cited in Plaintiff's declarations); see also, e.g., A. Sherry et al., "White House claims 'more than 1,000%' rise in assaults on ICE agents, data say otherwise," NPR (Oct. 10, 2025), https://www.npr.org/2025/10/10/nx-s1-5565146/white-house-claims-more-than-1-000-rise-in-assaults-on-ice-agents-data-says-otherwise.

[17] W. Sytsma & N. Schwellenbach, "DHS Assault Cases Spiked to a Record High," Project on Government Oversight (Feb. 24, 2026), https://www.pogo.org/investigates/dhs-assault-cases-spiked-to-a-record-high-experts-and-judges-have-raised-alarms.

declarations I reviewed do not identify a single physical assault on an officer (or their family) when off-duty and outside of an enforcement operation, that resulted from facial visibility during an enforcement operation. A June 2025 analysis in the Washington Post identified no such episodes. While Plaintiff's declarations discuss elevated risks, threats, and intelligence of such, the only physical attack related to doxxing of a concealed identity that I see identified in the declarations is the slashing of the tires of an unoccupied, unmarked vehicle. Weiss Decl. ¶ 38; *cf.* Decl. of Matthew W. Allen (describing "[a]nticipated [i]mpacts" but no past examples); Decl. of Ian Kaufmann (opining that law "could reasonably be expected" to have adverse impacts but not citing past examples of doxxing-related assault); Hargis Decl. ¶ 9 (describing multiple alarming doxxing incidents and threats, none of which are tied to a physical assault).

29. The Plaintiff's brief and declarations leave out the critical context for this rise in threats and assaults. In the years before 2025, most immigration enforcement took place at the U.S. border; in jails and prisons; and in targeted fugitive operations rather than at-large sweeps. The volume of at-large enforcement that ICE, CBP, and officers borrowed from other federal agencies have been conducting has risen markedly over that same time period, with operations like Midway Blitz in Chicago and Metro Surge in the Twin Cities leading to thousands of encounters between officers, agents, and the general public that had no parallel in prior years. This is not to justify any harassment or assault, but to note that one would ordinarily expect adverse events to scale alongside a dramatic increase in

encounters between law enforcement and the public; all the more when those encounters are large-scale, dramatic, and lead to civilian casualties, as took place in Metro Surge.[18]

**Assessment**

***1. Accountability, Oversight, and Interactions with the Public***

30.     Law enforcement oversight depends on investigators being able to discover, after the fact, which officers or agents were involved in potential misconduct. A visible identifier—ideally a name tag, or when necessary, an identification number that can be linked to an individual officer with agency records—is critical to that inquiry. Only by recording the specifics of the personnel with whom they interact can members of the public file meaningful, actionable reports or complaints about improper conduct by officers. Investigating an excessive force or unlawful arrest complaint at DHS, for example, would be effectively impossible without a name or numerical identifier that would allow an oversight office to identify the personnel involved in the incident, unless there were cell-phone or body-camera footage that allowed for visual identification.

31.     I am unaware of any officer safety or privacy reason to fail to display a badge number or similar identifier, even in circumstances where an officer's own name could present some risk of exposure. It is true that officers generally bear one

---

[18] In well publicized incidents, an ICE agent fatally shot one U.S. citizen in a traffic encounter on January 7, 2026, and CBP officers fatally shot another citizen upon taking him down to the street on January 24, 2026. *See* Killing of Renée Good, Wikipedia, https://en.wikipedia.org/wiki/Killing_of_Renée_Good; Killing of Alex Pretti, Wikipedia, https://en.wikipedia.org/wiki/Killing_of_Alex_Pretti.

badge number throughout their tour at an agency. But even if—and I am unaware of this being a well-founded concern—outside observers were able to link badge numbers to officer names, the agency could always issue a short-term identification number, to be worn on uniforms and changed regularly, for visibility and accountability. That is, a temporary or operation-specific identifier could be assigned for a defined period or operation and recorded internally so that oversight personnel can identify the officer if a complaint or use-of-force review later arises, while members of the public would not be able to determine the officer's name or personal information from the identifier alone. There is no logical reason that an officer would be placed at risk by displaying an anonymized number that is meaningful only as an index to agency records. I have not found any such reason offered in Plaintiff's supporting declarations.

32. I have familiarity with DOJ, DHS, and component policies concerning body-worn cameras in pre-planned federal law-enforcement operations. Those policies reflect an agency judgment that transparency and accountability can be compatible with planned arrests, searches, and other enforcement operations. In my experience, the same principle applies to visible agency identification and unique officer identifiers. Accountability measures can be structured to protect officer safety while preserving the ability to identify officers after the fact for oversight, complaint review, use-of-force review, and discipline where appropriate.

33. Visible identifiers are especially important because after-the-fact oversight depends on the ability to determine which officers participated in an

16

incident. DHS has multiple oversight mechanisms, including the Office of the Inspector General and component offices of professional responsibility, but those mechanisms cannot function effectively if complaints, videos, or witness accounts cannot identify the officers involved.

34.     Officers in intimidating, ad hoc masks, without visible identification, are at greater risk of a hostile encounter with the public. This is true for several reasons: The public may worry that the officers are in fact impersonators, since they are not in regular gear; the public may be on edge due to threatening (Punisher, etc.) symbolism inconsistent with a law enforcement role; masks can inhibit verbal and nonverbal communication; and members of the public may recognize that without identification in the form of a name tag, badge number, or facial features, the officer has a level of impunity from oversight or accountability, meaning that the public has less protection from misconduct by those officers.

35.     A recent Illinois statutory commission's report on Operation Midway Blitz confirms these points. It identified "ICE agents concealing their identities [as] a prime example of paramilitary style tactics that created a sense of occupation" and "a perception that the state did not want to be truthful about incidents where agents used force."[19] The Illinois commission noted that use of unmarked rental vehicles, plain clothes, and masks also supported suppression of lawful observation and protest of the officers.

---

[19] Illinois Accountability Commission, Final Report (April 2026), at 123, https://ilac.illinois.gov/2026-04-iac-final-report.html.

36.     Paragraph 120 of the Complaint mischaracterizes federal agents' obligations to announce their identities in the course of an immigration arrest. Title 8, C.F.R. § 287.8(c) provides regulatory standards for the conduct of immigration arrests. While the Complaint describes immigration officers as having "discretion as to when they announce themselves," the text of the regulation provides an objective, nondiscretionary standard: "At the time of the arrest, the designated immigration officer shall, *as soon as it is practical and safe to do so* . . . identify himself or herself as an immigration officer . . . and[ s]tate that the person is under arrest and the reason for the arrest." *Id.* § 287.8(c)(iii) (emphasis added). I am not clear why the government says this is discretionary, rather than a bright-line rule.

37.     The categories of circumstances in which masking may be operationally justified are generally identifiable in advance and can be addressed by written policy. In my experience, those circumstances include undercover work; surveillance; certain gang, drug, or organized-crime investigations; tactical operations; specific medical or environmental hazards; and other particularized safety risks identified through supervisory review. I do not understand ordinary public-facing civil immigration enforcement to require routine identity-concealing masks as a categorical matter, and I can think of no reason that an exception for an unusual operation should be decided ad hoc by front-line officers rather than by supervisors implementing a written policy.

### 2. Risks of Ad Hoc Masking

38. I acknowledge that there are circumstances in which an officer wearing a face covering for non-medical reasons may be necessary or sensible in light of specific risks, as noted in Plaintiff's declarations. However, what Plaintiff's presentation leaves out is that concealing the face also creates significant risks to officers and to the individuals with whom they interact. Non-verbal communication through facial expressions and clarity of speech, particularly when dealing with hearing impaired or limited English proficient persons, can be beneficial in a high-tension encounter.

39. The body armor and uniform policies cited above expressly prohibit officers and agents from wearing any body armor sourced themselves as opposed to supplied by the agency. It is striking, in that context, that federal agencies have encouraged mask wearing without identifying or supplying an approved, official mask as part of a uniform or tactical equipment suite. In other words, if officer-safety face coverings were warranted, based on my expertise in law enforcement policy and procedures, I would expect face coverings to be treated as any other officer-safety equipment, issued by the agency and used in conformity with a uniform or equipment policy.

40. The fact that ICE appears to have informally allowed its personnel to wear irregular face coverings, rather than a uniform mask with a reasonable accompanying policy, in my view undermines the suggestion that wearing those masks is necessary to officer safety. If the point is to project law enforcement

authority while protecting officer anonymity, a uniform mask would only further that aim, whether or not warranted. By instead allowing officers to wear ad hoc masks and comic-book villain logos, ICE has decreased the clarity of its officers' presentations, increased the risk of conflict with the public, and raised the likelihood that they can be impersonated by bad actors.

41. Indeed, the ad hoc nature of ICE officers' appearance has coincided with a significant rise in officer impersonation crimes.[20] A May 2026 investigation found a 600% increase in crimes committed by people impersonating immigration agents since the widespread use of ad-hoc masks began last year,[21] and an October 26, 2025 FBI bulletin warned police that "Criminal Actors Impersonate ICE Agents to Commit Violent Crime."[22] It does not appear from Plaintiff's declarations that this risk is being taken into account when agencies decide to allow ad hoc mask use.

42. The failure to display agency or individual identifiers, officers' wearing of masks, and the driving of unmarked vehicles also increase the risk of federal officers being mistaken, by the public or by other (state, local, or tribal) law enforcement agencies, as criminal elements warranting a law enforcement response.

---

[20] https://www.cnn.com/2025/10/02/us/ice-impersonator-incidents-rise-invs-vis.

[21] https://www.nbcnews.com/news/us-news/ice-impersonators-immigrants-raids-violence-trump-administration-rcna265653?cid=eml_npd_nws_mrd_05252026.

[22] https://www.documentcloud.org/documents/26364028-20251016-fbi-alert-re-ice-impersonators/. The bulletin specifically notes "outdated, incorrect protective gear or equipment" as an indicator of an ICE impersonator (p. 3-4), but since ICE allows officers to wear anything on their faces, it would be impossible to determine whether an impersonator had an "incorrect" mask.

It seems self-evident that civilians engaging in conduct like making nonconsensual stops, bundling people into unmarked vehicles and driving off, brandishing long guns, and using tear gas or other less-lethal munitions would be committing serious crimes.[23] And so it is critical for public safety that federal agents deploying those tactics be understood by their targets, the general public, and especially other law enforcement elements as legitimate law enforcement personnel. Again, I do not see anything in the Plaintiff's presentation that acknowledges this risk or indicates that agencies are taking action to ensure that their masked, plain-clothes, un-badged officers are not mistaken for criminals.

43. Plaintiff fairly notes that facial recognition software has increased the risk to officers and agents of being identified off-duty. But it does not explain why there are seemingly few official policies on how to respond to this risk, outside of the CBP policy suggested in the Hargis declaration that has not been made public. It is hard to see how doxxing from publicly-available facial recognition software is different in kind from other evolving risks to officers and agents, which are dealt with through policy, application of risk-management standards by supervisors, issuance of appropriate body armor, and other ordinary law enforcement management tools. The way DHS, and especially ICE, have responded to these purported threats with a lack of written policy, lack of standards, and lack of a

---

[23] The Illinois commission noted that wearing a mask elevates kidnapping to aggravated kidnapping under that state's criminal law. Final Report, supra note 19, at 73.

uniform mask is inconsistent with a good-faith, professional response to any threat posed by facial recognition software.

44. Moreover, the fact that—to my knowledge—no state or local law enforcement agency in the country has adopted a broad policy of wearing privacy masks, despite facing similar risks from bad actors, makes me skeptical that facial recognition of federal officers is a materially different risk.

45. Some of the other allegations from the Plaintiff and its declarants about officer risk are either general risks faced by all of law enforcement, or else seemingly describe First Amendment protest activity:

a. Plaintiff describes the posting of officer identities to websites (*e.g.*, Weiss Decl. ¶¶ 39–40). I do not minimize the seriousness of doxxing or threats, and indeed I have personally experienced them. When I worked at ICE in 2022–25, my photograph and personal information was posted as a "target" on the "dhswatchlist.com" site, along with dozens of other DHS employees.[24] This and related websites argued that dozens of public servants should be fired for their personal views; I received an anonymous phone call threatening my home and children after the website posting. The posting of officer names and photos might be unpleasant, but it is hardly a distinct threat faced only now or only by federal agents.

---

24 See https://dhswatchlist.com/targets/scott-shuchart (describing this declarant as "unfit for public service").

Accordingly, the risks of doxxing can and should be balanced against the risks and harms of having anonymous, masked agents in public.

b. The declarations suggest that members of the general public observe and film federal agents "for the sole purpose of intimidating and harassing government employees." Weiss Decl. ¶ 34. This seems facially untrue: Protesters and civil observers have been documenting officer misconduct and using video of officer conduct as part of protected First Amendment political expression for many years, even before the 1991 Rodney King assault captured on videotape.

c. The declarations describe officers being followed home or to their hotels, but apart from the tire-slashing incident, do not state that anything violent happened as a result.

46. It is perhaps also relevant that the same agencies that here complain about their agents being called "terrorists" or having their officers' identities placed in databases themselves label lawful protesters as "domestic terrorists" and place their photographs in a "database"; and that the same agencies concerned about officers being subject to having their cars followed have themselves followed protesters' cars home with no predicate for a criminal investigation.[25]

---

[25] *See, e.g.*, C.J. Ciarmella, "ICE tells legal observer, 'We have a nice little database, and now you're considered a domestic terrorist,'" MSN.com (Jan. 23, 2026); Final Report, supra note 19, at 124–27; see generally *Hilton v. Mullin*, No. 26-cv-00092 (D. Me.) (litigation challenging protesters' database entries).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of June, 2026, in Chevy Chase, Maryland.

Scott Shuchart

# EXHIBIT J

# *Columbia Student Is Released From ICE After Mamdani-Trump Meeting*

Federal officials had misrepresented themselves to gain access, according to the university. Mayor Zohran Mamdani said President Trump had told him the student would be let go.

 ▶  Listen · 8:23 min

 **By Sharon Otterman**

Published Feb. 26, 2026   Updated Feb. 27, 2026

See more of our coverage in your search results.

[ **Add The New York Times on Google** ↗ ]

In a dizzying sequence of events, a Columbia University undergraduate arrested by federal immigration agents in her college apartment Thursday morning was released later in the day after New York City's mayor intervened directly with President Trump.

It was the clearest sign yet that Mayor Zohran Mamdani, who has vocally opposed Mr. Trump on immigration enforcement matters, holds enough sway with the president to bend a highly charged situation through personal relationship and persuasion.

The drama at Columbia began unfolding shortly after 6 a.m. on Thursday, when five plainclothes immigration agents arrived at the university-owned apartment building of the student and demanded to be let inside, said Claire Shipman, the acting president of Columbia, in a statement released Thursday night.

The officers falsely told the building superintendent that they were from the Police Department and said that they were searching for a missing child. The superintendent let the officers in, Ms. Shipman said.

At the apartment door of the student, Ellie Aghayeva, 29, the officers repeated the same story to gain entry. "Our security cameras captured the agents in the hallway showing pictures of the alleged missing child," Ms. Shipman said.

Once the agents entered the apartment, it was clear that they had misrepresented themselves. A public security officer arrived and asked for a warrant, which was not produced, Ms. Shipman said. They refused to give the officer time to call his supervisor, and they then took the student, she said, calling the situation "utterly unacceptable."

**Sharon Otterman** is a Times reporter covering higher education, public health and other issues facing New York City.

---

A version of this article appears in print on , Section A, Page 16 of the New York edition with the headline: Columbia Says ICE Took Student From Building Under False Pretenses

# EXHIBIT K

U.S. NEWS

# Minneapolis mourns ICU nurse killed by a Border Patrol agent as a warmhearted neighbor and caregiver



1 of 2 |  This undated photo provided by Michael Pretti shows Alex J. Pretti, the man who was shot by a federal officer in Minneapolis on Saturday, Jan. 24, 2026. (Michael Pretti via AP)

Read More

BY  MICHAEL BIESECKER, JIM MUSTIAN AND SARAH RAZA

Updated 6:26 PM EDT, January 25, 2026
Leer en español

MINNEAPOLIS (AP) — As Minneapolis mourned the intensive care nurse [killed by Border Patrol officers](#) in a hail of gunfire, those who knew [Alex Pretti](#) came forward Sunday to dispute the narrative of top Trump administration officials that he was a violent "domestic terrorist" and would-be assassin.

Pretti, 37, was remembered as kind and warm-hearted by his family, neighbors and the loved ones of the ailing veterans he treated at the Minneapolis VA Medical Center.

A video posted to social media showed Pretti reading a final salute at the foot of the flag-draped body of Terrance Lee Randolph, an Air Force vet who died at the hospital in 2024.

"Today we remember that freedom is not free," Pretti, wearing navy blue scrubs, says in the video. "We have to work for it, nurture it, protect it, and even sacrifice for it."

Randolph's son, Mac Randolph, remembered Pretti tending to his father in his final days and said he found the words "very on point" in the wake of Saturday's deadly shooting.

"He was extremely knowledgeable and caring," Mac Randolph said. "He was able to answer any questions we had and would really hear out our concerns. He treated my father and our family with the utmost dignity and respect. He was truly one of the best of us."

Family members say Pretti was deeply empathic of those he saw as being mistreated and was upset by [President Donald Trump's immigration crackdown](#) in his city. He had participated in protests following the [Jan. 7 killing](#) of [Renee Good](#) by an Immigration and Customs officer.

Pretti was also an avid outdoorsman who enjoyed getting in adventures with Joule, his beloved Catahoula Leopard dog who recently died.

"He cared about people deeply and he was very upset with what was happening in Minneapolis and throughout the United States with ICE, as millions of other people are upset," Michael Pretti told The Associated Press on Saturday shortly after his son's death. "He thought it was terrible, you know, kidnapping children, just grabbing people off the street. He cared about those people, and he knew it was wrong, so he did participate in protests."

Pretti was a U.S. citizen, born in Illinois. Like Good, court records show he had no criminal record, and his family said he had never had any interactions with law enforcement beyond a handful of traffic tickets.



**Sign up for Morning Wire:** Our flagship newsletter breaks down the biggest headlines of the day.

| Email address | Sign up |

☐ By checking this box, you agree to AP's Terms of Use and acknowledge that AP may collect and use your data pursuant to our Privacy Policy.

In a recent conversation with their son, his parents, who live in Colorado, told him to be careful when protesting.

"We had this discussion with him two weeks ago or so, you know, that go ahead and protest, but do not engage, do not do anything stupid, basically," Michael Pretti said. "And he said he knows that. He knew that."

The Department of Homeland Security said the man was shot after he "approached" Border Patrol officers with a 9 mm semiautomatic handgun. Officials did not specify if Pretti brandished the gun. In bystander videos of the shooting that emerged soon after, Pretti is seen with a phone in his hand but none appears to show him with a visible weapon.

Family members said Pretti owned a handgun and had a permit to carry a concealed handgun in Minnesota. They said they had never known him to carry it.

## Alex Pretti's family struggles for information about what happened

The family first learned of the shooting when they were called by an Associated Press reporter. They watched the video and said the man killed appeared to be their son. They then tried reaching out to officials in Minnesota.

"I can't get any information from anybody," Michael Pretti said Saturday. "The police, they said call Border Patrol, Border Patrol's closed, the hospitals won't answer any questions."

Eventually, the parents called the Hennepin County Medical Examiner, who they said confirmed had a body matching the name and description of their son.

As of Saturday evening, the family said they had still not heard from anyone at a federal law enforcement agency about their son's death.

After seeing videos of DHS Secretary Kristi Noem and others suggesting their son was a "domestic terrorist" who attacked the officers who shot him, they issued a written statement describing themselves as both heartbroken and angry.

"The sickening lies told about our son by the administration are reprehensible and disgusting," the family said. They added that videos showed Alex Pretti was not holding a gun when he was tackled by federal agents, but holding his phone with one hand and using the other to shield a woman who was being pepper-sprayed.

"Please get the truth out about our son. He was a good man," they said.

Alex Pretti grew up in Green Bay, Wisconsin, where he played football, baseball and ran track for Preble High School. He was a Boy Scout and sang in the Green Bay Boy Choir.

After graduation, he went to the University of Minnesota, graduating in 2011 with a bachelor's degree in biology, society and the environment, according to the family. He worked as a research scientist before returning to school to become a registered nurse.

## Alex Pretti had protested before

Pretti's ex-wife, who spoke to the AP but later said she didn't want her name used, said she was not surprised he would have been involved in protesting Trump's immigration crackdown. She said she had not spoken to him since they divorced more than two years ago and she moved to another state.

She said he was a Democratic voter and that he had participated in the wave of street protests following the killing of George Floyd by a Minneapolis police officer in 2020, not far from the couple's neighborhood. She described him a someone who might shout at law enforcement officers at a protest, but she had never known him to be physically confrontational.

She said Pretti got a permit to carry a concealed firearm about three years ago and that he owned at least one semiautomatic handgun when they separated.

## Pretti had 'a great heart'

Pretti lived in a four-unit condominium building about 2 miles (3.2 kilometers) from where he was shot. Neighbors described him as quiet and warmhearted.

"He's a wonderful person," said Sue Gitar, who lived downstairs from Pretti and said he moved into the building about three years ago. "He has a great heart."

If there was something suspicious going on in the neighborhood, or when they worried the building might have a gas leak, he would jump in to help.

Pretti lived alone and worked long hours as a nurse, but he was not a loner, his neighbors said, and would sometimes have friends over.

His neighbors knew he had guns — he'd occasionally take a rifle to shoot at a gun range — but were surprised at the idea that he might carry a pistol on the streets.

"I never thought of him as a person who carried a gun," said Gitar.

As a light dusting of snow fell over Minneapolis Sunday morning, community members lit candles, lay fresh flowers and stood somberly around a makeshift vigil at the site of Pretti's death. Pine cones were assembled to read, "Long live Alex Pretti." Some bouquets had a layer of frost from being out all night. A few Minneapolis police cars stood nearby.

## Pretti was passionate about the outdoors

A competitive bicycle racer who lavished care on his new Audi, Pretti had also been deeply attached to his dog, who died about a year ago.

His parents said their last conversation with their son was a couple days before his death. They talked about repairs he had done to the garage door of his home. The worker was a Latino man, and they said with all that was happening in Minneapolis he gave the man a $100 tip.

Pretti's mother said her son cared immensely about the direction the country was headed, especially the Trump administration's rollback of environmental regulations.

"He hated that, you know, people were just trashing the land," Susan Pretti said. "He was an outdoorsman. He took his dog everywhere he went. You know, he loved this country, but he hated what people were doing to it."

———

Biesecker reported from Washington and Mustian from New York. Associated Press reporter Tim Sullivan contributed from Minneapolis.



## MICHAEL BIESECKER

Biesecker is a global investigative reporter for The Associated Press, based in Washington. He reports on a wide range of topics, including human conflict, climate change and political corruption.





## JIM MUSTIAN

Mustian is an Associated Press investigative reporter for breaking news.





## SARAH RAZA

Raza covers South Dakota for The Associated Press. She is based in Sioux Falls, South Dakota.

