**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

THE UNITED STATES OF AMERICA,

*Plaintiff*,

v.

THE COMMONWEALTH OF VIRGINIA,
JAY JONES, in his official capacity as
Attorney General of Virginia, and STEVE
DESCANO, in his official capacity as
Commonwealth Attorney for Fairfax, Virginia,
*Defendants*.

Case Number: 3:26-cv-00545-REP

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
TO STAY ORDER GRANTING THE UNITED STATES' MOTION
FOR PRELIMINARY INJUNCTION AND ENJOINING ATTORNEY
GENERAL JAY JONES FROM ENFORCING SB 352 PENDING APPEAL**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..............................................................................................................ii

INTRODUCTION ..........................................................................................................................1

BACKGROUND .............................................................................................................................3

    I.    The Enactment of the Mask Law ........................................................................................3

    II.    Plaintiff's Lawsuit...............................................................................................................5

LEGAL STANDARD .....................................................................................................................6

ARGUMENT...................................................................................................................................6

    I.    Virginia is Likely to Succeed on the Merits on Appeal .....................................................7

        A.  The Mask Law Falls Squarely Within the Commonwealth's Traditional
           Police Powers...........................................................................................................7

        B.  The Mask Law Does Not Violate Intergovernmental Immunity ......................................8

           1.    The Mask Law Does Not Impermissibly Regulate the Federal Government, Its
                Agencies or Its Officers ..................................................................................8

    II.    Virginia Will Suffer Irreparable Harm If A Stay is Not Granted .....................................11

        A.  Irreparable Injury Caused by Enjoining Enforcement of the Mask Law.........................11

        B.  Uneven Evidentiary Treatment Inflicts Irreparable Harm on the
           Commonwealth .......................................................................................................13

    III.    The Federal Government Will Not Be Substantially Harmed by the Stay ......................14

    IV.    The Public Interest Strongly Favors Staying the Injunction Pending Appeal ..................16

CONCLUSION..............................................................................................................................18

CERTIFICATE OF SERVICE......................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Aghayeva v. Genalo*,
   No. 1:26-cv-01602 (S.D.N.Y.) ................................................................................. 5

*Coler v. Draper,*
   No. WDQ-12-2020, 2012 U.S. Dist. LEXIS 152476, 2012 WL 5267436 (D.
   Md. Oct. 23, 2012) ................................................................................................. 6

*Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship,*
   188 B.R. 205 (W.D.Va. 1995) ................................................................................ 6

*De Buono v. Nysa-Ila Med. & Clinical Servs. Fund,*
   520 U.S. 806 (1997) ......................................................................................... 11, 13

*Johnson v. Maryland*,
   254 U.S. 51 (1920) ................................................................................................ 10

*Kelley v. Johnson*,
   425 U.S. 238 (1976) ......................................................................................... 7, 9, 10

*Long v. Robinson,*
   432 F.2d 977 (4th Cir. 1970) ................................................................................. 6

*McCulloch v. Maryland*,
   17 U.S. 316 (1819) ................................................................................................. 8

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995) ......................................................................................... 11, 13

*Texas v. DHS*,
   123 F.4th 186 (5th Cir. 2024) ............................................................................... 8

*United States Morrison*,
   529 U.S. 598 (2000) ............................................................................................... 7

*United States v. Virginia*,
   139 F.3d 984 (4th Cir. 1998) ........................................................................... 2, 11

*United States v. Washington*,
   596 U.S. 832 (2022) ........................................................................................... 8, 9

**Statutes**

Section 19.2-83.6:1, Code of Virginia ........................................................... 1, 4, 10

Section 9.1-101, Code of Virginia ......................................................................... 3

**INTRODUCTION**

Virginia Attorney General Jay Jones respectfully requests that this Court issue a stay pending appeal of its Order granting the United States' Motion for a Preliminary Injunction enjoining the Commonwealth from enforcing SB 352.  *See* ECF No. 8; *see* Fed. R. Civ. P. 62(d). Enacted on March 31, 2026, SB 352 (the "Mask Law")  requires all law-enforcement officers to remove face coverings during encounters and to provide identifying information—including name and badge number—whenever they engage in policing or other public-facing law-enforcement activities within the Commonwealth.  *See* Virginia Code § 19.2-83.6:1.  The law would have gone into effect on July 1, 2026.

This Court should exercise its discretion to stay the preliminary injunction pending appeal. The Attorney General is likely to show that a preliminary injunction was unwarranted, and without a stay the Commonwealth will face immediate and irreparable harm. Enjoining enforcement of the Mask Law would allow officers to continue concealing their identities in ways that create confusion, prevent accountability for violations of law, enable impersonation, and erode public trust, while preventing Virginia from promoting accountability in its policing activities. A stay therefore serves the Commonwealth's best interests. This case presents difficult and genuinely novel questions at the intersection of intergovernmental immunity and traditional state police powers, and reasonable minds could—and already have—differed on how those principles apply.

The procedural posture leading to the injunction further underscores the need for a stay. The federal government had months to prepare its evidentiary submissions and, by its own account, three weeks to obtain declarations from federal employees.  The Commonwealth, by contrast, was afforded only three business days to respond.  The Court nonetheless credited the federal declarations while finding Virginia's counter-declaration insufficient, and it noted that Virginia

1

could have obtained additional time by agreeing not to enforce its own statute. Respectfully, that left the Commonwealth with no meaningful choice: either suspend enforcement of a duly enacted law or proceed on an undeveloped record.

Substantively, the district court construed the Mask Law as regulating federal operations, yet the statute does not regulate the federal government, intrude into any federal domain, or conflict with any existing federal mandate. It is a neutral, evenhanded exercise of Virginia's core police authority governing how all law-enforcement officers—state, local, and federal—present themselves during public-facing encounters within the Commonwealth. By establishing uniform identification practices that reduce confusion, prevent impersonation, and promote accountability, the Mask Law supports the Commonwealth's ability to oversee policing practices conducted within Virginia without imposing any burden on federal prerogatives or federally protected operations.

Virginia has a compelling and well-recognized interest in promoting transparency, accountability, and public trust in policing. Requiring officers to refrain from concealing their faces during public-facing enforcement is a neutral, evenhanded measure directed at the conduct of *all* officers operating in Virginia, whether state, local, or federal. And unlike the statutes at issue in *United States v. Washington*, *United States v. California*, *United States v. Alabama*, or *United States v. Virginia*, there is no federal mandate, qualification, entitlement, or authorization governing the use of masks by federal officers in routine enforcement operations. Because federal law does not grant federal officers any right to conceal their faces during ordinary enforcement activity, the Mask Law does not regulate federal operations—it simply applies a uniform public-facing rule to everyone acting as law enforcement within the Commonwealth.

2

For these reasons, the Commonwealth respectfully requests that this Court stay its order enjoining the Attorney General from enforcing the Mask Law.

## BACKGROUND

Across the country, communities have experienced a deepening mistrust of law enforcement as reports have proliferated of masked, unidentified individuals conducting immigration-related operations—often in ways indistinguishable from criminal activity. At the same time, many community members, including U.S. citizens, have been swept into these masked enforcement actions, further heightening fear and eroding confidence in legitimate police activity. These concerns were further intensified by the widely reported killings of U.S. citizens Alex Pretti and Renée Good, incidents that underscored the risks associated with aggressive enforcement tactics and the lack of accountability surrounding them. *See* Exhibit A.

In the Commonwealth of Virginia, these developments were particularly destabilizing in immigrant neighborhoods, where residents increasingly struggled to distinguish legitimate law enforcement from impersonators and became less willing to report crimes or cooperate with investigations. *See* Exhibit B; *see also* Exhibit C and Exhibit D.

### I.    The Enactment of the Mask Law

In 2026, the Virginia General Assembly enacted the Mask Law in response to growing public concern about the use of facial coverings and the lack of visible identification by law-enforcement officers operating within the Commonwealth. *See* Exhibit E.; *see also* Exhibit F. The Mask Law provides that "no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while such law enforcement officer is engaged in the performance of his official duties." *See* Va. Code § 19.2-83.6:1(B). Under the Mask Law, "law enforcement officer" expressly includes federal as well as state and local officers for purposes of the statute's requirements and its exceptions. *See* Va. Code § 19.2-83.6:1(A) ("'Law-

3

enforcement officer' means (i) the same as that term is defined in § 9.1-101 and (ii) any full-time or part-time employee of a federal law-enforcement agency."). A violation of the Mask Law constitutes a Class 1 misdemeanor unless the agency has adopted the required written policy. The law takes effect on July 1, 2026.

The General Assembly acted against a national backdrop in which several high-profile federal immigration-enforcement operations drew widespread attention for the use of masked or unidentified officers in civilian settings. In Portland, Oregon for example, federal personnel wearing tactical gear and face coverings detained individuals in unmarked vans during the 2020 protests, prompting national scrutiny. *See* Exhibit G. In several major cities—including Philadelphia and New York—similar concerns emerged as federal officers conducted street-level arrests while masked or without visible identification. *See* Exhibit H. At the same time, unrelated impersonators used masks to pose as law-enforcement officers for the purpose of committing crimes, further eroding public trust and creating confusion about who was a legitimate officer. *Id.* These widely publicized incidents heightened public unease about the deployment of unidentifiable officers in civilian environments and underscored the risks of confusion, escalation, and lack of accountability during such encounters.

ICE has faced litigation over deceptive arrest tactics, including the use of misleading attire and verbal misrepresentation of agency affiliation. *See* Exhibit I, Expert Rep. and Decl. of Scott Shuchart. In early 2025, ICE settled a class action in *Kidd v. Noem*, No. 2:20-cv-03512 (C.D. Cal.), agreeing that officers in the Central District of California would no longer identify themselves simply as "police" or wear jackets labeled "POLICE" unless "ICE" appeared with equal prominence. *Id.*; *see also* Exhibit B, Class Settlement Agreement and Release. Outside the Central District of California, ICE officers have continued to rely on deceptive tactics to effectuate

4

civil immigration arrests.  *See id*. ¶ 17.  For example, according to a habeas petition and contemporaneous reporting, ICE officers conducting an arrest operation at Columbia University in February 2026 posed as local police searching for a missing child to gain entry to a university-owned apartment building without a judicial warrant.  *See Aghayeva v. Genalo*, No. 1:26-cv-01602 (S.D.N.Y.); *see also* Exhibit J.

Public concern was further shaped by nationally reported incidents involving ICE enforcement operations that resulted in civilian deaths, including the fatal shooting of Renée Good and Alex Pretti during an ICE-led operation in Minnesota.  *See* Exhibit K.

Although these events occurred outside the Commonwealth, they contributed to a broader climate of mistrust surrounding masked or unidentified officers and reinforced legislative concerns about transparency and public safety.  The Mask Law was designed to address those concerns by ensuring that all officers operating in the Commonwealth are identifiable and subject to uniform transparency requirements intended to promote safety, accountability, and public confidence.

## II.    Plaintiff's Lawsuit

On June 11, 2026, nearly a month after the Mask Law was signed, Plaintiff filed this action asserting six counts against the Commonwealth of Virginia, the Attorney General of Virginia, Jay Jones, and Fairfax County Commonwealth's Attorney, Steve Descano (collectively, the "Virginia Defendants").  Count I alleges that the Mask Law constitutes an unlawful regulation of the federal government in violation of the Supremacy Clause and Count II alleges that the Mask Law unlawfully discriminates against the federal government based on the statute's mask-identification provisions.

Counts III through VI concern Plaintiff's challenges to SB 783, raising Contract Clause, preemption, and intergovernmental immunity theories unrelated to the Mask Law and the

identification requirements at issue here.  Shortly thereafter—on June 17, 2026, the eve of a federal and state holiday—Plaintiff filed a motion for a preliminary injunction seeking to enjoin enforcement of both statutes pending resolution of this case.  On June 22, 2026, the Court entered an order bifurcating the preliminary injunction briefing and directing that the parties first address only the Mask Law with any evidence and briefing due the following day.

On June 29, 2026, the Court had a hearing to hear argument regarding the Preliminary Injunction pertaining to the Mask Law.  On June 30, 2026, the Court granted Plaintiff's preliminary injunction enjoining the Attorney General from enforcing the mask law on federal officers while they conduct policing and public-facing law enforcement activities within the Commonwealth.

## LEGAL STANDARD

The Court applies the same standard for a stay pending appeal as for a preliminary injunction.  *Coler v. Draper,* No. WDQ-12-2020, 2012 U.S. Dist. LEXIS 152476, 2012 WL 5267436, at *3 (D. Md. Oct. 23, 2012); *Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship,* 188 B.R. 205, 208 (W.D.Va. 1995) (quoting *Long v. Robinson,* 432 F.2d 977 (4th Cir. 1970)).  The Fourth Circuit applies a straightforward four-part standard for a stay pending appeal: the movant must demonstrate "(1) that he will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).

## ARGUMENT

The preliminary injunction should be stayed pending appeal.  The equities strongly favor the Commonwealth, and Virginia is at least reasonably likely to succeed on the merits—indeed, this is precisely the kind of case where reasonable jurists can disagree.  The dispute presents a

novel and unsettled federalism question: how far the federal government may go in displacing a neutral, traditional state public-safety regulation governing policing practices within the Commonwealth. The Mask Law should be permitted to take effect while that important constitutional question is resolved on appeal, rather than suspended through an extraordinary remedy that rests on contested legal premises.

I.    **Virginia is Likely to Succeed on the Merits on Appeal**

A.  **The Mask Law Falls Squarely Within the Commonwealth's Traditional Police Powers**

Virginia's Mask Law is a core police power that is designed to protect public safety, ensure transparent law enforcement practices, and regulate the conduct of officers policing within the Commonwealth. The Supreme Court has long recognized that the States retain primary responsibility for protecting public safety and responding to violent crime. *See United States Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). The Commonwealth's authority to ensure uniformity, recognizability, and consistency in the appearance of law enforcement officers—core elements of public safety, public trust, and accountability—falls squarely within its traditional police powers. *See Kelley v. Johnson*, 425 U.S. 238, 247–48 (1976) (upholding state authority to regulate officers' appearance and recognizing that uniform, readily identifiable attire is rationally related to legitimate public safety objectives and the public's need to recognize law enforcement personnel). The Commonwealth cannot fulfill those core functions if it cannot identify officers who may commit another crime or otherwise endanger the public safety.

Here, the Mask Law represents precisely the kind of state authority the Tenth Amendment preserves. Regulating how law enforcement officers present themselves to the public and

7

determining when and how state personnel and resources may be used in cooperation with federal immigration enforcement, are classic exercises of the Commonwealth's police power to protect public safety, maintain community trust, and manage its own institutions.  The Mask Law does not intrude on federal prerogatives; they reflect the Commonwealth's sovereign responsibility to structure its own law enforcement apparatus and ensure that policing within its borders occurs in a manner that promotes safety, accountability, and public confidence.

### B.  The Mask Law Does Not Violate Intergovernmental Immunity

#### 1.  The Mask Law Does Not Impermissibly Regulate the Federal Government, Its Agencies or Its Officers

Under the Supremacy Clause, States may not control the operations of the federal government, a principle long recognized as the foundation of the intergovernmental-immunity doctrine.  *McCulloch v. Maryland*, 17 U.S. 316, 435 (1819). That doctrine prohibits States from either directly regulating the federal government or discriminating against it.  *United States v. Washington*, 596 U.S. 832, 838–39 (2022).  The United States contends that Virginia's Mask Law directly regulates ICE's enforcement of federal immigration laws. But this is simply not the case.

Nothing in federal law requires ICE agents to wear masks, nor has Congress enacted any statute that occupies or controls the field of officer attire with respect to face coverings.  The federal government's own regulations leave mask wearing entirely discretionary, confirming that this is not a federally protected operational necessity but merely a policy preference.  The Mask Law does not violate the intergovernmental immunity doctrine because it is a legitimate exercise of the Commonwealth's police power that, "at most, only incidentally affects" federal immigration and law enforcement operations.  *Texas v. DHS*, 123 F.4th 186, 205 (5th Cir. 2024).

In response to widespread public criticism of the manner in which federal immigration enforcement has been carried out throughout the country—often perceived as unnecessarily

8

aggressive, reckless, and destabilizing to communities—the United States now seeks to conceal its officers' identities.  But a federal agency's desire to shield its personnel from public scrutiny cannot override a neutral state law that falls squarely within the Commonwealth's police power to ensure public safety, promote transparency in law enforcement encounters, and protect residents from unidentifiable armed officers operating in their neighborhoods.

The statute regulates face coverings and identification practices that are merely incidental to federal officers' duties—not core operational functions.  *See* Va. Code §§ 19.2-83.6:1(B).  Because the Mask Law does not "interfer[e] with or control[] the operations of the Federal Government," *Washington*, 596 U.S. at 838, but instead imposes neutral, generally applicable safety and accountability rules, it does not amount to an unconstitutional direct regulation.

The statute's requirement that officers identify themselves during law enforcement encounters likewise does not regulate federal operations.  *See* Va. Code §§ 19.2-83.6:1(B).  Identification is a standard feature of policing, and requiring officers to identify themselves does not "prevent" federal enforcement.

The Mask Law does not dictate how federal officers conduct arrests, detentions, or tactical operations, and it does not impede ICE operations in any way.  Nor does it override federal standards or impose conflicting obligations.  The Mask Law simply ensures that officers interacting with Virginians are identifiable and accountable—an interest firmly within the Commonwealth's police powers.  *See, e.g., Kelley*, 425 U.S. at 247–48 (recognizing that uniformity and similarity in officers' appearance serve the legitimate state interest of making law-enforcement personnel "readily recognizable to the public," and holding that such appearance-based regulations are rationally related to public-safety objectives).  Ensuring that officers are visibly identifiable to the public promotes the very accountability and transparency

9

that *Kelley* recognized as essential to legitimate law enforcement authority.  And that visibility, in turn, strengthens public trust—an indispensable component of maintaining law and order, encouraging community cooperation, and ensuring that residents feel safe reporting crimes and engaging with law enforcement.

As the Court explained on pages 25–27 of its opinion, it viewed the Mask Law as imposing "additional requirements" on federal immigration officers—identification and mask-removal obligations—"in addition to those that the [federal] Government has pronounced sufficient." *Case No. 3:26-cv-00545-REP, ECF No. 34, at 26* (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)).  But that premise presupposes the existence of a federal baseline governing mask use or public-facing identification for ICE officers engaged in routine enforcement.

No such federal mandate, entitlement, or regulatory scheme exists.  The federal government has not "pronounced sufficient" any standard for face coverings or identification in ordinary policing.  In the absence of a federal requirement, Virginia is not adding to or contradicting federal qualifications; it is exercising its traditional police authority to regulate the manner in which *all* officers—state, local, and federal—present themselves during public-facing enforcement activities within the Commonwealth.  The "in addition to" language the Court relied upon only applies where a state adds requirements to an existing federal qualification.  Here, there is no federal qualification to add to.  That is precisely why the Mask Law fits within the category of permissible, generally applicable rules—akin to traffic-control laws or other neutral public-safety measures—that incidentally affect how federal officers carry out their duties without regulating federal employment or federal prerogatives.

Nor does the Mask Law "lay hold of" federal officers in their specific attempt to obey federal orders, as the Court suggested.  *See* ECF No. 34 at 26–27.  The statute does not dictate who

10

federal officers may arrest, how they conduct immigration investigations, or what federal policies they must follow.  It regulates only the *public-facing manner* in which any officer interacts with civilians in Virginia—a core state function tied to transparency, accountability, and preventing impersonation.

The decision in *United States v. Virginia* does not alter this conclusion.  This case involved a state licensing scheme that conflicted with a comprehensive set of federal qualifications already established for Background Investigation Contract Services with the FBI.  *See United States v. Virginia*, 139 F.3d 984, 986-87 (4th Cir. 1998).  The Mask Law presents the opposite situation: there is no federal qualification or entitlement to wear a mask that Virginia is attempting to override or supplement.  Because federal law does not grant federal officers any right to conceal their faces during ordinary enforcement activity, the Mask Law does not regulate federal operations; it simply applies a uniform public-facing rule to everyone acting as law enforcement within the Commonwealth.

## II.    Virginia Will Suffer Irreparable Harm If A Stay is Not Granted

### A.  Irreparable Injury Caused by Enjoining Enforcement of the Mask Law

Virginia will suffer irreparable injury if the Mask Law cannot be enforced during the appeal because policing, public-facing law-enforcement conduct, and the rules governing officer identification are core state functions rooted in the Commonwealth's traditional police powers.  *De Buono* makes clear that when "federal law is said to bar state action in fields of traditional state regulation," courts must operate on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *De Buono v. Nysa-Ila Med. & Clinical Servs. Fund*, 520 U.S. 806, 813 n.8 (1997) (quoting *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)).  The Mask Law—an evenhanded public-safety measure requiring officers

11

exercising coercive authority in public to display visible identification—falls squarely within those traditional police powers. And because Congress has articulated no "clear and manifest" purpose to displace state regulation of how officers present themselves during public-facing encounters, the Commonwealth's enactment of the Mask Law cannot be understood as directly regulating the federal government for purposes of intergovernmental immunity.

If the stay is denied, Virginia will be irreparably harmed because the Commonwealth will be prevented from enforcing a statute—rooted in its police powers—designed to promote transparency, accountability, and public trust in law-enforcement activities conducted within the state. Routine masking and removal of visible identifiers in ordinary public-facing enforcement creates confusion, escalates encounters, impedes oversight, and increases impersonation risks. *See* Expert Rep. & Decl. of Scott Shuchart ¶¶ 11, 34, 38, 41. There have been multiple reported instances of serious impersonation crimes nationwide, including a Philadelphia robbery committed by a man carrying a gun and a fake ICE badge and a North Carolina assault where a man posed as an ICE agent to coerce a woman into sex. *See* Exhibit H. Once residents experience encounters with masked individuals claiming to be officers—whether real agents or criminals—the mistrust and fear that follow cannot be undone. That erosion of trust itself is an irreparable injury to the Commonwealth's ability to maintain safe, effective policing.

Enjoining the Mask Law during the pendency of the appeal would likewise heighten the risk of escalation and conflict in everyday interactions between Virginians and law-enforcement officers. Masks impede facial expression, clarity of speech, and nonverbal communication— critical tools for de-escalation, especially for hearing-impaired or limited-English-proficient individuals. *See* Expert Rep. & Decl. of Scott Shuchart ¶ 38. Masked, unbadged officers are more likely to be mistaken for criminal actors by civilians or other law-enforcement agencies, increasing

12

the likelihood of unnecessary tension, resistance, or violence. *See id.* at ¶ 42. These harms fall directly on the public and on Virginia's own officers, and they cannot be remedied after the fact.

Finally, denying the stay would mark the beginning of a broader dismantling of core state police powers through federal overreach. Preventing Virginia from enforcing a neutral, public-safety rule governing officer identification would effectively allow federal agencies to displace traditional state regulation of policing without any "clear and manifest" congressional authorization, contrary to *De Buono* and *Travelers*. The resulting harm to Virginia's sovereignty, its ability to regulate law-enforcement conduct within its borders, and its relationship with its residents is irreparable.

**B. Uneven Evidentiary Treatment Inflicts Irreparable Harm on the Commonwealth**

The Commonwealth will suffer irreparable harm if a stay is not granted because the preliminary injunction rests on a record the Commonwealth had no meaningful opportunity to develop. The court relied heavily on the record before it, but that record was the product of a stark procedural imbalance: the federal government had months to prepare its evidentiary submissions and, by its own admission, three weeks to obtain declarations from federal employees, while the Commonwealth was afforded only three business days to respond. The Court nonetheless credited the federal declarations and discounted Virginia's, concluding that the Commonwealth's evidence was insufficient. And when Virginia explained that it could not produce additional declarations on such compressed notice, the Court stated that Virginia "was offered the opportunity to slightly delay enforcement and have the PI MOTION consolidated with a merits determination under Rule 65." ECF 34 at 38. In practical effect, the Commonwealth was presented with a Hobson's choice: suspend enforcement of a duly enacted statute or proceed on an undeveloped record. That procedural posture deprived Virginia of a fair opportunity to defend its law and now threatens to prevent the Commonwealth from exercising core police powers during the pendency of the appeal.

13

The resulting harm is irreparable. The Mask Law regulates public-facing law-enforcement conduct—an area at the heart of the Commonwealth's traditional police powers.  Preventing Virginia from enforcing a neutral, generally applicable identification rule based on a one-sided record undermines the Commonwealth's ability to maintain transparency, accountability, and public trust in policing.  The federal declarations the district court credited assert speculative harms and a newly claimed need for federal agents to operate without visible identification, while Virginia's evidence showed concrete risks of impersonation, confusion, and escalation when officers conceal their faces or identifying information.  Once the injunction prevents enforcement of the Mask Law, those harms cannot be undone: encounters with masked, unidentifiable individuals claiming to be officers—whether genuine agents or criminals—erode trust in ways that cannot be remedied after the fact.

The Court grounded its assessment of irreparable harm and the public interest in its conclusion that the United States was likely to succeed on the merits.  Because that conclusion rested on an incomplete and asymmetrical record, the injunction imposes an immediate and irreparable injury on the Commonwealth's sovereign ability to regulate policing within its borders. A stay is therefore necessary to preserve Virginia's authority and protect the public while the appeal proceeds.

## III.    The Federal Government Will Not Be Substantially Harmed by the Stay

The federal government will not be substantially harmed by staying the Court's June 30, 2026 order enjoining the Commonwealth and Attorney General Jay Jones from enforcing the Mask Law because the statute does not conflict with any federal mandate, does not impede federal immigration enforcement, and imposes only neutral, evenhanded public-safety requirements that apply equally to state and federal officers.  There is no federal statute, regulation, or policy requiring federal immigration officers to conceal their identities during ordinary public-facing

14

enforcement, and routine masking and removal of identifiers were not standard ICE or CBP practice before 2025. *See* Expert Rep. & Decl. of Scott Shuchart ¶¶ 11, 24–26. Because no federal law requires anonymity, there is no Supremacy Clause conflict and no federal interest that would be harmed by allowing the Mask Law to remain enforceable during the appeal.

Federal officers likewise will not suffer substantial harm because the Mask Law contains broad exceptions and safe harbors that apply equally to state and federal personnel. The circumstances in which masking may be operationally justified—undercover work, surveillance, gang or drug investigations, tactical operations, or specific medical or environmental hazards— are well-defined and can be addressed through written policy rather than ad hoc anonymity. *See* Expert Rep. & Decl. of Scott Shuchart ¶ 37. The Mask Law expressly accommodates those circumstances. And where officers have legitimate safety concerns, agencies can issue temporary, anonymized identification numbers that change regularly and cannot be used to track or dox officers, while still allowing oversight bodies to identify personnel if a complaint or use-of-force review arises. *See id.* ¶¶ 30–31. These tools eliminate any meaningful risk of officer harm while preserving the transparency necessary for safe public-facing enforcement.

The federal government will not be harmed by a stay because the district court's conclusions about potential risks to federal officers rested on speculative assertions rather than evidence of actual conditions in Virginia. The Court heavily credited conclusory statements describing high rates of assault and doxxing of federal officers in other states and then reasoned that similar harms *could* hypothetically occur here. *See* ECF No. 34 at 6-20. But the record shows only one isolated incident in Richmond over the many years ICE has operated in the Commonwealth—an operation otherwise marked by the absence of widespread assaults, doxxing, or targeted harassment of federal immigration officers. *See id.* at 12. The federal government's

15

own submissions identified no pattern of such harm in Virginia, and nothing suggests that enforcing a neutral identification rule would suddenly create them. Indeed, ICE conducted enforcement activities unmasked in Virginia for decades without experiencing the kinds of dangers the United States now speculates about. Because those harms have not materialized despite long-standing, unmasked federal operations—and because the recent shift toward masking is precisely what the Commonwealth seeks to regulate under its traditional police powers—the federal government will not suffer injury from complying with SB 352 during the appeal. A stay would simply preserve the status quo in Virginia, where no evidence shows that federal officers face the heightened risks the district court assumed.

## IV.     The Public Interest Strongly Favors Staying the Injunction Pending Appeal

Allowing the Mask Law to take effect during appellate review advances core state interests in public safety, transparency, and accountability by ensuring that individuals exercising police authority can be readily identified—interests squarely within the Commonwealth's police power. The statute protects communities by reducing confusion about the respective roles of state and federal officers and by preventing the erosion of trust that occurs when law-enforcement personnel operate anonymously. Masked-officer incidents reported across the country underscore the public-safety risks SB 352 is designed to prevent. Recent examples include masked men in tactical gear marked "Police" violently detaining a man in the street, masked plainclothes officers leading away a woman and her child outside a San Antonio courthouse, and multiple impersonation crimes—such as a Philadelphia robbery committed by a man with a gun and a fake ICE badge, and a North Carolina assault by a man posing as an immigration agent. *See* Exhibit H. These incidents show how masked enforcement activity creates confusion about whether an individual is a legitimate officer or a criminal actor, fueling mistrust and fear in affected communities.

16

The public interest is served because masked, unidentifiable officers increase the risk of confusion, hostility, and escalation during encounters between law-enforcement officers and members of the public within the Commonwealth. Anonymity in public-facing enforcement "heighten[s] hostility and confusion during encounters," contributes to a "paramilitary" atmosphere that erodes trust, and has coincided with a 600% increase in impersonation crimes by individuals posing as immigration agents. *See* Expert Rep. & Decl. of Scott Shuchart ¶¶ 11, 16, 34–35, 41. Masking also impedes nonverbal communication, facial expression, and clarity of speech—critical tools for de-escalation, especially when interacting with hearing-impaired or limited-English-proficient individuals. *Id*. ¶ 38. These communication barriers increase the risk that civilians will misinterpret officers' intentions, escalate unnecessarily, or mistake federal officers for criminal actors. *Id*. ¶ 42. The Mask Law directly addresses these dangers by ensuring that officers interacting with the public are identifiable and accountable, while still preserving exceptions and policy-based safe harbors for situations where masking is genuinely justified.

Although impersonation may already be illegal, after-the-fact prosecution does not solve the public-safety problem at the moment of an encounter—particularly if the impersonator cannot be identified. Once a civilian is confronted by a masked individual claiming to be law enforcement, the resulting mistrust, fear, and confusion cannot be undone; those perceptions persist and shape future interactions between the public and all officers who police within the Commonwealth. That erosion of trust not only undermines effective policing but also creates a broader public-safety concern for communities across Virginia. The Mask Law is designed to prevent that confusion before it occurs, and allow for accountability afterward. Public-facing identification helps civilians, local officers, and federal officers know who is exercising lawful authority, reducing the risk of unnecessary escalation and protecting everyone involved.

17

Nor does the government's doxxing argument justify eliminating identification altogether. Accountability requires that investigators be able to determine which officers were involved in an incident, and a visible identifier—whether a name tag or an anonymized numerical identifier— serves that function. *Id*. ¶ 28.  There is no officer-safety reason to prohibit displaying a badge number or similar identifier, and agencies can issue short-term identification numbers that change regularly to prevent tracking or misuse.  *Id*. ¶ 29.  These anonymized identifiers preserve officer safety while ensuring the public can file meaningful complaints and oversight bodies can conduct investigations.  *Id*. ¶¶ 28–30.  The Mask Law thus promotes accountability and officer safety, and the public interest strongly favors staying the Court's June 30 order.

## **CONCLUSION**

For the foregoing reasons, Defendants request this Court to stay its order granting Plaintiff's Motion for a Preliminary Injunction and preliminarily enjoining the Attorney General from enforcing the Mask Law, *see* Dkt.30, pending appeal.

Respectfully Submitted,

Dated: July 6, 2026

**THE COMMONWEALTH OF VIRGINIA** and **JAY JONES**, in his official capacity as Attorney General of Virginia

By: */s/ Triston Chase O'Savio*
Triston Chase O'Savio (VSB # 100111)
*Assistant Solicitor General*

Jay Jones
   *Attorney General*

Tillman J. Breckenridge (VSB #84657)
   *Solicitor General*
Gretchen Ellen Nygaard (VSB No. 82475)
   *Deputy Attorney General*
Triston Chase O'Savio (VSB #100111)
   *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

19

## CERTIFICATE OF SERVICE

I, Triston Chase O'Savio,  hereby certify that on July 6, 2026, I electronically filed the foregoing was served on all registered counsel of record via Notice of Electronic Filing through the Court's CM/ECF system.

GERARD MENE
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov

ALESSANDRA FASO
Senior Litigation Counsel
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Telephone: 202-451-7728
Alessandra.faso@usdoj.gov

*/s/ Triston Chase O'Savio*
Triston Chase O'Savio, Esq.

20