# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

THE UNITED STATES OF AMERICA,

    *Plaintiff*,

      v.

THE COMMONWEALTH OF VIRGINIA,
*et al.*,

    *Defendants*.

Case Number: 3:26-cv-00545-REP

**DEFENDANTS COMMONWEALTH OF VIRGINIA
AND JAY JONES' MEMORANDUM IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

   I.   History of 287(g) Contracts ......................................................................... 2

   II.  Governor Youngkin's Executive Order and Resource Burdens of Expanded
       287(g) Participation ..................................................................................... 3

   III. Structure of Existing 287(g) Agreements in Virginia ................................. 4

   IV. The Task Force Model Undermines Virginia's Core Police Powers by
       Diverting Resources, Increasing Liability Exposure, and Restricting FOIA
       Transparency ................................................................................................ 6

      A.  287(g) Agreements Shift Litigation Risk and Costs onto Virginia's
          Law-Enforcement Agencies .................................................................. 7

      B.  Release-of-Information Provisions in 287(g) Agreements Intrude on
          Virginia's FOIA Authority and Obligations .......................................... 7

   V.  Governor Spanberger Rescinds Executive Order 47 .................................. 8

   VI. The Virginia General Assembly Enacts the 287(g) Law ........................... 8

   VII. Plaintiff's Lawsuit ...................................................................................... 9

LEGAL STANDARD ..................................................................................................... 10

   I.   Preliminary Injunction Standard ................................................................ 10

   II.  Ripeness Standard ...................................................................................... 11

   III. Intergovernmental and Supremacy-Clause Immunity Standard ................ 11

   IV. Contract Clause Standard ........................................................................... 12

ARGUMENT .................................................................................................................. 13

   I.   Plaintiff's 287(g) Law Claims Are Unripe ............................................... 13

   II.  Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits
       Because the 287(g) Law Complies Fully with the Supremacy Clause and
       the Contract Clause ..................................................................................... 14

      A.  The Commonwealth's Dillon-Rule Authority and Traditional Police
          Powers Defeat Plaintiff's 287(g) Claim ............................................... 14

      B.  The 287(g) Law Does Not Violate Intergovernmental Immunity ......... 15

i

1. The 287(g) Law Regulates Only Virginia's Own Officers and Resources—It Does Not Regulate Federal Officers or Operations at All ........................................................................................................... 15

2. The 287(g) Law Does Not Discriminate Against the Federal Government........................................................................................ 19

C. The 287(g) Law Is Not Conflict-Preempted Under Federal Immigration Law .............................................................................................................. 22

D. The 287(g) Law Does Not Violate the Contracts Clause................................ 23

1. The 287(g) Law Does Not Currently Impair Any Existing 287(g) Contracts ............................................................................................... 23

2. The 287(g) Law Is Justified by a Significant and Legitimate Public Purpose................................................................................................. 24

III. Plaintiff Cannot Demonstrate Immediate Irreparable Harm................................. 27

IV. The Balance of Equities Weigh Heavily Against a Preliminary Injunction and in Favor of the Commonwealth ....................................................................... 29

V. The Public Interest Strongly Supports Enforcement of The 287(g) Law ........................... 29

CONCLUSION................................................................................................................. 30

CERTIFICATE OF SERVICE......................................................................................... 32

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978)..................................................................... 12, 13, 23

*Arizona v. United States*,
567 U.S. 387 (2012)............................................................................. 6, 22

*Baltimore Teachers Union v. Mayor and City Council of Baltimore*,
6 F.3d 1012 (4th Cir. 1993)............................................................... 12, 26

*Catawba Indian Tribe of S.C. v. City of Rock Hill*,
501 F.3d 368 (4th Cir. 2007)................................................................... 12

*City of Charleston v. Pub. Serv. Comm's of W. Va.*,
57 F.3d 385 (4th Cir. 1995)..................................................................... 13

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2023)......................................................... 16, 17, 18

*Davis v. Mich. Treasury*,
489 U.S. 803 (1989).................................................................................. 11

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017)......................................................... 28, 29, 30

*Doe v. Va. Dep't of State Police*,
713 F.3d 745 (4th Cir. 2013).............................................................. 11, 13

*Energy Reserves Group v. Kansas Power & Light Co.*,
459 U.S. 400 (1983)............................................................................ 25, 26

*Geo Grp. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025)................................................................. 12

*Geo Grp. v. Newsom*,
50 F.4th 745 (9th Cir. 2022)..................................................................... 12

*James Stewart & Co. v. Sadrakula*,
309 U.S. 94 (1940)................................................................................... 27

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470 (1987)................................................................................. 24

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819)........................................................... 17, 18

*McHenry Cty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022).............................................................. passim

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977) .................................................................................................. 11

*North Dakota v. United States*,
495 U.S. 423 (1990) .................................................................................................... 11

*Public Housing Administration v. Bristol Township*,
146 F. Supp. 859 (E.D. Pa. 1956) ............................................................................... 27

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
872 F.2d 75 (4th Cir. 1989) ........................................................................................ 28

*Richmond v. Confrere Club of Richmond, Inc.*,
239 Va. 77 (1990) ............................................................................................ 1, 14, 16

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) ..................................................................................... 12

*U.S. Trust Co. v. New Jersey*,
431 U.S. 1 (1977) ........................................................................................... 12, 23, 24

*United States Trust Company of New York v. New Jersey*,
431 U.S. 1 (1977) ........................................................................................................ 13

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ........................................................................... 16, 17, 18

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) ..................................................................................... 21

*United States v. Morrison*,
529 U.S. 598 (2000) .................................................................................................... 11

*United States v. New York*,
814 F. Supp. 3d 266 (2025) ......................................................................................... 23

*United States v. Washington*,
596 U.S. 832 (2022) ................................................................................. 11, 20, 21, 33

*Washington v. United States*,
460 U.S. 536 (1983) .................................................................................................... 12

*Whitaker v. Monroe Staffing Servs., LLC*,
42 F.4th 200 (4th Cir. 2022) ................................................................................. 11, 13

*Wild Virginia v. Council on Env't Quality*,
56 F.4th 281 (4th Cir. 2022) ................................................................................. 11, 13

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008) .................................................................................................. 10, 11

*Wreal, LLC v. Amazon.com*,
840 F.3d 1244 (11th Cir. 2016) .................................................................................. 28

**Statutes**

28 C.F.R. § 50.15 .......................................................................................................... 7

8 U.S.C. § 1357(g) ............................................................................................ passim

Section  2.2-3700, Code of Virginia............................................................................ 8

Section 15.2-1726.1, Code of Virginia ...................................................................... passim

**Other Authorities**

American Immigration Council, Local Enforcement of Immigration Laws
    Through the 287(g) Program (2021)................................................................................ 3

**INTRODUCTION**

Under Virginia's sovereign authority to regulate its own law enforcement agencies, the General Assembly enacted SB 783, codified at Virginia Code § 15.2-1726.1 (the "Enforcement Agreements Act" or "the 287(g) Law"). The 287(g) Law regulates the terms under which any Virginia law-enforcement agency may participate in federal immigration-enforcement agreements ("287(g) Agreements"). It prohibits agencies from maintaining, renewing, or entering into such agreements unless they include specified safeguards under Virginia Law. *See* Va. Code § 15.2-1726.1(C)(1)–(12) (including safeguards that require advance identification of ICE personnel, compliance with all Virginia laws, clear non-police identification during operations, limits on enforcement locations, restrictions on information-sharing and surveillance, judicial-warrant requirements, and state oversight of any shootings involving federal agents). Virginia, of course, can choose not to enter into a contract for almost any reason or no reason at all. And the federal government understandably did not challenge Virginia's choice to terminate its 287(g) agreement when Virginia sent its termination notice. The right to terminate is consistent with both the statutory scheme and the contract itself.

The federal government now challenges Virginia's right to direct the affairs of its own subdivisions in a way the federal government acknowledged Virginia can direct itself. This misunderstands basic Virginia law. Under Dillon's Rule, "municipal corporations possess and can exercise only those powers expressly granted by the General Assembly, those necessarily or fairly implied therefrom, and those that are essential and indispensable." *Richmond v. Confrere Club of Richmond, Inc.*, 239 Va. 77, 79 (1990). Local subdivisions are arms of the state, and they may not enter into *any* contracts—including § 287(g) agreements—without statutory authorization from the General Assembly. Localities and local law enforcement derived their abilities to enter into

1

287(g) agreements from enabling statutes. The 287(g) Law simply reflects Virginia's decision to change the scope of that authorization.

Without identifying any basis for invading Virginia's sovereignty or presenting evidence of irreparable harm to its immigration-enforcement efforts in Virginia—the United States now seeks the extraordinary remedy of a preliminary injunction. It asks this Court to prevent the Commonwealth from exercising fundamental authority over how its own law-enforcement personnel operate within its borders, including how state resources are deployed in support of federal immigration programs. Because Plaintiff cannot demonstrate a likelihood of success on the merits, cannot show irreparable harm, and cannot establish that the equities or public interest favor overriding Virginia's considered public-safety judgments, its motion should be denied.

## BACKGROUND

### I.      History of 287(g) Contracts

Section 287(g) of the Immigration and Nationality Act ("INA") authorizes the federal government to delegate certain immigration-enforcement functions to state and local law-enforcement agencies. *See* 8 U.S.C. § 1357(g). Under these written agreements—commonly referred to as 287(g) agreements—specially trained state or local officers may perform defined functions related to the investigation, apprehension, or detention of noncitizens.

Congress authorized § 287(g) agreements in the 1996 Illegal Immigration Reform and Immigrant Responsibility Act, the first agreement was not implemented until 2002, when the program gained renewed attention following the September 11 attacks. *See* Exhibit A, Congressional Research Service, Immigration Enforcement: 287(g) Agreements (IF11898, updated Feb. 14, 2024). Participation expanded steadily thereafter: the number of state and local law-enforcement agencies with 287(g) agreements grew to 72 by 2011, before declining to 35 by the end of the Obama Administration. *Id.* In 2017, the Trump Administration issued Executive

Orders 13767 and 13768, which directed federal agencies to encourage broader state and local participation. *Id.* Following those directives, the number of agencies with 287(g) agreements rose from 35 in January 2017 to 150 by September 2020.

Although participation in 287(g) agreements has increased over the years, it remains entirely voluntary, and the statute says so in unmistakably permissive terms. *See* 8 U.S.C. § 1357(g); *see also* Exhibit B, Exemplar 287(g) Agreement with Termination Clause. Congress used discretionary language—stating that the Attorney General "may enter into" such agreements—and then went even further by expressly providing that "[n]othing in this subsection shall be construed to require any State or political subdivision… to enter into an agreement." *Id.*

## II. Governor Youngkin's Executive Order and Resource Burdens of Expanded 287(g) Participation

Executive Order 47, issued during the Youngkin Administration, directed the Virginia State Police and the Virginia Department of Corrections to pursue deputization under ICE's 287(g) program. This directive expanded the role of state agencies in federal civil-immigration enforcement by encouraging state officers to assume federal screening and enforcement functions. As a practical matter, participation in 287(g) requires state and local agencies to commit personnel, training time, detention capacity, and administrative support to carry out federal responsibilities— costs that are borne by state and local taxpayers rather than the federal government. *See* American Immigration Council, Local Enforcement of Immigration Laws Through the 287(g) Program (2021).

Virginia jurisdictions with prior 287(g) experience illustrate the fiscal and operational strain associated with these agreements. Prince William County, for example, reported that its 287(g) program required raising property taxes to cover initial implementation costs. *See* Exhibit C, American Immigration Council, *Local Enforcement of Immigration Laws Through the 287(g)*

*Program* (May 2014). The program cost approximately $6.4 million in its first year and was projected to cost $26 million over five years, leading the county to cut $3.1 million from its public-safety budget—funds originally intended for police vehicle cameras. *Id.* Local officials also reported that the county spent nearly $2.4 million to support the program in later years, even as the adult detention center faced high turnover and staffing shortages. *See* Exhibit D*, Prince William Will Let Controversial 287(g) Program Expire, Occoquan District.* These resource constraints contributed to the Prince William County Jail Board's decision to allow the county's 287(g) agreement to expire. Reports from county leadership and law-enforcement officials further noted that the program did not produce measurable crime-reduction benefits and that it strained community trust, with some residents becoming reluctant to report crimes due to concerns about immigration consequences. *Id.*

### III. Structure of Existing 287(g) Agreements in Virginia

Congress established the 287(g) Program to allow—but never require—States and localities to enter written agreements with ICE under which designated officers may perform limited civil immigration-enforcement functions under federal supervision. *See* 8 U.S.C. § 1357(g) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection."). Participation is voluntary, and the scope of any delegation is defined by the standardized 287(g) Agreements executed between ICE and the jurisdiction. Over time, ICE has developed several distinct operational models, each reflected in a corresponding 287(g) Agreement.

One model is the Jail Enforcement Model ("JEM"), under which correctional officers receive extensive ICE training and are delegated authority to investigate, question, and file immigration charges against detainees already in local custody. *See* Exhibit E, Shuchart Decl.

¶ 12(a). These officers operate under ICE supervision and purportedly serve as a "force multiplier" to ICE's Criminal Alien Program, which would otherwise need to dispatch federal personnel to local jails to perform these functions.

Another model is the Warrant Service Officer ("WSO") Program, created in 2019 in response to widespread legal concerns that ICE detainer practices could violate the Fourth Amendment. *See id.* at ¶ 12(b). Courts and state attorneys general recognized that holding an individual on an ICE detainer—without a judicial warrant or criminal charge—could exceed the lawful period a locality may detain a person. *See id.* In response, ICE developed the WSO Program to circumvent this constitutional issue. *See id.* Under WSO programs, local officers receive minimal training and are *not* delegated immigration-officer authority. *See id.* Instead, they are certified to serve immigration charging documents that ICE has already prepared. *See id.* Once served, the individual is considered transferred to ICE custody "on paper" while remaining physically in the same facility, thereby avoiding the constitutional issue that arises when a jail holds someone beyond the permissible period solely to await ICE pickup. *See id.*

The third model is the Task Force Model ("TFM"), under which state or local officers are trained and delegated authority to make civil immigration arrests in the field, including during traffic stops and Terry stops. *See id.* at ¶ 12(c). Abuse of this authority—most notably in Maricopa County, Arizona—led to extensive DOJ litigation and caused ICE to allow all TFM agreements to sunset beginning in 2012. ICE revived TFM agreements in 2025. *See id.*

As of this filing, Virginia jurisdictions participate in 30 total 287(g) Agreements: 24 TFM agreements, 5 WSO agreements, and 1 JEM agreement. *See* Exhibit F, Participating Agencies. Although the 287(g) Law applies uniformly to all 287(g) agreements, its practical operation in Virginia is driven by the predominance of TFM agreements, which uniquely authorize field level

civil immigration enforcement requiring sustained deployment of local officers. *See, e.g.*, Exhibit B. Because TFM agreements demand significant diversion of state and local police resources away from core public safety responsibilities, they present the greatest practical risk to the Commonwealth's ability to maintain its own criminal justice priorities, ensure transparency, and safeguard community trust.

**IV.    The Task Force Model Undermines Virginia's Core Police Powers by Diverting Resources, Increasing Liability Exposure, and Restricting FOIA Transparency**

Under the standard TFM 287(g) agreement, participating law enforcement agencies ("LEA") must bear substantial personnel-related costs—including salaries, benefits, overtime, local transportation, administrative supplies, and security equipment—whenever officers are trained or perform delegated federal functions. *See* [Exhibit B, § X, *Costs and Expenditures*; *see also* Exhibit E, Shuchart Decl. ¶ 14. ICE provides instructors and training materials, but law enforcement agencies remain responsible for the salaries and benefits of both the officers performing TFM duties and the officers backfilling their regular assignments during training. *Id*. These obligations divert already strained state and local policing resources away from core public-safety responsibilities. *See id.*; *see also* Exhibit G, Baron Decl. ¶ 14.

Beginning in 2025, ICE added a substantial incentive-based reimbursement scheme that further intensifies this diversion. Under the TFM Reimbursement Plan, law enforcement agencies may receive $7,500 in equipment funding per trained Task Force Officer, $100,000 for new vehicles for each 287(g) agreement executed, reimbursement for officer salaries and benefits, and overtime reimbursement up to 25% of salary. *See* Exhibit H, *Task Force Model Reimbursement Plan Benefits*. These incentives create powerful financial pressures to maximize federal immigration enforcement activity effectively encouraging local officers to focus on federal immigration law at the expense of their local policing duties. Historically, when localities bore the

full cost of 287(g) participation, federal immigration enforcement consumed substantial state resources; after ICE began offering funding in 2025, the problem worsened, as law enforcement agencies became financially motivated to redirect officer time and attention toward federal priorities rather than the public safety needs of their communities.

### A. 287(g) Agreements Shift Litigation Risk and Costs onto Virginia's Law-Enforcement Agencies

The liability provisions of 287(g) Agreements further underscore why these arrangements are costly for Virginia's law-enforcement agencies. Under a 287(g)'s Liability and Responsibility clause, law enforcement agencies must "bear the costs" associated with death, injury, or other incidents giving rise to liability involving participating officers. *See* Exhibit B, § XIV, *Liability and Responsibility*. Although officers are treated as federal employees for purposes of the Federal Tort Claims Act when performing authorized ICE functions, they may still face personal-capacity litigation and must affirmatively request DOJ representation—an option granted only at DOJ's discretion. *See id.*; *see also* 28 C.F.R. § 50.15. This structure places substantial litigation-related risk and expense on agencies, which must absorb personnel costs, cooperate with federal investigations, and manage potential exposure arising from federal immigration-enforcement activities. Combined with the TFM's incentive-driven reimbursement scheme, these liability provisions magnify the diversion of scarce state and local resources away from core public-safety responsibilities and toward federally delegated civil immigration enforcement.

### B. Release-of-Information Provisions in 287(g) Agreements Intrude on Virginia's FOIA Authority and Obligations

The Release of Information to Third Parties provision in TFM 287(g) agreements imposes an additional and significant burden on Virginia's core sovereign functions by purporting to give ICE final authority over the disclosure of records "obtained or developed as a result of this MOA," including documents created by the law enforcement agency itself. *See* Exhibit B, § XIII, *Release*

*of Information to Third Parties*.  By requiring law enforcement agencies to coordinate with—and obtain approval from—ICE before releasing such information, the MOA effectively allows local agencies to contract out of their obligations under the Virginia Freedom of Information Act, which mandates that public records "shall be presumed open" and that exemptions must be "narrowly construed."  Va. Code § 2.2-3700(B).  FOIA compliance is a core state police power, and Virginia's public bodies cannot divest themselves of statutory duties by private agreement with a federal agency.  Yet 287(g) Agreement's disclosure-control language places ICE in the position of determining whether records held by Virginia officers may be released, creating a direct conflict with the Commonwealth's FOIA regime and threatening the transparency obligations that safeguard public oversight of state and local law-enforcement activity.

### V.      Governor Spanberger Rescinds Executive Order 47

In Executive Order 10, issued on January 17, 2026, Governor Abigail Spanberger rescinded Executive Order 47, explaining that the prior directive had already caused Virginia agencies to divert "their limited resources for use in enforcing federal civil immigration laws" rather than core public-safety duties.  *See* Exhibit I, Rescission of Executive Order 47. The Governor stated that "ensuring public safety in Virginia requires state and local law enforcement to be focused on their core responsibilities of investigating and deterring criminal activity, staffing jails, and community engagement," and concluded that Executive Order 47 "is not an appropriate use of state or local resources."  *Id.*  The rescission emphasized that federal civil-immigration enforcement remains the responsibility of federal authorities, not state agencies.  *Id.*

### VI.     The Virginia General Assembly Enacts the 287(g) Law

Following Governor Spanberger's executive order and responding to the increasing burdens that 287(g) participation was imposing on state and local policing resources, the General Assembly enacted the 287(g) Law.  The law provides that "[n]o law-enforcement agency shall

maintain, renew, or enter into any federal immigration enforcement agreement unless such agreement includes" a series of safeguards that limit exposure to liability and ensure compliance with Virginia law—requiring advance identification of ICE agents, compliance with all Virginia laws, clear non-police identification, limits on enforcement locations, restrictions on information-sharing and surveillance, judicial-warrant requirements, and state oversight of any shootings involving federal agents. *See* Va. Code § 15.2-1726.1(C)(1)-(12). It also contains provisions requiring the federal government to agree to aspects of compliance with Virginia law— and accountability for failure to do so—to obtain the assistance of Virginia agencies. *Id*. The federal government is, of course, free to reject contract terms, just as Virginia is.

### VII.    Plaintiff's Lawsuit

In the months following the enactment of the Mask Law and the 287(g) Law, Plaintiff did not immediately challenge either statute. Instead, months later, on June 11, 2026, Plaintiff filed this action asserting six counts against the Commonwealth of Virginia, Virginia Attorney General, Jay Jones, and Fairfax County Commonwealth's Attorney, Steve Descano (collectively, the "Virginia Defendants"). *See* ECF No. 1. Count I alleges that the Mask Law unlawfully regulates the federal government in violation of the Supremacy Clause and Count II asserts that the Mask Law unlawfully discriminates against the federal government through its mask-identification provisions.. *See id.* Count III contends that the 287(g) Law violates the Contract Clause, while Count IV raises a federal-preemption challenge to the 287(g) Law.. *See id.* Counts V and VI further allege that the 287(g) Law violates the intergovernmental-immunity doctrine under the Supremacy Clause. *See id.* Shortly thereafter—on June 17, 2026, the eve of a federal holiday— Plaintiff filed a motion for a preliminary injunction seeking to enjoin enforcement of both statutes pending resolution of this case. *See* ECF No. 8.

On June 22, 2026, the Court bifurcated preliminary-injunction briefing and directed the parties to address only the Mask Law at the outset. *See* ECF No. 12. On June 29, 2026, the Court held a hearing on Plaintiff's preliminary-injunction motion as to the Mask Law under SB 352, and on June 30, 2026, it granted that motion, enjoining the Attorney General from enforcing the Mask Law against Plaintiff and dismissing Mr. Descano from the case. *See* ECF No. 30. At that same hearing, the Court ordered the Virginia Defendants to file a response addressing the remaining challenged statute—the 287(g) Law—and to explain why a preliminary injunction should not issue preventing the Attorney General from enforcing the 287(g) Law against Plaintiff. *See* ECF No. 29. This memorandum therefore addresses only the 287(g) Law.

## LEGAL STANDARD

### I. Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.* 555 U.S. 7, 22 (2008) (citation omitted). The Court may not grant a preliminary injunction unless a plaintiff establishes that (1) it is likely to succeed on the merits of its claim; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. A plaintiff's burden is particularly heavy in cases seeking to enjoin state statutes because a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined. *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

## II. Ripeness Standard

Ripeness flows from Article III's case-or-controversy requirement and prevents courts from entangling themselves in abstract or hypothetical disputes. *See Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 209 (4th Cir. 2022). Courts assess ripeness by weighing "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 294 (4th Cir. 2022) (citation omitted)). A claim is unripe when the plaintiff has not yet suffered any injury and any potential future harm "remains wholly speculative." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (citation omitted).

## III. Intergovernmental and Supremacy-Clause Immunity Standard

A state regulation violates intergovernmental immunity only if it directly regulates the United States or discriminates against the federal government or its contractors. *See North Dakota v. United States*, 495 U.S. 423, 435 (1990). The doctrine protects each sovereign's operations from undue interference, *Davis v. Mich. Treasury*, 489 U.S. 803, 814 (1989), while preserving the States' authority to exercise their own police powers—including core public-safety functions the Constitution reserves to them. *See United States v. Morrison*, 529 U.S. 598, 617 (2000). States may not control federal operations, *see United States v. Washington*, 596 U.S. 832, 838 (2022), but they may enact neutral laws that incidentally affect federal activity. *See Texas v. DHS*, 123 F.4th 186, 205 (5th Cir. 2024).

Consistent with principles of state sovereignty, intergovernmental immunity is not implicated simply because a State chooses to withhold its own officers or resources from federal civil-immigration enforcement. *Compare*, *Geo Grp. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (invalidating law that required federal agency to "entirely transform" its detention operations), with *Geo Grp. v. Inslee*, 151 F.4th 1107, 1118 (9th Cir. 2025) (upholding law that did not prevent

11

federal detention operations); *see also McHenry Cty. v. Raoul*, 44 F.4th 581, 591–92 (7th Cir. 2022) (states may withhold their own resources from federal civil immigration enforcement). Where discrimination is alleged, the doctrine is violated only if the state treats a comparable federal entity less favorably than similarly situated state actors. *See Washington v. United States*, 460 U.S. 536, 544–45 (1983); Inslee, 151 F.4th at 1118.

### IV. Contract Clause Standard

A state law violates the Constitution's Contracts Clause only if the claimant satisfies the Supreme Court's three-part test. First, the claimant must show that the law impairs a contractual obligation. *See U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 17 (1977) ("as a preliminary matter, [a] claim requires a determination that the [state action] has the effect of impairing a contractual obligation"). Second, the claimant must demonstrate that the impairment is substantial. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978) ("whether the state law has, in fact, operated as a substantial impairment of a contractual relationship"). Third, if a substantial impairment is shown, the claimant must establish that the impairment is not justified as "a legitimate exercise of the state's sovereign powers." *Baltimore Teachers Union v. Mayor and City Council of Baltimore*, 6 F.3d 1012, 1015 (4th Cir. 1993); *see also Catawba Indian Tribe of S.C. v. City of Rock Hill*, 501 F.3d 368, 371 (4th Cir. 2007) ("[A] claimant must show (1) contractual impairment, (2) that is substantial, and (3) not a legitimate exercise of state power."); *City of Charleston v. Pub. Serv. Comm's of W. Va.*, 57 F.3d 385, 391 (4th Cir. 1995) ("Only if there is a contract, which has been substantially impaired, and there is no legitimate public purpose justifying the impairment, is there a violation of the Contract Clause.").

Although the Contract Clause appears to proscribe any impairment, the "prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." *United States Trust Company of New York v. New Jersey,* 431 U.S. 1, 22 (1977) (citations omitted).

"Literalism in the construction of the contract clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self protection." *Allied Structural Steel Company v. Spannaus*, 438 U.S. 234, 240 (1978).

**ARGUMENT**

**I.     Plaintiff's 287(g) Law Claims Are Unripe**

Plaintiff's challenge to the 287(g) Law is not ripe for judicial review.  Ripeness "flows from Article III's case-or-controversy requirement and prevents courts from entangling themselves in abstract or hypothetical disputes." *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 209 (4th Cir. 2022).  Courts evaluate ripeness by considering "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 294 (4th Cir. 2022).  A claim is unripe where the plaintiff has suffered no present injury and any alleged future harm "remains wholly speculative." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013).  Both elements confirm that Plaintiff's claims are premature.

The 287(g) Law does not require any immediate action by the United States.  Indeed, it does not require any action by the United States at all.  The statute provides that any existing 287(g) Agreement must be modified or renegotiated by September 1, 2026—a deadline that remains more than two months away.  *See* Va. Code § 15.2-1726.1(D).  Until that date arrives, no agreement is non-compliant, no contract is in violation, and no federal operation is affected.  The United States has not identified any concrete dispute over the terms of a renegotiated agreement, nor any instance in which a Virginia locality has refused to negotiate or insisted on terms that conflict with federal law.  The asserted injuries are therefore hypothetical and contingent on future events that may never occur.

**II. Plaintiff Cannot Demonstrate a Likelihood of Success on the Merits Because the 287(g) Law Complies Fully with the Supremacy Clause and the Contract Clause**

**A. The Commonwealth's Dillon-Rule Authority and Traditional Police Powers Defeat Plaintiff's 287(g) Claim**

Virginia's strict Dillon's Rule forecloses Plaintiff's challenge because localities "possess and can exercise only those powers expressly granted by the General Assembly, those necessarily or fairly implied therefrom, and those that are essential and indispensable." *Richmond,* 239 Va. at 79. Localities therefore have no inherent authority to enter, renew, or maintain § 287(g) agreements; they may do so only when—and only to the extent—the General Assembly authorizes participation. The 287(g) Law does exactly that: it modifies the terms and limits of the authorization the General Assembly has chosen to confer. That falls well within the Commonwealth's prerogative to define, limit, or withdraw the powers of its political subdivisions. Because localities are arms of the State, they cannot unilaterally bind Virginia to federal civil immigration enforcement or continue participation once the General Assembly changes the governing conditions.

This authority reflects the Commonwealth's traditional police powers, which include regulating how its officers present themselves to the public, determining when and how state personnel and resources may be used in cooperation with federal immigration enforcement, and preserving scarce state and local resources for core public-safety functions. As an exercise of those same powers, a State may also decline to provide its facilities, personnel, or resources for federal civil-immigration enforcement. *See McHenry County v. Raoul*, 44 F.4th 581, 591–92 (upholding Illinois's decision to bar local participation in federal immigration-detention contracts and explaining that the INA reflects, at most, a federal preference for state cooperation—not a requirement—thereby confirming that a State may withhold its own facilities, personnel, and resources as an exercise of its sovereign police power).

14

The 287(g) Law is far more modest than the Illinois statute upheld in *McHenry*: it permits participation so long as agreements incorporate the safeguards Virginia has specified. These provisions do not intrude on federal prerogatives; they simply reflect the Commonwealth's sovereign responsibility to structure its own law-enforcement apparatus, safeguard its limited resources, and ensure that policing within its borders promotes safety, accountability, and public confidence. Plaintiff cannot demonstrate a likelihood of success on its 287(g) Claims.

**B. The 287(g) Law Does Not Violate Intergovernmental Immunity**

### 1. The 287(g) Law Regulates Only Virginia's Own Officers and Resources—It Does Not Regulate Federal Officers or Operations at All

The 287(g) Law does not regulate the federal government at all; it regulates only Virginia's own officers and Virginia's own resources. The statute governs when *Virginia* law enforcement agencies may assist in federal civil immigration enforcement and the conditions under which *Virginia* may choose to enter a federal immigration enforcement agreement. Any requirements listed in § 15.2-1726.1(C) operate solely as contractual terms Virginia insists upon before allowing its own personnel, facilities, or resources to be used in support of federal immigration enforcement. The federal government can, tellingly, refuse to enter into an agreement that requires it to adhere to basic Virginia law. Then, Federal agents would remain entirely free to conduct federal immigration operations under federal authority, and the 287(g) Law would impose no state law penalties, duties, or restrictions on them. They would only be constrained by state law as otherwise established. The 287(g) Law is a resource allocation statute: it directs how Virginia's own officers may act and how Virginia's own resources may be deployed, without regulating or burdening federal officers themselves.

Plaintiff's argument rests on a fundamental misunderstanding of how Dillon's Rule limits local authority and a mischaracterization of both the 287(g) Law and the structure of 8 U.S.C.

§ 1357(g).  Under Dillon's Rule, only the Commonwealth may decide whether its subdivisions are authorized to enter contracts—including § 287(g) Agreements—and may revise, limit, or withdraw that authorization at any time.  *See Richmond*, 239 Va. at 79.

Additionally, Section 1357(g) does not create a federal program that states are required to join, nor does it impose obligations on states.  Consistent with the Tenth Amendment's reservation of powers to the States, it is a voluntary delegation mechanism: Congress authorized the Secretary of Homeland Security to enter into agreements with willing state and local governments, and only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1).  The 287(g) Law simply regulates Virginia's own political subdivisions and defines the conditions under which they may participate in that voluntary federal program—an exercise of state self-governance fully consistent with § 1357(g)'s express preservation of state autonomy, which provides that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Secretary." Id. § 1357(g)(9).

Plaintiff's reliance on *McCulloch*, *Arcata*, and *CoreCivic* is misplaced. Those decisions involved state laws that directly regulated federal officers or federal contractors, or that imposed state-law penalties on federal operations in ways that effectively prevented the federal government from carrying out its enforcement responsibilities.  *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436-37 (1819) (holding that Maryland's tax on the Bank of the United States unconstitutionally regulated the federal government itself—by imposing state-law penalties on a federal instrumentality and asserting state control over federal operations—and reaffirming that intergovernmental immunity bars any state law that burdens, conditions, or interferes with the execution of federal powers); *United States v. City of Arcata*, 629 F.3d 986, 988–92 (9th Cir. 2010) (striking down municipal ordinances that expressly targeted federal military recruiters, prohibited

16

them from performing federally authorized recruitment activities, and imposed local civil penalties on federal officers for carrying out federal duties; holding that such laws violate intergovernmental immunity because they directly regulate and discriminate against the federal government, attempt to control federal operations, and cannot be justified under the Tenth Amendment); *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 319–29 (3d Cir. 2023) (invalidating New Jersey's ban on immigration-detention contracts because it directly regulated the federal government by eliminating every potential contracting partner in a market that exists solely to implement a core federal function; holding that the statute violated intergovernmental immunity by functionally prohibiting federal officers and federal contractors from performing federally authorized detention operations, substantially interfering with federal immigration enforcement, and doing indirectly—by banning private contracting—what a State may not do directly under the Supremacy Clause).

The 287(g) Law does nothing of the sort. It does not bind federal agents, impose liability on federal personnel, dictate how ICE must conduct federal immigration enforcement, or in any way prevent the federal government from carrying out its own enforcement efforts. It only requires Virginia localities to negotiate the contract. If the federal government does not want to engage in such negotiations, that certainly is within its right. The parties can walk away from the table.

This case aligns far more closely with *McHenry* than with *McCulloch*, *Arcata*, or *CoreCivic*. There, Illinois prohibited its counties from contracting with ICE to house civil immigration detainees. *McHenry*, 44 F.4th at 586. The *counties* argued that the INA preempted the law and that Illinois's refusal to cooperate interfered with federal operations. *Id.* at 592-93. The court rejected that argument, holding that the INA expresses at most a "general preference" for using state facilities—not a mandate—and that "States are not bound by [federal] hope[s] or expectation[s]." *Id.* at 591–92. The same reasoning applies here. Section 287(g) authorizes—but

does not require—state participation in federal civil immigration enforcement. Congress created a voluntary program—it literally requires an agreement. The 287(g) Law simply exercises Virginia's prerogative to decline or condition its participation in such contractual arrangements. As *McHenry* makes clear, a State's decision to withhold its own officers and resources from federal civil immigration enforcement is fully permissible and does not violate the Supremacy Clause or the doctrine of intergovernmental immunity. *See id.* at 590 ("[W]e operate under a "working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power. . . .").

Plaintiff's argument that the 287(g) Law 'binds federal agents to Virginia law' misreads the statute. The 287(g) Law regulates only Virginia's own officers and resources by requiring that any § 287(g) Agreement entered into by a Virginia locality includes certain provisions governing the conduct of Virginia officers. It does not purport to bind federal agents, and nothing in the statute imposes liability, duties, or restrictions on federal personnel acting under independent federal authority. The only circumstance in which federal agents become subject to any of the statute's terms is when ICE voluntarily enters into a § 287(g) agreement containing the required provisions—contractual terms that apply solely because ICE has agreed to them. And even those provisions do not regulate federal agents as a matter of state law: the statute merely requires that any agreement include language such as "any federal agent operating pursuant to the federal immigration enforcement agreement shall comply with all applicable laws of the Commonwealth" and that ICE "consent to the jurisdiction of the courts of the Commonwealth" for conduct undertaken pursuant to the agreement. Va. Code § 15.2-1726.1(C)(2), (5). These requirements apply only when federal agents choose to operate under delegated authority within a § 287(g)

agreement; they do not apply to ICE agents acting independently under federal law. Plaintiff's argument conflates the two.

Nor does the 287(g) Law "alter" the terms Congress imposed in § 1357(g). Congress required that state officers acting under a 287(g) agreement "adhere to Federal law." The 287(g) Law does not instruct Virginia officers to violate federal law; it imposes additional state-law constraints on how Virginia officers may exercise delegated authority. States routinely impose additional restrictions on their officers beyond what federal law requires. A state may forbid its officers from engaging in certain investigative techniques, from participating in certain joint operations, or from enforcing certain federal laws. That is a core aspect of state sovereignty. Nothing in § 1357(g) prohibits a state from limiting the conduct of its own officers, even when they are temporarily exercising delegated federal authority.

Plaintiff's challenge to the 287(g) Law's requirement that existing agreements be modified or terminated likewise cannot succeed. A state may withdraw from a voluntary federal program at any time. If a state may withdraw entirely, it may also condition continued participation on compliance with state law. The 287(g) Law does not invalidate federal agreements; it declares that Virginia localities may not maintain agreements that violate state law, and the agreements themselves allow termination. That is a regulation of Virginia political subdivisions, not of the federal government. Accordingly, the 287(g) Law does not violate the doctrine of intergovernmental immunity. Plaintiff cannot succeed on the merits on these grounds.

### 2. The 287(g) Law Does Not Discriminate Against the Federal Government

Plaintiff argues that the 287(g) Law discriminates against federal officers by imposing unique restrictions on 287(g) Agreements that do not apply to agreements between Virginia and

19

other states or local entities.  In their view, the statute singles out federal partners for unfavorable treatment and thereby violates the intergovernmental-immunity doctrine.  That is incorrect.

The 287(g) Law does not treat federal entities worse than state entities.  It treats all Virginia agencies the same: none may enter into new 287(g) agreements or perform certain civil immigration functions without judicial process.  *See* Va. Code § 15.2-1726.1(B).  The statute imposes no burden on federal agencies and does not restrict federal operations.  It simply limits what Virginia's own officers may do.  *Id.*  The 287(g) Law does not treat the federal government worse than similarly situated entities.  It does not single out federal agencies for adverse treatment, impose special burdens on federal officers, or interfere with federal enforcement authority.  It merely sets the terms under which Virginia officers may exercise delegated federal authority.

Plaintiff's reliance on *Washington* is misplaced.  In *Washington*, the state enacted a law that expressly applied only to federal contract workers and imposed unique burdens on them that did not apply to any state or private workers.  *See Washington*, 596 U.S. at 839.  The Supreme Court held the law discriminatory because it "explicitly treat[ed] federal workers differently."  *Id*.  The 287(g) Law does nothing of the sort.  It does not impose obligations on, or single out, federal officers.  It does not regulate federal employees.  It does not create a separate set of rules for federal personnel.  It regulates Virginia officers—and only Virginia officers—when they choose to participate in a voluntary 287(g) agreement.

Plaintiff's comparison to *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), is equally inapposite.  King County enacted a ban that applied only to ICE charter flights and had no application to any other entity.  The Ninth Circuit found discrimination because the law "burden[ed] federal operation, and only federal operation."  *Id*. at 757.  The 287(g) Law bears no resemblance to that kind of direct restraint on federal activity.  It does not restrict, impede, or

regulate federal immigration enforcement, and ICE remains entirely free to conduct immigration operations in Virginia using federal agents and federal authority. The 287(g) Law merely limits how Virginia's own officers and Virginia's own resources may participate in federal civil-immigration enforcement. A State's decision to regulate the conduct of its own personnel—and to define the terms under which its own resources may be used—is not discrimination against the federal government. Restricting how a State allocates its own officers and resources is fundamentally different from the prohibition in King County, which barred ICE from using a specific facility and thereby directly obstructed a federal operation itself.

Plaintiff's attempt to compare the 287(g) Law to Virginia statutes governing inter-local or inter-state cooperation agreements misunderstands the relevant comparator. The proper comparison is not between federal and non-federal entities in the abstract, but between entities seeking to exercise delegated federal immigration authority. Only the federal government can enter into 287(g) Agreements; there is no state or local analogue. Because no other entity is similarly situated, there is no baseline against which to measure discriminatory treatment. *See Washington*, 596 U.S. at 840 (discrimination requires treating the federal government worse than a comparable non-federal entity). The 287(g) Law does not treat the federal government worse than any similarly situated entity because there is no similarly situated entity.

Moreover, Plaintiff's argument ignores the structure of § 1357(g). Congress expressly preserved state autonomy by providing that nothing in § 1357(g) "shall be construed to require any State or political subdivision of a State to enter into an agreement." 8 U.S.C. § 1357(g)(9). A state that may decline to participate entirely may also participate on conditions. The 287(g) Law simply sets those conditions. That is not discrimination; it is the exercise of the very autonomy Congress preserved.

**C. The 287(g) Law Is Not Conflict-Preempted Under Federal Immigration Law**

In *McHenry County v. Raoul*, the Seventh Circuit affirmed dismissal of a conflict-preemption claim because the counties failed to plausibly allege that the Illinois Way Forward Act obstructed any federal mandate governing immigration detention. Conflict preemption requires a plaintiff to plead facts showing either (1) impossibility—that compliance with both federal and state law is physically impossible—or (2) that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *McHenry Cnty. v. Raoul*, 44 F.4th 581, 589 (7th Cir. 2022) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). The counties alleged no impossibility, and their obstacle theory rested only on a generalized claim that Congress preferred use of existing detention facilities. The court rejected that argument, explaining that § 1231(g) merely instructs ICE to "consider" available facilities—a directive far too weak to constitute a congressional command—and that the INA provisions at issue merely permit cooperation rather than require States or localities to provide detention space. *Id.* at 589, 592. The court therefore held that the counties had not plausibly alleged conflict preemption and affirmed dismissal. *Id.* at 592. The reasoning in *United States v. New York* reinforces this conclusion: there, the court likewise held that the United States had not plausibly alleged conflict preemption because no federal statute required New York to share DMV information with immigration authorities, emphasizing that "refusing to help is not the same as impeding" and that conflict preemption requires a "sharp" conflict, not mere tension. *United States v. New York*, 814 F. Supp. 3d 266, 279–80 (2025).

The same principles foreclose any conflict-preemption challenge to the 287(g) Law. Plaintiff identifies no federal mandate requiring Virginia to enter, maintain, or renew § 287(g) Agreements, and Congress expressly preserved state discretion by providing that "[n]othing…shall be construed to require any State or political subdivision…to enter into an

agreement." 8 U.S.C. § 1357(g). The 287(g) Law does not make compliance with federal law impossible, nor does it create a "direct and positive" obstacle to Congress's objectives. Like the statutes upheld in *McHenry County* and *United States v. New York*, the 287(g) Law simply regulates how Virginia chooses to deploy its own officers and resources—an area of traditional state police power—and conditions voluntary cooperation on safeguards designed to protect transparency, accountability, and public safety. Because the 287(g) Law can "be reconciled and consistently stand together" with federal law, Plaintiff cannot plausibly allege conflict preemption, and its claim must be dismissed.

## D. The 287(g) Law Does Not Violate the Contracts Clause

### 1. The 287(g) Law Does Not Currently Impair Any Existing 287(g) Contracts

The Contracts Clause does not disable a State from exercising its core police powers, and the Supreme Court has repeatedly emphasized that the Clause "is not to be read with literal exactness like a mathematical formula" and cannot be construed in a way that "obliterate[s] the police power of the States." *United States Trust Co.*, 431 U.S. at 22; *Allied Structural Steel*, 438 U.S. at 240; *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503-04 (1987). . The 287(g) Law fits squarely within that settled framework.

The 287(g) Law does not require the immediate termination or modification of any existing 287(g) agreement. The statute provides that any modification, renegotiation, or nonrenewal of such agreements need not occur until September 1, more than two months from now. To date, no 287(g) Agreement has been altered, modified, or terminated as a result of the 287(g) Law. Because the statute has not yet affected any contractual obligation, Plaintiff cannot satisfy the first element of the test. As the Supreme Court has made clear, a Contract Clause claim "requires a

determination that the [state action] has the effect of impairing a contractual obligation." *U.S. Trust Co.*, 431 U.S. at 17. Here, there is no effect and therefore no impairment.

In any event, there is no obligation to impair. These 287(g) Agreements expressly confirm that participation is voluntary, and the standard 287(g) agreements authorize termination upon notice: "This MOA becomes effective upon signature of both parties and will remain in effect until either party, upon 90-day written notice to the other party, provides notice of termination or suspension of the MOA." *See* Exhibit B, § XVIII, *Effective Date, Suspension, and Termination of This MOA*. That termination framework is fully consistent with § 1357(g), which permits agreements only with willing state and local governments and only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1). Because § 1357(g) establishes a voluntary delegation mechanism—not a mandatory federal program—the Commonwealth remains entitled to discontinue a 287(g) Agreement whenever it determines that continued participation no longer serves its public-safety priorities.

### 2. The 287(g) Law Is Justified by a Significant and Legitimate Public Purpose

Even if Plaintiff could show a substantial impairment (it cannot), the 287(g) Law would still be constitutional because it is supported by a significant and legitimate public purpose. The Supreme Court's decision in *Energy Reserves Group* is instructive. There, the Court upheld Kansas's Natural Gas Price Protection Act because—even assuming a substantial impairment— the statute was supported by a "significant and legitimate public purpose," including addressing "serious economic dislocations" and protecting vulnerable consumers from hardship. *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 411–13 (1983). The Court emphasized that the State acted to address a "broad and general social or economic problem," not to benefit a narrow private interest. *Id*. at 412.

24

The 287(g) Law responds to similarly serious dislocations in Virginia's criminal-justice system and local budgets caused by voluntary participation in federal immigration enforcement as well as the need to assure compliance with Virginia law by its law enforcement agencies and anyone they cooperate with. In just one fiscal year—2016—ICE issued nearly 3,500 detainer requests to Virginia facilities, more than 3,100 of which were directed to local and regional jails. If those detainers had been fully honored with 48-hour holds, local governments would have incurred approximately $830,000 in additional costs in that single year alone, on top of average per-inmate daily operating expenses exceeding $85 and federal per-diem reimbursement rates that frequently fall short of actual costs. *See* Exhibit J, The Commonwealth Institute for Fiscal Analysis, *Federal Responsibility, Local Costs: Immigration Enforcement in Virginia* (Sept. 2018). Localities also shoulder other costs of § 287(g) agreements—paying for officer salaries, overtime, benefits, transportation to ICE's four-week training, infrastructure upgrades, and office space— while bearing legal exposure for unconstitutional detentions and enforcement practices. *See id.*; *see also*, Exhibit B, § XIV, *Liability and Responsibility*. These burdens ripple through communities with additional costs: detainers and deputized enforcement separate parents from children, depress household income (with deportation cutting median immigrant-family income from roughly $36,000 to $15,400), increase foster-care costs, and erode trust between immigrant communities and local police. *See* Exhibit J. The 287(g) Law is supported by broad and legitimate public purposes: it protects public safety, the integrity of state criminal-justice processes and policing, the orderly enforcement of state law, and the Commonwealth's resources, ensuring they are not diverted into federal immigration enforcement without judicial oversight.

Like the Kansas statute in *Energy Reserves Group*, the 287(g) Law is a measured exercise of the police power aimed at preventing systemic harm, protecting vulnerable communities, and

25

preserving essential state resources in the face of serious economic dislocations caused by voluntary local participation in federal immigration enforcement. Under *Energy Reserves Group*, legislation enacted to serve such a significant and legitimate public purpose fully satisfies the Contract Clause.

The Fourth Circuit's decision in *Baltimore Teachers Union* further confirms that the 287(g) Law is reasonable and necessary to serve an important public purpose. There, the court upheld a temporary salary-reduction plan because the city acted to address "extraordinary reductions in revenue," took "needed and measured steps," and tailored the plan "as narrowly as possible" to prevent the "breakdown of government." *See Baltimore Teachers Union,* 6 F.3d at 1020–21. The 287(g) Law reflects the same characteristics. It addresses a broad public-safety and criminal-justice concern, not a narrow private interest. It applies uniformly to all Virginia agencies. It preserves essential state functions by ensuring that federal civil-immigration enforcement does not undermine state law-enforcement priorities. And it avoids more drastic alternatives, such as prohibiting all cooperation with federal immigration authorities. Just as Baltimore acted to prevent governmental breakdown, the 287(g) Law acts to prevent the breakdown of state criminal-justice systems and protect the safety and welfare of Virginians. Under *Baltimore Teachers Union*, this is a constitutionally legitimate public purpose.

The reasoning of *Public Housing Administration v. Bristol Township*, 146 F. Supp. 859 (E.D. Pa. 1956), further reinforces this conclusion. In *Bristol Township*, the federal government argued that a federal housing contractor should be exempt from local building-permit requirements because of its federal contract. The court rejected that argument, holding that the Supremacy Clause does not invalidate state public-safety regulations unless Congress has unmistakably stated an intent to preempt them. *Id*. at 864–65. The court emphasized that the federal government bears

26

the burden of proving that compliance with local regulations would "interfere with, or obstruct, in a substantial way the performance of federal functions," and found that the government had failed to meet that burden. *Id*. at 866. The court further reaffirmed that federal contractors "do not share any governmental immunity" from state safety regulations and that such regulations "are effective in the federal area, until such time as the Congress may otherwise provide." *Id*. at 866–67 (quoting *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 105 (1940)). The principle animating *Bristol Township* applies with full force here: a federal contract cannot override or nullify a state's exercise of its police power to protect the safety and welfare of its residents. The 287(g) Law, like the local safety regulations in *Bristol Township*, is a neutral, generally applicable measure designed to safeguard the public and preserve the integrity of state institutions. Federal involvement alone does not displace that authority.

## III.    Plaintiff Cannot Demonstrate Immediate Irreparable Harm

A preliminary injunction requires a "clear showing" of immediate and irreparable harm— not speculation or self-inflicted injury. *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 79–80 (4th Cir. 1989) (affirming denial of preliminary injunction where plaintiffs waited months before seeking relief, and their delay—creating avoidable disruption and cost—showed no "immediate" irreparable harm warranting extraordinary equitable intervention); *see also Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm. A preliminary injunction requires showing 'imminent' irreparable harm."); *Di Biase v. SPX Corp.*, 872 F.3d 224, 235-36 (4th Cir. 2017) (denying preliminary injunction and finding no irreparable harm where the "moving parties have not shown that they availed themselves of opportunities to avoid the injuries of which they now complain"). The Court evaluates delay in seeking a preliminary injunction by examining how the movant's lack of prompt

27

action undermines any claim of immediate irreparable harm, and by weighing that prejudice against the harm or disruption an injunction would impose on the defendants. *Hodel*, 872 F.2d at 79.

The 287(g) Law cannot cause the federal government immediate irreparable harm because it does not take effect until September 1, 2026, and nothing in the statute restricts ICE's present or future ability to conduct federal immigration enforcement using federal agents and federal authority. The only change the 287(g) Law will eventually implement is a limitation on how Virginia chooses to deploy its own officers and resources—an area where the Commonwealth already retains full discretion. And far from creating imminent disruption, the delayed effective date has given federal agencies more than six months to adjust any voluntary arrangements with Virginia localities or prepare for the possibility that it will not agree to comply with Virginia law and will lose the assistance of Virgina agencies.

The record further confirms that federal immigration enforcement will continue unhindered even without 287(g) agreements. Sheriff P. Baron of the City of Norfolk explains in his declaration (¶¶ 5–8) that Virginia law-enforcement agencies routinely assist ICE through information-sharing, coordinated criminal investigations, and other lawful cooperative efforts that do not depend on 287(g) contracts and will continue regardless of this statute. *See* Exhibit G. That ongoing cooperation is echoed in the Virginia State Police's termination letter to ICE and DHS, which expressly states that VSP "remains committed to working with ICE as well as our other federal, state, and local partners to identify and dismantle criminal enterprises and arrest criminal actors who threaten the safety and well-being of all who live in and travel through the Commonwealth of Virginia." Exhibit K. This contemporaneous evidence demonstrates that meaningful cooperation persists outside the 287(g) framework and that federal operations remain fully

supported. Under these circumstances, Plaintiff cannot show the kind of immediate, non-speculative injury required for irreparable harm.

**IV.     The Balance of Equities Weigh Heavily Against a Preliminary Injunction and in Favor of the Commonwealth**

A preliminary injunction is unwarranted where the balance of equities favors the nonmovant and weighs against disrupting the status quo. *See Di Biase*, 872 F.3d at 235–36 (affirming denial of preliminary injunction where the balance of equities favored the nonmovant and weighed against disrupting the status quo). Here, the equities strongly favor allowing the 287(g) Law to take effect. The equities likewise disfavor enjoining the 287(g) Law. The statute protects Virginia's sovereign authority to control the deployment of its own officers and ensures that state personnel are not involuntarily diverted into federal civil immigration enforcement contrary to state priorities. Preventing the 287(g) Law from taking effect would force the Commonwealth to continue participating in federal operations in a manner inconsistent with its considered policy judgments—an intrusion that constitutes a substantial equitable harm. By contrast, Plaintiff identifies no concrete, imminent injury that would result from allowing the statutes to operate while this case proceeds to a full merits determination. The balance of equities therefore weighs decisively against the extraordinary remedy of a preliminary injunction.

**V.     The Public Interest Strongly Supports Enforcement of The 287(g) Law**

A preliminary injunction should be denied where the public interest favors allowing the dispute to proceed to a full merits determination rather than disrupting the status quo through emergency relief. *Di Biase*, 872 F.3d at 224, 235–36 (concluding that the public interest favored denying preliminary injunctive relief and allowing the case to proceed to a merits determination). The public interest strongly supports that outcome here. The 287(g) Law protects Virginia's sovereignty by preventing state officers from being drawn into federal civil immigration

enforcement in ways that disrupt state priorities, confuse residents about the roles of state and federal authorities, or undermine community trust. These are all interests that fall squarely within the Commonwealth's police powers.

The public interest also strongly favors denying preliminary relief because TFM 287(g) Agreements impose substantial and compounding burdens on Virginia's limited law-enforcement resources: they require law enforcement agencies to absorb significant personnel costs and litigation exposure under standard 287(g) Agreements' Liability and Responsibility clauses; they financially incentivize officers to prioritize federal civil-immigration enforcement over core public-safety duties through ICE's reimbursement scheme; they obligate law enforcement agencies to deploy state personnel and equipment to carry out federal tasks; and, through the Release of Information clauses, they purport to give ICE control over disclosure decisions in ways that conflict with Virginia's FOIA obligations and intrude on a core state police power. These combined pressures divert scarce state and local resources away from the Commonwealth's own public-safety priorities and undermine transparency requirements that safeguard community trust—precisely the harm the 287(g) Law was enacted to prevent.

By contrast, Plaintiff's asserted harms are speculative and unsupported. It identifies no concrete evidence that compliance with the 287(g) Law will impede federal operations or endanger federal officers in Virginia, and its delay in seeking relief further undercuts any claim of urgency. When weighed against the Commonwealth's substantial public-safety and governance interests, these conjectural concerns cannot justify the extraordinary remedy of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be denied.

Respectfully Submitted,

Dated: July 13, 2026

**THE COMMONWEALTH OF VIRGINIA**; and **JAY JONES**, in his official capacity as Attorney General of Virginia

By: */s/ Triston Chase O'Savio*
Triston Chase O'Savio (VSB # 100111)
*Assistant Solicitor General*

Jay Jones
   *Attorney General*

Tillman J. Breckenridge (VSB #84657)
   *Solicitor General*
Gretchen Ellen Nygaard (VSB No. 82475)
   *Deputy Attorney General*
Triston Chase O'Savio (VSB #100111)
   *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

**CERTIFICATE OF SERVICE**

I, Triston Chase O'Savio, hereby certify that on July 13, 2026, I electronically filed the foregoing Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction with the Clerk of Court using the CM/ECF system.

GERARD MENE
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov

ALESSANDRA FASO
Senior Litigation Counsel
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Telephone: 202-451-7728
Alessandra.faso@usdoj.gov

*/s/ Triston Chase O'Savio*
Triston Chase O'Savio, Esq.