**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>THE COMMONWEALTH OF VIRGINIA, *et al.*,<br><br>*Defendants*. | Case Number: 3:26-cv-00545-REP |

**AMENDED MEMORANDUM IN SUPPORT OF DEFENDANTS THE COMMONWEALTH OF VIRGINIA AND ATTORNEY GENERAL OF VIRGINIA JAY JONES' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

LEGAL STANDARD ........ 5

ARGUMENT ........ 5

I. The Mask Law and the 287(g) Law Fall Squarely Within Virginia's Traditional Police Powers ........ 5

II. Plaintiff's Intergovernmental and Supremacy-Clause Immunity Claims Fail as a Matter of Law ........ 7

A. Plaintiff Fails to Plausibly Allege an Intergovernmental-Immunity Violation Under SB 783 ........ 8

1. Plaintiff Fails to State a Plausible Claim That the 287(g) Law Does Not Regulate Federal Officers ........ 8

2. Plaintiff Fails to Plausibly Allege That the 287(g) Law Treats Similarly Situated State Officers More Favorably Than Federal Officers ........ 10

i. The 287(g) Law's Overall Structure Precludes Any Reading Suggesting Discriminatory Impact on Federal Officers ........ 11

ii. 287(g) Law Should Be Interpreted to Avoid Constitutional Difficulties ........ 13

B. Plaintiff Fails to Plausibly Allege an Intergovernmental-Immunity Violation Under SB 352 ........ 14

1. Plaintiff Fails to Plead that the Mask Law Regulates Any Existing Federal Law, Mandate, Regulation, or Domain of Federal Authority ........ 14

2. Plaintiff Fails to State a Claim That the Mask Law Discriminates Against Federal Officers ........ 16

i. The Mask Law's Overall Structure Demonstrates That It Applies Evenhandedly to All Officers ........ 17

ii. The Avoidance Canon Forecloses Plaintiff's Discriminatory Reading of the Mask Law ........ 18

III. Plaintiff Has Not Plausibly Alleged a Contract Clause Violation ........ 19

IV. Plaintiff Cannot State a Preemption Claim Because No Federal Law Conflicts with the 287(g) Statute ........ 20

CONCLUSION ........ 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramski v. United States*,
573 U.S. 169 (2014) .......... 12, 17

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 20

Ashcroft v. Iqbal,
556 U.S. 662 (2009) .......... 5

*Beck v. PACE Int'l Union*,
551 U.S. 96 (2007) .......... 18

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) .......... 5

*Bond v. United States*,
572 U.S. 844 (2014) .......... 13

*Brown v. Plata*,
563 U.S. 493 (2011) .......... 13

*Davis v. Mich. Treasury*,
489 U.S. 803 (1989) .......... 7

*Dawson v. Steager*,
586 U.S. 171 (2019) .......... 16

*Energy Reserves Group v. Kan. Power & Light Co.*,
459 U.S. 400 (1983) .......... 19

*Geo Grp. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025) .......... 8, 11, 16

*Geo Grp. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) .......... 8, 9

*Kelley v. Johnson*,
425 U.S. 238 (1976) .......... 6, 15

*McHenry Cty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .......... passim

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 7

*Northwest Austin Mun. Util. Dist. No. 1 v. Holder*,
557 U.S. 193 (2009) .......... 13, 18

Papasan v. Allain,
478 U.S. 265 (1986) .......... 5

*Richmond v. Confrere Club of Richmond, Inc.*,
239 Va. 77 (1990) .......... 1, 10, 11

*Samantar v. Yousuf*,
560 U.S. 305 (2010) .......... 12, 18

*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024). .......... 7

Thomas v. Consolidation Coal Co.,
380 F.2d 69 (4th Cir. 1967). .......... 5

*UAW Int'l Union v. Fortuño*,
633 F.3d 37 (1st Cir. 2011) .......... 19, 20

*United States Trust Co. v. New Jersey*,
431 U.S. 1 (1977) .......... 19, 20

*United States v. Morrison*,
529 U.S. 598 (2000) .......... 5, 6, 7

*United States v. New York*,
814 F. Supp. 3d 266 (2025) .......... 7, 10, 13, 21

*United States v. Washington*,
596 U.S. 832 (2022) .......... 7, 15

*Washington v. United States*,
460 U.S. 536 (1983) .......... 8, 11, 16

**Statutes**

8 U.S.C. § 1357(g) .......... 9, 21

Section 15.2-1726.1, Code of Virginia .......... 12

Section 19.2-83.6:1, Code of Virginia .......... 14, 17

**Rules**

Rule 12(b)(6), Federal Rules of Civil Procedure .......... 1, 5

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiff's Complaint should be dismissed in its entirety because the Complaint fails to state a claim under the Supremacy Clause with respect to either SB 352 or SB 783. Regarding SB 352—the "Mask Law,"—the Commonwealth only requires compliance to generally applicable law that applies to law enforcement officers regardless of their employers. And concerning SB 783, the "287(g) Law," Virginia has every right not to engage in the federal government's voluntary program, and as a matter of state sovereignty, it has every right to restrict localities' engagement. Both statutes regulate only state policing activities and public-facing law-enforcement conduct within Virginia, matters squarely within the Commonwealth's police powers. Neither statute regulates federal operations, and neither treats federal actors less favorably than similarly situated state or local entities.

The 287(g) Law is a clearly-allowable exercise of Virginia's power over its subdivisions. Dillon's Rule governs the powers of local subdivisions in the Commonwealth. Under Dillon's Rule, "municipal corporations possess and can exercise only those powers expressly granted by the General Assembly, those necessarily or fairly implied therefrom, and those that are essential and indispensable." *Richmond v. Confrere Club of Richmond, Inc.*, 239 Va. 77, 79 (1990). Local subdivisions are arms of the state, and they may not enter into contracts—including § 287(g) agreements—without statutory authorization from the General Assembly. Agencies entered into voluntary agreements with termination provisions under the authority granted by the General Assembly, and the 287(g) Law simply reflects Virginia's decision to change the scope of that authorization. The Commonwealth is fully entitled to determine whether its subdivisions may enter, renew, or terminate cooperative agreements with the federal government, and to specify the conditions under which such participation may occur. The basic question of whether Virginia

chooses to participate in a voluntary federal program is a prerogative reserved to the State, not to Plaintiff.

Plaintiff's Contract Clause claim regarding the 287(g) Law likewise fails. The law does not impair any existing obligation, and Plaintiff identifies no contract that the statute actually alters or prohibits. Even if Plaintiff could identify such a contract—it cannot—the law is a valid exercise of the police power enacted to serve a significant and legitimate public purpose, including addressing the substantial economic burdens and resource strains that voluntary participation in federal civil immigration enforcement has imposed on Virginia's criminal-justice system and local governments. Under settled precedent, legislation enacted to address such broad social and economic concerns is constitutionally permissible.

The Mask Law, with its related requirement of providing information by which the Commonwealth can identify individual officers who break Virginia law, also is a fair and allowable exercise of Virginia's police power. It is a generally applicable provision that applies to *all* law enforcement officers, regardless of whether alleged abuses by federal agents motivated it. The General Assembly saw the problem of lack of accountability combined with potentially unlawful behavior, and it determined it was appropriate to enact a mechanism by which officers in the Commonwealth—local, state, or federal—who are public employees doing government work can be held accountable if there ever is a violation of Virginia law by law enforcement.

## BACKGROUND

The General Assembly enacted the Mask Law in 2026. The statute prohibits any law-enforcement officer—state, local, or federal—from wearing facial coverings that obscure their identity while performing official duties. The law was designed to restore public trust, reduce confusion during enforcement encounters, and ensure accountability by requiring officers operating in Virginia to be visibly identifiable.

At the same time, Virginia faced growing operational and fiscal strain from federal civil-immigration enforcement conducted through § 287(g) agreements. Local agencies reported diversion of personnel, increased training and administrative burdens, and significant community-trust erosion as federal immigration priorities drew officers away from core state policing responsibilities.

In just one fiscal year—2016—ICE issued nearly 3,500 detainer requests to Virginia facilities, more than 3,100 of which were directed to local and regional jails. If those detainers had been fully honored with 48-hour holds, local governments would have incurred approximately $830,000 in additional costs in that single year alone, on top of average per-inmate daily operating expenses exceeding $85 and federal per-diem reimbursement rates that frequently fall short of actual costs. *See* Exhibit A, The Commonwealth Institute for Fiscal Analysis, *Federal Responsibility, Local Costs: Immigration Enforcement in Virginia* (Sept. 2018). Localities also shoulder the full cost of § 287(g) agreements—paying for officer salaries, overtime, benefits, transportation to ICE's four-week training, infrastructure upgrades, and office space—while bearing legal exposure for unconstitutional detentions and enforcement practices. *Id.* These burdens ripple through communities: detainers and deputized enforcement separate parents from children, depress household income (with deportation cutting median immigrant-family income from roughly $36,000 to $15,400), increase foster-care costs, and erode trust between residents living in communities with large immigrant populations and communities of color and their local police. *Id.*

These pressures intensified after Executive Order 47 directed state agencies to pursue deputization under 287(g), prompting concerns that Virginia's limited resources were being redirected toward federal civil-immigration enforcement at the expense of essential public-safety

functions. Governor Spanberger rescinded Executive Order 47 in early 2026, emphasizing that federal civil-immigration enforcement is the responsibility of federal authorities and that Virginia's agencies must remain focused on their core duties.

In response to these operational and fiscal pressures, the General Assembly enacted the 287(g) Law in 2026 to ensure that local and state personnel working with federal immigration officers limit exposure, focus on enforcing Virginia law, and comply with Virginia law when enforcing federal law. Section 287(g) agreements have required substantial personnel commitments, additional training and administrative work, and contributed to community-relations challenges as federal immigration priorities drew local resources away from core state policing responsibilities. The legislation established uniform statewide parameters for any future participation in § 287(g), ensuring that decisions about entering, renewing, or ending cooperative arrangements with the federal government reflect the Commonwealth's broader public-safety and resource-management considerations.

On June 11, 2026, Plaintiff filed this action asserting six counts against the Commonwealth of Virginia, the Attorney General of Virginia, Jay Jones, and Fairfax County Commonwealth's Attorney, Steve Descano (collectively, the "Virginia Defendants"). Count I alleges that the Mask Law constitutes an unlawful regulation of the federal government in violation of the Supremacy Clause and Count II alleges that the Mask Law unlawfully discriminates against the federal government based on the statute's mask-identification provisions. Counts III, IV, V, VI of Plaintiff's Complaint challenge the 287(g) Law, asserting Contract Clause, preemption, and intergovernmental-immunity theories premised on alleged discrimination against and regulation of the federal government. Plaintiff requests declaratory and injunctive relief and damages.

## LEGAL STANDARD

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. The plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id*. at 555 (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Defendants may raise preclusion defenses in a motion to dismiss. *Thomas v. Consolidation Coal Co.,* 380 F.2d 69, 75 (4th Cir. 1967).

## ARGUMENT

### I. The Mask Law and the 287(g) Law Fall Squarely Within Virginia's Traditional Police Powers

Plaintiff's challenges to the Mask Law and the 287(g) Law fail at the pleadings stage because both statutes regulate matters that fall squarely within the Commonwealth's core police powers. Virginia retains primary authority to safeguard public safety, promote transparent and accountable law-enforcement practices, and determine how officers conduct public facing policing activities within the Commonwealth. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). These are traditional state functions that the Constitution reserves to the States, and neither statute attempts to control federal operations or discriminate against federal actors in a manner that could support an intergovernmental immunity, Contract Clause, or preemption claim.

A State's authority to regulate the conduct of its own law-enforcement officers and to preserve its own institutional resources is a core aspect of its retained police powers. The Supreme Court has long recognized that the States retain primary responsibility for protecting public safety and responding to violent crime. *See Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

The Commonwealth's authority to ensure uniformity, recognizability, and consistency in the appearance of law-enforcement officers—core elements of public safety, public trust, and accountability—falls squarely within its traditional police powers. *See Kelley v. Johnson*, 425 U.S. 238, 247–48 (1976) (upholding state authority to regulate officers' appearance and recognizing that uniform, readily identifiable attire is rationally related to legitimate public-safety objectives and the public's need to recognize law-enforcement personnel). Likewise, a State's authority to decide how its own law-enforcement resources are allocated, preserved, and deployed is itself a fundamental component of the police power. *See McHenry Cty. v. Raoul*, 44 F.4th 581, 591–92 (7th Cir. 2022) (upholding Illinois's decision to bar local participation in federal immigration-detention contracts and explaining that the INA reflects, at most, a federal preference for state cooperation—not a requirement—thereby confirming that a State may withhold its own facilities, personnel, and resources as an exercise of its sovereign police power).

Here, the Mask Law and the 287(g) Law represent precisely the kind of state authority the Tenth Amendment preserves. Regulating how law-enforcement officers present themselves to the public, and determining when and how state personnel and resources may be used in cooperation with federal immigration enforcement, are classic exercises of the Commonwealth's police power to protect public safety, maintain community trust, and manage its own institutions. These statutes

do not intrude on federal prerogatives; they reflect Virginia's sovereign responsibility to structure its own law-enforcement apparatus, safeguard its limited resources, and ensure that policing within its borders occurs in a manner that promotes safety, accountability, and public confidence.

Because these standards turn on individualized circumstances and not on the validity of the neutral state public-safety regulations disputed here in this case, they underscore why Plaintiff's attempt to preemptively invalidate laws that fall squarely within the Commonwealth's police powers is unsupportable as a matter of law. Count I, II, III, IV, V, and VI of Plaintiff's Complaint should be dismissed with prejudice.

## II. Plaintiff's Intergovernmental and Supremacy-Clause Immunity Claims Fail as a Matter of Law

To plausibly state a claim under the intergovernmental-immunity doctrine, a plaintiff must allege facts showing either that the challenged state law directly regulates the federal government or its officers, or that it discriminates against the federal government or its contractors by treating them less favorably than similarly situated non-federal entities. *North Dakota v. United States*, 495 U.S. 423, 435 (1990); *United States v. New York*, 814 F. Supp. 3d 266, 280–83 (2025); *McHenry Cnty. v. Raoul*, 44 F.4th 581, 593–94 (7th Cir. 2022). The doctrine protects each sovereign's operations from undue interference, *Davis v. Mich. Treasury*, 489 U.S. 803, 814 (1989), while preserving the States' authority to exercise their own police powers, including core public-safety functions the Constitution reserves to them. *United States v. Morrison*, 529 U.S. 598, 617 (2000). Although States may not "control" federal operations, *United States v. Washington*, 596 U.S. 832, 838 (2022), they may enact neutral laws that only incidentally affect federal activity. *Texas v. DHS*, 123 F.4th 186, 205–06 (5th Cir. 2024).

Intergovernmental immunity is not implicated simply because a State chooses to withhold its own officers or resources from federal civil-immigration enforcement. *Compare*, *Geo Grp. v.*

*Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (invalidating law that required federal agency to "entirely transform" its detention operations), with *Geo Grp. v. Inslee*, 151 F.4th 1107, 1118 (9th Cir. 2025) (upholding law that did not prevent federal detention operations); *see also McHenry Cty. v. Raoul*, 44 F.4th 581, 591–92 (7th Cir. 2022) (states may withhold their own resources from federal civil immigration enforcement). Where discrimination is alleged, the doctrine is violated only if the state treats a comparable federal entity less favorably than similarly situated state actors. *See Washington v. United States*, 460 U.S. 536, 544–45 (1983); *Inslee*, 151 F.4th at 1118.

### A. Plaintiff Fails to Plausibly Allege an Intergovernmental-Immunity Violation Under SB 783

#### 1. Plaintiff Fails to State a Plausible Claim That the 287(g) Law Does Not Regulate Federal Officers

In *McHenry County v. Raoul*, the Seventh Circuit held that the Illinois Way Forward Act did not directly regulate the Federal Government because the statute governed only state and local entities and exercised control solely over Illinois's own resources and officers, not federal personnel. *See McHenry County v. Raoul* 44 F.4th 581, 593 (7th Cir. 2022). The court explained that the Act "impose[d] obligations only on state and local officials," and nothing in the statute "place[d] a prohibition on the Federal Government" or required federal officers to alter their operations. *Id*. The Act simply reflected Illinois's sovereign prerogative to decide whether—and under what conditions—its own subdivisions would participate in federal civil immigration enforcement. *Id.* Because the statute regulated state participation rather than federal enforcement, and because federal officers remained fully free to carry out federal immigration law using federal resources and federal procedures, the court concluded that the plaintiffs had not plausibly alleged any direct regulation of federal officers under the intergovernmental-immunity doctrine. *Id.*

The 287(g) Law does not regulate federal officers because, like the statutes upheld in *McHenry*, it regulates only Virginia's own political subdivisions and governs only the conduct of

Virginia officers acting under Virginia law. The statute imposes conditions on *Virginia's* participation in voluntary § 287(g) agreements—agreements federal law expressly makes optional for States and localities—and nothing in 287(g) purports to bind, command, or penalize federal officers or federal agencies. Intergovernmental immunity is not implicated simply because a State chooses to withhold its own officers or resources from federal civil immigration enforcement. *But cf. Geo Group v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (invalidating a law that required a federal agency to "entirely transform" its detention operations). The 287(g) Law does exactly that: it sets conditions for Virginia's participation and leaves federal enforcement untouched. Federal officers remain fully free to enforce federal immigration law anywhere in Virginia using federal resources, federal procedures, and federal equipment.

In Paragraph 162 of the Complaint, Plaintiff alleges the 287(g) Law "conflicts with" the INA, but § 1357(g)(9) makes participation voluntary, and nothing in federal law requires Virginia to authorize its subdivisions to enter or maintain § 287(g) agreements. Compl. ¶ 162. In Paragraph 163, Plaintiff asserts the 287(g) Law prohibits honoring administrative warrants or subpoenas, yet the statute regulates only how state and local resources may be used; federal officers remain free to execute federal process using federal resources. *See* Compl. ¶ 163. In Paragraph 167, Plaintiff asserts SB 783 "imposes conditions" that violate federal law, but the statute imposes conditions only on Virginia's subdivisions, not on federal officers, and States may set terms for how their own personnel and facilities may be used in voluntary cooperative agreements. Compl. ¶ 167. In Paragraph 168, Plaintiff alleges SB 783 regulates how federal officers enforce immigration law, *see* Compl. ¶ 168, but the statute governs only the conditions under which Virginia's own resources and personnel may be used in voluntary § 287(g) agreements; federal officers remain free to use their own technology, attire, procedures, and investigative protocols, subject only to generally

applicable state limits on public-facing conduct such as Virginia's prohibition on identity-obscuring masks. The 287(g) Law imposes these requirements only if the federal government elects to enter into a § 287(g) agreement with a Virginia subdivision—conditions the Commonwealth is fully entitled to set when determining how its own officers and facilities may participate in cooperative enforcement. *See City of Richmond*, 239 Va. at 79 ("In determining the legislative powers of local governing bodies, Virginia follows the Dillon Rule of strict construction. The Dillon Rule provides that municipal corporations possess and can exercise only those powers expressly granted by the General Assembly, those necessarily or fairly implied therefrom, and those that are essential and indispensable.").

**2. Plaintiff Fails to Plausibly Allege That the 287(g) Law Treats Similarly Situated State Officers More Favorably Than Federal Officers**

In *McHenry*, F.4th 581, 593 (7th Cir. 2022), the Seventh Circuit affirmed dismissal of the intergovernmental-immunity claim because the plaintiffs failed to plausibly allege discriminatory treatment of federal actors. The court held that the Illinois Way Forward Act did not discriminate against the federal government because it applied uniformly to all Illinois political subdivisions, did not single out federal contractors for less favorable treatment, and merely reflected the State's choice not to participate in voluntary federal detention programs. *Id*. at 593–94. The absence of any differential treatment or direct regulation meant the counties failed to state a claim under the intergovernmental-immunity doctrine. *United States v. New York* reached the same conclusion, dismissing the discrimination claim because the federal government failed to identify any provision that treated federal actors less favorably than comparable state entities; the law applied neutrally, and "refusing to help is not the same as impeding [the government's operations]." *United States v. New York* 814 F. Supp. 3d at 279–80. The same conclusion should be reached here.

In Paragraphs 172–173 of the Complaint, Plaintiff asserts that the 287(g) Law "discriminates" against the federal government, but the statute merely defines the conditions under which Virginia authorizes its subdivisions to enter cooperative agreements—conditions the Commonwealth is fully entitled to set, particularly in matters affecting policing, public safety, and community trust. *Compl.* ¶¶ 172–173. Under *Richmond v. Confrere Club*, 239 Va. 77, 79 (1990), localities may exercise only those powers the General Assembly grants, meaning Virginia may revise, limit, or withdraw authorization for § 287(g) agreements at any time. The 287(g) Law therefore regulates only Virginia's own subdivisions and their use of state resources; it imposes no burdens on federal officers and applies uniformly to all Virginia law-enforcement agencies and political subdivisions. Intergovernmental immunity prohibits discrimination only when a State treats a comparable federal entity less favorably than similarly situated state actors, *see Washington v. United States*, 460 U.S. 536, 544–45 (1983); *Inslee*, 151 F.4th at 1118, and Plaintiff identifies no such comparator.

Even if Plaintiff's theory of "discrimination" were correct (it is not), the Commonwealth is fully entitled to decide with whom it will and will not enter cooperative agreements, particularly in matters affecting policing, public safety, and the trust and welfare of the residents who receive law-enforcement services. Because the 287(g) Law neither imposes obligations on federal personnel nor treats any similarly situated state entity more favorably, Plaintiff's discrimination theory fails as a matter of law. Count VI should be dismissed with prejudice.

#### i. The 287(g) Law's Overall Structure Precludes Any Reading Suggesting Discriminatory Impact on Federal Officers

Even if the 287(g) Law contained any ambiguity suggesting a discriminatory impact on the federal government (it does not), the statute must still be construed in a manner that preserves its overall structure and internal coherence. The 287(g) Law uses uniform language to regulate only

Virginia's own political subdivisions and to define the conditions under which Virginia officers may participate in voluntary § 287(g) agreements. *See, generally,* Va. Code §15.2-1726.1. Reading the statute to impose employer-based distinctions or to treat federal officers differently from Virginia officers would contradict the statute's architecture and disrupt its integrated regulatory design.

The overall structure of the 287(g) Law forecloses any discrimination theory because the statute regulates only Virginia law-enforcement agencies and localities, not federal actors, and defines the conditions under which *Virginia* authorizes its subdivisions to enter voluntary federal immigration-enforcement agreements. The statute's repeated references to "a law-enforcement officer or employee of the Commonwealth or any of its localities," "law-enforcement agency" meaning only state or local entities, and its directive that "no law-enforcement agency shall maintain, renew, or enter into any federal immigration enforcement agreement unless…" confirm that the regulated class consists exclusively of Virginia governmental units. Va. Code §15.2-1726.1(A)-(C). Reading the statute to "discriminate" against the federal government would contradict this text, which uniformly governs state and local participation and imposes no burdens on federal officers beyond the terms Virginia is entitled to set when determining how its own resources may be used in cooperative agreements.

The Supreme Court has repeatedly rejected interpretations that isolate statutory terms from the broader statutory scheme. *See Abramski v. United States*, 573 U.S. 169, 181–84 (2014) (rejecting an interpretation that, though textually plausible in isolation, would unravel the statute's broader regulatory design and emphasizing that statutory terms must be read in a way that preserves the statute's overall structure and operational coherence); *Samantar v. Yousuf*, 560 U.S. 305, 315–19 (2010) (declining to read "foreign state" to include individual officials because such

a reading would contradict the FSIA's overall structure, definitions, and remedial scheme). Under these principles, any conceivable ambiguity in the 287(g) Law must be resolved in favor of the reading that harmonizes the statute's provisions and maintains its consistent focus on Virginia's regulation of its own officers, not federal personnel.

**ii. 287(g) Law Should Be Interpreted to Avoid Constitutional Difficulties**

Likewise, even if the 287(g) Law is ambiguous with respect to its discriminatory conduct (it is not), the avoidance canon requires adopting the interpretation that does not raise serious constitutional concerns under the Supremacy Clause or the intergovernmental-immunity doctrine. *Brown v. Plata*, 563 U.S. 493, 526–40 (2011) (rejecting interpretations that would create "serious constitutional concerns" or eliminate a viable remedy); *Bond v. United States*, 572 U.S. 844, 857–60 (2014) (courts must adopt any fair construction that avoids federalism or constitutional conflict); *Northwest Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 206–11 (2009) (choosing the interpretation that avoids "serious constitutional questions"). Plaintiff's reading would create constitutional tension by suggesting that SB 783 imposes obligations on federal officers or singles them out for unfavorable treatment—an interpretation that would raise the very constitutional difficulties the avoidance canon forbids. Courts must reject statutory constructions that generate such conflicts when a plausible alternative avoids them. *See id.*

The constitutionally sound reading of the 287(g) Law is the one that mirrors the statutes upheld in *McHenry County* and *United States v. New York*: the 287(g) Law regulates only Virginia's own officers, applies uniformly to all Virginia agencies, and merely conditions Virginia's voluntary participation in § 287(g) agreements. Under established avoidance principles, that uniform, conduct-based interpretation is the only permissible construction. Count VI of Plaintiff's Complaint fails as a matter of law and should be dismissed with prejudice.

### B. Plaintiff Fails to Plausibly Allege an Intergovernmental-Immunity Violation Under SB 352

#### 1. Plaintiff Fails to Plead that the Mask Law Regulates Any Existing Federal Law, Mandate, Regulation, or Domain of Federal Authority

Plaintiff alleges that the Mask Law unlawfully regulates the Federal Government by banning federal agents from wearing facial coverings, *see* Compl. ¶ 138, requiring visible identification, *see* Compl. ¶ 139, and thereby "directly regulat[ing]" federal operations in violation of intergovernmental immunity, *see* Compl. ¶ 140–141, but these assertions are conclusory and mischaracterize a neutral, generally applicable statute governing only public-facing officer conduct within Virginia.

The Mask Law does not impose any requirement that conflicts with, overrides, or adds to an existing federal mandate. *See, generally*, Va. Code § 19.2-83.6:1. The Complaint asserts that the statute "bans" federal agents from wearing facial coverings and "requires" them to display visible identification, but federal law contains no mandate whatsoever governing mask-wearing or identification for federal officers performing ordinary law-enforcement duties. Congress has enacted no statute addressing face coverings, and federal regulations make mask use discretionary. Because no federal qualification or entitlement exists in this area, Virginia is not adding to or contradicting any federal standard; it is exercising its traditional authority to regulate the public-facing manner in which officers interact with civilians within the Commonwealth.

Plaintiff's characterization of the statute as a "ban" is also inaccurate. The Mask Law contains exceptions and safeguards that apply equally to state, local, and federal officers, including exceptions for undercover work, exigent circumstances, and situations where safety or operational needs justify temporary face-covering use. *See* Va. Code § 19.2-83.6:1. These exceptions ensure that officers—regardless of employer—may wear facial coverings when necessary to protect safety, preserve anonymity in sensitive operations, or respond to emergent conditions. *Id.* The

statute therefore does not categorically prohibit federal officers from wearing masks; it establishes neutral, generally applicable rules governing when face coverings may be used during public-facing encounters, with exceptions available to all officers on equal terms.

These two points—the absence of any federal mandate and the presence of neutral exceptions—together foreclose Plaintiff's theory of regulation. Intergovernmental immunity is triggered only when a state imposes a requirement that interferes with, contradicts, or burdens *an existing* federally protected mandate. But where federal law is silent, and where the state's rule contains exceptions that preserve operational flexibility, there is no federal function for the state to regulate and no federal prerogative for the state to burden. A state cannot "regulate" federal activity in an area where the federal government has chosen not to regulate at all. *See United States v. Washington*, 596 U.S. 832, 838 (2022) (intergovernmental immunity applies only when a state law "interferes with or controls" federal operations). The Mask Law does not dictate who federal officers may arrest, how they conduct investigations, what federal procedures they must follow, or what federal policies govern their operations. It regulates only incidental aspects of officer appearance—matters firmly within the Commonwealth's police powers and is long recognized as legitimate public-safety measures. See *Kelley*, 425 U.S. at 247–48 (appearance-based regulations serve public-safety objectives by making officers "readily recognizable to the public").

Because there is no federal mandate governing mask-wearing or identification, and because the Mask Law's exceptions and safeguards apply equally to all officers, Plaintiff's allegations do not plausibly allege any conflict with federal law or any regulation of federal prerogatives. The Complaint therefore fails to state a claim under the intergovernmental-immunity doctrine. Count I of Plaintiff's Complaint should be dismissed with prejudice.

### 2. Plaintiff Fails to State a Claim That the Mask Law Discriminates Against Federal Officers

Plaintiff alleges that subsections (C)(5) and (E) of the Mask Law discriminate against federal officers by providing undercover-operations exceptions and penalty-mitigation mechanisms for state and local officers but not for federal personnel, *see* Compl. ¶¶ 144–147, and concludes that these provisions constitute unlawful discrimination under intergovernmental immunity, *see* Compl. ¶¶ 148–149. These assertions are conclusory and fail because Plaintiff identifies no similarly situated comparator that the Mask Law treats more favorably than federal officers—an essential element of a discrimination claim under intergovernmental immunity. The doctrine prohibits discrimination only when a State "treats someone else better than it treats [the federal government]," *Washington v. United States*, 460 U.S. 536, 544–45 (1983), and only when a State affords more favorable treatment to a comparable state entity, *see GEO Group v. Inslee*, 151 F.4th 1107, 1118 (9th Cir. 2025) ("A state law or regulation impermissibly discriminates against the federal government if it treats a state entity more favorably than it treats a comparable federal entity.") (citing *Dawson v. Steager*, 586 U.S. 171, 175–76 (2019)).

Plaintiff's theory rests on the premise that the statute's undercover and tactical-operations exceptions exclude federal officers, but that premise cannot be reconciled with the statute's text. Subsection (B) provides that, "except as provided in subsection C, no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while… engaged in the performance of his official duties," and subsection (A) defines "law-enforcement officer" to include "any full-time or part-time employee of a federal law-enforcement agency."

By its plain terms, the statute imposes identical obligations on all officers—federal, state, and local—whenever they exercise police authority in the Commonwealth. And subsection (C) makes the exceptions equally available to any law-enforcement officer, listing twelve

circumstances (including translucent face shields, N95 masks, toxin-protection gear, motorcycle helmets, SWAT-team facial coverings, and facial coverings used by officers assigned to undercover, drug, gang, or surveillance units) in which "a law-enforcement officer" may lawfully use a facial covering while performing official duties. Because both the obligations and the exceptions apply uniformly to federal and state personnel alike, the Mask Law does not single out or disadvantage federal officers in any respect, and Plaintiff's discrimination theory fails as a matter of law.

#### i. The Mask Law's Overall Structure Demonstrates That It Applies Evenhandedly to All Officers

Even if there were any ambiguity in the Mask Law's text regarding its purported discriminatory impact on federal officers (there is none), the statute must be interpreted in a manner consistent with its overall structure. Section 19.2-83.6:1(A) defines "law-enforcement officer" to include "any full-time or part-time employee of a federal law-enforcement agency," and subsection (B) provides that, "except as provided in subsection C, no law-enforcement officer shall wear a facial covering that conceals, obscures, or otherwise covers his face while… engaged in the performance of his official duties." This uniform language makes clear that the statute imposes the same conduct-based obligation on all officers—federal, state, and local—and nothing in the statutory scheme suggests that the General Assembly intended to create employer-based distinctions. Reading the statute to exclude federal officers from exceptions would make the statute internally incoherent, because it would impose identical obligations on all officers while making exceptions turn on agency identity, a result the structural-consistency canon forbids. Courts must avoid interpretations that disrupt a statute's integrated design or create asymmetries the legislature did not adopt. *See, e.g., Abramski v. United States*, 573 U.S. 169, 181–84 (2014) (rejecting an interpretation that, though textually plausible in isolation, would unravel the statute's

broader regulatory design and emphasizing that statutory terms must be read in a way that preserves the statute's overall structure and operational coherence); *Samantar v. Yousuf*, 560 U.S. at 315-19. (declining to read "foreign state" to include individual officials because such a reading would contradict the FSIA's overall structure, definitions, and remedial scheme, reinforcing that statutory terms must be interpreted in harmony with the statute's architecture); *Beck v. PACE Int'l Union*, 551 U.S. 96, 106–11 (2007) (rejecting an interpretation that would treat merger as a permissible termination method because it conflicted with ERISA's overall structure, which draws clear distinctions between termination and merger procedures, PBGC oversight, and the consequences for plan assets and participant protections).

**ii. The Avoidance Canon Forecloses Plaintiff's Discriminatory Reading of the Mask Law**

Likewise, the avoidance canon requires rejecting any interpretation that would render the statute unconstitutional or raise serious constitutional difficulties. Plaintiff's reading would create an intergovernmental-immunity problem by imposing asymmetric burdens on federal officers that do not apply to comparable state or local officers, raising Supremacy Clause concerns and forcing the Court to confront a constitutional question unnecessarily. When a statute is susceptible to a plausible interpretation that avoids such constitutional conflict, courts must adopt that reading. *See, e.g.*, *Northwest Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 206–11 (2009) (declining to reach the constitutionality of section 5 of the Voting Rights Act by adopting a broader, textually permissible reading of the bailout provision because the narrower reading would raise "serious constitutional questions"). Here, the plain, conduct-based interpretation applies uniformly to all officers and avoids any discriminatory impact or constitutional defect, making it the only permissible construction under established avoidance principles. *See id.* Plaintiff's

discrimination claim as to the Mask Law therefore fails as a matter of law. Count II of Plaintiff's Complaint should be dismissed with prejudice.

### III. Plaintiff Has Not Plausibly Alleged a Contract Clause Violation

To state a plausible Contract Clause claim, a plaintiff must allege facts showing both that the challenged state law "operate[s] as a substantial impairment of a contractual relationship," *Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983), and that any impairment was not "reasonable and necessary to serve an important government purpose." *UAW Int'l Union v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011) (citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 25 (1977)). As Fortuño explains, lack of reasonableness or necessity is an element of a Contract Clause claim that plaintiffs must affirmatively plead. *See id.* 45–46. The First Circuit affirmed dismissal because the plaintiffs offered only conclusory assertions that Act No. 7 was unreasonable or unnecessary, failed to identify the contractual provisions allegedly impaired, and pled no facts undermining Puerto Rico's stated purpose of enacting a measure specifically designed to address a $3.2 billion deficit. *See id*. at 46–47. The court stressed that Contract Clause claimants must allege facts showing that the State's chosen approach was excessively drastic, insufficiently tailored to its fiscal objective, or adopted for illegitimate reasons—none of which appeared in the disputed complaint. *See id*. The plaintiffs simply never alleged anything that would call into question the reasonableness or necessity of a statute enacted to confront a multibillion-dollar fiscal emergency. *Id.*

This reasoning applies squarely here. Like the plaintiffs in *Fortuño*, the United States does not plead any facts showing that the 287(g) Law is unreasonable or unnecessary to serve Virginia's important governmental purposes—namely, ensuring transparency, accountability, and public safety in civil-immigration enforcement partnerships. The complaint identifies no alternative measures Virginia allegedly ignored, no facts suggesting that the 287(g) Law is excessively drastic,

and no allegations undermining the Commonwealth's stated policy rationale. As *Fortuño* explains, plaintiffs must plead facts that "undermine the credibility" of the State's stated motives or show that a "more moderate course would serve its purposes equally well." *Id*. at 46 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 31 (1977)). The United States pleads none.

Because the United States—like the plaintiffs in *Fortuño*—offers only conclusory assertions and no factual content showing that the 287(g) Law is not "reasonable in light of the surrounding circumstances" or that it "impose[d] a drastic impairment when an evident and more moderate course would serve its purposes equally well," *Fortuño*, 633 F.3d at 46, it has not plausibly alleged the second essential element of a Contract Clause claim. Its claim therefore fails as a matter of law. Count III of Plaintiff's Complaint should be dismissed with prejudice.

## IV. Plaintiff Cannot State a Preemption Claim Because No Federal Law Conflicts with the 287(g) Statute

Plaintiff asserts that the 287(g) Law is preempted because it allegedly "require[s] provisions in § 287(g) agreements" that conflict with federal law and "prohibit[s] law enforcement from honoring administrative warrants or subpoenas," thereby obstructing the INA's enforcement scheme. *See* Compl. ¶¶ 162–164. These assertions mirror the same type of conclusory obstacle-preemption allegations rejected in *McHenry Cnty*, where the Seventh Circuit affirmed dismissal because the counties failed to plausibly allege that the Illinois Way Forward Act obstructed any federal mandate governing immigration detention. Conflict preemption requires a plaintiff to plead facts showing either (1) impossibility—physical impossibility of complying with both federal and state law—or (2) that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *McHenry Cnty.*, 44 F.4th at 591 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). The counties alleged no impossibility, and their obstacle theory rested only on a generalized claim that Congress preferred

use of existing detention facilities—an argument the court rejected because § 1231(g) merely instructs ICE to "consider" available facilities, a directive far too weak to constitute a congressional command, and because the INA provisions at issue merely permit cooperation rather than require States or localities to provide detention space. *Id.* at 589, 592.

The reasoning in *United States v. New York* reinforces the point. In that case, the court held that the United States had not plausibly alleged conflict preemption because no federal statute required New York to share DMV information with immigration authorities, emphasizing that "refusing to help is not the same as impeding" and that conflict preemption requires a "sharp" conflict, not mere tension. *United States v. New York*, 814 F. Supp. 3d 266, 279–80 (N.D.N.Y. 2025). The same principles foreclose Plaintiff's challenge here.

Plaintiff identifies no federal mandate requiring Virginia to enter, maintain, or renew § 287(g) agreements, and Congress expressly preserved state discretion by providing that "[n]othing . . . shall be construed to require any State or political subdivision… to enter into an agreement." 8 U.S.C. § 1357(g). The 287(g) Law does not make compliance with federal law impossible, nor does it create a "direct and positive" obstacle to Congress's objectives. Like the pleadings rejected in *McHenry Cnty.* and *New York*, the Complaint here fails to allege facts showing that the 287(g) Law restricts federal officers, prohibits federal enforcement activity, or nullifies any federal mandate. Plaintiff does not identify a single federal statute or regulation that the 287(g) Law prevents federal officers from executing, nor does it allege facts demonstrating that federal law requires Virginia's subdivisions to participate in § 287(g) agreements or to provide state resources for federal administrative warrants or subpoenas. Instead of pleading a concrete conflict, Plaintiff offers only generalized assertions that the 287(g) Law "stands as an obstacle" to federal immigration enforcement—precisely the type of conclusory allegations both courts held

insufficient. *See* Compl. ¶ 162. The Complaint thus fails to plausibly allege any federal requirement that the 287(g) Law obstructs, and its conflict-preemption theory collapses for the same pleading-deficiency reasons identified in those cases. Because the 287(g) Law can "be reconciled and consistently stand together" with federal law, Plaintiff cannot plausibly allege conflict preemption. Count IV of Plaintiff's Complaint should be dismissed with prejudice.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be granted.

Respectfully Submitted,

Dated: July 17, 2026

**RESPECTFULLY SUBMITTED,**

**THE COMMONWEALTH OF VIRGINIA** and **JAY JONES**, in his official capacity as Attorney General of Virginia

By: <u>*/s/ Triston Chase O'Savio*</u>
Triston Chase O'Savio (VSB # 100111)
*Assistant Solicitor General*

Jay Jones
*Attorney General*

Tillman J. Breckenridge (VSB #84657)
*Solicitor General*
Gretchen Ellen Nygaard (VSB No. 82475)
*Deputy Attorney General*
Triston Chase O'Savio (VSB #100111)
*Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

## CERTIFICATE OF SERVICE

I, Triston Chase O'Savio, hereby certify that on July 17, 2026, I electronically filed the foregoing Amended Memorandum in Support of Defendants' Motion to Dismiss Under Rule 12(b)(6) with the Clerk of Court using the CM/ECF system.


GERARD MENE
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov

ALESSANDRA FASO
Senior Litigation Counsel
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
Telephone: 202-451-7728
Alessandra.faso@usdoj.gov


*/s/ Triston Chase O'Savio*
Triston Chase O'Savio, Esq.