**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>THE COMMONWEALTH OF<br>VIRGINIA, *et al.*,<br><br>              Defendants. | No. 3:26-cv-00545-REP<br><br>**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AS TO SB 783 / VA CODE § 15.2-1726.1** |

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

ARGUMENT .................................................................................................................................2

    I.      THE UNITED STATES IS LIKELY TO SUCCEED ON THE MERITS ..................2

        A.  This Dispute is Ripe ..........................................................................................2

        B.  Section 15.2-1726.1 Violates the U.S. Constitution's Contract Clause ..................4

            1.  There is Substantial Contractual Impairment ........................................4

            2.  Virginia's Post-Hoc Public Purposes Fail...............................................6

        C.  The 287(g) Law Unconstitutionally Discriminates Against the Federal Government................................................................................................... 9

        D.  The 287(g) Law Regulates the Federal Government..............................................12

        E.  Section 15.2-1726.1 Is Conflict Preempted ...........................................................16

    II.     THE UNITED STATES HAS SHOWN IRREPARABLE HARM ...........................18

    III.    THE FINAL MERGED FACTORS FAVOR THE UNITED STATES .....................19

CONCLUSION...........................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Air Evac EMS, Inc. v. Cheatham*,
   260 F. Supp. 3d 628 (S.D.W. Va. 2017) .................................................................................. 3

*Arizona v. California*,
   283 U.S. 423 (1931) ............................................................................................................... 16

*Arlington Cty. v. White*,
   528 S.E.2d 706 (2000) ............................................................................................................. 4

*Baltimore Teacher's Union v. Mayor of Baltimore*,
   6 F.3d 1012 (4th Cir. 1993) ..................................................................................................... 5

*Barnett Bank v. Nelson,*
   517 U.S. 25 (1996) ................................................................................................................. 17

*United States v. California*,
   173 F.4th 1060 (9th Cir. 2026) .............................................................................................. 13

*Charter Fed. Sav. Bank v. Off. of Thrift Supervision*,
   976 F.2d 203 (4th Cir. 1992) ............................................................................................... 2, 3

*City of New York v. United States*,
   179 F.3d 29 (2d. Cir. 1999) .............................................................................................. 15, 17

*CoreCivic, Inc. v. Governor of New Jersey*,
   145 F.4th 315 (3d Cir. 2025) ............................................................................................ 14, 16

*Di Biase v. SPX Corp.*,
   872 F.3d 224 (4th Cir. 2017) ................................................................................................... 2

*DoorDash, Inc. v. City of N.Y.*,
   692 F. Supp. 3d 268 (S.D.N.Y. 2023) ...................................................................................... 5

*Energy Reserves Grp. v. Kan. Power & Light Co.*,
   459 U.S. 400 (1983) ............................................................................................................. 6, 8

*Equip. Mfrs. Inst. v. Janklow*,
   300 F.3d 842 (8th Cir. 2002) ................................................................................................... 7

*Hisp. Leadership Fund, Inc. v. Fed. Election Comm'n*,
   897 F. Supp. 2d 407 (E.D. Va. 2012) .................................................................................. 2, 3

*Home Bldg. & Loan Asso. v. Blaisdell*,
    290 U.S. 398 (1934)......................................................................................................... 4

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    2 F.4th 330 (4th Cir. 2021) ..................................................................................... 19, 21

*Mayo v. United States*,
    319 U.S. 441 (1943)....................................................................................................... 12

*McCulloch v. Maryland*,
    17 U.S. 316 (4 Wheat.) (1819).................................................................................... 13

*McHenry v. Raoul*,
    44 F.4th 581 (7th Cir. 2022) ....................................................................................... 15

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ..................................................................................... 2, 3

*Mt. Valley Pipeline, LLC v. 6.56 Acres*,
    915 F.3d 197 (4th Cir. 2019) ....................................................................................... 18

*Murphy v. NCAA*,
    584 U.S. 453 (2018)....................................................................................................... 18

*Retail Indus. Leaders Ass' v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) ..................................................................................... 3, 4

*Southern California Gas Co. v. City of Santa Ana*,
    336 F.3d 885 (9th Cir. 2003) ......................................................................................... 7

*Tennessee v. Davis*,
    100 U.S. 257 (1879)....................................................................................................... 15

*Toledo Area AFL-CIO Council v. Pizza*,
    154 F.3d 307 (6th Cir. 1998) ......................................................................................... 7

*United Healthcare Ins. Co. v. Davis*,
    602 F.3d 618 (5th Cir. 2010) ......................................................................................... 5

*United States Trust Co. v. New Jersey*,
    431 U.S. 1 (1977)....................................................................................................... 4, 6

*United States v. City of Arcata*,
    629 F.3d 986 (9th Cir. 2010) ....................................................................................... 14

*United States v. King County*,
  122 F.4th 740 (9th Cir. 2024) ................................................................................... 11

*United States v. Washington*,
  596 U.S. 832 (2022).......................................................................................... 10, 11

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................... 18

**Statutes**

8 U.S.C. § 1357(g) ........................................................................................... 11, 14, 15

8 U.S.C. § 1357(g)(8) ............................................................................................... 16

8 U.S.C. § 1373 ........................................................................................................... 9

8 U.S.C. § 1644 ........................................................................................................... 9

42 U.S.C. § 1981 ....................................................................................................... 11

Va. Code § 15.2-1700 ............................................................................................... 20

Va. Code § 15.2-1701 ............................................................................................... 20

Va. Code § 15.2-1704 ............................................................................................... 20

Va. Code § 15.2-1726 ................................................................................. 6, 10, 11, 20

Va. Code § 15.2-1726.1 ....................................................................................... *passim*

Va. Code § 15.2-1727 ........................................................................................... 10, 11

**Other Authorities**

U.S. Const. art. II .................................................................................................... 15

Virginia SB 783 ......................................................................................................... 1

**Websites**

Diaz, Olivia, AP News (Aug. 14, 2025), Youngkin praises Virginia's economy, dismissing
  Democrats concerns over Medicaid and job cuts, available at
  https://apnews.com/article/virginia-youngkin-economy-medicaid-
  d33efebd45ecee69938dab665ccc32a6. (last visited July 20, 2026) ........................................ 8

Graham, Chris, Augusta Free Press, Report: Virginia government ends year with near-billion-dollar surplus, available at https://augustafreepress.com/news/report-virginia-government-ends-year-with-near-billion-dollar-surplus/ (last visited July 20, 2026) .................................... 8

Manzanares, Keyris, VPM News, General Assembly sends slate of immigration bills to Spanberger's desk (Mar. 23, 2026), available at https://www.vpm.org/generalassembly/2026-03-23/immigration-bills-salim-lopez-ice-enforcement-287g-spanberger (last visited July 20, 2026) ....................................................................................................................... 7

Powell, Luca, Richmond Times-Dispatch, Virginia Governor dissolves 287(g) agreements between state LE agencies, ICE (Feb. 5, 2026), available at https://www.police1.com/federal-law-enforcement/va-governor-dissolves-287g-agreements-between-state-le-agencies-ice (last visited July 20, 2026)...................................................................................... 3

Senator Saddam Salim, https://www.salimforsenate.com/policy (last visited July 20, 2026). ...... 7

Serre, Jared, FFX Now, (Jan. 28, 2026), State Sen. Salim highlights proposed bills to 'end ICE abuses' across Virginia, available at https://www.ffxnow.com/2026/01/28/state-sen-salim-highlights-proposed-bills-to-end-ice-abuses-across-virginia/ (last visited July 20, 2026)......... 7

Virginia State Police, https://vsp.virginia.gov/wp-content/uploads/2026/07/Crime-In-Virginia-2025.pdf (last visited July 20, 2026).  ...................................................................... 9

**INTRODUCTION**

This Court should enjoin Defendants from enforcing the newly enacted SB 783, codified at Section 15.2-1726.1 of the Virginia Code (hereinafter "287(g) Law").

The Constitution is clear: "No State shall… pass any … law impairing the Obligation of Contracts[.]" Const. Art. I, § 10, cl. 1. Yet Virginia did just that. The 287(g) Law targets and impairs existing agreements between the Department of Homeland Security ("DHS") and Virginia localities by requiring new, onerous terms in those contracts. 287(g) agreements that are not amended will be voided. Virginia's law is unconstitutional under the Contracts Clause and its arguments to the contrary fail. The dispute is ripe, the contracts are impaired, and Virginia's post-hoc rationalizations for its law are belied by both the law's text and the statements of the Senator who introduced it. The law cannot stand.

The law also violates the Supremacy Clause. Intergovernmental immunity prevents states from discriminating against or regulating the Federal Government. Yet Virginia's law targets immigration enforcement efforts and the federal officers and agents who carry out those efforts, treating them less favorably because of the federal function and regulating where, how, and under what conditions they do their jobs. The law is also preempted because it seeks to block 287(g) agreements in Virginia altogether, even though Congress created such agreements by statute.

Finally, the United States has shown an irreparable harm and that the balance of hardships and public interest weigh in its favor. That is particularly true where, as here, there are significant constitutional issues at play. This Court should grant the United States' motion.[1]

---

[1] On July 17, 2026, Legal Aid Justice Center submitted an amicus brief in support of Virginia's Opposition. *See* ECF 48. Where the brief does not reiterate Virginia's arguments, it presents general policy arguments in support of the 287(g) Law. It should be given little, if any, weight.

## ARGUMENT

## I.    THE UNITED STATES IS LIKELY TO SUCCEED ON THE MERITS

### A.  This Dispute is Ripe

Constitutionality of the 287(g) Law is ripe for judicial review. "Ripeness is a closely related inquiry to standing that arises in the context of pre-enforcement challenges." *Hisp. Leadership Fund, Inc. v. Fed. Election Comm'n*, 897 F. Supp. 2d 407, 424 (E.D. Va. 2012). Virginia has never contested pre-enforcement standing. To analyze ripeness, courts "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quotations/citation omitted). Legal questions are fit for review, as are challenges where the "rule or action giving rise to the controversy is final[.]" *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]" from enforcement of the law. *Id.* at 208-09.

Virginia contends any challenge to the 287(g) Law is unripe because the law "does not require any immediate action" before its September 1, 2026, deadline. Opp.13.[2] But the United States need not wait for its existing contracts to be voided on September 1 to seek judicial relief; the point of preliminary injunctive relief is to preserve the status quo and prevent irreparable harm. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Virginia's position would eviscerate both pre-enforcement standing and preliminary injunctions and should be rejected. Moreover, if the United States did wait, Virginia would likely argue that preliminary relief was unavailable because of the delay. *See* ECF 22 at 17-18 (making delay argument as to Mask Ban). Further, as set forth in the Supplemental Weiss Declaration filed herewith, certain localities in Virginia have

---

[2] "Opp." refers to the Opposition to Plaintiff's Motion for Preliminary Injunction as to the 287(g) Law, ECF 40.

begun refusing to honor up to 72-hour holds to transfer prisoners, indicating that the agreements will end as of September 1, 2026, because of the new law. *See* Supp. Weiss Decl. ¶¶ 6-9.

Under the proper standard, the challenge to the 287(g) Law is (1) fit for judicial review and (2) the United States faces substantial (indeed irreparable) harm absent the Court's consideration of the issue. *Miller*, 462 F.3d at 319. The United States raises questions of law under the Contract Clause and the Supremacy Clause. *See Retail Indus. Leaders Ass' v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) (pre-enforcement challenge ripe for review where it "present[ed] purely legal questions" and "because of their certain applicability to" plaintiff); *Hisp. Leadership Fund, Inc.*, 897 F. Supp. 2d at 425 (finding a "pre-enforcement action for a declaratory judgment is ripe for adjudication."). First, the law is final and in effect. *See Charter Fed. Sav. Bank*, 976 F.2d at 208. Indeed, as to the 287(g) Law, Governor Spanberger announced that "[t]aking personnel, and basically giving them over to ICE, is something that ends today." https://www.police1.com/federal-law-enforcement/va-governor-dissolves-287g-agreements-between-state-le-agencies-ice (last visited July 20, 2026). Because the United States will not amend its 287(g) agreements to comply with the 287(g) Law (ECF 9-1 (Weiss Decl.) ¶ 62), all 287(g) agreements between DHS and Virginia entities will be voided.

Second, voiding the 287(g) agreements on September 1, is "a present, concrete hardship." *See Air Evac EMS, Inc. v. Cheatham*, 260 F. Supp. 3d 628, 638 (S.D.W. Va. 2017) (finding present hardship based on plaintiff's "inability to escape liability under the statute unless it complies with the altered billing requirements now"); *see* ECF 9 (PI Memo) at 27 (discussing the harms the United States will suffer upon the termination of the remaining 287(g) agreements in Virginia). Accordingly, this matter is ripe for judicial review.

### B.    Section 15.2-1726.1 Violates the U.S. Constitution's Contract Clause

#### 1.  There is Substantial Contractual Impairment

Virginia argues that its police powers trump the Contract Clause, citing *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977) and other cases. Opp.23. But there is no absolute rule that state police powers justify contract impairment. Rather, the Supreme Court cautioned that "the scope of the State's reserved power depends on the nature of the contractual relationship with which the challenged law conflicts" and that "laws intended to regulate existing contractual relationships must serve a legitimate public purpose." *Id.* at 21-22.[3] Virginia does not claim that the existing 287(g) agreements bargained away its police powers such that the reserved powers doctrine applies, *see id.* at 23, nor does Virginia allege that its localities lacked authority to execute the contracts in the first place, making them void *ab initio*. Thus, its reliance on its police powers is misplaced, *id.* at 23, as is its reliance on Dillon's Rule (Opp.14), which addresses the powers of local legislative bodies. *See Arlington Cty. v. White*, 528 S.E.2d 706, 708 (2000) (explaining scope of Dillon's Rule). While Virginia might be able to modify the authority of jurisdictions to enter into future agreements, that does not give it license to invalidate *existing* contracts. As the Supreme Court explained, "the Contract Clause limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation." *United States Trust Co.*, 431 U.S. at 21. "A State could not adopt as its policy the … destruction of contracts." *Id.* at 22 (quotation/citation omitted). Under Virginia's interpretation, Virginia could vitiate any contracts entered by its subdivisions at will. Instead, because states have

---

[3] *City of Trenton* stands for the unremarkable proposition that a state can give and take away certain powers from a city vis-à-vis the state, not that the state can vitiate any contract entered into by a city. *Id.* at 185-86 (city suing state for change in law under contract clause). The cases show that the Contract Clause protects the contractual rights of third parties (i.e., a utility company) against the state or political subdivision if acting as a proprietor. *Id.* Here, the Federal Government is the relevant third party whose contractual rights are protected by the Contract Clause.

a self-interest in using laws to terminate their own contracts, when a state is a contracting party, less deference is afforded to its legislative judgments. *Baltimore Teacher's Union v. Mayor of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993).

Virginia next argues that there is no contractual impairment from the law because the contracts will not be voided until September 1, 2026. Opp.23. This is a failed redux of their ripeness argument. Virginia's law imposes onerous new terms on DHS for the contracts to continue, and imposing such terms is a contract impairment because they are central terms that were not part of the original agreement between the parties. Moreover, Virginia's law requires the new terms to be incorporated in a matter of weeks or the contracts are rendered void. It is plainly wrong to suggest that the United States must wait until the contracts are voided by the law to seek relief. Furthermore, the contracts are already being impaired. Supp. Weiss Decl. ¶¶ 6-9.

Virginia also argues that no obligation will be impaired because entry into the 287(g) contracts is voluntary. Opp.24. Such an argument is nonsensical—*all* valid contracts are voluntary. *See* Restatement (2d) of Contracts, § 22 (mutual assent); §§ 152, 153 (contract voidable by mutual mistake); 164 (contract voidable by material misrepresentation). Likewise, Virginia cites no law to support its assertion that contracts that may be terminated at will cannot be substantially impaired. Courts have reached the opposite conclusion. *See, e.g.*, *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 628 (5th Cir. 2010) ("We conclude that [the district court's] first reason-- that the contracts were terminable at will by OGB--does not prevent a finding of contract impairment."); *DoorDash, Inc. v. City of N.Y.*, 692 F. Supp. 3d 268, 290 (S.D.N.Y. 2023) ("Defendant's argument that as a matter of law 'there can be no substantial impairment where contracts are terminable at-will' has no merit."). And Virginia acknowledges the agreements are only terminable after a 90-day written notice. Opp.24. Forcing unwilling parties to modify or

terminate agreements, even if they otherwise could, is a substantial impairment.

Further, while Virginia may be able to dictate the terms of, and terminate its own contracts, it delegated the power to contract for police services to localities, Va Code § 15.2-1726, and it cites no authority to suggest that it can unilaterally demand new terms in contracts or void validly-executed contracts of its localities, let alone that the General Assembly may do so by legislative enactment. To the contrary, Virginia's own constitution states "that the General Assembly shall not pass any law impairing the obligation of contracts;" Virginia Constitution, Art. I, sec. 11. So Virginia substantially impaired the existing 287(g) agreements by demanding that its new terms and obligations be imposed on DHS and voiding any contracts that do not include these terms.

## 2. Virginia's Post-Hoc Public Purposes Fail

Where there is a substantial impairment of contracts, courts next look to whether there is a legitimate public purpose behind the law and if so, "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Reserves Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 412 (1983) (quoting *United States Trust Co.*, 431 U.S. at 22). Virginia cannot meet that test. It offers a post-hoc rationalization of its law which conflicts with the contemporaneous evidence and text of the law itself. And because the text of the law does not reflect its alleged purpose, even if the purpose were deemed legitimate, the impairment is not "of a character appropriate to the public purpose." *Id.* at 412.

Virginia argues[4] that the law has a legitimate public purpose because the law prevents localities from diverting resources to immigration enforcement, thus saving money and focusing

---

[4] Once a substantial impairment is shown, the state has the burden to show a legitimate public purpose. *See, e.g.*, *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998) *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 894 (9th Cir. 2003).

local police on policing criminal matters rather than separating families through immigration enforcement. *See* Opp.25-26. Additionally Virginia argues, at various points, that 287(g) agreements impose risks and liabilities on local departments (Opp.7) and are more restrictive than Virginia's Freedom of Information Act (FOIA) requirements (Opp.8). Virginia cites no statutory text, legislative history, or contemporaneous statements of legislators to show that these alleged purposes are in fact the reasons behind the law. Its post-hoc rationalizations should be rejected. *See Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859–60 (8th Cir. 2002) (refusing to credit post-hoc articulation of public purpose that conflicted with the evidence).

The evidence shows that the purposes now advanced by Virginia are not what the legislature had in mind. First, the text of the law itself contains no references to costs, liabilities, FOIA, or policing priorities. Were such issues truly the point of the law, the legislature would have addressed them. Instead, all conditions the law imposes on existing contracts relate to immigration enforcement by federal agents and agencies, including investigative techniques, uniforms, and applicable laws. Va. Code § 15.2-1726.1(C). None of that plausibly addresses costs, local policing, or FOIA. Instead, it is all designed to regulate federal immigration enforcement within Virginia.

Second, contemporaneous statements made by the senator who introduced the legislation show the law is about immigration enforcement. *See, e.g.*, https://www.salimforsenate.com/policy ("In the Senate, [Sen. Salim] is carrying legislation that gets rid of 287G agreements that prohibits local law enforcement from working with ICE, legislation that prohibits federal authorities from arresting or detaining individuals at a courthouses, as well as legislation that prohibits federal law enforcement from wearing face masks when performing their official duties."); https://www.vpm.org/generalassembly/2026-03-23/immigration-bills-salim-lopez-ice-enforcement-287g-spanberger (discussing immigration enforcement bills);

https://www.ffxnow.com/2026/01/28/state-sen-salim-highlights-proposed-bills-to-end-ice-abuses-across-virginia/ (quoting Sen. Salim as saying that the three immigration bills he introduced, including the 287(g) bill, will keep "the chaos, lawlessness, and violence that we have seen perpetrated against Minnesotans from coming to Virginia."). Thus, the public discourse around the bills does not align with Virginia's professed public purpose. Virginia's law thus differs substantially from the cases it cites, including *Energy Reserves* and *Baltimore Teachers Union* (Opp.24-25) because unlike those cases, Virginia's law is not drawn to the purposes it touts.

Indeed, Virginia's own briefing admits that the law "regulates the terms under which any Virginia law-enforcement agency may participate in federal immigration-enforcement agreements" (Opp.1) to ensure that localities do not "unilaterally bind Virginia to federal civil immigration enforcement[.]" Opp.14. Virgina's opposition is apparent in its claim that it wants to avoid family separation, which, incidentally also occurs sometimes with criminal enforcement. But opposition to federal law cannot be a legitimate public purpose.

Third, Virginia's claims as to its budget are belied by the facts. In August 2025, Virginia had a $572 million budget surplus, a $4.7 billion rainy day fund, and economic output in the state grew more than forecasted. *See* https://apnews.com/article/virginia-youngkin-economy-medicaid-d33efebd45ecee69938dab665ccc32a6. At the time, then-Governor Youngkin's Executive Order 47, which encouraged 287(g) agreements, had been in place for six months. As of July 2026, Governor Spanberger announced that Virginia finished the fiscal year with a nearly $1 billion surplus. https://augustafreepress.com/news/report-virginia-government-ends-year-with-near-billion-dollar-surplus/. That despite the existence of 287(g) agreements. Further, Virginia acknowledges that some Task Force Agreements come with reimbursements, yet Virginia somehow claims the localities' choice to accept that assistance makes things worse. Opp.6-7.

8

Finally, much of the local police budgets come from local taxes, a point Virginia ignores. *See* PI Memo, ECF 9, at 23-24. And at any rate, localities can terminate the agreements if they find such agreements are costly.  *See* Opp.4 (describing Prince William County termination).

Finally, Virginia's assertions that 287(g) agreements create liability and undermine local policing efforts fail. Localities can terminate the agreements if they believe the liability is too great or if they believe other priorities are more pressing. Indeed, localities are beholden to their resident voters, who will make it known if they believe local crime has surged. But it hasn't. The Virginia State Police's crime report for 2025 shows across-the-board decreases in crime in Virginia. *See https://vsp.virginia.gov/wp-content/uploads/2026/07/Crime-In-Virginia-2025.pdf* at 10.

The primary public purpose of Virginia's law is to obstruct federal immigration enforcement efforts in Virginia, as is apparent from the text itself, and Virginia's assertions otherwise should not be credited. Furthermore, while Virginia claims that its law "avoids more drastic alternatives, such as prohibiting all cooperation with federal immigration authorities," Opp.26, Virginia cannot prohibit all such cooperation. *See, e.g.*, 8 U.S.C. § 1373, 1644. Regardless, even if this Court were to credit Virginia's justifications for the law, Virginia did not seek a reasonable and necessary way to advance those objectives because the objectives are not mentioned in the law at all.

### C. The 287(g) Law Unconstitutionally Discriminates Against the Federal Government.

The 287(g) Law discriminates against the Federal Government, in violation of intergovernmental immunity, because it "singl[es] out the Federal Government for unfavorable treatment." *United States v. Washington*, 596 U.S. 832, 839 (2022).

Virginia characterizes the law as "treat[ing] all Virginia agencies the same," yet ignores the other side of that coin that is relevant to this analysis: the Federal Government. Opp.20. The

287(g) Law imposes *onerous* requirements on the Federal Government should DHS wish to continue existing 287(g) agreements or enter new agreements with Virginia entities, without which the contracts are voided. Va. Code § 15.2-1726.1. Losing this congressionally authorized program for vital cooperation is a substantial burden and disrupts federal operations. Weiss Decl., ECF 9-1 ¶¶ 51, 56, 58-60; Supp. Weiss Decl. ¶¶ 6-9.

Virginia next claims that "[t]he 287(g) Law does not treat the federal government worse than any similarly situated entity because there is no similarly situated entity." Opp.21. Strangely, Virginia defines the relevant comparator as those who can enter 287(g) agreements and declares that because only federal officers have such authority there can be no comparator. *Id.* Troublingly, such a principle suggests that Virginia believes states have *more* leeway to discriminate against certain federal functions *because* they are inherently federal. That turns the intergovernmental immunity doctrine, which is meant to protect the Federal Government, on its head. Instead, the relevant comparator is cooperative agreements between law enforcement agencies.

Such comparators abound. Virginia does not place similarly onerous restrictions on comparable cooperative agreements that entities within the Virginia may enter. For example, Section 15.2-1726 permits localities to enter into agreements with localities, universities, and federal agencies for cooperation in furnishing police services.  Section 15.2-1727 provides for reciprocal agreements between Virginia entities and localities outside Virginia to provide for mutual aid. The statutes do not dictate where those police officers may engage in their law enforcement duties, restrict the methods by which they conduct their duties, or require those officers to alert Virginia before engaging in enforcement activity under the threat of termination. *See* Va. Code §§ 15.2-1726; 15.2-1727. This is a clear example of improper discrimination against the Federal Government by singling out the Federal Government—and immigration enforcement

10

in particular—for unfavorable treatment. *United States v. Washington*, 596 U.S. 832, 840 (2022).

The Ninth Circuit's decision in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), is directly on point. Just like the 287(g) Law, the challenged Executive Order in *King County* specifically barred entities "from servicing ICE charter flights *because of their role in carrying out the federal immigration laws*." 122 F.4th at 757 (emphasis added). In deeming the order to be unlawfully discriminatory against the Federal Government, the Ninth Circuit did not require an immigration comparator because "the only entity in the business, so to speak, of deporting immigration detainees, is the federal government." *Id.* The court held that the challenged Executive Order "discriminatorily burdens the United States specifically because of federal immigration operations, based on the County's disagreement with federal policy." *Id.* at 757-58. Virginia tries to distinguish that case by saying it singled out ICE. But the same is true here, the 287(g) Law only applies to agreements for immigration enforcement. There is no difference.

Finally, Virginia contends that the voluntary nature of 8 U.S.C. § 1357(g) negates any discrimination claim because the parties are free to contract or not. Opp.21. However, a state *cannot* take that choice away from those local entities by effectively prohibiting 287(g) agreements through the imposition of mandatory requirements that bind the Federal Government. Nor can it do so discriminatorily. All contracts are voluntary, but that does not entitle states to rely on illegal reasons to ban contracts. *Cf.* 42 U.S.C. § 1981 (illegal to discriminate in making contracts). By imposing strict requirements on 287(g) agreements resulting in a *de facto* ban of the program, Virginia seeks to impermissibly discriminate against the Federal Government while continuing to allow similar agreements for other law enforcement.

### D.  The 287(g) Law Regulates the Federal Government

"[T]he activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). The purpose and effect of the 287(g) Law is to dictate

11

with whom the Federal Government may—or may not—contract to enforce immigration law, and to dictate how such enforcement is performed in Virginia if DHS does contract with local Virginia entities. Virginia cannot dictate such terms.

On its face, the 287(g) Law seeks to bind federal officers, not Virginia officers as Virginia claims (Opp.18). For example, subsection (C)(1) mandates "[t]hat *U.S. Immigration and Customs Enforcement shall provide* to the law-enforcement agency the names and ranks of all federal agents involved in any immigration enforcement activity within the Commonwealth at least seven days prior…" Va. Code § 15.2-1726.1(C)(1) (emphasis added). The law prohibits DHS from conducting immigration enforcement activities in certain places: "no *agent of U.S. Immigration and Customs Enforcement shall* conduct any immigration enforcement activity on the property of any school, faith-based organization, or courthouse within the Commonwealth." *Id.* § (C)(4) (emphasis added); *see also id.* § (C)(8) (prohibiting immigration enforcement near a polling place). The law also requires consent to liability under state law. *Id.* § (C)(5), (10)-(12). The law dictates how federal officers may do their jobs, prohibiting "*U.S. Immigration and Customs Enforcement [and] its agents* [from] us[ing] any surveillance technology to conduct immigration enforcement" and requiring them to clearly identify themselves as ICE, which this Court already ruled was unconstitutional. *Id.* § (C)(3), (9) (emphasis added). Virginia is free to regulate its own officers, but none of these requirements are placed on state officers. The law explicitly regulates federal officers performing their official duties. Subsections (C)(1)-(12) are clearly direct regulations.

While it is true that such requirements only attach if the Federal Government chooses to enter into a 287(g) agreement with a Virginia entity, Opp.18, it remains an impermissible regulation. The state is dictating what entities the Federal Government can contract with. "[I]f a state law directly regulates the conduct of the United States, it is void … irrespective of the degree

12

to which the state law interferes with federal functions or operations." *United States v. California*, 173 F.4th 1060, 1066 (9th Cir. 2026). 287(g) agreements are mission critical to DHS's immigration enforcement operations and ensure preservation of DHS resources, the safe and timely transfer of dangerous individuals, and prompt removal of such individuals upon release from state custody. *See* Weiss Decl. ¶ 50. The 287(g) Law's draconian limitations on voluntary cooperative agreements authorized by federal statute are an outright ban on such agreements in Virginia. The Framers "did not intend" for federal operations to "depend on the discretion of the state governments," *McCulloch v. Maryland*, 17 U.S. 316, 327, 362 (4 Wheat.) (1819), yet that is the power Virginia seeks to exert over the Federal Government's immigration enforcement authority.

According to Virginia, the 287(g) Law solely constrains Virginia law enforcement agencies. Opp.15. In the same vein, Virginia contends that, should the Federal Government disagree with those terms, it need not enter into those agreements in Virginia. *Id.* This forces the Federal Government to choose the method of state regulation: enter into 287(g) agreements and comply with Virginia's overt regulation of federal operations, or forego these agreements entirely, thereby affecting how the Federal Government engages in immigration enforcement in Virginia. Virginia knows it cannot directly place these limits on federal officers, so it is using the 287(g) Law "to evade the limits on immunity by indirectly achieving the same result." *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 322 (3d Cir. 2025) (internal quotation marks omitted) ("what cannot be done directly cannot be done indirectly."). In *CoreCivic*, the Third Circuit invalidated a state law that banned state and local governments and private parties from making, renewing, or extending contracts to detain people for civil immigration violations. 145 F.4th 315, 319 (2025). Although the law did not name the Federal Government in its text, the Third Circuit probed the purpose and self-evident operation of the statute, "easily see[ing] the law for what it

13

really [was]: a regulation" of the Federal Government. *Id.* at 325. The clear purpose and effect of the 287(g) Law is similar. Virigina has not been shy that its purpose is to regulate federal immigration enforcement that it disagrees with and thus impede federal operations. Indeed, when analyzing a related law in this case, this Court found that Virginia was clearly trying to disrupt federal immigration enforcement. Memorandum Opinion, ECF 34. The same is true here.

Virginia's reliance on Dillon's Rule for the proposition that "only the Commonwealth may decide whether its subdivisions are authorized to enter contracts" is misplaced. Opp.16. Dillon's Rule does not authorize a state to regulate the Federal Government by directing its subdivisions to impose onerous requirements on federal immigration enforcement agreements. Try as it may, Virginia cannot circumvent the principles of intergovernmental immunity by invoking an inapposite doctrine. *CoreCivic*, 145 F.4th at 322.

The voluntary nature of 8 U.S.C. § 1357(g) likewise does not change the analysis. *See* Opp.16. Virginia contends that Congress crafted Section 1357(g) in accordance with the Tenth Amendment's reservation of powers to the states. *Id.* But the Tenth Amendment has no bearing on the question of whether the 287(g) Law impermissibly regulates the Federal Government because regulating the Federal Government is not "a power reserved to the states." *United States v. City of Arcata*, 629 F.3d 986, 992 (9th Cir. 2010). The United States has the power to "take Care that the Laws be faithfully executed," U.S. Const. art. II § 3, an authority that "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). In turn, Virginia has no power to pass a blanket law that regulates (and essentially bans) cooperation with the federal immigration system through 287(g) agreements when Congress expressly provided for those agreements. In seeking this injunction, the United States is not forcing Virginia to do anything; it demands that Virginia refrain from unlawfully

14

regulating the Federal Government, interfering with existing contracts, and obstructing federal immigration enforcement. *See City of New York v. United States*, 179 F.3d 29, 35 (2d. Cir. 1999).

Virginia attempts to liken the 287(g) Law to the dispute in *McHenry v. Raoul*, 44 F.4th 581 (7th Cir. 2022). Opp.17. While it is the United States' position that *McHenry* was wrongly decided, it is nevertheless distinguishable from this matter. In *McHenry*, Illinois barred law enforcement, State, and local government entities, from entering into immigration detention agreements with the Federal Government. 44 F.4th at 593. It did not, however, place restrictions on those agreements should local entities choose to enter them. Here, Virginia is directly regulating 287(g) agreements within Virginia, imposing requirements on the Federal Government not contemplated by Congress, including dictating how federal officers must identify themselves, Va. Code § 15.2-1726.1(C)(3), limiting where they may operate, *id.* §§ (C)(4), (8), and restricting the techniques and processes federal agents may employ when executing their duties, *id.* §§ 15.2-1726.1(C)(6), (7), (9), (10). This is a textbook example of state regulation of a federal program.

And despite Virginia's assurance that the 287(g) Law does not alter the terms Congress imposed in 8 U.S.C. § 1357(g), *see id.*, that is refuted by the statutory text. Section (C)(5) of the law, which requires that the Federal Government "and its agents … consent to the jurisdiction of the courts of the Commonwealth for any civil or criminal proceedings arising from" a violation of the new law or any violation of Virginia law in performance of duties related to the 287(g) agreement, is inconsistent with 8 U.S.C. § 1357(g)(8). That provision specifies that federal law shall be used "for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8). The 287(g) Law also requires that "any federal agent operating pursuant to the federal immigration enforcement agreement shall comply with all applicable laws of the Commonwealth while

15

conducting any immigration enforcement activity within the Commonwealth." Va. Code § 15.2-1726.1(C)(2); *see also id.* § (C)(11) (demanding that immigration officers adhere to Virginia law when conducting arrests and detention); *id.* § (C)(12) (requiring DHS to agree that federal agent involved shootings will be investigated by the Virginia State Police and subject to prosecution by state prosecutors). These provisions place "mandate[s] on the federal government" to submit to Virginia law when Congress intended for 287(g) agreements to remain within the purview of federal supervision, and constitute impermissible regulation. *CoreCivic*, 145 F.4th at 321; *see also Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."). Thus the 287(g) Law is a direct regulation of the federal government and Virginia cannot escape that reality by framing the law as a regulation of its own officers.

### E.  Section 15.2-1726.1 Is Conflict Preempted

Virginia claims that its "287(g) Law does not make compliance with federal law impossible, nor does it create a 'direct and positive' obstacle to Congress's objectives" because 287(g) agreements are voluntary and Virginia's law merely "regulates how Virginia chooses to deploy its own officers and resources." Opp. 22-23. But Virginia's law *does* create a direct obstacle to Congress's objectives by effectively foreclosing such agreements in Virginia. Further, Virginia's law imposes onerous terms on *federal* law enforcement agents, not on "how Virginia chooses to deploy its own officers and resources." Op. 22-23. Subsections (C)(1)-(12) all pertain to Federal agents and agencies explicitly, including what they must wear, where they may operate, what laws they must follow, investigative techniques they may not use, and to what legal jurisdiction they must submit. Rather than manage its own resources, the 287(g) Law seeks to manage impermissibly the Federal Government, thus making any such contracts an impossibility for as long as the law is in effect. And by making such contracts impossible until the law is

16

repealed, Virginia has obstructed Congress's scheme—a scheme that enhances safety for all involved. *See* Wess Decl. ¶¶ 51, 58-60.

Virginia cites *McHenry* to argue that preemption requires a mandatory law. Opp.22. The Second Circuit's reasoning in *City of New York* is more persuasive:

> The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

> We therefore hold that states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs.

179 F.3d at 35 (citing *Barnett Bank v. Nelson,* 517 U.S. 25, 31 (1996)). Virginia's law either regulates Federal officers or completely bans a cooperative program created by Congress. As the Second Circuit made clear, such general bans on cooperation by states are preempted. *Id.*

Regardless, Virginia reads *McHenry* too broadly. The question is not whether a law is mandatory or permissive. Courts have often upheld instances of cooperative federalism, in which states can voluntarily choose to participate in a federal program, but such participation may come with federally-imposed conditions. *See Murphy v. NCAA*, 584 U.S. 453, 476 (2018) (describing precedents upholding such "cooperative federalism" programs). Here, Virginia has blocked the federal scheme in its entirety—a scheme localities in Virginia participate in—by imposing onerous conditions on federal agents and agencies as a prerequisite for entering a 287(g) agreement—conditions to which the Federal government cannot agree. Virginia's law is conflict preempted.

## II.    THE UNITED STATES HAS SHOWN IRREPARABLE HARM

Because of Virginia's law, all existing 287(g) contracts with entities in Virginia will

17

necessarily be voided as of September 1, 2026. Virginia does not and cannot dispute that: its law demands contract terms that conflict with federal law and are thus impossible to implement. Instead, Virginia argues that there is no "immediate" irreparable injury because the injury will not occur until September 1st. Opp.28. The standard for irreparable injury is that it is "*likely* in the absence of an injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). It does not require a party to wait until it has suffered harm to obtain injunctive relief. As to immediacy, an injury must be "neither remote nor speculative, but actual and imminent" *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019) (quotations/citation omitted), which is sometimes referred to as "immediate" injury. Here, the United States has made such a showing – the injury is actual and imminent – a mere six and a half weeks from the filing of this brief and less than a month from the hearing date. Indeed, if the United States waited Virginia would argue such delay cuts against irreparable harm. Regardless, the Supplemental Weiss Declaration shows that harms are already occurring. *See* Supp. Weiss Decl. ¶¶ 6-9.

Virginia argues that "federal immigration enforcement will continue unhindered" even when the 287(g) agreements are voided, relying on a declaration from the Sheriff of Norfolk, Virginia. Opp.28. That evidence is unpersuasive. Sheriff Baron is not competent to speak to the effect on ICE of voiding all 287(g) agreements in the state, particularly since he states that he does not enter such agreements with ICE. ECF 40-7 ¶ 6. Nor is Sheriff Baron competent to speak for all jurisdictions in Virginia. He admits that his agency's role is limited because it is not the primary law enforcement agency in Norfolk, and he admits that some jurisdictions may have a different view of 287(g) agreements. *Id.* ¶¶ 8, 15. Thus his statements about what his jurisdiction does are insufficient to rebut the United States's showing of irreparable harm to DHS. Indeed, it is notable that Virginia did ***not*** obtain a declaration from any jurisdiction with a 287(g) agreement regarding

18

the impact of voiding the agreement. Finally, Sheriff Baron's personal views as to the legislature, the constitutional effects of 287(g) agreements, or the scope of the challenged law (*Id.* ¶¶ 10, 19, 20) are irrelevant. In short, Sheriff Baron's declaration is beside the point.

Virginia likewise relies on the State Police's generic assertion of support for cooperation on criminal investigations as evidence of "meaningful cooperation" between federal and local officials. Opp.28. The statement's lack of detail aside, the question is not whether there is some level of cooperation on criminal matters between state and federal authorities, but whether voiding all existing 287(g) agreements will harm the United States, and the United States has put forth evidence that it will. PI Memo at 27 (citing Weiss Decl.); *see also* Supp. Weiss Decl. ¶¶ 6-9.

Finally, Virginia ignores the United States' argument that a presumption of irreparable harm applies in many constitutional cases and courts have applied such a presumption to violations of the Contract Clause and the Supremacy Clause. PI Memo. at 25; *see also Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). This Court has already ruled such harms are irreparable. *See* ECF 34, Memorandum Opinion (July 2, 2026) at 33.

Valid contracts between DHS and localities in Virginia will be voided by operation of Virginia law on September 1, 2026. The United States has shown a likelihood of irreparable harm.

## III.    THE FINAL MERGED FACTORS FAVOR THE UNITED STATES

Virginia argues that the last two factors weigh in its favor because the 287(g) Law protects its "considered policy judgments" to "control the deployment of its own officers" and "ensure[] that state personnel are not involuntarily diverted into federal civil immigration enforcement[.]" Opp.29. However, the broad authority Virginia grants to localities and their police forces undermines this argument. *See, e.g.,* Va. Code § 15.2-1700 ("[a]ny locality may provide for the protection of its inhabitants and property and for the preservation of peace and good order");

19

§ 15.2-1701 ("chief of police shall be the chief law-enforcement officer of that locality"); § 15.2-1704 (duties of local police); § 15.2-1726 (localities have "discretion" to "enter into a reciprocal agreement with any other locality, any agency of the federal government exercising police powers" and other entities including certain private departments, "under such conditions as the contracting parties deem advisable."). Virginia has ceded control over local police matters to localities.

Conversely, as explained in the United States' moving papers, Congress explicitly provided for 287(g) agreements to enhance coordination between federal, state, and local authorities on immigration matters, and Virginia's law seeks to undermine Congress's considered judgment. Further, there is no doubt that jurisdictions frequently model laws on a topic after one another, and that allowing Virginia's law to proceed will likely result in other states passing similar laws.

Moreover, such agreements have been in place in Virginia for decades without issue. Virginia puts forth no argument or evidence as to why delaying the law through a preliminary injunction, so that this Court may make a final merits determination without the United States incurring injury, would pose any hardship to it. Indeed, as the Fourth Circuit has held, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (citations omitted). Indeed, the public interest is served by enforcing our Constitutional Order.

## CONCLUSION

The United States respectfully requests that this Court enjoin enforcement of the 287(g) Law.

DATED: July 20, 2026                    Respectfully submitted,

20

TODD BLANCHE
Acting Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney


*/s/ Gerard Mene*
GERARD MENE
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General

JACQUELINE COLEMAN SNEAD
Deputy Director

ALESSANDRA FASO
Senior Litigation Counsel

By: *s/ Alexandra McTague Schulte*
ALEXANDRA MCTAGUE SCHULTE
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
202-718-0483
Alexandra.Schulte@usdoj.gov

21