**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | Case Number: 3:26-cv-545-REP |
| THE COMMONWEALTH OF VIRGINIA, *et al.*, | |
| *Defendants*. | |

**STATEMENT OF POSITION**

The Court has directed the Commonwealth to submit a Statement of Position setting forth: "(1) the authority under which Virginia localities entered into 287(g) agreements that are at issue in this case in reliance on previously granted legislation enacted by the General Assembly and . . . therein explain[ing] how Dillon's rule permits modification or termination of agreements made; (2) copies of all 287(g) agreements with Virginia localities; and (3) the status of all those agreements." ECF 79. The Commonwealth responds to each of these three matters below. (*See infra* Section I & Exhibits 1-2 on items 2 & 3 and Section II briefing on item 1.)

## I.   Submissions Regarding 287(g) Agreements and Their Status

To address the Court's second and third questions, the Commonwealth contacted all local jurisdictions known to have entered into 287(g) agreements to date and provides a chart identifying those 287(g) Agreements, copies of the 287(g) Agreements,[1] and any information that any local

---

[1]    Subsequent to August 3, 2026 hearing, OAG learned that ICE maintains and makes available to the public copies of all 287(g) Agreements it has executed with localities and law enforcement agencies across the United States and U.S. territories. The ICE spreadsheet containing hyperlinks to those 287(g) Agreements is available at https://tinyurl.com/3ja86p5z (see hyperlinks

jurisdiction provided regarding termination of any 287(g) Agreement at Exhibit 1. (*See also* Exhibit 2, August 4, 2026 Letter from Deputy Attorney General Nygaard.) All entities known to have agreements but one responded to our inquiry and two entities have terminated their agreements.[2] Exhibit 1 contains a table of all entities, the type of agreement entered into, and the entities' response on the status of the agreement – followed by copies of all agreements.

## II.   Authority to Enter into and Terminate 287(g) Agreements

With respect to the Court's first question, this brief addresses it in three parts: *first*, the brief identifies the authority under which Virginia localities entered into 287(g) agreements that are at issue in this case; *second*, the brief explains the relevance of Dillon's Rule to the questions at issue in this case; and *finally*, by reference to Dillon's Rule, the brief addresses the federal constitutionality of the 287(g) Law in requiring localities to either renegotiate or withdraw from existing 287(g) agreements.

### a.   Prior to the Enactment of the 287(g) Law, Local Jurisdictions Were Permitted to Enter Into 287(g) Agreements Under Virginia Code § 15.2-1726

Prior to the enactment of the 287(g) Law, localities were allowed into 287(g) agreements under Virginia Code § 15.2-1726, which states: "Any locality may, in its discretion, enter into a reciprocal agreement with any other locality, any agency of the federal government exercising police powers, [or other specified agencies], for such periods and under such conditions as the contracting parties deem advisable, for cooperation in the furnishing of police services." Although

---

in "MOA" column). Agreements contained in Exhibit 1 are copies from ICE's publicly available online archive.

[2]   As of the time of filing, the Commonwealth has not received a response from the Shenandoah Police Department and the ICE website does not include any agreement. The Commonwealth will continue its efforts to contact the Department and will file a supplement with the Court when more information is obtained.

§ 15.2-1726 remains in the Virginia Code, it has now been superseded in relevant part by the 287(g) Law, which is separately codified at § 15.2-1726.1.[3] To be clear, Virginia does not dispute that local governments previously had authority to enter into the 287(g) agreements at issue here and does not dispute that such agreements were otherwise legally permissible when executed. But Virginia does maintain that the 287(g) Law—which requires certain terms in any new 287(g) agreement and requires localities either to negotiate such terms or withdraw from extant 287(g) agreements—is a valid exercise of its state authority and consistent with the United States Constitution.

### b. The 287(g) Law is Consistent with Dillon's Rule, and the State Law Constitutionality of the 287(g) Law is Not Before the Court

Neither Dillon's Rule nor any other principle of state law prohibits the General Assembly from enacting a requirement that localities comply with state standards if they enter into or remain parties to a contract.

The Virginia Constitution confers on the General Assembly authority over "all subjects of legislation not herein forbidden or restricted," and provides that "a specific grant of authority in this Constitution upon a subject shall not work a restriction of its authority upon the same or any other subject." Va. Const. art. IV, § 14. By virtue of Article VII, Section 2, moreover, the General Assembly is empowered to "provide by general law for the organization, government, [and] powers . . . of counties, cities, town, and regional governments." By virtue of these constitutional provisions, it is well within the General Assembly's authority to regulate contract practices by local governments.

---

[3] At least one Virginia court held—prior to the enactment of the 287(g) Law—that Virginia statutory law empowered sheriffs to enter into 287(g) agreements. *See McClary v. Jenkins*, 102 Va. Cir. 187 (2019), *aff'd on other grounds*, 299 Va. 216 (2020). Like Virginia Code § 15.2-1726, that decision has been superseded by the enactment of the 287(g) Law and is no longer good law.

Indeed, the General Assembly routinely imposes mandatory contract clauses for political subdivisions, including in the Virginia Public Procurement Act. *See* Va. Code § 2.2-4311.1. The Commonwealth has not identified any principle of state law limiting the General Assembly's authority to require localities to renegotiate or exit contracts that are abhorrent to state policy. If such a principle existed, it would effectively empower localities to enter into all manner of contracts in perpetuity and purport to bind themselves to conduct or adopt policies that are repugnant to the Commonwealth. That view would be incongruous with the bedrock principle that localities in Virginia are merely political subdivisions "created by the Commonwealth" with "no element of sovereignty." *Sinclair v. New Cingular Wireless PCS, LLC*, 283 Va. 567, 576 (2012) (citations omitted). And it would be especially odd to claim that localities could exercise such power in the context of a contract that is purely voluntary, allows either party to terminate the contract at will, and is governed by a federal statute that authorizes participating state officials to act only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1); *see id.* § (g)(9). Moreover, it would contravene the Tenth Amendment if the federal government could commandeer a state's local law-enforcement resources under conditions that the state opposes.

In any event, the United States does not seek a preliminary injunction on the grounds that the 287(g) Law is inconsistent with Dillon's Rule or otherwise violates state law. Nor could it. The *Pennhurst* doctrine bars federal courts from awarding injunctive relief against state officials based on purported violations of state law. *See Miller v. French*, 530 U.S. 327, 332 (2000) (explaining that "federal courts [lack] jurisdiction over claims for injunctive relief against state officials based on state law" (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984))).

4

### c.   The 287(g) Law is Consistent with the U.S. Constitution

The Commonwealth's exercise of its Dillon's Rule authority also does not violate federal law. The text of the Immigration and Nationality Act ("INA"), the language of the existing 287(g) agreements, and longstanding Contracts Clause principles all confirm that Virginia may lawfully direct its localities either to renegotiate or withdraw from their existing 287(g) agreements.

To begin, the text of § 287(g) itself contemplates that the contours and validity of 287(g) agreements may be affected by changes in state law: The statute's first subsection provides that anyone who seeks carry out federal immigration-enforcement functions pursuant to a 287(g) agreement may do so only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1). That provision necessarily implies that localities may be forced to seek modifications of 287(g) agreements—or cancel them outright—in response to changes in state or local law. For that reason alone, the federal government cannot demand that localities adhere to a voluntary agreement in the face of countervailing state or local law.

Furthermore, the terms of standard 287(g) agreements (including all of the 287(g) agreements included in Exhibit 1) expressly permit either party to terminate at will. *See, e.g.*, ECF 40-2, at 8 ("This MOA becomes effective upon signature of both parties and will remain in effect until either party terminates or suspends the MOA.").[4] The at-will nature of the contract thus forecloses the United States' view that the Commonwealth cannot direct its own localities—whose

---

[4]    All Virginia 287(g) agreements provide that the agreement will remain in force and effect until either party terminates or suspends the agreement, with one immaterial distinction: Warrant Service Officer Program standard agreements require 90 days' written notice prior to termination becoming effective, while 287(g) Task Force and Jail Enforcement Model standard agreements do not. *See generally* Exhibit 1 (compare initial clauses of "Effective Date and Termination of this MOA" in Warrant Service Officer Program agreements with "Effective Date, Suspension, and Termination of this MOA" in 287(g) Task Force and Jail Enforcement Model agreements).

powers are, as noted, entirely derivative of the Commonwealth itself—to modify or cancel their existing 287(g) agreements.

Nor does the Contracts Clause preclude Virginia from exercising that authority over its localities. As the Supreme Court has recognized, the Contracts Clause is not an inflexible bar on all legislative action affecting existing contracts between the state and the federal government; rather, it "must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434 (1934)). As a sovereign state, Virginia has the authority to discontinue a contractual relationship when—as here—maintaining the relationship would strain its resources or undermine public safety. *See McHenry County v. Raoul*, 44 F.4th 581, 591–92 (7th Cir. 2022) (recognizing the State's sovereign authority to control its own law-enforcement resources).

To establish that the 287(g) Law violates the Contracts Clause, the United States would have to show that the law "operate[s] as a substantial impairment of a contractual relationship" and that the impairment was not reasonable and necessary to serve a "significant and legitimate public purpose." *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411–12 (citations omitted). The United States cannot satisfy either of these elements.

*First*, nothing in the 287(g) Law operates as a "substantial impairment" of a contractual relationship. On its face, the law's renegotiate-or-withdraw requirement does not impair any contractual relationship at all; it simply directs localities to engage in ordinary contracting behavior—that is, to attempt to renegotiate the terms of an entirely voluntary agreement. *See* ECF 40, at 23–24.

*Second*, even if the United States could establish a substantial impairment of a contractual relationship (and it cannot), the 287(g) Law would still be valid because it is reasonable and necessary to serve a legitimate government purpose. As one federal court recently recognized, a state's decision not to expend state resources on federal immigration enforcement is a legitimate purpose for modifying or terminating a contract. *United States v. New York*, No. 26-cv-1360, 2026 WL 2225423, at *20–21 (N.D.N.Y. Aug. 3, 2026) (denying the United States' motion to preliminarily enjoin a New York law that terminated all localities' existing 287(g) agreements). And the Commonwealth's purpose is clear from the 287(g) Law's text, which restricts officers' "use [of] any law-enforcement resources" to facilitate federal immigration-enforcement operations. Va. Code § 15.2-1726.1(B). The Commonwealth also made this purpose clear before the 287(g) Law was enacted by the General Assembly and signed by Governor Spanberger. In rescinding Executive Order 47, Governor Spanberger stated that the Commonwealth's prior directive to enter into 287(g) agreements was "not an appropriate use of state or local resources," which are limited to begin with. ECF 40-9, at 1; ECF 40, at 8. Promoting public safety—a purpose highlighted by the legislation's sponsor, *see* ECF 56, at 7–8—is an equally sufficient interest, *see* ECF 40, at 24–27.

That the 287(g) Law allows Virginia to control the contractual authority of *localities* does not change the analysis. Virginia is not a disinterested nonparty interfering with the contractual rights of localities. Localities are political subdivisions "created by the Commonwealth" and thus have "no element of sovereignty." *Sinclair*, 283 Va. at 576 (citations omitted). As arms of the state, localities operate solely through the authorization of the General Assembly and must adhere to the prerogatives of the Commonwealth. *See* ECF 40, at 14. Localities cannot, on their own, commit to ongoing federal enforcement partnerships once the legislature redefines the terms of engagement.

7

Virginia therefore enjoys the power to direct localities to modify or terminate existing contracts—including 287(g) agreements.

## CONCLUSION

For the foregoing reasons, the Court should deny the United States' motion to preliminarily enjoin the 287(g) Law.

Respectfully submitted,

**COMMONWEALTH OF VIRGINIA**
**ATTORNEY GENERAL JAY JONES**

*/s/ Stanley W. Hammer*

| | |
|---|---|
| Joshua Adam Matz (*pro hac vice*) | Ethan P. Fallon (VSB No. 102491) |
| Nicolas Yoshi Riley (*pro hac vice*) | *Deputy Solicitor General* |
| Hecker Fink LLP | Gretchen Ellen Nygaard (VSB No. 82475) |
| 1050 K Street NW, 10th Floor | *Deputy Attorney General* |
| Washington, D.C. 20001 | Triston Chase O'Savio (VSB No. 100111) |
| Telephone: (212) 763-0883 | *Assistant Solicitor General* |
| Facsimile: (212) 564-0883 | Stanley W. Hammer (VSB No. 82181) |
| | *Assistant Attorney General* |
| Madeline Rose Verniero (*pro hac vice*) | Office of the Attorney General |
| Hecker Fink LLP | 202 North Ninth Street |
| 350 Fifth Avenue, 63rd Floor | Richmond, Virginia 23219 |
| New York, NY 10118 | Telephone: (804) 200-4216 |
| Telephone: (212) 763-0883 | Facsimile: (804) 371-2087 |
| Facsimile: (212) 564-0883 | shammer@oag.state.va.us |
| | *Counsel for Defendants the Commonwealth of* |
| | *Virginia and Attorney General Jay Jones* |

8

## CERTIFICATE

I hereby certify that on August 7, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

*/s/ Stanley W. Hammer*
Stanley W. Hammer
*Assistant Attorney General*

9