# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

THE UNITED STATES OF AMERICA,

    *Plaintiff*,

      v.

THE COMMONWEALTH OF VIRGINIA,
*et al.*,

    *Defendants*.

Case Number: 3:26-cv-545-REP

## RESPONSE TO UNITED STATES'
## STATEMENT OF POSITION

The federal government's statement of position opens with a key concession. It says that "the United States does not take the position that any declination to enter a 287(g) agreement is an obstruction of federal law because, as explained below, such agreements were made voluntary by statute." ECF 81, at 1. That affirmative disavowal of the view that states and localities *must* enter into 287(g) agreements directly undercuts the United States' central argument here: that Virginia's 287(g) Law somehow obstructs federal law. Put simply, if federal law gives states the prerogative to decline participation in 287(g) agreements—as the United States acknowledges—then federal law cannot bar a state from exercising that prerogative via a statute.

Regardless, even absent the United States' concession, none of its claims here has merit. As explained below, its conflict-preemption challenge rests on a federal statute that cannot serve as the basis for a preemption claim and does not conflict with Virginia law in any event; its intergovernmental-immunity argument fails to articulate a viable theory as to how Virginia has regulated or discriminated against the federal government; and its Contracts Clause claim—which

it treats as an afterthought in its supplemental brief—strains a basic understanding of what it means to impair a contractual relationship. A federal district judge rejected all of these arguments just last week in a directly analogous case. *United States v. New York*, No. 26-cv-1360, 2026 WL 2225423, at \*16–\*23 (N.D.N.Y. Aug. 3, 2026). This Court should do the same.

## I.    The United States' Preemption Claim Fails.

The United States' argument that Virginia's 287(g) Law is preempted by § 287(g) of the Immigration and Nationality Act ("INA") fails for two basic reasons. First, § 287(g) cannot serve as the basis for a valid preemption claim because it regulates state actors, not private actors. Second, even if § 287(g) could preempt state law, the statute does not conflict with Virginia's 287(g) Law.

### A.    Section 287(g) of the INA Cannot Preempt Virginia Law Because It Does Not Regulate Private Actors.

A federal statute cannot serve as the basis for a preemption claim unless the statute regulates private actors. The Supreme Court provided the clearest articulation of this rule in *Murphy v. NCAA*, 584 U.S. 453 (2018). There, it stated: "[R]egardless of the language sometimes used by Congress and this Court, every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." *Id.* at 479. As the Court explained, "since the Constitution 'confers upon Congress the power to regulate individuals, not States,' [a federal statute] must be best read as one that regulates private actors" to serve as a basis for preemption. *Id.* at 477 (citation omitted).

This rule dooms the United States' preemption claim here. Section 287(g) of the INA does not regulate private actors. Rather, as the provision's title makes clear, it governs the "[p]erformance of immigration officer functions by *State* officers and employees." 8 U.S.C. § 1357(g) (emphasis added). The statute's text makes no reference to private actors. And the United

2

States' own description of the statute recognizes that its sole function is to grant federal immigration authorities "the ability and means to cooperate with *states and localities*." ECF 81, at 3 (emphasis added). The statute therefore cannot provide a basis for a preemption challenge.

The Third Circuit relied on the *Murphy* rule in rejecting an INA-based preemption claim that closely resembles the United States' claim in this case. In *Ocean County Board of Commissioners v. Attorney General of New Jersey*, a pair of New Jersey counties argued that the INA preempted a gubernatorial directive "limit[ing] the ability of state and local law enforcement officers to cooperate with federal immigration authorities." 8 F.4th 176, 178 (3d Cir. 2021). The counties pointed to two provisions of the INA that barred states and localities from restricting the information their officials could share with immigration authorities. *Id.* at 181–82. The Third Circuit rejected their preemption claim. *Id.* Citing *Murphy*, the court reasoned that the two INA provisions ultimately imposed a "prohibition on state action" and "sa[id] nothing about private actors." *Id.* at 182. The court thus concluded: "A federal statute that does not regulate private actors cannot serve as a basis for preemption, so [the counties'] claims must fail." *Id.* The same logic governs here.

> **B.** **The United States Has Not Identified Any Conflict Between § 287(g) and Virginia Law.**

Even if the United States' preemption claim were not foreclosed by *Murphy*, it would still fail because Virginia's 287(g) Law does not conflict with INA § 287(g). When considering conflict-preemption claims, "courts should assume that 'the historic police powers of the States' are not superseded unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, 567 U.S. 387, 400 (2012) (citation omitted). Section 287(g) of the INA does not reflect a "clear and manifest purpose of Congress" to supersede state law; in fact, its text suggests just the opposite.

By its plain terms, § 287(g) preserves states' ability to decide for themselves whether and how to participate in 287(g) agreements. Congress expressly contemplated that states may constrain the conduct of state and local officials who participate in 287(g) agreements by including language in § 287(g) requiring such officials to conform their conduct to "State and local law." 8 U.S.C. § 1357(g)(1). The statute also provides that "[n]othing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection." *Id.* § 1357(g)(9). And lest there be any doubt about the voluntary nature of state participation in 287(g) agreements, the agreements themselves all contain a clause providing for unilateral termination by the state or locality. *See, e.g.*, ECF 40-2, at 8 ("This MOA becomes effective upon signature of both parties and will remain in effect until either party terminates or suspends the MOA.").

The United States—which concedes that 287(g) agreements are "voluntary," ECF 81, at 1—does not identify any language in INA § 287(g) that actually conflicts with Virginia law. Instead, it gestures toward some unwritten "preference by Congress for the Federal Government to have the ability and means to cooperate with states and localities." ECF 81, at 3. But "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.). While "Congress may have hoped or expected that States would cooperate" with federal immigration authorities under § 287(g), the "States are not bound by that hope or expectation." *McHenry County v. Raoul*, 44 F.4th 581, 592 (7th Cir. 2022). As the Seventh Circuit put it, "[i]t would make no sense to hold that a federal statute premised on State cooperation preempts a State law withholding that cooperation." *Id.*

That is why another federal district court recently rejected the federal government's preemption challenge to a directly analogous state law. In *United States v. New York*, the United States sought to preliminarily enjoin a recently enacted New York law that required localities to terminate all existing 287(g) agreements and barred them from entering into new ones. 2026 WL 2225423, at *1–*3 (N.D.N.Y. Aug. 3, 2026). Judge D'Agostino concluded that the plain text of § 287(g) and a wide body of caselaw refuted any notion that § 287(g) preempted the state's ban on 287(g) agreements. *Id.* at *16 –*17. Indeed, Judge D'Agostino recognized, if Congress had tried to mandate that states enter into such agreements, that mandate would have violated the Tenth Amendment's anti-commandeering principle. *See id.* at *17 ("[U]nder the Tenth Amendment, Congress could not compel local entities to enforce immigration law." (citation and quotation marks omitted)).

This reasoning does not stand alone. It echoes decisions by other courts that have rejected preemption attacks on state laws forbidding local cooperation with federal immigration authorities. *See, e.g.*, *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 382–83 (D.N.J. 2020) (rejecting preemption challenge to New Jersey's "prohibition of § 287(g) agreements between the United States and New Jersey state, county, and local law enforcement agencies" because such agreements are "entirely voluntary").[1] In fact, courts have invoked this same logic in rebuffing preemption

---

[1]     *See also, e.g.*, *United States v. California*, 921 F.3d 865, 889 (9th Cir. 2019) ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities."); *United States v. Minnesota*, No. 25-cv-3798, 2026 WL 2085701, at *16 (D. Minn. July 20, 2026) (concluding that the United States' "preemption claims fail because these provisions [*i.e.*, Section 287(g) of the INA and its implementing regulation] are voluntary and cannot carry preemptive force"); *United States v. New York*, 810 F. Supp. 3d 329, 350 (N.D.N.Y. 2025) ("Courts, however, have consistently found that similar state and local policies, which withhold state cooperation for federal immigration enforcement activities, are not preempted by this provision."); *United States v. Illinois*, 796 F. Supp. 3d 494, 531 (N.D. Ill. 2025) ("Because any collaboration under the INA is permissive, not mandatory, there is no hook for the United States's preemption argument[.]").

challenges to state laws that *encourage* localities to cooperate with federal immigration authorities. *E.g.*, *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) (upholding a Texas law that forbade localities from withholding cooperation, while recognizing that § 287 of the INA "does not require cooperation at all").

To counter this voluminous caselaw, the United States leans on the Second Circuit's decision in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999). But its reliance on the case is misplaced, and its description of the case is deeply inaccurate. Contrary to the United States' account, that case did not "invalidate[], on Supremacy Clause grounds, a New York law prohibiting voluntary cooperation with federal immigration officials." ECF 81, at 6. Rather, the case rejected a *Tenth Amendment* challenge brought by the City of New York against two *federal* statutes that required states and localities to share certain information with federal immigration officials. *City of New York*, 179 F.3d at 31–33. The court's analysis focused on the scope of the Tenth Amendment—referencing the Supremacy Clause just once—and underscored the "substantial" burden that the City bore in bringing a facial challenge to federal statutes. *Id.* at 33; *see also id.* at 35 ("It suffices to say that, *at least in the context of the City's facial challenge*, Sections 434 and 642 are [constitutional]." (emphasis added)). The decision did not invalidate any City law on preemption grounds—and, if it had, the decision would not survive *Murphy*'s holding that federal statutes regulating state actors cannot preempt state or local law.[2]

In any event, the court's reasoning in *City of New York* is inapposite here. The federal statutes upheld in that case explicitly prohibited states and localities from restricting information sharing with federal immigration authorities; indeed, both statutes opened with the phrase,

---

[2]    Notably, the two statutes at issue in *City of New York* were the exact same statutes that the Third Circuit held could not provide a basis for preemption claims in *Ocean County Board of Commissioners*, 8 F.4th at 181–182, discussed above.

"Notwithstanding any other provision of Federal, State, or local law . . . ." 179 F.3d at 32–33 & nn.2–3 (quoting 8 U.S.C. §§ 1373(a), 1644). Those prohibitions created a clear conflict between the text of federal law and the City's policy against sharing information with immigration officials. Here, in contrast, the United States has conspicuously failed to identify any language in INA § 287(g)—or any other federal statute—that actually proscribes what Virginia has done. And, as noted, § 287(g)'s actual text undermines the government's preemption theory by expressly providing that state and local officials who seek to carry out immigration-enforcement activities under 287(g) agreements may do so only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1). The United States' failure to identify any real conflict between § 287(g) and Virginia's 287(g) Law thus renders *City of New York* irrelevant. After all, even under the United States' strained reading of *City of New York*, conflict preemption still requires an actual conflict.[3]

It is also doubtful that *City of New York*'s understanding of even the Tenth Amendment remains good law. *See, e.g.*, *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018) ("[T]his Court must respectfully disagree with *City of New York v. United States*."). The Second Circuit based its Tenth Amendment holding on the distinction "between invalid federal measures that seek to impress state and local governments into the administration of federal programs and valid federal measures that prohibit states from compelling passive resistance to particular federal programs." 179 F.3d at 35. But the Supreme Court has since held that "[t]his distinction is empty." *Murphy*, 584 U.S. at 475. In *Murphy*, the Court explicitly rejected the view that unlawful "commandeering occurs 'only when Congress goes beyond precluding state action and

---

[3]    *See County of Ocean*, 475 F. Supp. 3d at 383 (concluding that *City of New York* did not cast doubt on a state law restricting localities' participation in 287(g) agreements because, "where federal law plainly allows states to decide whether to participate in a federal program, that same set of laws cannot have a preemptive effect on a state's regulation prohibiting such participation").

affirmatively commands it.'" *Id.* at 474 (citation omitted). As the Court held, the "basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.* at 475. Thus, even on its own terms, *City of New York* is entitled to little weight here.

### C.     The United States' "Law On the Books" Distinction Makes No Sense.

The United States maintains there is "stark difference between individual jurisdictions declining to enter such agreements and a law on the books that seeks to regulate the terms of all such agreements within the state to the point of effectively banning them." ECF No. 81, at 3.[4] That proposition is wrong for at least two reasons.

First, the United States fails to explain why Virginia localities can lawfully refuse to enter into 287(g) agreements yet cannot have their participation in such agreements restricted by state law. Nor does the United States cite any authority to suggest that Virginia, which plainly has the power under state law to restrict its localities' contracting authority, *see* ECF 80, at 3–4, somehow offends the Supremacy Clause by formally codifying such a restriction in a "law on the books." At any rate, the Supreme Court has rejected the notion that preemption claims turn on whether the challenged state action has been formally codified or not. As the Court has explained: "Pre-emption analysis . . . turns on the actual content of [the state]'s policy and its real effect on federal rights." *Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994) (holding that federal law preempted an unwritten state policy). Thus, if Virginia can adopt an unwritten policy restricting its localities from participating in 287(g) agreements, it can adopt a written statute doing the same.

---

[4]     The United States made this same argument at last week's hearing, asserting: "[I]t's the United States' position that there is a difference between individually terminating contracts or deciding not to participate, and the legislature passing a law that forbids that cooperation when Congress, which federal law is supreme, has a law that says such cooperation is allowed." 8/3/2026 Hr'g Tr. 93–94.

Second, the 287(g) Law is not a "ban" on 287(g) agreements. Rather than prohibiting 287(g) agreements, the statute merely sets conditions for localities seeking to participate in such agreements. These conditions, as previously explained, serve Virginia's legitimate interests in conserving state resources and protecting public safety. *See* ECF 40, at 24–25; ECF 80, at 7. The federal government's aversion to these conditions does not convert the 287(g) Law into a "ban" on new agreements: when two parties discuss a potential new contract, they are each free to take the position that they can sign the contract only if certain terms are included (or excluded), and they are equally free to decline to enter into a contract if they cannot reach such agreement. It is commonplace, moreover, for a contracting party to say that it requires certain terms as a matter of its own separate legal obligations (indeed, that is standard fare in all government contracting). In both form and substance, then, the 287(g) Law does not ban new agreements: it simply defines the terms on which localities may otherwise voluntarily choose to enter into such new contracts.

## II.    The United States' Intergovernmental Immunity Claim Fails.

The United States' intergovernmental-immunity argument fares no better than its preemption argument. Once again, the recent *New York* decision is instructive. There, the United States raised the same arguments it raises here, asserting that New York's ban on localities entering into 287(g) agreements constituted a direct regulation of federal law-enforcement and discriminated against the federal government. *See* 2026 WL 2225423, at *17–*18. Like every other court to confront these contentions, Judge D'Agostino rejected them. And given that her case concerned an outright ban on all 287(g) agreements—imposing an even more severe restriction on localities than Virginia's 287(g) Law—her reasoning applies with even greater force here.

### A.    The 287(g) Law Does Not Regulate the Federal Government.

With respect to the direct regulation argument, Judge D'Agostino held that "a state law which prohibits localities from entering into 287(g) Agreements 'does not regulate the United States directly; it regulates only the conduct of state and local law enforcement agencies in the' state." *Id.* at \*17 (quoting *County of Ocean*, 475 F. Supp. 3d at 385). She thus concluded that New York's challenged law because it "seeks only to control whether New York and its localities voluntarily engage in certain cooperation with federal authorities." *Id.*

This conclusion mirrored that of the many other courts that have upheld state laws restricting localities from cooperating with federal immigration authorities. *E.g.*, *McHenry County*, 44 F.4th at 593 (holding that an Illinois law that forbade localities from entering into cooperation agreements for immigration detention "imposes no direct regulation on any federal official or agency" and "does not discriminate against the federal government"); *California*, 921 F.3d at 891 (rejecting intergovernmental-immunity attack on a California law that restricts localities' cooperation with federal immigration authorities); *Minnesota*, 2026 WL 2085701, at \*21 (D. Minn. July 20, 2026) (holding that Minnesota laws and local ordinances that precluded cooperation with federal immigration authorities "do not regulate the federal government"); *County of Ocean*, 475 F. Supp. 3d at 385 ("Here, there is no question that the Directive [which bans localities from, *inter alia*, entering into 287(g) agreements] does not regulate the United States directly; it regulates only the conduct of state and local law enforcement agencies in the State of New Jersey.").

These cases confirm that the 287(g) Law does not impermissibly seek to regulate the federal government. The law acts only upon localities and requires only that they meet certain terms as a precondition to entering into or maintaining any 287(g) agreements. No federal official is required to do, or not do, anything on account of this state law requirement, except to the extent

10

it affects the negotiating posture that federal officials may take when proposing agreements to localities in the Commonwealth. Given that 287(g) agreements are voluntary in nature—and that it would violate the Tenth Amendment for federal officials to commandeer state or local participation in federal immigration enforcement—the Constitution plainly authorizes Virginia to establish these requirements for its own localities.

The United States faults Judge D'Agostino for not discussing *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025). But nothing in *CoreCivic* undermines the extensive body of caselaw on which her decision rests. In *CoreCivic*, the Third Circuit held that a New Jersey law that barred private parties, state agencies, and localities from entering into immigration-detention contracts with the federal government violated the intergovernmental-immunity doctrine. *Id.* at 319–20. The court's analysis, however, focused on the law's restrictions on private contractors—not localities—in situations where the federal government needed those contractors to carry out its basic functions. *See id.* at 325–27 (discussing precedents concerning "other regulations of federal contractors" and restrictions on the federal government's "ability to hire whom it chooses").[5] The court highlighted, in particular, how New Jersey's law blocked federal immigration authorities from contracting with the only facility in the state capable of meeting their needs. *Id.* at 320. It thus concluded that states "cannot regulate private parties in a way that severely undercuts a federal function." *Id*. at 322. That is far from the scenario here: Virginia's 287(g) Law does not regulate private federal contractors, much less private contractors whose services are mission critical. The law simply regulates Virginia's own localities. As this Court recently

---

[5]    The law's application to state agencies and localities was not even before the district court. *CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467, 480 (D.N.J. 2023) ("[T]he Court does not decide the constitutional soundness of the portion of AB 5207 that restricts the ability of the federal government to enter contracts with New Jersey and its subdivisions—the parties stipulate that this question is not now before the Court.").

11

recognized, caselaw evaluating state efforts to regulate federal contractors cannot be universally applied to other contexts. *See* ECF 34, at 27. Nor does the 287(g) Law prevent federal officers from carrying out their enforcement duties, unlike the law at issue in *CoreCivic*. To state the obvious, the United States does not depend on 287(g) agreements to enforce immigration law in Virginia in the way that it depended on private detention facilities in New Jersey.

> **B.** **The 287(g) Law Does Not Discriminate Against the Federal Government.**

The United States' discrimination argument is equally unavailing. As Judge D'Agostino reasoned in *New York*, "the mere fact that the [state law] touches on an exclusively federal sphere is not enough to establish discrimination." 2026 WL 2225423, at \*18 (quoting *McHenry County*, 44 F.4th at 594). Rather, she explained, a state law offends the federal non-discrimination requirement only if it treats the federal government differently from a similarly situated comparator. 2026 WL 2225423, at \*18 (citing *Washington v. United States*, 460 U.S. 536, 544–45 (1983)). And because the United States had failed to identify such a comparator, she held that its discrimination claim failed.

The United States argues that *New York* is inapposite because "the United States did not identify a comparator in that case, which differs from the present case." *See* ECF 81, at 7 n.3 (citation omitted). But the United States raised the same arguments in that case that it is raising here. Just like in this case, the United States in *New York* argued that localities are allowed to enter into agreements with other (non-federal) law enforcement agencies for non-immigration matters. *See* 2026 WL 2225423, at \*18. It argued that the New York law "discriminates against the Federal Government 'by solely preventing the Federal Government and local agencies from creating 287(g) Agreements for civil immigration enforcement,' while 'state and local government[] offices and municipalities are not barred from forming agreements to facilitate the detention of individuals

12

for non-immigration purposes and with other entities.'" *Id.* (citation omitted). That argument failed because those comparators were not in fact similarly situated. As Judge D'Agostino explained: "[T]he federal government (along with New York and local government entities) remains free to participate in intergovernmental cooperation for other enforcement or detention services unrelated to immigration. 'The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government.'" *Id.* (quoting *McHenry County*, 44 F.4th at 594 n.7).

That reasoning applies with even greater force here. The 287(g) Law explicitly protects localities' ability to cooperate with *federal* law enforcement efforts outside of the immigration sphere. It states: "Nothing in this subsection shall be construed to prohibit a law-enforcement officer from investigating, or assisting in the investigation of, a state or federal crime, including operations conducted with, or as part of, a joint state-federal law-enforcement task force." Va. Code § 15.2-1726.1(B). That carveout confirms that the purpose of the 287(g) Law is not to target the federal government but, rather, to ensure that the specific harms that federal immigration-enforcement efforts have caused elsewhere—both fiscal and human—do not arise in Virginia.

### III.    The United States' Contracts Clause Claim Fails.

The United States' supplemental brief relegates its entire discussion of the Contracts Clause to a footnote, where it once again attempts to distinguish *New York*'s reasoning. That discussion fails to persuade.

The United States criticizes Judge D'Agostino's ruling for finding that New York's stated interest in preserving state resources was a valid justification for banning all 287(g) agreements. According to the United States, the court's reasoning "turns the Contract Clause on its head" by allowing states "to eviscerate any costly contract it entered into that may relate to broad police

13

powers." ECF No. 81, at 7 n.3. But that argument overstates the scope of Judge D'Agostino's ruling and, in any event, cannot be squared with Fourth Circuit precedent. In *Baltimore Teachers Union v. Mayor & City Council of Baltimore*, the Fourth Circuit expressly recognized that "ensuring the financial integrity of the City is a significant public purpose." 6 F.3d 1012, 1019 (4th Cir. 1993). There, a group of police and teachers' unions challenged a city ordinance that reduced their annual salaries, arguing that the ordinance impaired their collective bargaining agreements in violation of the Contracts Clause. *Id.* at 1014–15. The court rejected the challenge, even though city officials were openly seeking to "preserv[e] resources that an agreement was costing them." ECF 80, at 7 n.3. Citing the "legitimacy of the City's need to balance its budget" and the constrained nature of the salary reduction, the court concluded that the ordinance was permitted by the Contracts Clause. *Baltimore Teachers*, 6 F.3d at 1022.

Virginia's interest in preserving state resources is just as legitimate as the interests the Fourth Circuit endorsed in *Baltimore Teachers*. Section 287(g) explicitly requires that any local immigration-enforcement functions be carried out "at the expense of the State or political subdivision," *see* 8 U.S.C. § 1357(g)(1), and places serious financial burdens on localities, *see* ECF 40, at 3–4. Virginia's interest in mitigating those costs is neither unreasonable nor some "post hoc" justification for the 287(g) Law. ECF 81 at 7, n.3. Rather, its cost-saving concerns are reflected in the text of the 287(g) Law itself, which expressly restricts the "use [of] any law-enforcement resources to facilitate" specified immigration-enforcement operations. Va. Code § 15.2-1726.1(B). Moreover, Governor Spanberger's recission order, which pre-dated the legislation's enactment, offers further evidence of the state's intended purpose. *See* ECF 80, at 7; *see also New York*, 2026 WL 2225423, at *21 (crediting the governor's memorandum in support of legislation as proof of the state's purpose).

14

Like the law upheld in *New York*, the 287(g) Law also serves an additional interest in promoting public safety by preventing law enforcement misconduct. *See Conn. State Police Union v. Rovella*, 36 F.4th 54, 64 (2d Cir. 2022) (holding that addressing police misconduct is "a broad societal goal" permissible under the Contracts Clause). As this Court recognized at last week's hearing, there have been a number of "unfortunate and sad and despicable instances" of law enforcement misconduct by federal immigration authorities over the past year, 8/3/2026 Hr'g Tr. 89, and Virginia has a legitimate interest in preventing similar incidents. States are always free to identify multiple justifications for a law under the Contracts Clause—and Virginia has identified multiple legitimate justifications here. *See Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 416–417 (1983) (identifying consumer protection and market correction as two distinct legitimate purposes behind the law).

Moreover, the United States' focus on Virginia's justifications for the 287(g) Law skips past the threshold step in the Contracts Clause analysis: whether the law substantially impairs any contractual relationship. The United States cannot make that showing here. As explained above, INA § 287(g) expressly contemplates that the contours of 287(g) arrangements may be subject to changes to state and local law. *See* 8 U.S.C. § 1357(g)(1). In scenarios like this, where the parties to an agreement understand that the agreement may be affected by future changes in the law, those changes cannot constitute a substantial impairment. *E.g.*, *City of Charleston v. Pub. Serv. Comm'n of West Virginia*, 57 F.3d 385, 392 (4th Cir. 1995) (finding that state law affecting contracts between cities and bondholders did not result in substantial impairment because, *inter alia*, the contracts at issue "expressly state[d] that the cities' enforcement authority [wa]s limited to that 'authorized by the laws of the state . . .'").

15

In *Energy Reserves Group*, for instance, the Supreme Court held that a state law altering the prices of natural gas did not substantially impair natural-gas supply contracts between an oil company and public utility because the contracts at issue "expressly recognize[d] the existence of extensive regulation by providing that any contractual terms [we]re subject to relevant present and future state and federal law." 459 U.S. at 416. As the Court reasoned, the parties "knew [their] contractual rights were subject to alteration by state price regulation." *Id.*; *see also Sveen v. Melin*, 584 U.S. 811, 821–22 (2018) (upholding a state law that revoked an individual's beneficiary designation of a former spouse upon divorce because "an insured cannot reasonably rely on a beneficiary designation remaining in place after a divorce"). Given the voluntary nature of 287(g) agreements—and the frequency with which states and localities exercise their prerogative to withdraw from such agreements—the United States cannot claim any substantial impairment of its contractual relationships. For that reason alone, its Contracts Clause claim fails.

## CONCLUSION

For the foregoing reasons, the Court should deny the United States' motion to preliminarily enjoin the 287(g) Law.

Respectfully submitted,

**COMMONWEALTH OF VIRGINIA
ATTORNEY GENERAL JAY JONES**

Joshua Adam Matz (*pro hac vice*)
Nicolas Yoshi Riley (*pro hac vice*)
Hecker Fink LLP
1050 K Street NW, 10th Floor
Washington, D.C. 20001
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

*/s/ Triston Chase O'Savio*
Ethan P. Fallon (VSB No. 102491)
  *Deputy Solicitor General*
Gretchen Ellen Nygaard (VSB No. 82475)
  *Deputy Attorney General*
Triston Chase O'Savio (VSB No. 100111)
  *Assistant Solicitor General*
Stanley W. Hammer (VSB No. 82181)
  *Assistant Attorney General*

16

Madeline Rose Verniero (*pro hac vice*)
Hecker Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 200-4216
Facsimile: (804) 371-2087
shammer@oag.state.va.us
*Counsel for Defendants the Commonwealth of*
*Virginia and Attorney General Jay Jones*

## CERTIFICATE

I hereby certify that on August 11, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

/s/ Triston Chase O'Savio
Assistant Solicitor General