**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>THE COMMONWEALTH OF VIRGINIA, *et al.*,<br><br>*Defendants*. | Case Number: 3:26-cv-545-REP |

**REPLY IN SUPPORT OF THE COMMONWEALTH OF VIRGINIA'S STATEMENT OF POSITION**

The United States' response to the Commonwealth's supplemental brief rehashes arguments this Court has already considered and offers almost no legal authority to support them. As explained below, those arguments remain unavailing.

**I. The United States' Arguments About Virginia Law Are Wrong and Irrelevant.**

The United States insists that Virginia lacks "clear" authority under state law to limit its localities' contracting powers, ECF 84, at 1–2, and even suggests that the 287(g) Law may be invalid under Virginia's Constitution, ECF 84, at 2–3. It is not obvious what the United States hopes to gain by advancing arguments that are plainly foreclosed by the *Pennhurst* doctrine—a doctrine on which the United States' brief is conspicuously silent. *See* ECF 80, at 4. But, regardless, the United States' understanding of Virginia law is wrong.

Indeed, the Supreme Court of Virginia has long made clear that "[c]ounties and municipal corporations are the creatures of the legislature" that "have such powers to contract, and only such powers, as the legislature grants to them." *America-LaFrance & Foamite Indus. v. Arlington Cnty.*,

164 Va. 1, 5 (1935) (citation and internal quotation marks omitted). "When the legislature withholds power to contract, or *permits the exercise of the power in a given case only in accordance with imposed restrictions*, the corporation may no more bind itself by implied contract than by the forbidden express contract." *Id.* at 5–6 (emphasis added). These precedents leave no doubt about the General Assembly's authority to dictate the terms of localities' contracting powers.

Nor is there any doubt that the General Assembly may exercise that authority even when it affects existing contracts. Here, too, the Supreme Court of Virginia has articulated the rule plainly: "[P]rivate contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict." *Commonwealth ex rel. Page Milling Co. v. Shenandoah River Light & Power Corp.*, 135 Va. 47, 57 (1923) (citation omitted). Thus, a contract "must be considered as containing an implied condition that it is subject to the exercise of the State's regulatory police power." *Haughton v. Lankford*, 189 Va. 183, 190 (1949). "Such sovereign power of the government to protect the general welfare of the people of the State is paramount to any rights which may be acquired by individuals by virtue of any contracts between them." *Id.* "This principle is so well-established that it needs no elaboration." *Id.* at 190–91; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987) ("It is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States. . . . This power, . . . known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.") (internal quotation marks omitted).

The United States' arguments to the contrary are unavailing. It asserts that if the Commonwealth had direct control over its localities' contracting powers, "it would have simply directed them to terminate the contracts just as Governor Spanberger did for state law

enforcement." ECF 84, at 2. But that argument fundamentally misunderstands how Virginia law works and ignores the Commonwealth's Statement of Position explaining it. *See* ECF 80, 2–8. It is legislation passed by the *General Assembly and signed by the Governor*, not just a decree by the Governor, that grants powers to localities under Dillon's Rule. *See*, *e.g*., *Marble Techs., Inc. v. City of Hampton*, 279 Va. 409, 418 (2010). The Commonwealth does indeed have direct control over its localities' contracting powers; it just is exercised by the General Assembly rather than the Governor alone. And the 287(g) law enacted by the General Assembly has the same authority over localities as the Governor's Executive Directive 1—directing agencies to terminate the 287(g) contracts—has over agencies. Thus, the United States' argument, in addition to exposing its limited understanding of Virginia law and Dillon's Rule, also further bolsters the Commonwealth's position that it does in fact have direct control over localities and their ability to contract.

## II. The 287(g) Law Does Not Violate the Supremacy Clause.

The federal government's response brief says little about the Supremacy Clause that the Commonwealth has not already addressed in prior briefing. But it does invoke one new authority: a recent district court decision preliminarily enjoining a Maryland county from revoking a private company's construction permit to build an immigration detention facility. *See Genesis GSA Strategic One, LLC v. Howard Cnty.*, No. 26-cv-915, 2026 WL 2294479 (D. Md. Aug. 10, 2026). That decision is inapposite for the same reasons *CoreCivic* is inapposite. *See* ECF 82, at 11–12.

Like *CoreCivic*, the *Genesis GSA* suit was brought by a private contractor who sought to challenge a state law that effectively blocked the federal government from operating a mission-critical immigration-detention facility. 2026 WL 2294479, at *1. The court held that the law impermissibly singled out the federal government because it imposed permitting requirements on the construction of federal detention facilities that it did not impose on other (non-federal)

detention facilities "like a police precinct or courthouse." *Id.* at *20. That rationale has no bearing here. As explained, Virginia's 287(g) Law does not single out the federal government for unfavorable treatment. To the contrary, it expressly *preserves* state and local law-enforcement officers' ability to cooperate with federal law-enforcement officers in any context other than immigration enforcement. *See* Va. Code § 15.2-1726.1(B). That carveout—which the United States steadfastly refuses to acknowledge—shows that Virginia is not singling out federal law enforcement writ large but, rather, is seeking to address the specific harms associated with federal immigration enforcement.

Nor does Virginia law treat the federal government in a meaningfully different way than other local-government contractors: the Commonwealth's Public Procurement Act imposes various restrictions on other local-government contractors aimed at protecting state resources and mitigating the specific risks posed by those particular contractors.[1] The federal government is not singled out for unfavorable treatment any more than other parties that contract with local governments.

### III. The 287(g) Law Does Not Violate the Contracts Clause.

To obtain relief under the Contracts Clause, the United States must prove both that the 287(g) Law substantially impairs a contractual relationship and that the law does not serve a legitimate public purpose. The United States cannot satisfy either prong.

---

[1] *See, e.g.*, Va. Code § 2.2-4303.1 (capping the costs of contracts for architectural or engineering services); *id.* § 2.2-4311.4 (requiring that contracts for the procurement of imported goods contain provisions prohibiting the use of forced child labor); *id.* § 2.2-4332 (requiring that contractors for construction projects provide workers' compensation coverage for employees).

### A. The United States Cannot Show Substantial Impairment.

The United States' supplemental response brief says little about the "substantial impairment" element of its Contracts Clause claim. That element typically requires a showing that the law at issue "interferes with a [contracting] party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin,* 584 U.S. 811, 819 (2018). But the United States barely even tries to make that showing here. That omission is not surprising: The 287(g) contracting framework effectively makes it impossible for the United States to show that Virginia's 287(g) Law actually interfered with federal immigration authorities' reasonable expectations or prevented them from reinstating their rights.

Start with the text of § 287(g) of the Immigration and Nationality Act itself. The statute expressly provides that state and local officials who participate in 287(g) agreements may perform immigration-enforcement functions only "to the extent consistent with State and local law." 8 U.S.C. § 1357(g)(1). That language openly recognizes the reality that any 287(g) agreement may be affected by changes in state or local law. Although the United States attempts to downplay that language—by suggesting that it merely aims to avoid turning "a local dog catcher into a deputized federal officer," ECF 84, at 3—it cannot avoid that provision's obvious import: namely, that no party to a 287(g) agreement can reasonably expect that such agreements will be forever insulated from changes in state or local law.

Courts often reject Contracts Clause claims in circumstances just like these, where contracting parties are on notice that the terms of their agreement may be affected by future legal or regulatory developments. *See, e.g.*, *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 416 (1983) (no substantial impairment of contracts between an oil company and a public utility because the contracts "expressly recognize[d] the existence of extensive regulation by

providing that any contractual terms [we]re subject to relevant present and future state and federal law"); *City of Charleston v. Pub. Serv. Comm'n of West Virginia*, 57 F.3d 385, 392 (4th Cir. 1995) (no substantial impairment of contracts between cities and bondholders because the contracts "expressly state[d] that the cities' enforcement authority [wa]s limited to that 'authorized by the laws of the state . . .'"); *Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 438 (8th Cir. 2007) (no substantial impairment of a retailer's contracts with a state lottery authority and business owners because the contracts themselves were explicitly limited by applicable laws or regulations and thus demonstrated the retailer's "diminished contract expectations"). Indeed, one scholar has said that "[d]espite occasional assurances from the Supreme Court that the contract clause retains vitality, as a practical matter the provision has been virtually banished from the Constitution." James W. Ely, Jr., *Article & Essay: Is There Life in the Ruins? A Look at Post-Sveen Contract Clause Jurisprudence*, 14 Brigham-Kanner Prop. Rts. J. 49, *66 (Sept. 2025).

Furthermore, even absent § 287(g)'s clear language, the federal government had ample reason to know that its 287(g) agreements with localities might be affected by changes in state law. Indeed, Virginia is hardly the first state to enact a law affecting its localities' 287(g) agreements. Prior to 2025—when the vast majority of 287(g) agreements at issue in this case were signed—several states had adopted measures requiring their localities to modify or terminate their existing 287(g) agreements, or to refrain from entering into new ones.[2] Under those circumstances, the

[2] *See, e.g.*, N.J. Att'y Gen. Law Enforcement Directive No. 2018-6 (issued 2018, revised 2019); Keep Illinois Families Together Act, P.A. 101-0019, (2019) (codified as 5 Ill. Comp. Stat. Ann. 835 *et seq.*); Illinois Way Forward Act, P.A. 102-234 (2021) (codified as 5 Ill. Comp. Stat. Ann. 805/15(g)(2)); California Values Act, Ch. 495, Stats. (2017) (codified as Cal. Gov. Code § 7284 *et seq.*); Keep Washington Working Act, Laws of 2019 Ch. 440 (2019) (codified as Wash. Rev. Code Ann. § 10.93.160(11)); Connecticut Trust Act, P.A. 19-20 (2019) (codified as Conn. Gen. Stat. Ann. § 54-192h(b)(1)); Sanctuary Promise Act, Oregon Laws 2021, Ch. 550 (2021) (codified in Or. Rev. Stat. Ann. § 181A.829).

federal government could not have had a reasonable expectation that its 287(g) agreements would never be disrupted by such laws.

The at-will nature of the agreements only reinforces that conclusion. Localities may voluntarily withdraw from 287(g) agreements (with proper notice) at any time—as Prince William County did in 2020. *See* ECF 48, at 7–8. A state law directing localities to terminate their 287(g) agreements does not disrupt the federal government's reasonable expectations any more than does a locality's decision to do so on its own. In fact, the federal government has unilaterally withdrawn from these agreements on a number of occasions, including in Virginia. *See*, *e.g.*, Shannon Dooling, *ICE Terminates Contracts With Bristol County Sheriff*, WBUR.org, May 20, 2021, https://www.wbur.org/news/2021/05/20/ice-terminates-contracts-bristol-county-sheriff-hodgson; Leslie Perales Loges, *ICE Removes Immigration Program from Herndon*, Patch.com (Jan. 8, 2013), https://patch.com/virginia/herndon/ice-removes-287-g-immigration-program-from-herndon-di69c85d0573; Jeremy Duda, *Homeland Security revokes 287(g) agreements in Arizona*, The Arizona Capital Times (June 25, 2012), https://plus.lexis.com/api/permalink/2d2d42af-407e-4240-b73c-aea3ef2ef7d2/?context=1530671. And Virginia's 287(g) Law is, if anything, even less disruptive to the federal government's expectations than a state law that requires outright termination of all 287(g) agreements. As the federal government admits, the 287(g) Law "doesn't require termination" of the contracts outright; instead, it simply directs localities to "modify the contracts in accordance with the conditions in the law," and provides that "if they fail to do so, the contracts will be void." ECF 84, at 4. As previously explained, the court in *United States v. New York* upheld a state law that goes much further. *See* No. 26-cv-1360, 2026 WL 2225423, at *16–23 (N.D.N.Y. Aug. 3, 2026) (upholding New York's law that bans prospective and existing 287(g) agreements altogether).

### B. The United States Cannot Show Illegitimate Purpose.

Even if the United States could somehow establish substantial impairment, it still would not be entitled to relief under the Contracts Clause because it cannot show that the 287(g) Law was enacted for an illegitimate purpose. The United States contends that Virginia's cost-saving rationale is illegitimate, arguing that it is "post hoc and finds no basis in the law or its history." ECF 84, at 4. As already explained, however, ample precedent—including from the Fourth Circuit—recognizes that cost-saving is a legitimate rationale for Contracts Clause purposes. *See* ECF 40, at 24–27; ECF 82, at 14 (discussing *Balt. Teachers Union v. Mayor & City Council of Balt.*, 6 F.3d 1012 (4th Cir. 1993)).

The Commonwealth's invocation of that rationale cannot reasonably be characterized as "post hoc." The 287(g) Law is explicitly framed around cost-saving concerns: it provides that "no person acting in his capacity as a law-enforcement officer shall assist, cooperate with, or *use any law-enforcement resources* to facilitate any [federal immigration-enforcement] operation." Va. Code § 15.2-1726.1(B) (emphasis added). Governor Spanberger's order rescinding state-level 287(g) agreements reflected the same animating purpose. *See* ECF 40-9, at 1. The context and history surrounding 287(g) agreements reaffirms that the 287(g) Law is most naturally read as a cost-saving measure. After all, § 287(g) itself expressly states that any state or local immigration-enforcement activities must be carried out "at the expense of the State or political subdivision." 8 U.S.C. 1357(g)(1). And other states have invoked the same rationale for adopting similar laws. *See New York*, 2026 WL 2225423, at *21.

And, of course, like those other states, Virginia had another legitimate rationale: promoting public safety. *See id*. The harms caused by federal immigration enforcement efforts over the past year are well documented. Just this week, a masked ICE agent was filmed pointing a gun at a

woman in Falls Church, Virginia, who had reportedly done nothing more than shout at the agent from a distance. *See* Madaleine Rubin, *ICE Agent Points Gun at Woman in Car in Virginia, Videos Show*, N.Y. Times (Aug. 12, 2026), https://www.nytimes.com/2026/08/12/us/ice-gun-driver-virginia-immigration.html. This incident, like so many others across the country, belies the federal government's contention that federal immigration policy can never be "abhorrent to state policy" because "immigration policy is outside of State policy." ECF 84, at 2. When masked immigration agents threaten a state's citizens, it is not unreasonable—let alone unconstitutional—for a state to respond by declining to lend its own resources or localities in furtherance of those threats. Virginia's decision to do so here was more than legitimate under our system of federalism.

## CONCLUSION

For the foregoing reasons, the Court should deny the United States' motion to preliminarily enjoin the 287(g) Law.

Respectfully submitted,

**COMMONWEALTH OF VIRGINIA**
**ATTORNEY GENERAL JAY JONES**

*/s/ Stanley W. Hammer*

Ethan P. Fallon (VSB No. 102491)
*Deputy Solicitor General*
Gretchen Ellen Nygaard (VSB No. 82475)
*Deputy Attorney General*
Triston Chase O'Savio (VSB No. 100111)
*Assistant Solicitor General*
Stanley W. Hammer (VSB No. 82181)
*Assistant Attorney General*
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 200-4216
Facsimile: (804) 371-2087
shammer@oag.state.va.us
*Counsel for Defendants the Commonwealth of Virginia and Attorney General Jay Jones*

Joshua Adam Matz (*pro hac vice*)
Nicolas Yoshi Riley (*pro hac vice*)
Hecker Fink LLP
1050 K Street NW, 10th Floor
Washington, D.C. 20001
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

Madeline Rose Verniero (*pro hac vice*)
Hecker Fink LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
Facsimile: (212) 564-0883

**CERTIFICATE**

I hereby certify that on August 14, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

*/s/ Stanley W. Hammer*
Assistant Attorney General