**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

THE UNITED STATES OF AMERICA,

Plaintiff,

v.

THE COMMONWEALTH OF VIRGINIA, JAY JONES, in his official capacity as Attorney General of Virginia.

Defendants.

No. 3:26-cv-00545-REP

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS

**INTRODUCTION** ........ 1

**BACKGROUND** ........ 2

- **I. Governing Principles** ........ 2
  - A. Federal Law Enforcement ........ 2
  - B. Cooperative-Enforcement Agreements Under 8 U.S.C. § 1357(g) ........ 3
- **II. The Challenged Virginia Laws** ........ 3
  - A. The Mask Ban: Virginia Code § 19.2-83.6:2 ........ 3
  - B. The 287(g) Law: Virginia Code § 15.2-1726.1 ........ 5
- **III. Procedural History** ........ 6

**LEGAL STANDARD** ........ 7

**ARGUMENT** ........ 7

- **I. The Mask Ban and the 287(g) Law Violate Principles of Intergovernmental Immunity** ........ 7
  - A. The Mask Ban and the 287(g) Law Impermissibly Regulate the Federal Government ........ 7
    1. The Mask Ban Unconstitutionally Regulates Federal Officers ........ 8
    2. The 287(g) Law Unconstitutionally Regulates the Federal Government ........ 12
  - B. The Mask Ban and the 287(g) Law Impermissibly Discriminate Against the Federal Government ........ 15
    1. The Mask Ban Discriminates Against the Federal Government ........ 15
    2. The 287(g) Law Discriminates Against the Federal Government ........ 17
- **II. Virginia's Police Powers do not Give it License to Enact Unconstitutional Laws** ........ 20
- **III. The 287(g) Law is Invalid under the Contract Clause** ........ 22

**IV. The 287(g) Law is Preempted by Federal Law and Invalid** ....25

**CONCLUSION** ....28

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. California*,
283 U.S. 423 (1931) .......... 9

*Ayotte v. Planned Parenthood*,
546 U.S. 320 (2006) .......... 17, 20

*Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340, AFL-CIO v. Mayor & City Council of Baltimore*,
6 F.3d 1012 (4th Cir. 1993) .......... 22

*Barnett Bank v. Nelson,*
517 U.S. 25 (1996) .......... 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 7

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) .......... 25, 26

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) .......... 15, 27

*CoreCivic, Inc. v. Governor of N.J.*,
145 F.4th 315 (3d Cir. 2025) .......... passim

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 25, 27

*Elk Grove Unified Sch. Dist. v. Newdow*,
542 U.S. 1 (2004) .......... 11

*Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*,
459 U.S. 400 (1983) .......... 22, 23, 24

*Equip. Mfrs. Inst. v. Janklow*,
300 F.3d 842 (8th Cir. 2002) .......... 23

*Genesis GSA Strategic One LLC v. Howard County*,
No. 26-cv-915, 2026 WL 2294479 (D. Md. Aug. 10, 2026) .......... 19, 20

*Hancock v. Train*,
426 U.S. 167 (1976) .......... 8

*Harrold v. Hagen*,
174 F.4th 393 (4th Cir. 2026) .......... 7

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......... 26

*Mayo v. United States*,
319 U.S. 441 (1943) .......... 8

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) .......... 7

*McHenry v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .......... 15

*Murphy v. NCAA*,
584 U.S. 453 (2018) .......... 28

*North Dakota v. United States*,
495 U.S. 423 (1990) .......... 15, 17, 25

*Silva v. United States*,
866 F.3d 938 (8th Cir. 2017) .......... 26

*Sveen v. Melin*,
584 U.S. 811 (2018) .......... 22

*Sw. Airlines Co. v. Saxon*,
596 U.S. 450 (2022) .......... 16

*Tennessee v. Davis*,
100 U.S. 257 (1879) .......... 2, 8

*U.S. Tr. Co. of New York v. New Jersey*,
431 U.S. 1 (1977) .......... 24

*United States. v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) .......... 25

*United States v. Alas*,
63 F.4th 269 (4th Cir. 2023) .......... 25, 26

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) .......... passim

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 11

*United States v. City of Philadelphia*,
No. CV 26-4208, 2026 WL 1906075 (E.D. Pa. July 2, 2026) .......... 1, 9, 10

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) .......... 18

*United States v. New York*,
814 F. Supp. 3d 266 (2025) .......... 19

*United States v. New York*,
No. 1:26-cv-1360 (MAD/ML), 2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026) .......... 1, 8, 10, 21

*United States v. Washington*,
596 U.S. 832 (2022) .......... 15, 17, 18, 19

**Statutes**

5 U.S.C. § 301 .......... 2

5 U.S.C. § 5901 .......... 2

6 U.S.C. § 211 .......... 2

6 U.S.C. § 252 .......... 2

8 U.S.C. § 1103(a)(2) .......... 2

8 U.S.C. § 1225(d)(4) .......... 13

8 U.S.C. § 1226(a) .......... 13

8 U.S.C. § 1357(g) .......... 12

8 U.S.C. § 1357(g)(1) .......... 25

8 U.S.C. § 1357(g)(2) .......... 13

8 U.S.C. § 1357(g)(3) .......... 13

8 U.S.C. § 1357(g)(8) .......... 13, 26

28 U.S.C. § 509 .......... 2

28 U.S.C. § 531 .......... 2

28 U.S.C. § 561 .......... 2

28 U.S.C. § 599A .......... 2

29 U.S.C. § 668 .......... 3

Va. Code § 1-214 .......... 3

Va. Code § 15.2-1726.1(B) .......... 13

Va. Code § 15.2-1726.1(C)(1) .......... 12

Va. Code § 15.2-1726.1(C)(3) .......... 13, 15

Va. Code § 15.2-1726.1(C)(4) .......... 13, 15

Va. Code § 15.2-1726.1(C)(5) .......... 13

Va. Code § 15.2-1726.1(C)(6) .......... 15

Va. Code § 15.2-1726.1(C)(8) .......... 13, 15

Va. Code § 15.2-1726.1(C)(9) .......... 13, 15

Va. Code § 15.2-1726.1(C)(10) .......... 13, 15

Va. Code § 15.2-1726.1(C)(11) .......... 13

Va. Code § 15.2-1726.1(C)(12) .......... 13

Va. Code § 15.2-1726.1(D) .......... 14

Va. Code § 18.2-11 .......... 5

Va. Code § 19.2-83.6:2 .......... 3

Va. Code § 19.2-83.6:2(A) .......... 3, 4, 5, 16

Va. Code § 19.2-83.6:2(B) .......... 8

Va. Code § 19.2-83.6:2(C)(1)-(7) .......... 4, 16

Va. Code § 19.2-83.6:2(C)(5) .......... 3, 4, 5

Va. Code § 19.2-83.6:2(C)(8) .......... 16, 17

Va. Code § 19.2-83.6:2(D) ........ 5, 8

Va. Code § 19.2-83.6:2(E) ........ 5

**Regulations**

8 C.F.R. § 287.5 ........ 25

8 C.F.R. § 287.5(e)(2) ........ 13

## INTRODUCTION

This Court already ruled that the United States was likely to succeed on its claim that SB 352, Virginia Code § 19.2-83.6:2 (the Mask Ban) unconstitutionally regulates federal officers. ECF 34. And the Court emphatically denied Virgina's request for a stay pending appeal. ECF 76. Accordingly, it is difficult to see how the Commonwealth of Virginia and Virginia Attorney General Jay Jones (Defendants or Virginia) can argue that claim (Count I) should be dismissed. Indeed, in enjoining the Mask Ban, this Court joined another court that reached the same conclusion when analyzing a nearly identical law. *See United States v. California*, 173 F.4th 1060, 1067-68 (9th Cir. 2026). And after this Court issued its opinion enjoining the Mask Ban, two other courts followed suit in enjoining nearly identical laws. *See United States v. City of Philadelphia*, No. CV 26-4208, 2026 WL 1906075, at *10-11 (E.D. Pa. July 2, 2026), *United States v. New York*, No. 1:26-cv-1360 (MAD/ML), 2026 WL 2225423, at *15 (N.D.N.Y. Aug. 3, 2026). The law is clear: states cannot directly regulate the Federal Government to any degree.

The Mask Ban is also unconstitutional because it discriminates against the Federal Government by providing an important exception to state and local officers but not to federal officers (Count II). Likewise, SB 783, Virginia Code § 15.2-1726.1 (the 287(g) Law) is unconstitutional because it directly regulates the Federal Government by imposing onerous conditions on the contents of 287(g) agreements in Virginia (Count V) and discriminates against the Federal Government where comparable cooperative agreements are not similarly subject to such overbearing oversight (Count VI). Moreover, the 287(g) Law violates the Contract Clause (Count III) and is preempted by federal law (Count IV). For the reasons set forth in the United States' preliminary injunction briefing and those below, this Court should deny Virginia's Motion to Dismiss in its entirety.

## BACKGROUND

## I. Governing Principles

### A. Federal Law Enforcement

The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3. The authority to discharge that duty "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Federal law enforcement agencies, including those within the Departments of Justice ("DOJ") and Homeland Security ("DHS"), are created by federal law. *See, e.g.*, 28 U.S.C. § 531 (Federal Bureau of Investigation ("FBI")), *id.* § 561 (U.S. Marshal Service), *id.* § 599A (Bureau of Alcohol Tobacco Firearms and Explosives); 6 U.S.C. § 252 (U.S. Immigration and Customs Enforcement ("ICE")); 6 U.S.C. § 211 (U.S. Customs and Border Protection ("CBP")); Reorganization Plan No. 2 of 1973, 38 F.R. 15932, 87 Stat. 1091, as amended Pub. L. 93–253, §1, Mar. 16, 1974, 88 Stat. 50 (Drug Enforcement Administration ("DEA")).

To achieve their respective goals, the heads of each agency have the power to govern the agency's affairs and direct their agents' activities. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (authorizing the DHS Secretary to "control, direct[], and supervis[e]" all DHS employees). Included within that power to govern the agencies is the power to determine how agents must conduct themselves when engaged in official duties in accordance with federal law. Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment when carrying out their official duties. *See, e.g.*, 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for

a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees).

B. Cooperative-Enforcement Agreements Under 8 U.S.C. § 1357(g)

The United States incorporates by reference the Background Section of its opposition to Virginia's Motion to Dismiss under Rule 12(b)(1) to this brief. *See* ECF 87 at 2-4.

## II. The Challenged Virginia Laws

A. The Mask Ban: Virginia Code § 19.2-83.6:2

On May 20, 2026, Governor Spanberger signed SB 352, which added a new section to the Virginia Code, § 19.2-83.6:2,[1] *Prohibition on wearing of facial coverings; penalties See* ECF 1-1, Compl. Exh. A. This new law, which went into effect on July 1, 2026, *see* Va. Code § 1-214, attempts to regulate federal law enforcement agents and officers by defining "law-enforcement officer" to include "(ii) any full-time or part-time employee of a federal law-enforcement agency." Va. Code § 19.2-83.6:2(A). "Law-enforcement agency" is defined as "any agency or department responsible for the prevention and detection of crime and the enforcement of the penal, traffic, or highway laws of the Commonwealth." *Id.* This definition apparently *excludes* federal law enforcement agencies, as confirmed by the law's other uses of "*federal* law-enforcement agency" (in the definition of "Law-enforcement officer") and "agency" (in describing the motorcycle helmet exception to the facial covering ban). *Id.* §§ 19.2-83.6:2(A), (C)(5).

Section 19.2-83.6:2(B) prohibits federal officers from wearing facial coverings: "Except as provided in subsection C, no law-enforcement officer shall wear a facial covering that conceals,

[1] After the law went into effect on July 1, 2026, the Virginia Code Commission renumbered the Mask Ban from Va. Code § 19.2-83.6:1 to Va. Code § 19.2-83.6:2. ECF 62. The United States refers to the renumbered provision throughout this brief.

obscures, or otherwise covers his face while such law-enforcement officer is engaged in the performance of his official duties." Section 19.2-83.6:2(A) defines "Facial covering" as "any opaque mask, garment, helmet, headgear, or other item or device whereby a substantial portion of the face is hidden or covered to conceal the identity of the wearer, including a balaclava, tactical mask, gator, ski mask, or other similar face-shielding item or device. 'Facial covering' does not include sunglasses or prescription eyewear, provided that such sunglasses or eyewear does not otherwise conceal a substantial portion of the wearer's face."

The law contains limited exceptions that relate to health and safety, such as facial coverings to protect against diseases, toxins, gas, smoke, severe weather conditions (such as extreme cold), helmets, protective eyewear, or tactical team (SWAT) facial coverings. Va. Code § 19.2-83.6:2(C)(1)-(7). Section 19.2-83.6:2(C)(8) contains a different exception that relates to "a law-enforcement officer who is assigned to an undercover, drug, gang, or surveillance unit where the protection of such law-enforcement officer's identity is necessary as determined by the law-enforcement agency overseeing such unit or other responsible law-enforcement agency." As previously noted, "Law-enforcement agency" appears to be limited to state and local law enforcement agencies only. *Id.* § 19.2-83.6:2(A) (definitions). Thus, unlike the exception in subsection (C)(5), which allows any agency (state or federal) to decide whether a helmet is required for safety, the law apparently permits only state and local officers to wear masks if assigned to an undercover, drug, gang, or surveillance unit, and not federal officers and agents who also engage in such work.

The Mask Ban also contains an identification requirement for federal officers: "Except as otherwise provided by this section, a law-enforcement officer, while engaged in the performance of his official duties, shall visibly display (i) a badge or insignia bearing such law-enforcement

officer's name or other individual identifier unique to that particular law-enforcement officer and (ii) the name of the law-enforcement agency that employs such law-enforcement officer." *Id.* § 19.2-83.6:2(D). It is unclear whether paragraph (D)(ii) applies to federal officers, because it uses the defined term "law-enforcement agency" that does not appear to include federal agencies.

Violating sections 19.2-83.6:2(B) and (D) constitutes "a Class 1 misdemeanor unless the law-enforcement agency that employs such law-enforcement officer has adopted and established a written policy for the use of facial coverings, using as guidance the model policy established by the Department of Criminal Justice Services under § 9.1-102." *Id.* § 19.2-83.6:2(E). In Virginia, a Class 1 misdemeanor is punishable by confinement in jail for not more than twelve months and/or a fine of not more than $2,500. *See id.* § 18.2-11. Each Commonwealth Attorney can enforce the law. While the law provides a narrow exception based on "a written policy for the use of facial coverings," *id.* § 19.2-83.6:2(E), federal agents and officers do not appear to qualify because the exception appears limited to state and local "law-enforcement agenc[ies]," as defined in the law. *See id.* § 19.2-83.6:2(A). Moreover, the Department of Criminal Justice Services has not "established" any "model policy" against which to compare a "law-enforcement agency['s]," *id.* § 19.2-83.6:2(E), so no agency's policy could qualify.

B. <u>The 287(g) Law: Virginia Code § 15.2-1726.1</u>

The United States incorporates by reference the Background Section of its opposition to Virginia's Motion to Dismiss under Rule 12(b)(1) to this brief. *See* ECF 87 at 4-6.

## III. Procedural History

On June 11, 2026, the United States brought six counts against the Commonwealth of Virginia and Virginia Attorney General Jay Jones.[2] Counts I and II allege that the Mask Ban constitutes an unlawful regulation of and discrimination against the Federal Government and is invalid under the Supremacy Clause. Compl. ¶¶ 137-50. Counts III, IV, V, and VI contend that the 287(g) Law runs afoul of the Contract Clause, is preempted, and unlawfully regulates and discriminates against the Federal Government. Compl. ¶¶ 152-75. The United States seeks injunctive and declaratory relief.

On June 17, 2026, the United States moved for a preliminary injunction to enjoin both laws. ECFs 8, 9. Because existing 287(g) agreements would not be voided until September 1, 2026, the Court bifurcated the claims and set a separate briefing schedule for the challenge to the 287(g) Law. ECF 12. On June 30, 2026, this Court enjoined Defendants from enforcing the Mask Ban. ECF 30 (Order); ECF 34 (Memorandum Opinion). On July 6, 2026, Defendants filed a notice of interlocutory appeal of the Court's opinion and order enjoining the Mask Ban, ECF 37, and a motion to stay the preliminary injunction pending appeal. ECFs 35, 36. The United States opposed Defendants' motion to stay the preliminary injunction of the Mask Ban pending appeal. ECF 61. This Court denied Defendants' motion to stay. ECFs 76, 77.

A hearing on the motion for preliminary injunction on the 287(g) Law was held on August 3, 2026. ECF 75. The Court ordered supplemental briefing, ECF 79, which is now complete. ECFs 80, 81, 82, 84, 85, 86. The Court held a telephonic conference on August 12. A continuation of the hearing is scheduled for August 20. ECFs 75, 79.

Defendants moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6). ECFs 52-

[2] The Parties agreed to dismiss Commonwealth Attorney Descano as he agreed to be bound by any injunction entered against Virginia. ECF 28.

55. The arguments therein largely reflect those already briefed for the preliminary injunction.

## LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "is obliged to assume all well-pleaded factual allegations in the complaint to be true and determine whether, viewed in the light most favorable to the plaintiff, those factual allegations 'plausibly give rise to an entitlement to relief.'" *Harrold v. Hagen*, 174 F.4th 393, 400 (4th Cir. 2026) (quotation omitted). A claim will survive a motion dismiss if the plaintiff pleads facts sufficient to raise a right to relief beyond mere speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

### I. The Mask Ban and the 287(g) Law Violate Principles of Intergovernmental Immunity

#### A. The Mask Ban and the 287(g) Law Impermissibly Regulate the Federal Government

The United States' complaint states a claim for relief that the challenged Virginia laws impermissibly regulate the Federal Government. Under the Supremacy Clause, States have no power to "in any manner control[] the operations of" the Federal Government. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). "[I]ntergovernmental immunity … forbids States from regulating the federal government *qua* government and from controlling federal governmental functions in any manner and to any degree." *United States v. California*, 173 F.4th at 1068. A law that "applies exclusively to law enforcement agencies and their officers, including federal law enforcement agencies and federal law enforcement officers…. directly regulates conduct reserved to sovereigns" and is impermissible under the Supremacy Clause. *Id.*; *see CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025) (A state law unlawfully regulates the United States when it "'places [either] a prohibition' or mandate on the federal

government." (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976))). That is because the Supreme Court has long held that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Indeed, "[i]f when ... acting ... within the scope of their authority, [federal] officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State ... the operations of the general government may at any time be arrested at the will of one of its members." *Davis*, 100 U.S. at 262-63.

**1. The Mask Ban Unconstitutionally Regulates Federal Officers**

The complaint clearly sets forth a claim that through Virginia's enactment and intended enforcement of the Mask Ban, it seeks to regulate the actions of federal law enforcement officers within Virginia. The Mask Ban imposes criminal penalties for either (i) "wear[ing] a facial covering that conceals, obscures, or otherwise covers [one's] face while … engaged in the performance of his official duties" or (ii) failing to wear identifying information such as the "officer's name or other individual identifier," except in limited circumstances. Va. Code §§ 19.2-83.6:2(B), (D). This direct attempt to regulate federal agents runs afoul of the Supremacy Clause.

This Court has already determined that the United States is likely to succeed on the merits of the claim that the Mask Ban unconstitutionally regulates the Federal Government (Count I). ECF 34 at 25-30. The Court rejected Virginia's arguments once again in denying the motion to stay. ECF 76 at 5-10. The Court even analyzed Virginia's argument as a motion for reconsideration and concluded that Virginia failed to meet this burden as well. *Id.* at 9-10. Virginia's motion to dismiss fares no better.

Just last week, another court adopted this Court's rationale in concluding that a similar mask and identification law was unconstitutional. *New York*, 2026 WL 2225423, at *13-15. The District Court for the Northern District of New York reasoned that "whether the Face Covering

and Identity Acts are a valid exercise of New York's police powers is beside the point[]" where "[t]he Supreme Court has clearly held that '[t]he United States may perform its functions without conforming to the police regulations of a state.'" *Id.* at 14 (quoting *Arizona v. California*, 283 U.S. 423, 451 (1931)). And last month, the District Court for the Eastern District of Pennsylvania struck down a similar law, holding that "[i]n no uncertain terms, [the mask and identification law] explicitly seeks to control how federal law enforcement officers perform their governmental duties and conduct operations." *City of Philadelphia*, 2026 WL 1906075, at *10. That court acknowledged that it made no difference that the law applied to not only federal officers, but state and local officers as well. *Id.* In holding that the United States was likely to succeed on its claims that the law unlawfully regulated the Federal Government, the court explained that holding otherwise would allow the city of Philadelphia to "change totally the character of our federal system by transferring the supremacy, in fact, to a municipality." *Id.* at 11 (cleaned up).

Furthermore, as the Ninth Circuit observed with regard to a similar California law that sought to require federal law enforcement officers to "visibly display identification" when "performing their enforcement duties," Virginia's Mask Ban "seeks to control [federal officers'] conduct in performing law enforcement operations." *California*, 173 F.4th at 1067. The Ninth Circuit held that the challenged identification requirement "purports to override the federal government's power to determine whether, how, and when to publicly identify its officers," "[a]nd in so doing, it aims to regulate the manner and conditions under which federal agents can enforce federal law." *Id.* That reasoning applies directly to the Virginia identification requirement in Section 19.2-83.6:2(D), and applies with equal force to the facial coverings ban in Section 19.2-83.6:2(B). Virginia's law seeks to regulate the manner and conditions under which federal officers must operate when conducting their official duties and enforcing the law. *See id.* States have no

power to impose such regulations.

By dictating if and when federal agents may wear facial coverings and what identification they must display while carrying out their official duties, Section 19.2-83.6:2 improperly seeks to regulate how the Federal Government carries out its criminal and immigration law enforcement functions. Accordingly, the Mask Ban is facially invalid and unconstitutional as to federal law enforcement officers.

Virginia renews its confusing argument that since federal law does not *require* the use of facial coverings, Virginia was within its right to regulate this issue. MTD at 14-15. But the prohibition on states directly regulating the Federal Government does not require a conflict with federal law—that is the domain of conflict preemption. A state cannot regulate the Federal Government unless Congress expressly authorizes otherwise (something no one contends here). A similar argument was rejected by the court in *New York* last week, where the court noted that a state "cannot impose its own uniform requirements on federal agents simply because it disagrees with how the Federal Government is exercising its authority." 2026 WL 2225423, at *15. In any event, the policy of various federal agencies is to permit officers to wear facial coverings or remove identifiers in certain circumstances. Compl. ¶ 120. Virginia's law clearly conflicts with those federal policies by removing that discretion under the penalty of criminal prosecution.

Virginia also argues that the Mask Ban is not an outright ban because it "contains exceptions and safeguards." MTD at 14. But, as the court in *Philadelphia* correctly acknowledged, those "arguments miss the mark because, here," the Mask Ban "fundamentally 'prevents the federal government from choosing how ... it will carry out a core federal function' by directly regulating how federal law enforcement officers investigate criminal activity, conduct undercover operations, interact with the public, and enforce federal laws." 2026 WL 1906075, at *10 (quoting

*CoreCivic, Inc.*, 145 F.4th at 325). Moreover, the purported exception for officers "assigned to an undercover, drug, gang, or surveillance unit" does not appear to apply to federal law enforcement officers. ECF 24 at 10 (analyzing the plain text of Va. Code § 19.2-83.6:2, which excludes federal law enforcement from its definition of "law-enforcement agency"). Even if this exception did apply to federal law enforcement officers, it is vague and narrow, and Virginia appears to have reserved to itself the power to determine when the exception is met.

Further, Virginia claims the law is neutral because it applies to state and local officers. MTD at 14. But that conflates a regulation claim with the separate discrimination doctrine. And the law is not general, it expressly applies only to law enforcement in the performance of their duties, not the general public. *See California*, 173 F.4th at 1068.

At bottom, Virginia cites no cases or laws allowing it to regulate federal officers. Without substantiating its theory, Virginia appears to claim that the attendant regulation is "incidental" and that such regulation is permitted. MTD at 15. As the Supreme Court and others have explained, that is the wrong test, as "[t]here are no *de minimis* violations of the Constitution--no constitutional harms so slight that the courts are obliged to ignore them." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 36-37 (2004) (O'Connor, J. concurring); *see also United States v. California*, 921 F.3d 865, 883 (9th Cir. 2019) ("Supreme Court case law compels the rejection of a *de minimis* exception to the doctrine of intergovernmental immunity."). Virginia never grapples with this case law. In any event, Virginia defines the federal function at too high a level of generality, claiming its law does not run afoul of the Constitution because it does not tell officers who they can arrest. By Virgina's telling, every state and locality can micromanage the training, weapons, uniforms and more of federal officers as long as federal officers still retain the power to arrest people. This is wrong. And as explained, criminalizing what federal officers wear in the performance of their

duties is more than an incidental burden. *See* Compl. ¶¶ 113-27 (discussing harms); ECF 9 at 25-28 (same). The spirit and effect of the law are to control federal officers in the commission of their official duties and to chill the zealous enforcement of federal law. The Mask Ban is void "irrespective of the degree to which the state law interferes with federal functions or operations." *California*, 173 F.4th at 1067.

**2. The 287(g) Law Unconstitutionally Regulates the Federal Government**

Similarly, the United States has stated a claim that the 287(g) Law unlawfully regulates the Federal Government by imposing onerous conditions on the contents of 287(g) agreements, including conditions that violate federal law. 287(g) agreements are statutorily authorized by Congress. In creating that authorization, Congress set forth certain parameters of the agreements, including that state officers working under such agreements must adhere to federal law, are subject to the direction and supervision of the Secretary of Homeland Security, and are acting under color of federal authority for purposes of determining the liability, and immunity from suit, of the officer or employee in a civil action brought under federal or state law. 8 U.S.C. § 1357(g). Through its enactment of the 287(g) Law, Virginia is attempting to alter these express terms imposed by Congress by limiting what federal laws may be complied with, requiring compliance with Virginia law instead, and imposing liability pursuant to Virginia law. This is a textbook example of an unlawful attempt to regulate the Federal Government. *CoreCivic, Inc.*, 145 F.4th at 321.

On its face, the 287(g) Law seeks to bind federal officers, not Virginia officers as Virginia claims. *See* MTD at 8-10. For example, subsection (C)(1) mandates "[t]hat *U.S. Immigration and Customs Enforcement shall provide* to the law-enforcement agency the names and ranks of all federal agents involved in any immigration enforcement activity within the Commonwealth at least seven days prior…" Va. Code § 15.2-1726.1(C)(1) (emphasis added). The law prohibits DHS from

conducting immigration enforcement activities in certain places: "no *agent of U.S. Immigration and Customs Enforcement shall* conduct any immigration enforcement activity on the property of any school, faith-based organization, or courthouse within the Commonwealth." *Id.* § 15.2-1726.1(C)(4) (emphasis added); *see also id.* § 15.2-1726.1(C)(8) (prohibiting immigration enforcement near a polling place). The law also requires consent to liability under state law. *Id.* §§ 15.2-1726.1(C)(5), (10)-(12). This is directly contrary to Congressional intent. *See* 8 U.S.C. § 1357(g)(2) ("An agreement under this subsection shall require that an officer or employee of a State or political subdivision of a State performing a function under the agreement shall have knowledge of, and adhere to, Federal law …"); *see also id.* § 1357(g)(8). The law dictates how federal officers may do their jobs, prohibiting "*U.S. Immigration and Customs Enforcement [and] its agents* [from] us[ing] any surveillance technology to conduct immigration enforcement" and requiring them to clearly identify themselves as ICE, which this Court already ruled was unconstitutional. Va. Code § 15.2-1726.1(C)(3), (9) (emphasis added). In addition, the law restricts the use of administrative warrants, *id.* § 15.2-1726.1(B), even though federal law explicitly provides for their use. *See* 8 U.S.C. § 1225(d)(4) (administrative subpoenas); 8 C.F.R. § 287.5(e)(2) (administrative warrants); 8 U.S.C. § 1226(a) (administrative warrants). Virginia attempts to impose such regulations upon federal officers when Congress expressly designated that "[i]n performing a function under this subsection, an officer or employee of a State or political subdivision of a State shall be subject to the direction and supervision of the [Secretary of Homeland Security]." 8 U.S.C. § 1357(g)(3). Moreover, the 287(g) Law regulates federal officers by dictating with whom DHS can and cannot enter agreements: no locality in Virginia. Virginia is free to regulate its own officers, but none of these new requirements is placed on state officers,

who are still permitted to freely cooperate with each other. The law explicitly regulates federal officers performing their official duties. Subsections (C)(1)-(12) are clearly direct regulations.

Virginia understands it cannot directly place these limits on federal officers, so it is using the 287(g) Law "to evade the limits on immunity by indirectly achieving the same result." *CoreCivic, Inc.*, 145 F.4th at 322 ("[W]hat cannot be done directly cannot be done indirectly.") (internal quotation marks omitted). In *CoreCivic*, the Third Circuit invalidated a state law that banned state and local governments and private parties from making, renewing, or extending contracts to detain people for civil immigration violations. *Id.* at 319. Although the law did not name the Federal Government in its text, the Third Circuit probed the purpose and self-evident operation of the statute, "easily see[ing] the law for what it really [was]: a regulation" of the Federal Government. *Id.* at 325. The clear purpose and effect of the 287(g) Law is similar. Virigina has not been shy in expressing that its purpose is to regulate federal immigration enforcement with which it disagrees and thus impede federal operations. Indeed, when analyzing a related law in this case, this Court found that Virginia was clearly attempting to disrupt federal immigration enforcement. *See* ECF 34 at 4. The same is true here.

Not only does the law impose these unreasonable demands on all future agreements within the Commonwealth, but it also mandates that any agreement in effect on July 1, 2026, be modified by September 1, 2026. Va. Code § 15.2-1726.1(D). Should the Federal Government not comply with this demand, all existing agreements "shall be deemed void and unenforceable." *Id.*; *see also id.* § 15.2-1726.1(E) (providing that "[a]ny federal immigration enforcement agreement entered into or maintained in violation of this section shall be void and unenforceable"). The law thus regulates what agreements the Federal Government may enter into, requires modifications of existing federal agreements, and requires compliance with onerous state laws to permit existing

agreements to continue. That is a clear regulation of the Federal Government.

Virginia's attempt to liken the 287(g) Law to the dispute in *McHenry v. Raoul*, 44 F.4th 581 (7th Cir. 2022) fails. MTD at 8-9. While it is the United States' position that *McHenry* was wrongly decided, it is nevertheless distinguishable from this matter. In *McHenry*, Illinois barred law enforcement, State, and local government entities, from entering into immigration detention agreements with the Federal Government. 44 F.4th at 593. It did not, however, place restrictions on those agreements should local entities choose to enter them. Here, Virginia is directly regulating 287(g) agreements within Virginia, imposing requirements on the Federal Government not contemplated by Congress, including dictating how federal officers must identify themselves, Va. Code § 15.2-1726.1(C)(3), limiting where they may operate, *id.* §§ 15.2-1726.1(C)(4), (8), and restricting the techniques and processes federal agents may employ when executing their duties, *id.* §§ 15.2-1726.1(C)(6), (7), (9), (10). This is a clear example of state regulation of a federal program. Because Virginia's law seeks to "forbid all voluntary cooperation by state or local officials with particular federal programs" it is invalid under the Supremacy Clause because it is an improper regulation that dictates how the Federal Government must frame its 287(g) agreements in Virginia and with whom. *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

**B. The Mask Ban and the 287(g) Law Impermissibly Discriminate Against the Federal Government**

The United States has stated a claim that Virginia's laws discriminate against the Federal Government. *See United States v. Washington*, 596 U.S. 832, 841 (2022). Discrimination occurs when a state "treats someone else better than" the Federal Government, *North Dakota v. United States*, 495 U.S. 423, 438 (1990), or "singl[es] out the Federal Government for unfavorable treatment." *Washington*, 596 U.S. at 839. Both the Mask Ban and the 287(g) Law fit this definition.

### 1. The Mask Ban Discriminates Against the Federal Government

The United States has amply stated a claim that Virginia's Mask Ban unlawfully discriminates against the Federal Government. Virginia contends that the Mask Ban is not discriminatory because "[b]y its plain terms, the statute imposes identical obligations on all officers—federal, state, and local—whenever they exercise their police authority in the Commonwealth." MTD at 16. A closer reading of the statute refutes this contention. The Mask Ban does contain some generally applicable exceptions that appear to extend to federal law enforcement officers. *See* Va. Code § 19.2-83.6:2(C)(1)-(7). However, the critical exception for officers "assigned to an undercover, drug, gang, or surveillance unit" in section (C)(8) does not apply to federal law enforcement officers based on the statute's plain text, as it requires that "the *law-enforcement agency* overseeing such unit or other responsible *law-enforcement agency*" deem the protection of the officer's identity necessary. *See id.* § 19.2-83.6:2(C)(8) (emphases added). "Law-enforcement agency" is defined in the Virginia Code as "any agency or department responsible for the prevention and detection of crime and the enforcement of the penal, traffic, or highway laws of the Commonwealth[,]" thereby excluding federal law enforcement. *See id.* § 19.2-83.6:2(A). This definition stands in contrast to the definition of "law enforcement officer," which explicitly includes "a federal law-enforcement agency." *Id.* Thus, normal tools of statutory interpretation, such as meaningful variation, show that the exception for law enforcement agencies is not provided to federal officers. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea"). Otherwise, there would be no reason for this separate provision to exist and for the statute to distinguish between a "law enforcement officer" and "law enforcement agency." *Compare* Va. Code § 19.2-83.6:2(C)(5) (only

referencing a "law enforcement officer") *with id.* § 19.2-83.6:2(C)(8) (requiring a determination by a "law-enforcement agency" for the exception to apply). Virginia's only response is to disregard this variation and claim the entire statute is aimed at all law enforcement. MTD at 16-17. Virginia has no explanation for this difference, which would, in effect, render the definition of "law enforcement agencies" superfluous.

Virginia raises the canon of constitutional avoidance in a last-ditch effort to defend this patently discriminatory provision. *Id.* at 18. But that argument cannot salvage Virginia's position where, as discussed, the plain text of the statute makes abundantly clear that Virginia's aim is to target federal law enforcement through the Mask Ban. This is further illustrated by the spirit and purpose of the law, which "is to regulate the conduct of federal law enforcement officers in the enforcement of federal immigration law." ECF 76 at 6; *see also* ECF 22 at 1-2 (describing immigration enforcement incidents around the country and "escalating public safety concerns" as the impetus for the General Assembly to enact the Mask Ban). Enabling state and local law enforcement to protect their identities when conducting undercover work while declining to extend that exception to federal law enforcement is a prime example of discrimination where Virginia "treats someone else better than" the Federal Government, *North Dakota*, 495 U.S. at 438, and "singl[es] out the Federal Government for unfavorable treatment." *Washington*, 596 U.S. at 839. This Court should reject Virginia's invitation to rewrite its obviously discriminatory law for the sake of constitutional avoidance. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006).

**2. The 287(g) Law Discriminates Against the Federal Government**

The United States has stated a claim that the 287(g) Law impermissibly discriminates against the Federal Government. The 287(g) Law is patently discriminatory where it imposes a series of unreasonable (and unlawful) requirements on agreements between entities in Virginia and

the Federal Government that are not required for agreements between Virginia and other state and local entities. *See Washington*, 596 U.S. at 839 (law discriminatory because "[o]n its face" it "explicitly treats federal workers differently than state or private workers"); *United States v. King County*, 122 F.4th 740, 757 (9th Cir. 2024) (ban on servicing ICE charter flights was unlawful because it "burden[ed] federal operations, and *only* federal operations.") (emphasis in original). Virginia contends that the United States failed to identify a comparator for the discrimination analysis, MTD at 11, but that is plainly refuted by the complaint. *See* Compl. ¶ 95 (setting forth several comparators).

To start, Section 15.2-1727 of the Virginia Code discusses reciprocal agreements between the Commonwealth and external localities. Unlike the 287(g) Law's lengthy restrictions on Section 287(g) agreements, Section 15.2-1727 provides that any officers or agents of the Commonwealth "serving in a jurisdiction outside the Commonwealth under a reciprocal agreement entered into pursuant hereto are authorized to carry out the duties and functions provided for in the agreement under the command and supervision of the chief law-enforcement officer of the jurisdiction outside the Commonwealth." Moreover, Section 15.2-1730.1 (also referenced in the complaint at paragraph 95) allows the sheriff of a county where no police department has been established to "enter into agreements with any other governmental entity providing law-enforcement services in the Commonwealth, and may furnish and receive interjurisdictional law-enforcement assistance for all law-enforcement purposes[.]" State and local officers can freely enter into cooperative agreements under these laws.

Indeed, Virginia has admitted that Section 15.2-1726 provided the authority for localities to enter into cooperative agreements with federal, state, and local law enforcement entities, including 287(g) contracts. ECF 80 at 2-3. Virginia also admits that the 287(g) Law only restricts

that authority for 287(g) agreements. *Id.* Thus, Virginia law allows identical cooperative agreements between state and local law enforcement but not 287(g) agreements or similar arrangements with DHS. Only agreements with DHS are subject to Virginia's 12 onerous requirements, all of which are directed at immigration enforcement. And absent the United States agreeing to those onerous requirements, existing agreements are voided and any future agreements are barred. That is not true for any other agreement between law enforcement agencies under Virginia Code Section 15.2-1726, just federal 287(g) agreements. The District of Maryland just preliminarily enjoined a law specifically targeting immigration detention facilities, holding that the law discriminated against the Federal Government both because those facilities were for federal immigration enforcement and because the law treated immigration facilities worse as compared to other kinds of detention facilities. *Genesis GSA Strategic One LLC v. Howard County*, No. 26-cv-915, 2026 WL 2294479 at *19-20 (D. Md. Aug. 10, 2026). Preventing this sort of "discrimination against the Federal Government lies at the heart of the Constitution's intergovernmental immunity doctrine." *Washington*, 596 U.S. at 841. The United States has provided ample support for this claim.

In support of its argument, Virginia attempts to rely on *United States v. New York*, 814 F. Supp. 3d 266 (2025). MTD at 10. But *New York* is inapposite where the court rejected the United Sates' discrimination claim because the complaint did not identify a comparator. 814 F. Supp. 3d at 282. The same is not true here. *See* Compl. ¶ 95. Virginia's reliance on *McHenry* fails for the same reason. MTD at 10. Those cases, and Virginia, appear to argue that because 287(g) agreements are voluntary, it cannot be discriminatory to ban participation. That is illogical. Once Virginia allowed its officers to engage in cooperative agreements, as it did in Virginia Code Section 15.2-1726, it cannot then deny that authority discriminatorily against only federal 287(g)

agreements.

Virginia's statutory construction arguments similarly fail. According to Virginia, the 287(g) Law cannot possibly discriminate against the Federal Government because it purportedly "uniformly governs" only state and local entities. *Id.* at 12. But this argument ignores that the 287(g) Law is patently discriminatory against the *Federal Government and its agreements* – the relevant party in the discrimination analysis for purposes of intergovernmental immunity. The Third Circuit rejected a similar argument that a law only regulated private actors because it expressly targeted private immigration detention facilities, as the effect and purpose was to target federal detention. *CoreCivic, Inc.*, 145 F.4th at 325. The law here is more egregious because it expressly applies only to federal cooperative agreements, not any other cooperative agreements. *See Genesis GSA Strategic One LLC*, 2026 WL 2294479 at *20 (challenged law unlawfully discriminated against the Federal Government where it treated "federal detention facilities differently than state or local detention facilities by requiring an additional procedure and source of delay…that applies only to facilities for this exclusively federal function.").

This Court should similarly reject Virginia's appeal to the canon of constitutional avoidance. MTD at 13. The United States' reading of the 287(g) Law, which is based on its plain language, evidences the blatantly unconstitutional nature of the statute. Virginia would have this Court rewrite the statute to conform it to constitutional requirements, which the Supreme Court has cautioned against. *See Ayotte*, 546 U.S. at 329. It is not even clear what reading could avoid this issue, as the entire purpose of the law is to eliminate *federal* 287(g) agreements. Accordingly, Virginia's motion to dismiss Count VI for failure to state a claim can easily be rejected.

## II. Virginia's Police Powers do not Give it License to Enact Unconstitutional Laws

Throughout this litigation, Virginia has routinely relied upon its state police powers to justify its attempt to unlawfully regulate and discriminate against the Federal Government and

invalidate contracts with the Federal Government. Virginia renews those arguments here, ECF 55 (MTD) at 5-7, but this Court has twice rejected them. ECF 34 (Memorandum Opinion Granting Mask Ban PI) at 20, 29-30; ECF 76 (Memorandum Opinion Denying Motion to Stay Mask Ban PI) at 5, 13-14. This Court's reasoning is sound: "Virginia's police power cannot supplant the federal choice." ECF 34 at 20. While Virginia "retained a police power that allows her to regulate the conduct of her citizens and her law enforcement officers," "Virginia cites no authority that would permit her to exercise her police power to regulate the constitutionally delegated federal power to enforce the federal immigration laws." *Id.* at 29-30. Notably, "the Court [was un]able to locate any authority to support such a proposition." *Id.* at 30. In denying Virginia's motion for a stay of the Mask Ban preliminary injunction pending appeal, the Court declared that "Virginia is incorrect that regulation of federal officers is among its police powers. It is not. And Virginia cites no authority to the contrary." ECF 76 at 14. Instead, Virginia continues to cite *Kelley v. Johnson*, which rejected a First Amendment challenge to a police department's uniform policy. MTD at 6. That hardly stands for the proposition that a state's police power allows it to regulate federal officers; that would flip the Constitution on its head.

In its motion to dismiss, Virginia is still unable to substantiate its position. Another court recently joined this one in acknowledging that because "the United States is likely to succeed on its argument that the [challenged laws] unlawfully directly regulate the Federal Government, Defendants can find no safe harbor in [the state's] police powers." *New York*, 2026 WL 2225423, at *15; *id.* ("[A]n otherwise valid exercise of state police powers may still violate the intergovernmental immunity doctrine if the law at issue regulates these federal functions of law enforcement directly."). Accordingly, Virginia's police powers argument is not a basis to dismiss the United States' complaint.

## III. The 287(g) Law is Invalid under the Contract Clause

The United States plausibly stated a Contract Clause claim because the 287(g) Law impairs all 287(g) agreements in the State of Virginia and lacks a significant or legitimate purpose. The Contract Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, cl. 1.[3] State legislation like the 287(g) Law violates the Contract Clause if it substantially impairs a contractual relationship and is not an appropriate or reasonable way to advance a significant and legitimate public purpose. *See Sveen v. Melin*, 584 U.S. 811, 819 (2018). "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). Where a State is a party to the contract at issue, "the State's self-interest is at stake," and as such, "these contracts occupy what the Court has termed a special status for Contract Clause purposes," "and must be more scrupulously examined[.]" *Baltimore Tchrs. Union, Am. Fed'n of Tchrs. Loc. 340, AFL-CIO v. Mayor & City Council of Baltimore*, 6 F.3d 1012, 1019 (4th Cir. 1993) (internal quotations and citations omitted). Through the 287(g) Law, Virginia has legislated in its own self-interest, impacting the local entities who are parties to the contracts with the Federal Government. Accordingly, this Court should scrupulously examine the 287(g) Law where the law reflects Virginia's self-interests.

Tellingly, Virginia does not argue that the United States failed to allege that the 287(g) agreements are valid contracts that Virginia's law will substantially impair. Virginia's sole basis for dismissal of Count III is its claim that the United States has not pled "any facts showing that

---

[3] The Contract Clause seeks to protect contracts from interference by "the fluctuating policy" enacted by temporary legislative majorities and to "banish speculations on public measures, inspire a general prudence and industry, and give a regular course to the business of society." THE FEDERALIST NO. 44 (James Madison).

the 287(g) Law is unreasonable or unnecessary to serve Virginia's important governmental purposes – namely, ensuring transparency, accountability, and public safety in civil-immigration enforcement partnerships." MTD at 19. Moreover, Virginia alleges that the complaint contains "no allegations undermining the Commonwealth's stated policy rationale." *Id.* at 20. Virginia flips Rule 12(b)(6) on its head by requiring the United States to clairvoyantly predict what ad hoc purposes Virginia might conjure up in litigation and then pre-rebut them in the complaint. That is not the role of a motion to dismiss. And Virginia's conclusory listed purposes are not in the text of the law. Virginia offers nothing more than a post-hoc rationalization of its law which conflicts with the contemporaneous evidence and text of the law itself. *See* ECF 56 at 7-9 (discussing the evidence that refutes Virginia's purported purpose for the 287(g) Law). And because the text of the law does not reflect these alleged purposes, even if the purposes were deemed legitimate, the impairment is not "of a character appropriate to the public purpose." *Energy Rsrvs.*, 459 U.S. at 412. Virginia cites no statutory text, legislative history, or contemporaneous statements of legislators to show that these alleged purposes are in fact the reasons behind the law. Its post-hoc rationalizations should be rejected. *See Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 859-60 (8th Cir. 2002) (refusing to credit post-hoc articulation of public purpose that conflicted with the evidence). It is thus improper to dismiss the complaint based on such ad hoc assertions.

Regardless, the complaint refutes Virginia's claims. *See* Compl. ¶¶ 80-83. For example, the complaint discusses several purported purposes Virginia may claim justifies the 287(g) Law, including state funding, *id.* ¶ 82, and resource concerns, *id.* ¶ 83. The complaint then articulates that "the only basis for Virginia to effectively ban all existing 287(g)s is because of disagreements with the Federal government's immigration policies." *Id.; see also* ECF 22 at 2. That is neither a significant nor legitimate purpose. The same is true of Virginia's post-hoc transparency and

accountability goals; it is not clear how the law could further those goals nor is it clear how it is proper for a state to try and force its vision of transparency and accountability on federal officers. *See* MTD at 19. Nor is it apparent how eviscerating law enforcement cooperation could possibly further Virginia's now-stated goal of public safety. *See id.* Immigration is a purely federal function. Because the 287(g) Law impedes federal immigration enforcement, an area that is not historically subject to legislation by Virginia, the public purpose requiring its impairment must be extremely significant to pass constitutional muster. *See Energy Rsrvs.*, 459 U.S. at 411. Virginia's political disagreements are not a basis to void preexisting contracts or to obstruct a congressional scheme. And because Virginia has legislated in its own self-interest to specifically target the 287(g) agreements, the Court may not simply defer to the legislature's purported public purpose. *See U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 26 (1977) ("[C]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake."). Given that the 287(g) Law lacks any valid public purpose, its wholesale invalidation of longstanding agreements expressly contemplated by Congress is not justified.

Finally, even assuming that the 287(g) Law had a legitimate and significant purpose sufficient to warrant the termination of all 287(g) agreements in Virginia, it must be tailored to meet that purpose based on reasonable, limited conditions. *See Energy Rsrvs.*, 459 U.S. at 412 ("[T]he next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'") (quoting *U.S. Tr. Co.*, 431 U.S. at 22). The 287(g) Law's invalidation of all existing agreements absent the imposition of onerous conditions is far from reasonable and appropriate to address the supposed public purpose justifying its enactment. *Cf. U.S. Tr. Co.*, 431 U.S. at 29–30 ("[I]t cannot be said that total repeal . . . was essential; a less

drastic modification would have permitted the contemplated plan without entirely removing the . . . limitations . . ."). There is no justification for such an extreme measure. The 287(g) Law therefore violates the Contract Clause and is invalid, and Count III withstands dismissal.

**IV. The 287(g) Law is Preempted by Federal Law and Invalid**

The United States stated a claim that the 287(g) Law is conflict preempted. The preemption doctrine provides that federal interests trump state interests when federal and state law "clash." *North Dakota*, 495 U.S. at 435. A state law is naturally preempted to the extent of any conflict with a federal statute. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 366, 372 (2000). Moreover, a state law may not stand as an obstacle to the accomplishment of a federal objective. *United States. v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013). The 287(g) Law does just that.

8 U.S.C. § 1357(g)(1) reflects Congress's considered judgment that DHS may enter into written agreements with states and localities under which qualified state or local officers may perform specified "function[s] of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States" under federal supervision. 287(g) agreements were intended "to deputize local law enforcement officers to perform immigration enforcement activities pursuant to a written agreement," namely to assist in arrests, issue detainers, detain and transport aliens, gather evidence, and prepare Notices to Appear. *United States v. Alas*, 63 F.4th 269, 274 (4th Cir. 2023) (quotation omitted); *see* 8 C.F.R. § 287.5. "Under these agreements, state and local officials become de facto immigration officers, competent to act on their own initiative." *City of El Cenizo v. Texas*, 890 F.3d 164, 180 (5th Cir. 2018). Congress thus created a cooperative enforcement framework designed to expand federal immigration enforcement capacity through voluntary state participation, while ensuring that the scope of delegated authority would be defined by federal law.

By passing a law that precludes entry into 287(g) agreements because of its onerous conditions, and by requiring termination of all such existing agreements, Virginia obstructs the ability of the Federal Government to "deputize" willing local law enforcement, thereby frustrating Congress's objectives. *Alas*, 63 F.4th at 274. Indeed, conflict preemption asks whether state law, as authoritatively construed and applied, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Here, the 287(g) Law is a complete obstacle to the possibility of 287(g) agreements within the State, for as long as the law is on the books. That is because the law imposes onerous and illegal conditions on federal agents, including requirements that dictate what federal agents must wear, where they may operate, what laws they must comply with, what legal jurisdiction they are subject to, and how they may conduct investigations. Such provisions regulate federal officers in the performance of their official duties, which is impermissible, and discriminate against such officers and against federal immigration enforcement generally. By requiring such impossible conditions, the 287(g) Law in practice bars 287(g) agreements in Virginia.

While state law has some role in regulating local law-enforcement agencies that enter into 287(g) agreements, it cannot functionally ban such agreements by prohibiting all of the underlying conduct that such agreements authorize. Again, the agreements deputize local law enforcement to "become de facto immigration officers, competent to act on their own initiative." *El Cenizo*, 890 F.3d at 180. In doing so, local law enforcement gains new authorities to assist in federal immigration enforcement. And they "shall be considered to be acting under color of *Federal authority* for purposes of *determining the liability, and immunity from suit*, of the officer or employee in a civil action brought under Federal or State law." 8 U.S.C. § 1357(g)(8) (emphasis added); *Silva v. United States*, 866 F.3d 938, 942 (8th Cir. 2017). So, 287(g) deputizes local law

enforcement and grants them new authorities and immunities. States cannot completely obstruct that mechanism by effectively banning all the functions that Congress intended the agreements to confer.

The voluntariness of 287(g) agreements makes no difference to the analysis. Virginia may not disable the very custodial authority that Congress made available if local law-enforcement agencies chose to participate. *City of New York*, 179 F.3d at 35. Voluntariness addresses whether participation is compelled; it does not authorize a State to redefine or nullify the substance of a federal program in a manner that renders participation functionally impossible. Doing so impedes the Federal Government's ability to deputize willing participants. As the Supreme Court has made clear, even if federal law does not compel state participation, state measures are preempted when they threaten to frustrate federal statutory objectives or undermine the operation of a federal scheme. *Crosby*, 530 U.S. at 366, 373-74.

Virginia cites *McHenry* and *United States v. New York* to argue that preemption requires a mandatory law. MTD at 20-21. The Second Circuit's reasoning in *City of New York* is more persuasive:

> The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.
>
> We therefore hold that states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs.

179 F.3d at 35 (citing *Barnett Bank v. Nelson,* 517 U.S. 25, 31 (1996)). Virginia's law either regulates federal officers or completely bans a cooperative program created by Congress. As the

Second Circuit made clear, such general bans on cooperation by States are preempted. *Id.* The outright ban creates an obstacle and significantly impedes federal operations. Compl. ¶¶ 113-27.

Regardless, Virginia reads *McHenry* and *United States v. New York* too broadly. The question is not whether a law is mandatory or permissive. Courts have often upheld instances of cooperative federalism, in which states can voluntarily choose to participate in a federal program, but such participation may come with federally-imposed conditions. *See Murphy v. NCAA*, 584 U.S. 453, 476 (2018) (describing precedents upholding such "cooperative federalism" programs). Here, Virginia has blocked the federal scheme in its entirety—a scheme localities in Virginia participate in—by imposing onerous conditions on federal agents and agencies as a prerequisite for entering a 287(g) agreement—conditions to which the Federal Government cannot agree. The 287(g) Law is conflict preempted, and Virginia's motion to dismiss Count IV should be denied.

**CONCLUSION**

For the foregoing reasons, this Court should deny Virginia's 12(b)(6) Motion to Dismiss Plaintiff's Complaint in its entirety.

DATED: August 14, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

THEOPHANI K. STAMOS
First Assistant United States Attorney

*/s/ Gerard Mene*
GERARD MENE
Assistant United States Attorney
Eastern District of Virginia
Counsel for the United States
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3777
Facsimile: (703) 299-3983
Gerard.Mene@usdoj.gov

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

TIBERIUS DAVIS
Counsel to the Assistant Attorney General

JACQUELINE COLEMAN SNEAD
Deputy Director

ALEXANDRA MCTAGUE SCHULTE
Senior Litigation Counsel

By: *s/ Alessandra Faso*
ALESSANDRA FASO
Senior Litigation Counsel
U.S. Department of Justice Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
202-451-7728
Alessandra.faso@usdoj.gov