**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA,

Plaintiff,

v. Civil Action No. 3:26-cv-545

COMMONWEALTH OF VIRGINIA,

Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on the COMPLAINT (ECF No. 1) and its exhibits (ECF Nos. 1-1 and 1-2); PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (the "PI MOTION") (ECF No. 8); the MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 9) and the exhibits thereto (ECF Nos. 9-1 through 9-4); COMMONWEALTH'S ATTORNEY STEVE DESCANO'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF No. 21);[1] DEFENDANTS COMMONWEALTH OF VIRGINIA AND JAY JONES' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 22) ("VIRGINIA RESPONSE") and the exhibits thereto (ECF Nos. 22-1, 22-2 and 23); and the REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION ("US REPLY") (ECF No. 24). For the reasons set forth below, the PLAINTIFF'S MOTION

[1] By ORDER entered June 29, 2026 (ECF No. 28), the Complaint was dismissed with respect to the Defendant, Steve Descano, in his official capacity as Commonwealth Attorney.

FOR A PRELIMINARY INJUNCTION (ECF No. 8) was granted with respect to the enforcement of Va. Code § 19.2-83.6:2 (ECF No. 80).[2]

## BACKGROUND

### The Challenged Virginia Law

On May 20, 2026, citing concerns that federal law enforcement officers were "undercut[ting] basic expectations of accountability, sow[ing] fear and confusion, and erod[ing] the public trust," Governor Abigail Spanberger signed the Mask/Identity Law.[3] The Mask/Identity Law makes it a misdemeanor for a "law-enforcement officer" to "wear a facial covering that conceals, obscures, or otherwise covers his face while such law-enforcement officer is engaged in the performance of his official duties." Va. Code §§ 19.2-83.6:2(B), (E).

A "law-enforcement officer" includes both state and federal law enforcement officers. Va. Code §§ 19.2-83.6:2(A); Va. Code § 9.1-101.[4] A "facial covering" is "any opaque mask . . . or other

---

[2] To the extent that the PI MOTION and the briefs address Va. Code § 15.2-1726.1, those issues are proceeding on a different briefing schedule and set for a hearing on August 3, 2026. This MEMORANDUM OPINION does not address that code section or the request to enjoin its enforcement.

[3] ECF No. 15-1, 4; Governor Spanberger Acts on Legislation, Responds to Increased, Aggressive Federal Immigration Enforcement with Executive Order, Off. of Governor of Va.: News Releases (May 20, 2026), https://www.governor.virginia.gov/newsroom/news-releases/2026/may-releases/name-1118176-en.html [https://perma.cc/U5P5-VZ92].

[4] Va Code § 9.1-101 was amended as of July 1, 2026, but the amendments did not relate to the definition of "law-enforcement officer." HB 862, 2026 Gen. Assemb., Reg. session, (Va. 2026).

item or device whereby a substantial portion of the face is hidden or covered to conceal the identity of the wearer." Va. Code § 19.2-83.6:2(A). But, "sunglasses or prescription eyewear" do not constitute "facial covering[s]" as long as most of the face is visible. Id.

The Mask/Identity Law provides eight exceptions to the ban, including for facial coverings used during SWAT duties, facial coverings necessary for underwater use, and facial coverings when necessary to "protect against exposure to any toxin, gas, smoke . . . or other hazardous or harmful environmental condition." Va. Code § 19.2-83.6:2(C). There is also an exception for undercover drug, gang, or surveillance unit officers if the protection of the officers' identity is necessary as determined by the law-enforcement agency for which the officer works. Va. Code § 19.2-83.6:2(C)(8). "Law-enforcement agency" is defined as "any agency or department responsible for the prevention and detection of crime and the enforcement of the penal, traffic, or highway laws of the Commonwealth." Va. Code § 19.2-83.6:2(A). As the United States points out, this appears to apply only to Virginia law enforcement and would exclude federal law enforcement officers. ECF No. 9, 15. Virginia does not meaningfully address this issue, instead reiterating that the Mask/Identity Law applies to all law enforcement officers. ECF No. 22, 17-18. But, that is not the point. The question is whether the exceptions apply to federal law

enforcement. The exceptions rely on a determination by a law enforcement agency that controls that officer. Under Virginia's statute, a law enforcement agency is only an agency that enforces Virginia law (i.e., not the federal government).

The Mask/Identity Law also requires law enforcement officers to "visibly display" both a "badge or insignia" with the name or "other individual identifier," and an identification of what law-enforcement agency the officer works for. Va. Code § 19.2-83.6:2 (D). That aspect of the law also regulations additional details about the identification requirement.

The Mask/Identity Law offers a safe harbor for officers who work for law enforcement agencies that have "adopted and established a written policy for the use of facial coverings" similar to the Department of Criminal Justice Services' policy. Va. Code § 19.2-83.6:2(E). No federal agency has established such a policy. Nor, does it appear, has Virginia.

**Enactment of the Virginia Law and Filing of This Action**

The Senate and House of the General Assembly of Virginia enacted the Mask/Identity Law on March 30 and 31, 2026, respectively. ECF No. 15-1, 5. On April 12, 2026, Governor Spanberger returned the bill to the General Assembly with recommendations for modification. Id. After the legislation was modified, the Governor ultimately signed the Mask/Identity Law on May 20, 2026. ECF No. 1-1, 1. On June 11, 2026, the United States

filed the COMPLAINT, which alleges six counts against the Commonwealth of Virginia related to its passage of the Mask/Identity Law and another statute, Va. Code § 15.2-1726.1 (the "287(g) Ban"). See ECF No. 1. Count I alleges that the Mask/Identity Law is an unlawful regulation of the federal government and violates the supremacy clause. See id. at 41-42.[5] On June 17, 2026, the United States filed the PI MOTION (ECF No. 8), which seeks to stop enforcement of the Mask/Identity Law until the Court can rule on a permanent injunction. The PI MOTION relies on the claim in COUNT I. Because the Mask/Identity Law was to take effect on July 1, 2026, the proceedings on the PI MOTION were expedited.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their]

---

[5] COUNT II alleges that the Mask/Identity Law discriminates against the Federal Government, COUNT III alleges that the 287(g) Ban violates the Contract Clause, COUNT IV alleges that the 287(g) Ban is conflict preempted, COUNT V alleges that the 287(g) Ban violates the intergovernmental immunity doctrine, and COUNT VI alleges that the 287(g) Ban discriminates against the Federal Government. See ECF No. 1, 42-46.

favor, and that an injunction is in the public interest.". Am. Fed. Of State, Cnty. & Mun. Employees AFL-CIO v. Soc. Sec. Admin., 172 F.4th 361, 366 (4th Cir. 2026) (quoting Winter, 555 U.S. at 20). The third and fourth factors merge when the Government is a party. Nken v. Holder, 556 U.S. 418, 435 (2009); see also Am. Fed'n Tchrs. v. Bessent, No. 25-1282, 2025 U.S. App. LEXIS 8229, at *11 (4th Cir. Apr. 7, 2025); Nova Distro, Inc. v. Miyares, Civil No. 3:25cv857, 2025 U.S. Dist. LEXIS 262228, at *11 (E.D. Va. Dec. 18, 2025).

**FINDINGS OF FACT**

The COMPLAINT and the PI MOTION start temporally with the enactment of Va. Code § 19.2-83.6:2, "prohibition on wearing a facial covering; penalty" which was enacted by the General Assembly in the end of March, 2026, signed into law by Virginia's Governor on May 20, 2026, and which was to take effect on July 1, 2026. However, as made clear in the VIRGINIA RESPONSE and the declaration filed with it (ECF No. 22-1), the enactment of the statute was the response of Virginia to antecedent events. In particular, according to Virginia, "[a]cross the country, communities have experienced a deepening mistrust of law enforcement as reports have proliferated of masked unidentified individuals conducting immigration-related operations—often in ways indistinguishable from criminal activity." ECF No. 22, 5 (emphasis added). So, according to Virginia, "many community members, including U.S.

citizens, have been swept into these masked enforcement actions, further heightening fear and eroding confidence in legitimate police activity." Id. And, then Virginia says that the concerns thereby evinced were "further intensified by the widely reported killings of U.S. citizens Alex Pretti and Renee Good." Id. The result was that, in Virginia, immigrant neighborhoods "were particularly destabilize[ed] . . . where residents increasingly struggled to distinguish legitimate law enforcement from impersonators and became less willing to report crimes or cooperate with investigations." Id. (citations to newspaper articles omitted).

In further explanation of why the Mask/Identity Law was enacted, Virginia tells that "[i]n 2026, the Virginia General Assembly enacted the Mask Law in response to growing public concern about the use of facial coverings and the lack of visible identification by law-enforcement officers operating within the Commonwealth." Id. at 6 (citations omitted). So, "[t]he General Assembly acted against a national backdrop in which several high-profile federal immigration-enforcement operations drew widespread attention for the use of masked or unidentified officers in civilian settings." Id. at 7 (emphasis added). The VIRGINIA RESPONSE then cites to such events in Portland, Oregon, Philadelphia, Pennsylvania, and New York, New York. Id. And, we are also informed that:

> Although these events occurred outside the Commonwealth, they contributed to a broader climate of mistrust surrounding masked or unidentified federal officers and reinforced legislative concerns about transparency and public safety. The Mask Law was designed to address those concerns by ensuring that all officers operating in the Commonwealth—including federal personnel—are identifiable and subject to uniform transparency requirements intended to promote safety, accountability, and public confidence.

Id. at 9 (emphasis added).

Therefore, "[c]onfronted with these escalating public safety concerns, the General Assembly" enacted Virginia Code § 19.2-83.6:2 "to restore clarity, accountability, and public confidence in policing—fundamental responsibilities of state government." Id. at 6. But, by its own telling, it was not the conduct of Virgina's law enforcement officers that the Virginia sought to change and control. Rather, the objective of the new law was to alter the way that federal law enforcement officers enforced federal immigration law.

Those recitations, however, omit a pertinent part of the history and context for the enactment of the Virginia law, the case that is presented by the COMPLAINT, and the PI MOTION. So, we will briefly pause to provide that history and context which neither party overtly mentions but which quite clearly provides the predicate, not only for the enactment of statute at issue here,

but also for the federal enforcement of federal immigration law which that statute seeks to alter.

A 2024 release from the House Committee on Homeland Security, citing U.S. Customs and Border Protection ("CBP") statistics provide a good starting point for the context.[6] For example, the number of border encounters between CBP and those persons ineligible for admission (on a nationwide basis) between fiscal year ("FY") 2017 and FY 2020 was 3.004 million. Id. From FY 2021 through FY 2024 that figure rose to 10.8 million. Id. Those so-called "inadmissible encounters" at the southwest border for the same period rose from 2.37 million to 8.72 million. Id. The report refers also to "known gotaways." Id. That figure refers to people ineligible for admission who crossed the border, but who were not refused admission. On a nationwide basis, that figure for FY 2017 to FY 2020 was 521,247. From FY 2021 to FY 2024, that figure rose to 2 million. Id. Apprehensions by the border patrol of illegal aliens who were on the terrorist watch list also rose. From FY 2017 to FY 2020 the figure was 14. Id. So, from FY 2021 to FY 2024 the figure was 392. Id. Likewise, the border patrol arrests of illegal aliens with criminal backgrounds increased from 21,936

[6] Chairman Green on September Border Encounter Numbers: "We Simply Cannot Go On Like This As a Country," Comm. on Homeland Sec.: News (Oct. 22, 2024), https://homeland.house.gov/2024/10/22/chairman-green-on-september-border-encounter-numbers-we-simply-cannot-go-on-like-this-as-a-country/ [https://perma.cc/PW88-3UKX].

during the period of FY 2017 to FY 2020 to 55,106 during the period of FY 2021 to FY 2024. Id.

It is no secret that immigration was a central issue in the 2024 presidential campaign. Likewise, it is well-known that shortly after the new president was inaugurated in 2025, immigration enforcement increased significantly. It is that increased immigration enforcement activity to which the previously cited provisions of the VIRGINIA RESPONSE refer.

The description of the context for the enactment of the Virginia law and this case would not be complete without understanding that, in the wake of the increased enforcement of immigration laws by ICE as directed by the current administration beginning in 2025, there arose resistance from individuals and groups who were opposed to: (1) objectives (principally deportation) of federal immigration laws and to the operational methods employed by ICE to enforce the immigration laws; and (2) to the new administration's efforts to address the immigration situations that had been a central part of the 2024 presidential campaign. The record in this case shows that, with increased enforcement activity and the resistance thereto, there came to be "increasingly common threats of targeted harassment of and retaliation against federal immigration officers for simply doing their jobs." ECF No. 9-1, ¶ 33. In particular, it is shown by the affidavit of Eric S. Weiss, the Deputy Field Office Director for

the United States Department of Homeland Security, United States Immigration and Customs Enforcement, Enforcement and Removal Operations ("ERO") division, that:

> Individuals, including immigration activists and other members of the public, routinely photograph, film, and publish online ICE ERO enforcement actions to include the personal identities of ICE officers and other federal task force personnel. The photographs and films are posted online for the sole purpose of intimidating and harassing government employees and are directly used by members of local organized crime and transnational criminal organizations in serious and potentially deadly ways.

ECF No. 9-1, ¶ 34. That activity is commonly referred to as "doxxing."

According to Weiss, "ICE personnel regularly observe and overhear individuals shouting phrases such as 'doxx these people,' 'find out who they are and where they live,' and 'we will find out who you are and who your family members are.'" Id. ¶ 35. Weiss also avers that there is credible intelligence showing that Mexican criminals coordinating with domestic extremist groups:

> have placed targeted bounties for the murders of ICE and CBP personnel in a tiered bounty system. Cartels have disseminated a structed bounty program to incentivize violence against federal personnel, with payouts escalating based on rank and action taken.

Id. at ¶ 37. The bounty system includes $2,000 "for gathering intelligence or doxxing ICE officers," $5,000 to $10,000 "for kidnapping or non-lethal assaults on standard ICE/CBP" officers

and agents, and up to $50,000 "for the assassination of high-ranking officials." Id.

According to the record, "[d]oxxing of ICE officers/agents has also been encouraged across the web." Id. ¶ 39. For example, "ICESpy.org, ICEList.is, and ICEList.info" are sites that "perpetrat[e] the doxxing of ICE staff and contractors." Id.

Also, some who oppose the current modes of enforcing the immigration laws take pictures of ICE officers' faces and run those pictures through facial recognition applications so that the pictures can be searched through social media. Id. ¶ 40. Experience has shown that, when an identification of the officer is thereby made, the search continues to identify the ICE officers' family members and to locate the homes of the agents. Id. Those findings are then posted on the anti-ICE websites which urge harassment of the ICE officers and interference with them in the conduct of their jobs in enforcing immigration laws. Id.

These documented practices occur all over the country. And, the record shows that ICE officers in Richmond have noticed that individuals camp out in the parking lots of the field office location in Richmond to take pictures of the ICE personnel and their vehicles and license plates and following them when they leave the building. Id. The pictures and information are then posted on social media websites such as X. Id.

Those practices are not confined to ICE officers. The Declaration of Matthew W. Allen, the Chief of Operations for the Drug Enforcement Administration ("DEA") tells that the DEA special agents who sometimes help enforce immigration laws, alongside ICE officers, have reported that members of the media and the public often take both still photos and videos of the agents which can be shown on media outlets or social media websites. ECF No. 9-2, ¶ 15. Allen provides one example in which a DEA special agent image was posted on a social network with the caption "[t]rying to identify any of these FBI, Homeland Security, and ATF goons who invaded a Minneapolis community to kidnap and terrorize its members." Id. ¶ 16.

According to the Declaration of Justin Hargis who is employed by U.S. Customs and Border Protection ("CBP"), a part of the Department of Homeland Security ("DHS"), as the Executive Director for the Investigative Operations Directorate, who oversees approximately 500 criminal investigators charged with investigating, inter alia, threats to employees and doxxing involving DHS employees:

> CBP, including OPR, has received a marked increase in reports of threats against law enforcement agents and officers and other CBP employees since January 2025 associated with increased operations and the public's perception of CBP's involvement in ongoing DHS enforcement initiatives.

ECF No. 9-4, ¶¶ 3, 6. Hargis also reports that along with the increased enforcement activity and the increased protests, there has been a significant increase in reported assaults on CBP officers and agents in fiscal year 2025 over those in fiscal year 2024 (457 to 856). Id. ¶ 6. Partway through fiscal year 2026, there have been 1,164 assaults of CBP officers and agents. Id. Hargis reports that threats "increasingly take[] the form of posts and messages on social media, in group chats, and elsewhere that reveal personal identifiable information of CPB employees such as home address and personal phone numbers" (i.e. doxxing). Id. "Modern technology and the current political environment have made it easier for bad actors to find and widely distribute personal information about [ICE] officers" and increasing efforts are made to intimidate the employees and to interfere with their ability to carry out their job responsibilities. Id. ¶ 7. Hargis gives many examples that illustrate that the doxxing, death threats, threats of kidnapping and assaults are very real in the lives of all ICE enforcement agents. Id. ¶ 9.

Like many law enforcement organizations, such as the DEA and the FBI, ICE officers often use surveillance techniques which will not work if the law enforcement officers visibly identify the organization(s) with which they are associated. ECF No. 9-1, ¶ 44. Additionally, ICE officers, like agents in the DEA and the FBI, engage in undercover work where identification of their law

enforcement affiliation would jeopardize both their mission and their safety.

Accordingly, "[w]earing facial coverings or otherwise protecting the personal identities of immigration officers can be essential to mitigating" the threats previously identified and to accomplishment of the law enforcement mission. Id. ¶¶ 41-44. The DEA also permits using facial masking and/or concealing the identity of its officers when conducting their operations. ECF No. 9-2, ¶ 19.

As the Executive Director for the Investigative Operations Directorate at DHS explains, "the rise of doxxing, the advancement of facial recognition technologies, and the proliferation of bad actors on social media, has created an unprecedented operational risk for federal law enforcement officers." ECF No. 9-4, ¶ 14. Thus, "[p]ermitting officers and agents to cover their faces or remove visible identifying information from their uniforms helps to reduce the risk of doxxing by limiting the ability of facial recognition technology to identify the officer or agent and by reducing the likelihood that the officer or agent's full name and other identifying information will be discovered by those seeking to dox CBP personnel." Id.

Of course, those who oppose the actions of Government in enforcing the immigration laws are free to protest against the laws and the way they are enforced. But, the law does not permit

protesters, when doing so, to endanger the lives or safety of the law enforcement officers who are enforcing those laws. Nor may the protesters interfere with the enforcement of the law.

Those prohibitions notwithstanding, protesters, from time to time, violate those limits on the right to protest. And, in so doing, they sometimes violate the criminal law and are subject to prosecution. More importantly for today's case, law enforcement agencies are permitted to take measures to protect the lives and safety of their officers and to eliminate or reduce the adverse effects on enforcement of the law that ensue endangerment to officers who are tasked with enforcing the law.

And, so it was that the practical realities of enforcing the immigration laws prompted federal authorities responsible for enforcing the nation's immigration laws to authorize their officers to use masks to conceal the identity of the officers so that they can be protected in the performance of their jobs (and thereafter) and so that they can effectively and efficiently perform their jobs. In like fashion, removing organizational identification from their clothing further facilitates those objectives, protection and operational effectiveness.

Virginia attempts to meet the showing made in the declarations submitted by the United States by relying on the Declaration of Scott Schuchart, a consultant who asserts that he has general expertise in the field of immigration enforcement and law

enforcement policy based on his work within the Department of Homeland Security and his practice of law in private practice after having left government service. ECF No. 22-1, ¶¶ 2-7. Schuchart agrees that the routine use of identity-concealing masks and removal of visible individual identifiers during public-facing immigration enforcement was not standard ICE practice before 2025. Id. ¶ 11.

Shuchart does not refute the substance of the declarations offered by the United States that show increase in doxxing, threats, assaults, or the bounty system. Nor does he take issue with the adverse effects on enforcement of the law described in those declarations. Rather, he offers solutions other than those adopted by the federal immigration authorities. And in his view officer-safety concerns can be addressed through "written policies, supervisory risk assessments, officially issued equipment, and limited exceptions for undercover, surveillance, tactical, medical, and other sensitive circumstances, rather than ad hoc disguises left to officer discretion." Id.

To begin, that conclusion misstates the practices and policies of ICE. It is true that there is discretion not to use masks and not to remove identifiers in circumstances, depending on the situation to be confronted by ICE officers when enforcing the immigration laws. That discretion is not a basis to discount the need to wear masks or remove identifiers when the situation calls

for it. And, in any event, the permitted discretion enables the federal officers to respond to real-time conditions, some necessitating identity concealment, some not. Moreover, Schuhart does not explain how written policies, supervisory risk assessments, and officially issued equipment would have any effect on reducing the risks and safety concerns that he acknowledges regularly attend the efforts of ICE officers in enforcing the immigration laws.

To the extent that Schuhart expresses the opinion that the declarations filed by the United States "do not show that routine masking or withholding of unique identifiers is necessary across ordinary public-facing enforcement operations," that is a matter to be decided by the Court and Schuchart's opinion is not helpful to the finder of the fact. Id. at ¶ 11. To the extent that Schuhart's opinion is that "ad hoc masking and lack of visible agency or individual identifiers can increase public-safety risks by creating confusion, increasing the risk of impersonation, impeding oversight, and escalating encounters," that is a matter that falls within the discretion of the federal authorities charged with enforcing the law. Id.

As a general proposition, the Court does not credit Schuchart's testimony. Much of it is ipse dixit. In any event, the Court finds that Shuchart's reasoning and conclusions are ill-thought out, presented in conclusory fashion, and are not really

documented. They are not helpful to the fact finding task of the Court or to understanding any issue in the case.

His opinions on the quality of the evidence offered by the United States, as in ECF No. 22-1, ¶¶ 27, 28, and 29, are of no help to the finder of the fact because they are speculative and really are based on a lack of his admitted clear understanding of what is being discussed. Likewise, in ¶ 31, Schuchart expresses the opinion that he is "unaware of any officer safety or privacy reason to fail to display a badge number or similar identifier, even in circumstances where an officer's own name could present some risk of exposure." The fact that he is unaware actually disqualifies him from expressing a credible opinion. Moreover, he generally ignores the evidence of doxxing and the effect thereof that is set forth in the affidavits submitted by the United States. To the extent that he opines that the wearing of masks enables imposters to act, his opinions reflect the weighing of factors pertinent to the policy decision to authorize the use of masks and identifying uniforms. Id. at ¶¶ 38-42. Those decisions belong with the policymaker, here, the federal government.

In ¶ 43 of his declaration, Schuchart says that "it is hard to see how doxxing from publicly-available facial recognition software is different in kind from other evolving risks to officers and agents, which are dealt with through policy, application of risk-management standards by supervisors, issuance of appropriate

body armor, and other ordinary law enforcement management tools." Id., ¶ 43. That opinion is vague. It does not identify the other "evolving risks" and it utterly ignores how doxxing is unique in and of itself and how its risks are multiplied by the facts shown in the declarations submitted by the United States.

In sum, Schuchart does not help Virginia at all. The Court credits the testimony offered by Hargis and Weiss and the other submissions made by the United States and does not credit Schuchart.

When all is said, Virginia does not dispute most of the factual showings made by the declarations offered by the United States. Instead, Virginia bases its defense of the Mask/Identity Law on its policy views about the use of masks and identifying information. And, it relies on its police power to defend that law. For the reasons set forth below, the policy choice belongs to the federal government, not to Virginia. And, Virginia's police power cannot supplant the federal choice.

## CONCLUSIONS OF LAW

### I. Background

"E. Pluribus Unum." "Out of many, one." From July 4, 1776 until 1956, that was the motto of the United States of America.[7]

---

[7] Although it was replaced as a motto in 1956 by "In God We Trust," it remains on most coins and on the Great Seal of the United States. Great Seal of the United States, Britannica

It reflects the federal system of government pursuant to which the States agreed to establish a central government but also retained many powers. That foundational constitutional principle is at the core of the disputes in this case. It also guides the resolution of these disputes.

So, the analytical framework requires that we keep in mind that the Constitution delegates to the United States specific powers, and that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. And, as to powers delegated to the central government, Article I, Section 1 of the Constitution provides that: "All legislative Powers herein granted shall be vested in . . . Congress. . . ." (emphasis added). The Constitution delegates a specific power to the central government when it provides that: "[t]he Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization. . . ." U.S. Const. art. I § 8 cl.4 (emphasis added).

In so doing, the Founders deliberately removed the power of naturalization from the several states which, at the time of the founding, had diverse (and some objectionable and doubtful) rules respecting naturalization. So it was that Congress was accorded

---

https://www.britannica.com/topic/Great-Seal-of-the-United-States [https://perma.cc/4ULR-EY54].

the exclusive power over naturalization.[8] Conversely, nothing in the Constitution mentions, or conceives of, a role for the States in implementing or enforcing federal immigration law. Therefore, as the Supreme Court has explained, the federal government has "broad, undoubted power over the subject of immigration and the status of aliens," Arizona v. United States, 567 U.S. 387, 394 (2012), and an inherent obligation and broad authority to establish immigration laws, see id. at 394-95; Fiallo v. Bell, 430 U.S. 787, 792 (1977).

Congress exercised its authority to make laws governing the entry, presence, status, and removal of aliens when it enacted provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq. The INA confers upon Executive agencies extensive authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. See 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231. The INA also authorizes the Secretary of Homeland Security to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of [the INA]." 8 U.S.C.

---

[8] Thomas H. Calvert, Notes on the Constitution in 1 The Constitution and the Courts 737 (Edward Thompson Co. ed., 1924).; William Winslow Crosskey, 1 Politics and the Constitution in the History of the United States, (1953).

§ 1103(a)(3). The States cannot obstruct or take discriminatory action against the execution of those laws, see Arizona v. United States, 567 U.S. at 394-95; North Dakota v. United States, 495 U.S. 423, 435 (1990) (plurality); id. at 444-47 (Scalia, J., concurring), because only the federal government maintains the authority to grant an alien the privilege to enter our Nation and controls the terms and conditions of such privilege, see U.S. Const. art. 1 § 8 cl.4; Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 419 (1948).

**II. Pre-Enforcement Standing**

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. The Article III limitation, referred to as the doctrine of "standing," is a prerequisite to the resolution of any issues in every federal case. Article III standing requires "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision" Susan B. Anthony List v. Dreihaus, 573 U.S. 149, 159 (2014) (citation omitted) (citation modified).

The inquiry is slightly different when the case seeks relief from a law which is not yet in effect. In that case, a plaintiff must show (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) "proscribed

by a statute," and (3) the existence of "a credible threat of prosecution thereunder." Id. at 159; see also First Choice Women's Res. Ctrs., Inc. v. Davenport, 608 U.S. ----, 146 S. Ct. 1114, 1122 (2026). The plaintiff does not have to be arrested or prosecuted for Article III standing. Driehaus, 573 U.S. at 159.

Here, federal law enforcement agencies (ICE, DEA, and the FBI) intend to continue to direct their officers to wear masks as is called for by the situation, which they believe is within their sovereign authority to do. ECF No. 9, 20; ECF No. 9-2, ¶ 20; ECF No. 9-1, ¶ 62; ECF No. 9-3, ¶ 17. Officers who choose to wear a mask or not wear identification, or both, all of which is permitted by the policy of the federal government will be violating the Mask/Identity Law. Finally, there is a credible threat of prosecution. Virginia declined to disavow enforcement of the Mask/Identity Law once it became effective on July 1, 2026, and there is no reason to believe Virginia will not enforce the law it passed in May.

Virginia does not challenge pre-enforcement standing. And, the Court finds that the requirement is satisfied.

**III. Likelihood of Success on the Merits**

The threshold issue in the preliminary injunction analysis is whether Plaintiffs have shown they are likely to succeed on the merits. As presented in the PI MOTION, that issue is focused on the Mask/Identity Law as attacked in COUNT I. Specifically, the

United States argues that the Mask/Identity Ban impermissibly regulates the Federal Government.[9]

It is well-established that, pursuant to the Supremacy Clause, the States cannot control the activities of the federal government. McCulloch v. Maryland, 17 U.S. 316, 436 (1819). That principle, called the "intergovernmental immunity doctrine," has been interpreted to mean that the States cannot (1) directly regulate the federal government, or (2) discriminate against it. United States v. Washington, 596 U.S. 832, 838-39 (2022).

The United States argues that the Mask/Identity Law directly regulates ICE's enforcement of the federal immigration laws. The United States relies heavily on the decision in United States v. California, 173 F.4th 1060 (9th Cir. 2026). The Ninth Circuit's analysis focused on California's mandate of "visible display of identification" for law enforcement. Id. at 1064.[10] As the Ninth Circuit correctly explained, there is a direct regulation of the government where a state law, "lays hold of federal officers in their specific attempt to obey orders and requires qualifications in addition to those that the [federal] Government has pronounced

---

[9] In COUNT II of the COMPLAINT, the United States also alleges that the Mask/Identity Law discriminates against the Federal Government, but that argument does not appear in the PI MOTION. See ECF No. 1, ¶¶ 143-150. Therefore, the Court will only consider the issue raised in the PI MOTION.

[10] The district court found that the mask component of California's law discriminated against the Federal Government. That finding was not appealed. United States v. California, 173 F.4th at 1065 n.4.

sufficient." Id. at 1067 (quoting Johnson v. Maryland, 254 U.S. 51, 57 (1920)) (citation modified).

In Johnson, the Supreme Court held that a federal postal service employee could not be convicted of violating a state law that required drivers in the state to have a state driver's license because doing so would "lay[] hold of" employees and require additional qualifications the Federal Government did not have for its own employees. Johnson, 254 U.S. at 55-57. When so doing, the Supreme Court distinguished state laws like driver's license requirements from a "general rule[]" that "incidentally" might affect "the mode of carrying out the employment" (citing "the mode of turning at the corners of streets" as an example of a permissible law). Id. at 56. Applying, Johnson, the Ninth Circuit concluded that the California identification requirement "requires qualifications in addition to those that the [federal] Government has pronounced sufficient." United States v. California, 173 F.4th at 1067 (citation omitted). In other words, California added requirements for federal officers to follow while conducting law enforcement activities, and thereby regulated the federal activity.

In United States v. Virginia, 139 F.3d 984, 986 (4th Cir. 1998), the Fourth Circuit found invalid a similar kind of state law that sought to regulate the FBI's use of private contractors by imposing hiring requirements beyond those that had been set by

the FBI. Such additional requirements do "not merely touch the Government servants remotely by a general rule of conduct; [they] lay[] hold of them in their specific attempt to obey orders and require[] qualifications in addition to those that the [federal] Government has pronounced sufficient." Id. at 988 (quoting Leslie Miller v. Arkansas, 352 U.S. 187, 190 (1956)) (cleaned up).

And, the same is true here. The Mask/Identity Law requires that federal law enforcement officers satisfy additional requirements placed on them by Virginia - identification requirements, and masking requirements - which are not required under federal law, and which the federal authorities specifically say they need not meet. That offends the principle of intergovernmental immunity that forecloses application of the State law here.

Virginia argues that intergovernmental immunity "is violated only when a state law forces the federal government to fundamentally alter or abandon its operations, not when it merely affects the manner in which federal employees carry out their duties." ECF No. 22, 11. But, the cases on which it relies for that contention do not support it. Both Geo Grp. v. Newsom, 50 F.4th 745 (9th Cir. 2022) and Geo Grp. v. Inslee, 151 F.4th 1107 (9th Cir. 2025) relate to state regulation of Federal Government contractors, not the Government itself. See Newsom, 50 F.4th at 750; Inslee, 151 F.4th at 1116. As Newsom and Inslee discuss, the

state may regulate contractors more than it may regulate the Government directly. Id.

Virginia also cites Texas v. DHS, 123 F.4th 186 (5th Cir. 2024) for its argument that a state law that incidentally affects immigration enforcement is valid under the Supremacy Clause. ECF No. 22, 13. That decision does not help Virginia. To begin, there was no state statute at issue there. Instead, Texas sued DHS for common law trespass and conversion, and APA violations, following damage done by DHS to concertina wire on Texas' state property. Id. at 193. The Fifth Circuit rejected the Government's state regulation argument because Texas was acting as a private proprietor, not as a regulator. And because Texas did not "seek to control how Border Patrol agents carry out their duties," Texas had not violated intergovernmental immunity. Id. at 206-207. In fact, Border Patrol officers cut the wire to allow the passage of migrants, not to conduct border enforcement. Id. at 207. Nor did the DHS Border Patrol officers cut the wire to access any land that it could not otherwise access. Id. In other words, Texas' suit did not seek to control any activity in furtherance of federal law enforcement activity because the Border Patrol officers did not cut the wire in furtherance of their operations.

Virginia appears to argue that the Mask/Identity Law is generally applicable and that, like Border Patrol officers in Texas v. DHS, the wearing of masks by federal law enforcement officers

is not acting in furtherance of their duties in enforcing federal law. To that end, Virginia points out that there is no federal policy that requires officers to wear masks or a written policy that gives ICE officers discretion to conceal their identities. ECF No. 22, 15; ECF No. 22-1, ¶ 20 (lack of written ICE policy on masks). But, the facts here are not at all like those in Texas v. DHS most importantly because, the claim in Texas v. DHS was not based on a state regulatory law, but upon common law trespass and conversion causes of action that could be maintained against a private citizen who had cut the wire. Like traffic laws about how to turn at a corner, the Texas claim was based on a generally applicable rule - no one could cut wire on Texas property. The only exception to that general rule was if the cutting occurred while a law enforcement officer was acting in pursuance of his duties, which, in Texas v. DHS, was not the case.

Here, in contrast, ordinary citizens are not allowed to engage in law enforcement activities. So, the state law here "does not regulate conduct that any ordinary citizen could perform." United States v. California, 173 F.4th at 1068.

Virginia also argues that, under the Constitution, states retains robust police powers, and that ensuring accountability, public trust, and safety are firmly within Virginia's police power. ECF No. 22, 12. It is correct that, under the Constitution, Virginia retained a police power that allows her to regulate the

conduct of her citizens and her law enforcement officers. But, Virginia cites no authority that would permit her to exercise her police power to regulate the constitutionally delegated federal power to enforce the federal immigration laws. Nor was the Court able to locate any authority to support such a proposition.

Finally, Virginia argues that the conduct of ICE's enforcement of the federal immigration laws while masked and while not wearing identifying garb or badges creates dangerous conditions that the Mask/Identity Law will remedy. That may or may not be correct depending on the circumstances presented during the enforcement of the federal law. But that argument is addressed to the wisdom of the federal policy. And settled law establishes that federal, not state, authorities make the policies that animate the enforcement of federal immigration laws. See, e.g., Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 419 (1948). Virginia cites no authority to the contrary.

For the foregoing reasons, the United States is likely to succeed on the merits of COUNT I.[11]

[11] The United States does not raise the issue of preemption in the PI MOTION. The United States also does not plead a claim of preemption as to the Mask/Identity Law. In the Complaint's Background Section, the United States cites two laws about law enforcement uniform, but that does not equate to a preemption claim. ECF No. 1, ¶ 26.

**IV. Irreparable Harm**

The United States must also show an immediate irreparable harm absent injunctive relief. The likelihood of harm must be more than a possibility. Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). An irreparable harm is one where there is "no adequate compensatory or other corrective relief . . . available at a later date." Am. Fed. of State, Cnty. & Mun. Employees, AFL-CIO v. Soc. Sec. Admin., 172 F.4th 361, 372 (4th Cir. 2026). Also, being subjected to an unconstitutional law can constitute irreparable injury.

The United States argues that subjecting federal law enforcement to unconstitutional Virginia laws is an irreparable injury itself. ECF No. 9, 34. The United States cites New Orleans Public Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350 (1989) in support of that argument. New Orleans stated that "[i]rreparable injury may possibly be established, Younger suggested, by a showing that the challenged state statute is 'flagrantly and patently violative of express constitutional prohibitions.'" Id. at 366. (quoting Younger v. Harris, 401 U.S. 37, 53-54 (1971)). The United States seems to be saying that the Mask/Identity Law meets that description. And, indeed, the Mask/Identity Law does clearly seek to regulate federal law enforcement activity.

The Ninth Circuit held, under similar circumstances, that being subject to a deprivation of constitutional rights was irreparable harm. United States v. California, 173 F.4th at 1069 (citing Baird v. Bonta, 81 F.4th 1036, 1040 (9th Cir. 2023); Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)). The case relied upon by Melendres, Elrod v. Burns, 427 U.S. 347, 373 (1976), found a constitutional violation to be irreparable injury in the context of an individual's First Amendment rights. It is clear that constitutional violations of the First Amendment are irreparable injuries, but, outside of the Ninth Circuit, courts have not applied a presumption that any other constitutional deprivation is itself an irreparable harm. See Wright & Miller, Grounds for Granting or Denying a Preliminary Injunction – Irreparable Harm, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d. ed. April 2026 update) (citing cases); Leachco, Inc. v. CPSC, 103 F.4th 748, 755 (10th Cir. 2024).

However, in Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah, 790 F.3d 1000(10th Cir. 2015), then-Judge Gorsuch explained that "an invasion of tribal sovereignty can constitute irreparable injury." Id. at 1005 (citation omitted). That principle would apply equally to invasion of federal sovereignty. And, indeed, in New Mexico Dept. of Game & Fish v. United States Dept. of Interior, 854 F.3d 1236 (10th Cir. 2017), the Tenth Circuit held that while interference with a state's ability to

enforce its statutes (its sovereignty) would be irreparable injury, the state had not made such a showing. Id. at 1254-55. The District Court for the District of Oregon has held that violations of the Tenth Amendment caused by unlawful deployment of National Guard were irreparable injury. Oregon v. Trump, 812 F. Supp. 3d 1142, 1153 (D. Or. 2025).

It seems rather clear that being subjected to a state law that regulates an activity that is constitutionally delegated to the federal government is an infringement of the Supremacy Clause that constitutes an irreparable injury. It is significant that Virginia did not contest this view of the law in the VIRGINIA RESPONSE. And, at oral argument, Virginia agreed that a violation of the Supremacy Clause would, if proved,[12] constitute irreparable injury. ECF No. 32, 43.

The United States also argues that there is an additional immediate irreparable harm, to wit: "endangering federal officers and agents, impeding their functions, and chilling federal activities." ECF No. 9, 34. And that harm produces another: an adverse impact on the complete and effective enforcement of the law by federal officers who are subjected to doxxing, threats, assaults, and bounties and, indeed, by all federal officers engaged

[12] Virginia's argument was that the United States had not established that the Mask/Identity Law regulated federal enforcement of the federal immigration laws and therefore had not proved a violation of the Supremacy Clause.

in the enforcement of federal immigration law because of the doxxing, threats, assaults, and bounties.

According to the United States, and its declarations, federal law enforcement and agents would be placed in danger if the Mask/Identity Law went into effect because it would expose their personal identities which have been used for doxxing, which leads to threats and assaults. ECF No. 9, 35. The United States cites many examples of doxxing, threats, and assaults against federal agents. Id. Those incidents occurred largely due to the ability of individuals to take pictures of agents and use facial recognition software to identify them and then target them with harassment and threats and assault.[13] See ECF No. 9-4, ¶¶ 6-9 (CBP); ECF No. 9-1, ¶¶ 35-40 (ICE), ECF No. 9-3 ¶ 11-12 (FBI), ECF No. 9-2, ¶¶ 15-16 (DEA). Thus, without the ability to wear masks or otherwise conceal their identity, federal law enforcement would be subject to continuation of those consequences.

Virginia takes the view that the declarations do not sufficiently show immediate irreparable harm. According to Virginia, the declarations rely upon "generalized perceived risks, past or out-of-state episodes, and speculative predictions." ECF

---

[13] The United States does not focus on the fact that wearing a name plate or badge number combined with the department within which that agent operates could also subject an agent to doxxing.

No. 22, 21-22. So, the Court will turn to examination of the declarations.

First, the declaration of Eric Weiss for ICE. ECF No. 9-1. Weiss explains that, since early 2025, ICE agents are often threatened with being doxxed when conducting enforcement, and that, in the same period, there has been an extreme uptick in threats and assaults against ICE. Id. at ¶¶ 35-36.[14] He also cites intelligence received by DHS showing that cartels have placed bounties on ICE Agents. Id. at ¶ 37. And, he avers that individuals are taking pictures of ICE officers and running their face through facial recognition software to get personal information on the officers and posting their information so they can be harassed. Id. at ¶¶ 39-40. According to Weiss, Richmond ICE officers have had their pictures taken and been placed on posters for harassment. Id. at ¶ 40.

Next, the declaration of Matthew Allen relating to DEA. ECF No. 9-2. Allen states that DEA is concerned with the ability of the public to photograph and video DEA Special Agents during operations. Id. at ¶ 15. According to Allen, those pictures can be used by the public to harass or intimidate agents or be used by criminal organizations to target DEA Agents. Id. As an example,

[14] The statistics cited in support of the claim that threats and violence are up and their relevance to the masking issue are challenged by Virginia's expert, Scott Shuchart. See ECF No. 22-1, ¶ 27.

Allen cites a post on BlueSky with a picture of a DEA Agent in Minneapolis not wearing a mask, and a responder's comment identifying the Agent. Id. at ¶ 16. Allen also cites the need to conceal agent's identities on a surveillance or undercover operation. Id. at ¶ 17.

Third, the declaration of Ian Kaufmann of the FBI. ECF No. 9-3. Kaufmann states that display of an agent's face, badge, name, and identifying that they are with the FBI puts agents at risk of doxxing and threats. Id. at ¶ 12. And, Kaufmann states that FBI agents have been identified and actually targeted for harm. Id. at ¶ 13. Kaufman also explains identification and that exposing agents' identities during undercover or surveillance operations would jeopardize FBI's effectiveness.

Finally, the declaration of Justin Hargis of CBP. ECF No. 9-4. Hargis cites similar concerns about CBP agents as does Weiss as it relates to ICE officers. Hargis cites many specific instances of threats and harassment to ICE agents. Id. at ¶ 9. Some of those incidents involve use of pictures to identify agents and find out their personal information. Id. at ¶¶ 9c, 9e, 9f, 9g, 9i, 9j.

The declarations are based on events in many localities across the country, one of which is Richmond, Virginia. Those events show that the doxxing, threats, and assaults can occur in any locality where ICE is enforcing the immigration laws. So, the fact that only one occurred in Virginia does not detract from the fact that

those who would interfere with ICE operations, threaten or assault its officers, or attempt to collect bounties, can be expected to engage in the same, or like, tactics and conduct in Virginia. Indeed, that similar conduct has been used in many locations permits a reasonable inference that they likely would be used here.

Taking into account the declarations offered by the United States and the paucity of contradictory evidence offered by Virginia, it is quite clear that ICE officers regularly, and in many locations, face doxxing, threats, and assaults and that there are even bounties offering money for doxxing, threatening, and killing ICE officers. All of that presents clear and present risk of real harm to ICE's officers. And, as the declarations show, those risks reasonably can be expected to adversely affect the ability of ICE officers to enforce the immigration laws.

Virginia argues that the United States' delay in filing the PI MOTION undermines its argument that there will be an immediate and irreparable harm. ECF No. 22, 22. The Mask/Identity Law was passed in the end of March, 2026, and then returned to the Governor, who signed it on May 20, 2026. The Complaint was filed three weeks after that, on June 11, 2026, and the PI MOTION was filed six days later, on June 17, 2026. That timeline is certainly not evidence of undue delay of the sort that disproves immediate irreparable injury.

The United States responds by explaining that it was uncertain whether the law would be enacted after the Governor refused to sign it and returned it to the General Assembly. ECF No. 24, 19. And, says the United States, it filed suit promptly after the legislation returned to the Governor and she signed it. It is correct that the PI MOTION was filed three and a half weeks after the legislation was signed and that, at the time, there were only thirteen days until the effective date. The United States explained that it used the time to collect declarations and secure the necessary approvals to proceed with a request for unusual relief. Id. at 19-20. That, of course, is reasonable conduct. And, there is no evidence that the delay prejudiced the ability of Virginia to respond to the PI MOTION. And, Virginia was offered the opportunity to slightly delay enforcement and have the PI MOTION consolidated with a merits determination under Fed. R. Civ. P. 65. That would have allowed for a somewhat less expedited briefing and hearing schedule. Virginia declined. The delay here is slight and it does not at all undercut the showing of immediate irreparable injury.

**V. Balance of Equities & Public Interest**

The final factors are the balance of the equities and the public interest. The United States argues that enforcement of an unconstitutional law is not in the public interest. United States v. California, 173 F.4th at 1069; Giovani Carandola, Ltd. v. Bason,

303 F.3d 507, 521 (4th Cir. 2002). In other words, if the plaintiff is likely to succeed on the merits of a constitutional claim, the last two factors tip in its favor. United States v. California, 173 F.4th at 1069 (citation omitted). That is correct. The fact that the Mask/Identity Law is likely an unconstitutional law means that the equities and public interest which merge because the government is a party, weigh in favor of granting the PI MOTION. See also Leaders of a Beautiful Struggle v. Baltimore Police Dept., 2 F.4th 330, 346 (4th Cir. 2021) ("a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.") (quoting Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 191 (4th Cir. 2013).

Virginia argues that the equities tip in its favor because enforcement of the Mask/Identity Law would undermine public safety in Virginia. ECF No. 22, 23. And, it argues that the Court should not "disrupt[] the status quo through emergency relief." Id. at 24. However, the Commonwealth misunderstands the status quo. Here, the status quo is no Mask/Identity Law. The equities favor enjoining a state law that offends the Supremacy Clause and, in so doing disrupts the status quo. United States v. Alabama, 691 F.3d 1269, 1301 (11th Cir. 2012). That is because, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations. Frustration of

federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." Id.

**CONCLUSION**

For the foregoing reasons, the PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 8) was granted as to the Mask/Identity Law by the ORDER at ECF No. 30.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 18, 2026
nunc pro tunc July 2, 2026