**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA,

Plaintiff,

v. Civil Action No. 3:26cv545

COMMONWEALTH OF VIRGINIA,
et al.,

Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on the PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (the "PI MOTION") (ECF No. 8) and all of the supporting, opposing, reply, and related pleadings that pertain to the validity and enforceability of Va. Code Ann. § 15.2-1726.1 (2026) (generally referred to as the "Virginia 287(g) Law.")[1] Based on those papers and the argument of counsel, the PI MOTION will be granted in part and denied in part.

**BACKGROUND**

The United States filed the COMPLAINT (ECF No. 1) in this

[1] Those pleadings are MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 9 (to the extent that it relates to the 287(g) law)); DEFENDANTS COMMONWEALTH OF VIRGINIA AND JAY JONES' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 40); BRIEF OF AMICUS LEGAL AID JUSTICE CENTER IN SUPPORT OF THE COMMONWEALTH'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (ECF No. 48); REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AS TO SB 783/VA CODE § 15.2-1726.1 (ECF No. 56); and a variety of Statements of Position related to information about the 287(g) law (ECF Nos. 80, 81, 82, 84, 85, and 86).

action seeking to enjoin two recently enacted Virginia statutes. The first challenged statute is Va. Code Ann. § 19.2-83.6:2 (2026) entitled "Prohibition on wearing of facial coverings; penalty," which, in this case, is generally referred to as the "Mask/Identity Law." The claims relating to the Mask/Identity Law are presented in COUNT I and COUNT II of the COMPLAINT. ECF No. 1, 42-43. By ORDER and MEMORANDUM OPINION (ECF Nos. 90 and 91), the PI MOTION was granted with respect to the enforcement of the Mask/Identity Law.

The remaining counts of the COMPLAINT address the second challenged statute the "Virginia 287(g) Law," which is entitled "Immigration enforcement agreements with federal authorities; required provisions." COUNT III alleges that the Virginia 287(g) Law violates the Contracts Clause of the United States Constitution because it impairs existing contracts between local entities in Virginia and the federal government that are authorized by 8 U.S.C. § 1357(g). U.S. Const. art. I, § 10, cl. 1; ECF No. 1, 43. COUNT IV asserts that the Virginia 287(g) Law is preempted because it "conflicts with and stands as an obstacle to the cooperation envisioned by Congress" in federal law, including 8 U.S.C. § 1357(g). Id. at 44. COUNT V alleges that the Virginia 287(g) Law violates the Supremacy Clause because it unlawfully regulates the federal government by imposing conditions on how and where federal

officers can enforce the immigration laws of the United States. That direct regulation is alleged to violate the intergovernmental immunity doctrine and hence the Supremacy Clause. Id. at 45. COUNT VI alleges that the Virginia 287(g) Law violates the intergovernmental immunity doctrine because it discriminates against the federal government and, in that way, violates the Supremacy Clause. Id. at 45-46. As a whole, the COMPLAINT presents a primer on the concept of dual sovereignty reflected in the United States Constitution by which "We the People" have chosen to govern ourselves and the affairs of this country.

The disputes reflected in the six counts of the COMPLAINT have a rather substantial background. It is, therefore, necessary to pause before addressing the particulars of the PI MOTION to understand that background and the context in which these disputes arose.

That background and context of these immigration law claims must be resolved by recalling that the Constitution delegates to the central government the specific power over naturalization. U.S. Const. art. I, § 8, cl. 4. That clause provides: "[t]he Congress shall have Power to . . . establish a uniform rule of naturalization. . . ." Id. (emphasis added). In so doing, the Founders deliberately removed the power of naturalization from the several States which, at the time of the founding, had diverse

(and some objectionable and doubtful) rules respecting immigration and naturalization.[2] Also, it is significant to remember that nothing in the Constitution mentions, or conceives of, a role for the States in implementing or enforcing federal immigration law. Accordingly, the federal government has "broad, undoubted power over the subject of immigration and the status of aliens," and an inherent obligation and broad authority to establish immigration laws. Arizona v. United States, 567 U.S. 387, 394 (2012); Fiallo v. Bell, 430 U.S. 787, 792 (1977).

The Immigration and Nationality Act ("INA")[3] represents an exercise of Congressional authority respecting the entry, presence, status, and removal of aliens. The INA confers upon agencies operated by the executive branch of the federal government extensive authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully in the United States. See 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.[4]

---

[2] United States v. Virginia, No. 3:26-cv-545, 2026 WL 2411521, at *8 n. 8 (E.D. Va. Aug. 18, 2026).

[3] 8 U.S.C. §§ 1101 et seq.

[4] The INA authorizes the Secretary of Homeland Security to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under [the INA]." 8 U.S.C. § 1103(a)(3).

The States cannot obstruct, regulate, or take discriminatory action against the execution of the INA's provisions because only the federal government maintains the authority to grant an alien the privilege to enter our Nation and controls the terms and conditions of that privilege. See U.S. Const. art. 1, § 8, cl. 4; Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 419 (1948); Arizona v. United States, 567 U.S. at 394-95; North Dakota v. United States, 495 U.S. 423, 435 (1990) (plurality); id. at 444-47 (Scalia, J., concurring).

The system of immigration regulation and enforcement set by the INA has marked the country's approach to the enforcement of its immigration laws for many years. In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Section 1357(g) of IIRIRA (hereafter "§ 1357(g)") codified § 287(g) of the INA. That statute:

> permits the delegation of certain immigration enforcement functions to state and local law enforcement agencies. Agreements entered pursuant to INA § 287(g) (commonly referred to as § 287(g) agreements) enable specially trained state or local officers to perform specific functions relating to the investigation, apprehension, or detention of noncitizens during a predetermined time frame and under federal oversight by the Department of Homeland Security's (DHS's) Immigration and Customs Enforcement (ICE).[5]

---

[5] Abigail F. Kolker, Cong. Rsch. Serv., IF11898, The 287(g) Program: State and Local Immigration Enforcement (2021), 1

Those federal-state agreements are generally known as "§ 287(g) agreements," and that is the name by which they are called in this MEMORANDUM OPINION.

The first § 287(g) agreement was implemented in 2002 after the law was "given new urgency following the terrorist attacks on September 11, 2001." Id. By 2011, there were 72 such agreements. Id. That number declined to 35 by the end of 2016. Id. From January 2017 to September 2020, the number of local law enforcement agencies subscribing to § 287(g) agreements "increased by more than 300%, from 35 to 150." Id. By September 2025, there were more than 1,000 agreements in effect with state and local law enforcement agencies.[6] Recently, the Department of Homeland Security ("DHS") reported that there now are in effect "2382 Memorandums of Agreement for 287(g) programs covering 39 states and 2 U.S. Territories."[7]

---

https://www.congress.gov/crs_external_products/IF/PDF/IF11898/IF11898.1.pdf [https://perma.cc/8TYU-BM2E] (emphasis added).

[6] Press Release, Dept. of Homeland Sec., DHS 287(g) Reaches More Than 1,000 Partnerships with State and Local Law Enforcement to Help Remove the Worst of the Worst Criminal Illegal Aliens (Sept. 17, 2025), https://www.dhs.gov/news/2025/09/17/dhs-287g-reaches-more-1000-partnerships-state-and-local-enforcement-help-remove [https://perma.cc/UV3W-KKBN].

[7] Dept. of Homeland Sec., Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act (last visited Aug. 26, 2026) https://www.ice.gov/identify-and-arrest/287g [https://perma.cc/5ZQC-U9NP].

There is no real dispute that the purpose of the 287(g) agreements made under the authority conferred by 8 U.S.C. § 1357(g) is to provide a force-multiplier effect to assist federal authorities in the enforcement of federal immigration laws. That effect is achieved by training and designating local law enforcement agents to serve, under the direction of DHS, as federal immigration enforcement officers.

There are three different kinds of § 287(g) agreements. First, the Jail Enforcement Model permits appropriately designated officers or deputies working in jails or prisons to identify and process removable aliens who have pending or active criminal charges and who are incarcerated. ECF No. 9-1 ¶ 21; ECF No. 40-5 ¶ 12(a). Second, the Task Force Model allows local law enforcement officers to be designated as immigration officers to serve on routine police duties or as an active participant in an ICE-led task force. ECF No. 9-1 ¶ 21; ECF No. 40-5 ¶ 12(b). Third, the Warrant Service Officer Model permits appropriately designated state officers to serve and execute administrative warrants on aliens who are in the custody of the state authorities and the local authorities. ECF No. 9-1 ¶ 21; ECF No. 40-5 ¶ 12(c). Those three models reflect the Congressional purpose to use voluntarily-entered contracts between federal immigration officials and local law enforcement agencies to more effectively enforce the federal

immigration laws.

The record in this case establishes that the federal government has thirty contracts with twenty-six agencies in Virgina. See ECF Nos. 80-1, 80-2, 80-3, 80-4, 93-1.[8] Those agreements were executed between March 2025 and May 2026. Id.[9]

The background and context for the enactment of the Virginia 287(g) Law also includes the fact that, during the period 2020 to 2024, there was a significant increase in illegal immigration. That increase is reflected in a 2024 release from the House Committee on Homeland Security, citing U.S. Customs and Border Protection ("CBP") statistics and which provides a good summary of what occurred between 2020 and 2024.[10]

For example, the number of border encounters between CBP and those persons ineligible for admission (on a nationwide basis)

---

[8] On August 31, 2026, the Commonwealth advised the Court that four agreements, one with Craig County and three with Pittsylvania County no longer appeared on ICE's list of current 287(g) agreements but that the Commonwealth has been unable to confirm whether those agreements are terminated. ECF No. 99.

[9] One agreement has no execution date. Of the remaining twenty-nine, two were executed in May and June of 2026. Twenty-four agreements were executed between March 2025 and June 2025. The remaining three agreements were executed later in 2025.

[10] Chairman Green on September Border Encounter Numbers: "We Simply Cannot Go On Like This As a Country," Comm. on Homeland Sec.: News (Oct. 22, 2024), https://homeland.house.gov/2024/10/22/chairman-green-on-september-border-encounter-numbers-we-simply-cannot-go-on-like-this-as-a-country/ [https://perma.cc/PW88-3UKX].

between fiscal year ("FY") 2017 and FY 2020 was 3.004 million. Id. From FY 2021 through FY 2024 that figure rose to 10.8 million. Id. Those so-called "inadmissible encounters" at the southwest border for the same period rose from 2.37 million to 8.72 million. Id.

The report also refers to "known gotaways." Id. That term refers to people ineligible for admission who nonetheless crossed the border, who were not refused admission, and who were neither reviewed for admission nor vetted in any way. On a nationwide basis, the "known gotaway" number for FY 2017 to FY 2020 was 521,247. Id. From FY 2021 to FY 2024, that number rose to 2 million. Id.

During the same period, apprehensions of illegal aliens who were on the terrorist watch list also rose. From FY 2017 to FY 2020 the figure was 14. Id. From FY 2021 to FY 2024, the figure was 392. Id. Likewise, border patrol arrests of illegal aliens with criminal backgrounds increased from 21,936 during the period of FY 2017 to FY 2020 to 55,106 during the period of FY 2021 to FY 2024. Id.

Then came the 2024 elections. The foregoing immigration statistics featured prominently in the run-up to the election. Indeed, there is no dispute that illegal immigration became a central issue in the 2024 election, in particular the presidential campaign. And, it is not disputed that, shortly after the new

president was inaugurated in 2025, immigration enforcement increased significantly. A part of the effort to increase enforcement of the federal immigration laws was the significant post-election increase in the number of § 287(g) agreements executed between DHS and various local law enforcement agencies throughout the country. And, that, of course, included the § 287(g) agreements that are the subject of this action.

It is a likewise well-known background fact that the post-2024-election increase in immigration enforcement was met with considerable criticism and resistance. That criticism and resistance came from individuals, groups, and States displeased with the way in which the federal immigration officers were enforcing federal immigration law.[11] The Virginia 287(g) Law was part of a package of legislative measures passed by Virginia's General Assembly to address its displeasure on the subject and to change the immigration enforcement methods being used by the federal law enforcement officers.

---

[11] Indeed, it is also rather obvious from the public record that there is much not to like about the methods being used by the federal enforcement agencies. However, whether those methods of enforcement warrant criticism, approval, approbation, or even elimination, is not a matter before the Court. It is, though, quite pertinent to note that federal courts all over the country are handling suits brought by various individuals, organizations, and States that involve the consequences of the enforcement methods being used and the constitutionality of the methods.

As explained previously, among that package of laws was the so-called Mask/Identity Law which was passed in the same session as the Virginia 287(g) Law. The record respecting the Virginia General Assembly's purpose in passing the Mask/Identity law is relevant to the assessment of the Virginia 287(g) Law. Those reasons are set forth in full in the MEMORANDUM OPINION addressed to the Mask/Identity law, United States v. Virginia, No. 3:26-cv-545, 2026 WL 2411521, at *2-3 (E.D. Va. Aug. 18, 2026), and will not be recounted here except to say that, among the reasons given, by the General Assembly (and confirmed by the Commonwealth itself in its papers in this case) is that, in enacting the Mask/Identity Law and its legislative compatriot, the Virginia 287(g) Law, the General Assembly was reacting to disquieting immigration enforcement events that had recently taken place in Portland, Oregon, Philadelphia, Pennsylvania, New York, New York, and Minneapolis, Minnesota. ECF No. 22, 5-8.

That same reaction produced the Virginia 287(g) Law, one of a package of laws addressed to the events in those locales. For example, the senator who sponsored the Virginia 287(g) Law recites that "he is carrying legislation that gets rid of 287G agreements that prohibits local enforcement from working with ICE, legislation that prohibits federal authorities from arresting or detaining individuals at a courthouses, as well as legislation

that prohibits federal law enforcement from wearing face masks when performing their official duties."[12] Senator Salim is also quoted as saying that the three pieces of legislation he sponsored, including the Virginia 287(g) Law, will keep "the chaos, lawlessness, and violence that we have seen perpetuated against Minnesotans from coming to Virginia." Jared Serre, State Sen. Salim Highlights Proposed Bills to 'End ICE Abuses' Across Virginia, FFX Now (Jan. 28, 2026 at 9:42AM), https://www.ffxnow.com/2026/01/28/state-sen-salim-highlights-proposed-bills-to-end-ice-abuses-across-virginia/ [https://perma.cc/94QK-WNPT].

In the words of the sponsor of the Virginia 287(g) Law, it is intended to place Virginia and her local law enforcement agencies in opposition to the way that federal immigration authorities are enforcing federal immigration law. Senator Salim also described the three pieces of legislation that include the Virginia 287(g) Law by saying: "[t]he three bills I introduce share one goal: ensuring that immigrants, protestors, and all Virginians who value peace and justice know the Commonwealth of Virginia and its law enforcement agencies are on their side." Id. And, in another

---

[12] (sic) Senator Saddam Salim, https:/www/salim-forsenate.com/policy [https://perma.cc/JVE2-DRAF] (last visited August 26, 2026)

statement, Senator Salim stated that his three bills were meant to send a strong message, specifically that "Virginia will not be a staging ground for an unconstitutional mass deportation campaign."[13] It thus appears from the record contemporaneous with the enactment of the legislation (and it is confirmed in the briefing filed by Virginia in this case) that the basis for the restrictions in the Virginia 287(g) Law is Virginia's disagreement with the federal government's immigration policies and enforcement practices. So strong was that disagreement that, when the Governor cancelled § 287(g) agreements with statewide law enforcement agencies, she described the action as "a line in the sand," declaring that Virginia's previous cooperation with the federal government through § 287(g) agreements "is something that ends today."[14]

**The Text of the Law**

Sometimes, efforts to summarize a law lead to a misstatement

---

[13] Keyris Manzanares, General Assembly Sends Slate of Immigration Bills to Spanberger's Desk, VPM (March 23, 2026 at 9:00AM), https://www.vpm.org/general-assembly/2026-03-23/immigration-bills-salim-lopez-ice-enforcement-287g-Spanberger [https://perma.cc/SJ95-2TEA].

[14] Luca Powell, Va. Governor Dissolves 287(g) Agreements Between State LE Agencies, ICE, Police1 (Feb. 5, 2026 at 3:12PM) https://www.police1.com/federal-law-enforcement/va-governor-dissolves-287g-agreements-between-state-le-agencies-ice [https://perma.cc/6B6L-YG5M].

of its actual text. To a certain extent that seems to have occurred here, particularly in the descriptions of the law in Virginia's briefing of the PI MOTION. So, it is best now to set forth the full text of the parts of the Virginia 287(g) Law that are at issue. The law has four sections. Section A provides definitions. Section B provides as follows:

> Except as provided in [other sections of the code], no person acting in his capacity as a law-enforcement officer shall assist, cooperate with, or use any law-enforcement resources to facilitate any operation that seeks to identify, arrest, or otherwise impose a penalty upon an individual for any violation of federal civil immigration law unless presented with a judicial warrant or judicial subpoena.
>
> Va. Code Ann. § 15.2-1726.1(B) (2026) (emphasis added).

Section C is the focal point of this case. It reads:

> No law-enforcement agency shall maintain, renew, or enter into any federal immigration enforcement agreement unless such agreement includes the following provisions:
>
> 1. That U.S. Immigration and Customs Enforcement shall provide to the law-enforcement agency the names and ranks of all federal agents involved in any immigration enforcement activity within the Commonwealth at least seven days prior to engaging in such immigration enforcement activity;
>
> 2. That any federal agent operating pursuant to the federal immigration enforcement agreement shall comply with all applicable laws of the Commonwealth while conducting any immigration enforcement activity within the Commonwealth;
>
> 3. That any federal agent operating pursuant to the federal immigration enforcement agreement shall be clearly identified as an agent of U.S. Immigration and Customs Enforcement. No such clear identification shall include wearing any uniform or displaying the word "police" on any uniform, vehicle, or equipment while

conducting any immigration enforcement activity within the Commonwealth;

4. That no agent of U.S. Immigration and Customs Enforcement shall conduct any immigration enforcement activity on the property of any school, faith-based organization, or courthouse within the Commonwealth;

5. That, by entering into such federal immigration enforcement agreement, U.S. Immigration and Customs Enforcement and its agents consent to the jurisdiction of the courts of the Commonwealth for any civil or criminal proceedings arising from any violation of the provisions of this section or for any violation of the laws of the Commonwealth committed while acting in the performance of their official duties pursuant to such federal immigration enforcement agreement;

6. That neither U.S. Immigration and Customs Enforcement nor its agents shall make general requests or demands for information from any agency or entity of the Commonwealth or its localities that are not related to the investigation of a specific person;

7. That neither U.S. Immigration and Customs Enforcement nor any of its agents shall request information from any locality within the Commonwealth regarding the immigration or citizenship status of any person unless such request is made pursuant to a valid judicial warrant or judicial subpoena;

8. That no federal agent, during the times the polls are open and ballots are being counted, or within one hour of opening and after closing, shall conduct any immigration enforcement activity within 500 yards of any polling place;

9. That neither U.S. Immigration and Customs Enforcement nor its agents shall use any surveillance technology to conduct immigration enforcement within the Commonwealth or otherwise monitor residents of the Commonwealth. Such surveillance technology includes (i) biometric and identification technologies, such as facial recognition systems or fingerprint scanning; (ii) license plate readers; (iii) mobile telephone surveillance, such as cell-site simulators or phone location databases; (iv) digital forensics and hacking tools; and (v) drones or other aerial surveillance. The prohibition under this subdivision shall not apply to the use of surveillance technology to investigate, detain, or arrest any person who (a) is not lawfully

> present in the United States and (b) has been convicted of any offense set forth in § 17.1-805, 19.2-297.1, or 53.1-40.02;
>
> 10. That no federal agent, for the purpose of conducting any immigration enforcement activity, shall enter a home within the Commonwealth without a valid judicial warrant;
>
> 11. That, by entering into such federal immigration enforcement agreement, U.S. Immigration and Customs Enforcement and its agents shall adhere to the provisions of Chapter 7.1 (§ 19.2-83.3 et seq.) of Title 19.2 when conducting an arrest or detention related to immigration enforcement; and
>
> 12. That, in addition to the provisions of subdivision 5, by entering into such federal immigration enforcement agreement, U.S. Immigration and Customs Enforcement and its agents agree that any shooting involving any agent while such agent is in the performance of his official duties shall be investigated by the Virginia State Police and shall be subject to prosecution by the attorney for the Commonwealth or the Attorney General in the local jurisdiction where such shooting occurred or as otherwise provided by state law.

Va. Code Ann. § 15.2-1726.1(C) (2026) (emphasis added). Section D reads as follows:

> Any law-enforcement agency that has an existing federal immigration enforcement agreement that is in effect on July 1, 2026, shall obtain in writing no later than September 1, 2026, a modified federal immigration enforcement agreement that complies with the conditions provided in subsection C. Any federal immigration enforcement agreement that is not modified in accordance with the provisions of this subsection shall be deemed void and unenforceable.

Va. Code Ann. § 15.2-1726.1(D) (2026) (emphasis added). Section E provides:

> Any federal immigration enforcement agreement entered into or maintained in violation of this section shall be

void and unenforceable.[15]

Va. Code Ann. § 15.2-1726.1(E) (2026) (emphasis added).

The title of the law clearly tells that it is addressing "immigration enforcement agreements with federal authority," as to which it is imposing "required provisions." Va. Code Ann. § 15.2-1726.1 (2026). And, each of the twelve required provisions set by Section C is addressed either to U.S. Immigration and Customs Enforcement or its "agents," or to "federal agents" who conduct any immigration enforcement activity. Id.

Each key sentence in each of those twelve sections makes clear its subject (a federal entity), its command or negative imperative, and its object (the conduct required or prohibited). The subject of the sentences containing each of the twelve required provisions is the "U.S. Immigration and Customs Enforcement," "agent of U.S. Immigration and Customs Enforcement," or "federal agent." Each required provision contains verbs that are either (1) commands, such as "shall provide" (C)(1); "shall comply" (C)(2); "shall be" (C)(3); "shall conduct" (C)(4) do "consent" (C)(5); "shall adhere" (C)(11); and do "agree" (C)(12); or (2) negative imperatives such

[15] Section F provides for certain enforcement mechanisms and Section G continues to permit the Director of the Department of Corrections, a sheriff or a jail superintendent "upon receipt of a federal immigration detainer from U.S. Immigration and Customs Enforcement, to "transfer[] custody of an adult . . . as authorized by § 53.1-220.2." Va. Code Ann. § 15.2-1726(G) (2026).

as "shall [not] make" (C)(6); "shall [not] request" (C)(7); "shall [not] conduct" (C)(8); "shall [not] use" (C)(9); and "shall [not] enter" (C)(10).

Each command or negative imperative then is followed by its object: that is the immigration law enforcement conduct in which the federal subject must engage or from which the federal subject must refrain. In other words, the statutory text regulates the enforcement of federal immigration law. On the other hand, not one of those twelve required provisions mentions state or local law enforcement officials.

It is equally important to remember that, pursuant to Section D of the Virginia 287(g) Law, existing 287(g) agreements must be modified in writing no later than September 1, 2026 to include all of the commands or negative imperatives provided in Section C. The consequence of failing to effectuate those modifications is that any existing agreement "shall be deemed void and unenforceable." Va. Code Ann. § 15.2-1726.1(D) (2026). In other words, the federal agency must agree to the modification of its § 287(g) agreements with Virginia entities or the contracts are immediately void and unenforceable, not by the contractually agreed mode, but by operation of the Virginia 287(g) Law. If that is not sufficiently clear, Section E provides that "[a]ny federal immigration enforcement agreement entered into <u>or maintained</u> in violation of

this section shall be void and unenforceable." Va. Code Ann. § 15.2-1726.1(E) (2026) (emphasis added).

Thus, contrary to the position taken by Virginia in its briefing, the Virginia 287(g) Law does not simply direct localities to terminate their § 287(g) agreements or give localities the option to terminate. It operates to control the conduct of federal immigration enforcement officers and to void existing agreements immediately on September 1, 2026 unless there is a modification of the contract to include all of the statutorily "required provisions" that are directed to federal officials enforcing federal law.

With this background and context in mind and with a clear understanding of the statutory text before us, the analysis now turns to the resolution of the request of the United States for entry of a preliminary injunction.

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, Plaintiff "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.". Am.

Fed. Of State, Cnty. & Mun. Employees, AFL-CIO v. Soc. Sec. Admin., 172 F.4th 361, 366 (4th Cir. 2026) (quoting Winter, 555 U.S. at 20). The third and fourth factors merge when the Government is a party. Nken v. Holder, 556 U.S. 418, 435 (2009); see also Am. Fed'n Tchrs. v. Bessent, No. 25-1282, 2025 U.S. App. LEXIS 8229, at *11 (4th Cir. Apr. 7, 2025); Nova Distro, Inc. v. Miyares, Civil No. 3:25cv857, 2025 U.S. Dist. LEXIS 262228, at *11 (E.D. Va. Dec. 18, 2025).

## DISCUSSION

The PI MOTION seeks relief based on the claims asserted in Counts III, IV, V, and VI. The relief sought in Count III is predicated on the Contracts Clause of the U.S. Constitution. The relief sought in Count IV is based on the doctrine of conflict preemption. The relief sought in Counts V and VI is based upon the doctrine of intergovernmental immunity which flows from the Supremacy Clause. Count V is based on the theory that the Virginia 287(g) Law unlawfully regulates the federal government thereby violating the intergovernmental immunity doctrine and thus offends the Supremacy Clause. Count VI is based on the theory that the Virginia 287(g) Law discriminates against the United States and violates the intergovernmental immunity doctrine and the Supremacy Clause in that way.

The question now is whether the United States has shown

entitlement to a preliminary injunction standard under any of those counts.

**I. Standing and Ripeness**

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The Article III limitation, referred to as the doctrine of "standing," is a prerequisite to the resolution of any issues in every federal case. Article III standing requires "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision" Susan B. Anthony List v. Dreihaus, 573 U.S. 149, 157-58 (2014) (citation omitted) (citation modified).

Virginia does not contest that the United States has pre-enforcement standing. And, indeed, the United States does have pre-enforcement standing, because it shows an "injury that is concrete, particularized, and actual or imminent." First Choice Women's Res. Ctrs., Inc. v. Davenport, 608 U.S. ----, 146 S.Ct. 1114, 1122 (2026) (citation omitted). Here, that injury is the alleged violation of sovereignty. If the United States is correct that the 287(g) Law is unconstitutional, it alleges that it would suffer the additional harm of losing beneficial 287(g) agreements with willing Virginia localities or subjecting ICE to onerous

conditions to maintain the agreements. ECF No. 9, 21-22. The 287(g) Law will cause these injuries if there is such a violation. And, if the Court finds in the United States' favor, the injuries will be redressed. So, the United States has standing.

A closely related inquiry is the question of whether the claim is ready to be decided, called the doctrine of ripeness. Doe v. Va. Dep't of State Police, 713 F.3d 745, 758 (4th Cir. 2013). The Fourth Circuit has said about ripeness:

> In determining ripeness, "we balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration. A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and does not depend on future uncertainties."

Id. (quoting Miller v. Brown, 462 F.3d 312, 318-19 (4th Cir. 2006)).

Virginia contests the ripeness of the claims asserted by the United States. ECF No. 40, 19. According to Virginia, because no agreements have been affected, there are only hypothetical injuries. Id. Virginia is not correct. The issues here are legal, specifically, whether the 287(g) Law violates a number of constitutional doctrines. The 287(g) Law is final and would have gone into effect, on September 1, 2026, had it not been enjoined. There is nothing hypothetical or unsure about that. This case is ripe for decision.

## II. Likelihood of Success

### A. Count III: Contract Impairment[16]

The Contracts Clause of the Constitution provides that "[n]o State shall . . . pass any Law . . . impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10, cl. 1. Absolute as it may sound, the Contracts Clause does not prohibit every contractual impairment. United States Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 21 (1977). The analysis used to determine whether a law violates the Contract Clause proceeds in two steps: (1) "whether the state law has 'operated as a substantial impairment of a contractual relationship;'" and (2) "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance a 'significant and legitimate public purpose.'" Sveen v. Melin, 584 U.S. 811, 819 (2018) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978); Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 411-12 (1983)).

#### (1) The Substantial Impairment Inquiry

In analyzing whether there exists a substantial impairment of

---

16 The analysis as to this COUNT differs as it relates to Virginia's prospective withdrawal of authority for its localities to enter into new § 287(g) agreements. There must be a contract for there to be an impairment. Therefore, the United States is not likely to succeed on the merits of the Contracts Clause claim as it relates to the part of the Virginia 287(g) Law that withdraws authority for localities to enter into new § 287(g) agreements.

a contract right, the "Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." Id. The analysis also takes into account whether the law "operate[d] in an area already subject to state regulation." Allied Structural Steel Co., 438 U.S. at 250; Energy Reserves Grp., Inc., 459 U.S. at 411.

The § 287(g) agreements at issue were entered into by local law enforcement entities under the authority of a Virginia statute, Va. Code Ann. § 15.2-1726 (2026), which, in pertinent part, permits local authorities, in their discretion, to enter into an "agreement with . . . any agency of the federal government exercising police powers . . . for such periods and under such conditions as the contracting parties deem advisable, for cooperation in the furnishing of police services." Va. Code Ann. § 15.2-1726(A) (2026). For its part, federal law permits the § 287(g) agreements between federal immigration agencies and states or their localities. 8 U.S.C. § 1357(g).

No state or local authority is required to enter into this kind of agreement. 8 U.S.C. § 1357(g)(9). However, if there is an agreement, federal law requires that the agreement must provide that any chosen local law enforcement officer shall have received appropriate training, must "adhere to[] federal law," must be

subject to federal "direction and supervision" in performing the immigration function, and must be "considered to be acting under color of Federal authority for purposes of determining the liability, and immunity from suit" in a civil action. 8 U.S.C. § 1357(g)(2), (3), (8). And all the existing 287(g) agreements in Virginia do contain, inter alia, the foregoing terms.

The § 287(g) agreements at issue may be terminated upon the giving of notice (at will) or 90-day notice. There appears to be no dispute that, until the Virginia 287(g) Law was passed, both parties performed their obligations under the extant agreements. And, the record indicates that, before the Virginia 287(g) Law was passed, only one executed agreement was terminated by either party.[17] The record contains no evidence that, before enactment of the Virginia 287(g) Law, either party was contemplating issuing a notice of termination. So, in sum, the record is that, before the enactment of the Virginia 287(g) Law, the contractual expectations of the parties in the cooperative ventures reflected by the extant § 287(g) agreements were being met, and there was no reason to

[17] The exception was Prince William County. ECF No. 48, 11-12 (citing Laura Wainman, Prince William County Jail Board Ends ICE Agreement, WUSA9 (June 18, 2020 12:31 AM https://www.wusa9.com/article/news/local/virginia/prince-william-county-ends-immigration-agreement-with-ice/65-6e898d5e-b8f5-4685-8ce4-83cb080d398f [https://perma.cc/4YWU-V6GL]). At that time there was also an agreement with Culpepper County Sheriff's Office. Id.

believe that circumstances would change.

The Virginia 287(g) Law impairs the contractual agreements by demanding extensive substantive changes in the terms of the existing agreements: to wit, the incorporation of all twelve "required provisions" of section C. It also impairs the agreements by declaring the agreements void as of September 1, 2026, unless, by then, they are amended to include all of the impairing terms.

So too does the Virginia 287(g) Law undermine the contractual bargains. Clearly, the § 287(g) agreements at issue confer contractual rights upon both parties. See ECF No. 80-1. Among the rights enjoyed by the federal party is the right to augment its enforcement capabilities by enrolling local law enforcement officers to work under the supervision and direction of the federal party and to ensure that federal immigration law and procedures are performed in the federal way and in accord with federal law. ECF No. 80-1, 9-11. The Virginia 287(g) Law changes those bargained-for rights by adding the requirements of Section 1(C)(1)-(12). The law also changes the bargain by making federal officers subject to Virginia law, not federal law as the § 287(g) agreements (and federal law) provide. And, the law changes the entire complaint and disciplinary structure governing federal officers from that in the § 287(g) agreements to those required in the Virginia 287(g) Law. Compare ECF No. 80-1, 10-11, 15 with Va.

Code Ann. § 15.2-1726.1(C)(10)-(12) (2026).

All of the "required provisions" of the Virginia 287(g) Law operate to undermine the contractual bargains that were secured to federal party by the § 287(g) agreements. This further supports the view that the law operates to impair the federal party's contract rights.

And, beyond serious doubt, the impairments are substantial. The impairments change, and are intended to change, rather dramatically, how the federal party enforces federal immigration law. The impairing statute directs the clothing to be worn by federal agents when enforcing the laws, limits the places where federal immigration officers can conduct activities, limits what enforcement procedures and technology that federal agents can use to enforce the federal immigration law, and changes the law (from Federal to state) to which federal agents are subject when enforcing the federal immigration law. Va. Code Ann. § 15.2-1726.1(C) (2026). It is difficult to imagine a more substantial impairment where, as here, the extant § 287(g) agreements neither contain any of the strictures imposed by the Virginia 287(g) Law nor subject federal officers to Virginia law. In other words, the law interferes with the parties' reasonable expectation that the contract terms to which they had agreed would continue to be performed, as in fact, they were being performed from the date the

agreements were executed. At the same time, the federal party's contractual bargain was eliminated.

Another factor probative of whether a state law substantially impairs a contract is the extent to which, if any, the State previously has regulated in the area. Energy Reserves Grp., 459 U.S. at 411. Virginia does not argue that it has previously regulated in the immigration enforcement field. Nor does the record tell of any state regulation in that sphere. That, of course, is unsurprising, considering that the Constitution entrusts the enactment and enforcement of immigration law to the central government.

Also, as the United States points out, the record is devoid of any evidence that Virginia has regulated any contract made with any other federal agency made under § 15.2-1726. That is of some, but not dispositive, force in assessing the existence of a substantial impairment in this statute, the first, and only, regulation of any § 15.2-1726 agreement with a federal law enforcement agency.[18] Considered as a whole, the record respecting the "previous regulation" factor substantially undercuts Virginia's argument that the Virginia 287(g) Law does not

---

[18] Many localities have such contracts with the Federal Bureau of Investigation; the Drug Enforcement Administration; and the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

substantially impair contracts.

Virginia presents two responses. First, it says that there is no obligation to be impaired because the extant contracts are terminable at-will. Some of the 287(g) agreements are terminable upon at will and others are terminable upon advance notice. The right of notice affords the opportunity to renegotiate terms, if a term problem has precipitated notice. And, even though the § 287(g) agreements are not for a defined term, or terminable for cause, the federal party has a reasonable expectancy that the original terms will continue to be performed until the opposite party gives notice. And, of course, so too does the local Virginia entity. A state law that mandates extensive substantive revisions that change a party's obligation and rights is a substantial impairment of the extant rights, notwithstanding that the other party can terminate on notice. Until notice is given and the notice period has run, where applicable, an opposing party is entitled to performance of the original terms of the contract.

Virginia also argues that there is no impairment at all because the Virginia 287(g) Law's impairing terms occur only if the United States voluntarily agrees to modify its § 287(g) agreements. That argument is too clever by half and it fails. An honest assessment of the Virginia 287(g) Law shows that there is no element of voluntariness to it. First, its required, impairing

terms (Section C(1)-(12)) actually command the federal party to engage in specific conduct or to refrain from engaging in specific conduct in the enforcement of federal immigration law. Failure to do so subjects federal agents to prosecution in Virginia's courts. The law gives no quarter. Therefore, the agreement is either to be modified or it, and its appurtenant rights, are forfeited as of September 1, 2026.

Indeed, failure to knuckle under to the law's "required provisions" automatically renders the § 287(g) agreements void and unenforceable. Virginia offers no explanation how, under any definition of the word, that is voluntary. Nor does Virginia otherwise explain how such coerced consequences can be somehow construed as voluntary. In fact, Virginia's "no obligation exists because the modification is voluntary" argument is sophistry. Were coercion of that sort sufficient to permit a finding that no obligation exists, the entire concept of contractual impairment would be set at naught.[19] All a State would ever have to do to evade the proscription of the Contracts Clause is to pass a law that says "change the contract or it's void." There is no support for such a course.

---

[19] And, if applied broadly, the notion would fundamentally alter the law of contracts.

**(2) Legitimate Public Purpose / Reasonableness**

Virginia's next reason is that the Virginia 287(g) Law serves a legitimate public purpose. That, of course, brings the analysis to the second step: "whether the [Virginia] law is drawn in an 'appropriate' and 'reasonable' way to advance a 'significant and legitimate public purpose.'" Sveen, 584 U.S. at 819; Energy Reserves Grp., 459 U.S. at 411-12. Virginia fails here as well.

When the Virginia 287(g) Law was passed, its articulated public purpose was to oppose the methods being used by federal authorities to enforce the federal immigration law (see supra p. 11-13). It is rather obvious that Virginia could not satisfy step two of the contract impairment analysis by asserting that it was acting to oppose federal enforcement of federal immigration law. So, beginning with the Governor's signing of the bill and continuing into its briefing in this case (ECF No. 40, 12-13), Virginia shifted to an economic burden theory of "significant and legitimate public purpose." But that theory fails at the threshold because Virginia is perfectly amenable for its local authorities to bear the economic load of the § 287(g) agreements so long as the federal government accepts the enforcement methods and constraints that are required in Section C of the Virginia 287(g Law. That alone consigns Virginia's purported economic public purpose argument to the dust bin.

Moreover, to the extent that the § 287(g) agreements implicate non-federal funding, the economic load falls on the contracting local authority and its taxpayers, not on the Commonwealth. And, of course, the § 287(g) agreements allow the contracting localities to give notice to terminate if it should consider performance beyond its economic reach. Only one has done so. That too shows the fallacy of Virginia's late-breaking economic purpose theory.[20]

Assuming, however, that the economic purpose had support (it does not), the record does not show that Virginia chose an appropriate and reasonable way to advance that purpose. It can hardly be appropriate or reasonable for a State, in forwarding its economic intent, to tie the hands of federal law enforcement in enforcing federal law in an area clearly entrusted to the federal government by the Constitution. Nor can one find it appropriate or reasonable for a State, in forwarding its economic interest, to

---

[20] To the extent that Virginia is arguing that it (as opposed to the contracting local contracting parties) is somehow suffering economic adversity, the argument makes no sense because Virginia is not a party to the § 287(g) agreements. Moreover, Virginia has reported yet another budget surplus. So, its asserted "tasking of state resources" argument makes no sense from the economic standpoint. ECF No. 56, 14 (citing Chris Graham, Report: Virginia Government Ends Year With Near-Billion-Dollar Surplus, Augusta Free Press (July 14, 2026 6:18 PM), https://augustafreepress.com/news/report-virginia-government-ends-year-with-near-billion-dollar-surplus/ [https://perma.cc/Y4QQ-422V].

change the contract terms and the legal constructs (either the law to be followed or the law governing liability) which apply to federal officers when enforcing federal law.

Virginia argues also that the release of information provision in the § 287(g) agreements is at odds with Virginia's Freedom of Information Act. ECF No. 40, 13-14. This too is a late-breaking position. Nothing in the history of the enactment of the law suggests that its purpose was to address a problem with the Commonwealth's FOIA law. Nor did Virginia see this as a problem either when the localities entered the § 287(g) agreements or while the localities performed under them. In sum, the record teaches that the FOIA-based argument lacks merit.

Finally, Virginia contends that the law "protects public safety, the integrity of state criminal-justice processes and policing, the orderly enforcement of state law, and the Commonwealth's resources, ensuring that they are not diverted into federal investigation enforcement without judicial oversight," and "preserves essential state functions by ensuring that federal civil-immigration enforcement does not undermine state law-enforcement priorities." ECF No. 40, 31, 32.

The "state economic resources" piece is addressed above and will not be repeated here. But, as made here, that argument tells clearly that the purported legitimate state purpose is to change

the way that federal authorities are enforcing federal immigration law ("ensuring that [state resources] are not diverted into federal immigration enforcement without judicial oversight.")[21] Putting the economic purpose aside, leaves the conclusorily asserted and unexplained "public safety, criminal justice, and orderly law enforcement" purposes. Virginia does not actually explain how the Virginia 287(g) Law operates to effectuate these purposes.

Once substantial impairment is shown, it is Virginia's burden to show a legitimate public purpose. Its conclusory, unsupported, after-the-fact economic arguments do not meet that burden. Nor do the remainder of its conclusory assertions.

But, assuming that those conclusory arguments are part of a general State police power argument, it too fails. The argument begins with the assertion that the Contracts Clause does not obliterate Virginia's police power. Clearly, that is correct. The United States does not suggest otherwise.

But, reduced to its essence, the argument is that there exists a legitimate public purpose in ordering the modification of extant contracts to change, and control, the enforcement of federal immigration laws by federal agents. In essence, that posits the

[21] The caveat "without judicial oversight" is hard to understand considering the number of federal courts that have issued decisions addressing how federal immigration law is being enforced.

principle that, when Virginia's police power conflicts with federal police powers in the enforcement of a sphere constitutionally entrusted to the federal government, the federal police power must yield. That principle, if adopted, would turn the Supremacy Clause on its head. The Court declines Virginia's invitation to do that.

For the foregoing reasons, the United States has shown a strong likelihood of success on Count III.

**B. COUNT V: Intergovernmental Immunity (Violation by Regulation)**

In Count V, the United States asserts that the Virginia 287(g) Law, § 15.2-1726.1, regulates

> the Federal Government by imposing conditions on how and where Federal officers may enforce the immigration laws of the United States within the Commonwealth of Virginia, including the technology they may use, what they must wear, what legal process is required, and what laws they must obey, and specifying who must investigate incidents of use of force.

ECF No. 1, ¶ 168. That, says the United States, violates the intergovernmental immunity doctrine and thus the Supremacy Clause of the U.S. Constitution.

The intergovernmental immunity doctrine has its genesis in McCulloch v. Maryland, 17 U.S. 316 (1819), where "Chief Justice John Marshall explained that, under the Supremacy Clause, 'the States have no power, by taxation or otherwise, to retard, impede,

burden, or in any manner control, the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." United States v. Washington, 596 U.S. 832, 838 (2022) (emphasis added) (quoting McCulloch v. Maryland, 17 U.S. at 436). "The Court thus interpreted the Constitution as prohibiting States from interfering with or controlling the operations of the Federal Government." United States v. Washington, 596 U.S. at 838.

The intergovernmental immunity doctrine sprang from a tax case and was often referred to as the intergovernmental tax immunity doctrine. But, since then, the Supreme Court has come "to understand the doctrine, however, as prohibiting state laws that either 'regulat[e] the United States directly or discrimat[e] against the Federal Government or those with whom it deals." United States v. Washington, 596 U.S. at 838-39 (quoting North Dakota v. United States, 495 U.S. 423, 435 (1990) (plurality opinion)) (emphasis added)) (other citation omitted). "A direct regulation might arise where a State law or regulation 'places a prohibition on the Federal Government.'" McHenry Cnty. v. Raoul, 44 F.4th 581, 592 (7th Cir. 2022) (quoting Hancock v. Train, 426 U.S. 167, 180 (1976)).

Several appellate decisions have considered the doctrine of intergovernmental immunity in the immigration law context. First,

in McHenry, the Seventh Circuit rejected an intergovernmental immunity challenge to an Illinois law that prohibited Illinois law enforcement from entering cooperative agreements for immigration detention. Id. at 592-93. The Seventh Circuit reasoned that, because the federal government was still able to have detainees in its facilities or in private facilities and because participation in those cooperative agreements was voluntary, there was no regulation of the federal government. Id. at 593. Rather, the law regulated Illinois officials only.

On the other hand is CoreCivic, Inc. v. Governor of New Jersey, 145 F.4th 315 (3d Cir. 2025). In CoreCivic, the Third Circuit held that a law that prohibited "the state, its local governments, and private parties" from contracting with the federal government for immigration detention did regulate the federal government. Id. at 320, 325. To reach that result, the Third Circuit "look[ed] through form and behind labels to substance" and found that the New Jersey law was really an "effort to hamstring [the federal government's immigration] power." Id. at 322, 328 (citations omitted). Then, the Third Circuit found that the law substantially interfered with a federal function by destroying the supply of detention facilities for civil immigration detainees in the state. Id. at 327-28.

The Ninth Circuit in United States v. King County, 122 F.4th

740 (9th Cir. 2024) came to a similar conclusion as the Third Circuit in CoreCivic. In King County, the Ninth Circuit struck down an executive order that prevented an airfield from servicing flights that were used to deport ICE detainees. Id. at 747, 756. Even though the order acted only on third-parties, the Ninth Circuit found that it nonetheless violated intergovernmental immunity because it "requir[ed] ICE to entirely transform its approach to" transportation of detainees. Id. at 756.

The United States takes the view that the Virginia 287(g) Law regulates the federal government because it entirely transforms federal contracting power, as authorized by Congress, and entirely transforms immigration law enforcement by imposing conditions at odds with federal law. ECF No. 9, 25. Finally, says the United States, the 287(g) Law regulates the federal government because it substantially interferes with a core federal function. ECF No. 9, 27 (citing CoreCivic, 145 F.4th 315).

Virginia responds that the Virginia 287(g) Law only constrains the contracting power of its own localities and does not act on the federal government directly. ECF No. 40, 21-23. And, says Virginia, the law does not require the federal government to do anything unless and until the federal government consents to it. Id. at 23.

But, says the United States, Virginia cannot do indirectly

that which it cannot do directly. ECF No. 56, 19 (citing CoreCivic, 145 F.4th at 322). In other words, Virginia knows that it cannot impose these conditions on federal immigration officials directly, so the Commonwealth is doing so indirectly.

The reasoning in CoreCivic and King County is persuasive. The reasoning and the result in McHenry fails to take account of some sound advice from the Third Circuit in CoreCivic. That advice begins with the observation that "[i]ntergovernmental immunity is not a formalistic doctrine." CoreCivic, Inc. v. Governor of New Jersey, 145 F.4th at 322. That is because:

> [i]n gauging intergovernmental immunity, the Court has long instructed us to "look through form and behind labels to substance." City of Detroit v. Murray Corp. of Am., 355 U.S. 489, 492, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958). We must probe the "purpose or self-evident operation of a statute" to see if it is used to evade the limits on immunity "by indirectly achieving the same result." Miller v. City of Milwaukee, 272 U.S. 713, 715, 47 S.Ct. 280, 71 L.Ed. 487 (1927). "[W]hat cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 230, 143 S.Ct. 2141, 216 L.Ed.2d 857 (2023) (alteration in original) (quoting Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 325, 18 L.Ed. 356 (1867)).

Id. (emphasis added).

Applying that advice discloses that the Virginia 287(g) Law operates directly on the federal government by controlling what it must put in its contracts and how it must enforce federal immigration law. To do that, the Virginia 287(g) Law issues

commands and makes prohibitions. Those commands and prohibitions are issued directly to ICE, its agents and other federal agents, on matters directly regulating the conduct of federal law enforcement officers when enforcing federal immigration law. In sum, they do what has been forbidden since McCulloch v. Maryland: "control[] the operation of constitutional laws enacted by Congress to carry into execution the powers vested in the general government." 17 U.S. at 436.

Under the Virginia 287(g) Law, the federal governments' 287(g) agreements become null and void unless the federal party agrees to have the twelve required provisions demanded by sections C(1)-(12). Those provisions dictate what the federal immigration authorities must do (or not do) when enforcing federal immigration law in Virginia. And, by Virginia's own admission in its papers here, those twelve requirements are designed to change the way that federal immigration law is enforced, at least in Virginia.

Virginia well knows that it could not directly impose those twelve requirements on the federal government. So, it has chosen an indirect method to "retard, impede, burden" and otherwise "control" the operation of constitutional federal immigration laws enacted by Congress. McCulloch v. Maryland, 17 U.S. at 436. And, for good measure, Virginia has thrown down the gauntlet in Section E: either sign a contract modification or your contracts are void

and unenforceable. By any realistic look, when the "purpose or self-evident operation" of the Virginia 287(g) Law is probed, the Law is being "used to evade the limits on [intergovernmental] immunity 'by indirectly achieving the same result'" that could not be achieved directly. CoreCivic, 145 F.4th at 322.

Here, as in CoreCivic, applying the functional approach to intergovernmental immunity, "we can easily see the [Virginia 287(g) Law] for what it really is: a regulation 'laid upon the contract of the government.'" Id. at 325. In substance, the Virginia 287(g) Law is a direct regulation of the federal enforcement of immigration law, a sphere which in our dual system of sovereignty is entrusted by the Constitution to the federal government.

Virginia seeks to avoid this conclusion by arguing that the Virginia 287(g) Law regulates only its own officers. ECF No. 40, 21-24. That is just wrong, as a look at section C (1)-(12) confirms.

For example, all twelve parts of Section C addresses federal agencies by name or by using the term "federal agency." All twelve parts are explicit commands to those federal authorities as to the conduct in which they can, and cannot, engage when enforcing federal immigration law in Virginia. If that does not constitute regulation under the meaning of the intergovernmental immunity

doctrine, then none there would ever be.

That does not change upon Virginia's assertion that the law "regulates only Virginia's own officers and Virginia's own resources." ECF No. 40, 21. That argument is built on the statement:

> The statute governs when Virginia law enforcement agencies may assist in federal immigration and the conditions under which Virginia may choose to enter a federal immigration agreement.

ECF No. 40, 15 (emphasis in original). That statement, however, ignores most of what the statute says and all of what it does. It is correct that, in part, the Virginia 287(g) Law purports to lay out conditions for § 287(g) agreements for local law enforcement agencies.[22] But, after expressing that purpose, the law then turns its force and effect to command what federal law enforcement officials (and only federal officials) can, and cannot, do in the enforcement of immigration law.

Considering the statutory text and the context of its enactment, it does not take much probing of the law's "purpose or self-evident operation" to see that the law is being "used to evade the limits on immunity 'by achieving indirectly the same result'"

---

[22] Virginia erroneously refers to itself as the contracting party. That is, like much of what Virginia says, wrong. And it is at odds with representations made on the record stating that Virginia is not a party to any of the § 287(g) agreements at issue. ECF No. 102, 4-5.

that could not be achieved indirectly. CoreCivic, 145 F.4th at 322. Here, as in defense on COUNT III, Virginia reprises the voluntary consent argument. That contention fails here for the same reason it failed in the defense of COUNT III.

Nor does Virginia's reliance on Dillon's Rule change the self-evident purpose or operation of the statute. Dillon's Rule allows Virginia's legislature to withdraw the authority that it initially conferred by § 15.2-1726 to enter § 287(g) agreements. But Dillon's Rule does not operate to alter the intergovernmental immunity doctrine or to somehow authorize states to regulate the federal government in an area entrusted to it by the Constitution.

For the foregoing reasons, the United States has shown a strong likelihood of success on Count V.

**C. COUNT IV: Preemption & COUNT VI: Intergovernmental Immunity, Violation by Discrimination**

The briefs addressing the substantive merits, i.e., the likelihood of success, on COUNTS IV and VI are not well developed. Nor is the record. Both counts, as does the "substantial interference with a core function" component of COUNT V present factually dependent predicates for success on the merits. That predicate is favorably presaged, but not sufficiently established,

by the current record.[23] For that reason, and because the United States has shown a substantial likelihood of success on COUNTS III and V, it is not necessary to address that factor for COUNTS IV and VI.

**III. Irreparable Harm**

The United States must also show an immediate irreparable harm absent injunctive relief. The likelihood of harm must be more than a possibility. Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). An irreparable harm is one where there is "no adequate compensatory or other corrective relief [at law] . . . available at a later date." Am. Fed. of State, Cnty. & Mun. Employees, AFL-CIO v. Soc. Sec. Admin., 172 F.4th 361, 372 (4th Cir. 2026). Also, being subjected to an unconstitutional law constitutes irreparable injury.

The United States, citing New Orleans Public Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350 (1989), argues that subjecting federal law enforcement to unconstitutional Virginia laws is an irreparable injury itself. ECF No. 9, 34. New Orleans explained that "[i]rreparable injury may possibly be established . . . by a showing that the challenged state statute

[23] Whether Virginia may impose conditions on new contracts is an open issue still to be decided after full consideration of COUNTS IV and VI on the merits.

is 'flagrantly and patently violative of express constitutional prohibitions.'" Id. at 366. (quoting Younger v. Harris, 401 U.S. 37, 53-54 (1971)). The United States takes the view that the Virginia 287(g) Law meets that description. And, indeed, that law clearly does seek to regulate federal law enforcement activity, presenting strong support that, for that reason, it offends the intergovernmental immunity doctrine and thus the Supremacy Clause.

The Ninth Circuit recently held that being subject to a deprivation of constitutional rights was irreparable harm. United States v. California, 173 F.4th at 1069 (citing Baird v. Bonta, 81 F.4th 1036, 1040 (9th Cir. 2023); Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012)). Elrod v. Burns, 427 U.S. 347, 373 (1976), the decision relied upon by Melendres, found that a constitutional violation constituted irreparable injury in the context of an individual's First Amendment rights. It is clear that constitutional violations of the First Amendment are irreparable injuries, but, outside of the Ninth Circuit, courts have not applied a presumption that any other constitutional deprivation is itself an irreparable harm. See Wright & Miller, Grounds for Granting or Denying a Preliminary Injunction - Irreparable Harm, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d. ed. April 2026 update) (citing cases); Leachco, Inc. v. CPSC, 103 F.4th 748, 755 (10th Cir. 2024).

However, in Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah, 790 F.3d 1000(10th Cir. 2015), the Tenth Circuit held that "an invasion of tribal sovereignty can constitute irreparable injury." Id. at 1005 (citation omitted). That principle would apply equally to invasion of federal sovereignty. And, indeed, in New Mexico Dept. of Game & Fish v. United States Dept. of Interior, 854 F.3d 1236 (10th Cir. 2017), the Tenth Circuit held that, while interference with a state's ability to enforce its statutes (its sovereignty) would be irreparable injury, the state, in that case, had not made such a showing. Id. at 1254-55. The District Court for the District of Oregon has held that violations of the Tenth Amendment caused by unlawful deployment of National Guard were irreparable injury. Oregon v. Trump, 812 F. Supp. 3d 1142, 1153 (D. Or. 2025).

It seems rather clear that being subjected to a state law that regulates an activity that is constitutionally delegated to the federal government is an infringement of the Supremacy Clause that constitutes an irreparable injury. Virginia has not contested this view of the law in this case. And, at oral argument on the Mask/Identity Law, Virginia agreed that a violation of the Supremacy Clause would, if proved,[24] constitute irreparable injury.

[24] Virginia's argument was that the United States had not established that the Mask/Identity Law regulated federal

ECF No. 32, 43.

Thus, the United States has met the irreparable injury requirement because, if the Virginia 287(g) Law takes effect, the federal government will suffer an infringement of its rights under the Supremacy Clause. And, as explained above, there is a substantial likelihood that the United States will prevail on COUNT V.

Likewise, the impairment of the federal government's contract rights under the extant § 287(g) agreements presents an immediate, irreparable harm. There is no remedy at law to redress the deprivation asserted in COUNT III. And, the United States has shown a strong likelihood that its assertion of constitutional violation will prevail.

Virginia argues that the United States' delay in filing the PI MOTION undermines it argument that there will be an immediate irreparable harm. ECF No. 40, 33-34. The Virginia 287(g) Law was passed and signed on April 22, 2026. The Complaint was filed seven weeks after that, on June 11, 2026, and the PI MOTION was filed six days later, on June 17, 2026. That timeline is certainly not evidence of undue delay of the sort that disproves immediate, irreparable injury.

---

enforcement of the federal immigration laws and therefore had not proved a violation of the Supremacy Clause.

For the foregoing reasons, the United States has satisfied the irreparable injury requisite for preliminary injunctive relief.

**IV. Balance of Equities & Public Interest**

The final factors are the balance of the equities and the public interest. The United States argues that enforcement of an unconstitutional law is not in the public interest. United States v. California, 173 F.4th at 1069; Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002). In other words, if the plaintiff is likely to succeed on the merits of a constitutional claim, the last two factors tip in its favor. United States v. California, 173 F.4th at 1069 (citation omitted). That is correct. The fact that the Virginia 287(g) Law is likely an unconstitutional law means that the equities and public interest, which merge because the government is a party, weigh in favor of granting the PI MOTION. See also Leaders of a Beautiful Struggle v. Baltimore Police Dept., 2 F.4th 330, 346 (4th Cir. 2021) ("a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.") (quoting Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 191 (4th Cir. 2013).

Virginia also argues that the Court should not disrupt the status quo through emergency relief. Id. However, Virginia

misunderstands the status quo. Here, the status quo is no Virginia 287(g) Law. The equities favor enjoining a state law that offends the Supremacy Clause and, in so doing, disrupts the status quo. United States v. Alabama, 691 F.3d 1269, 1301 (11th Cir. 2012). That is because, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations. Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." Id.

Virginia also argues that the equities tip in its favor because continuation of the § 287(g) agreements would undermine Virginia's sovereign authority. ECF No. 40, 35. On that score Virginia reasserts that allowing the § 287(g) agreements to continue without modification will burden "Virginia's limited law enforcement resources." ECF No. 40, 36. That argument has no more force here than when it was presented as a legitimate public purpose in the analysis of COUNT III. And, enjoining the Virginia 287(g) Law will permit the localities to continue to participate in their respective § 287(g) agreements if they choose to do so without the artificial impetus to give notice to terminate that is created by a state law that likely will be held to be invalid under the Contracts Clause and the intergovernmental immunity doctrine. It is in the public interest to afford those contracting entities

the continuation of the contractual bargain they struck when not under the cloud of this statute of highly doubtful validity.

This record teaches that all applicable factors support the grant of the PI MOTION to preserve the status quo until the disputes presented by the COMPLAINT can be resolved on their merits.

**CONCLUSION**

The discussions of the Contracts Clause (COUNT III) and the intergovernmental immunity doctrine (COUNT IV) demonstrate that much is at stake in this case. What is at stake? It is the viability and effectiveness of the dual sovereignty concept which reflects the way in which "We the people" have chosen to structure our government. Our Constitution vested in the federal (central) government the power to make and enforce the country's immigration laws. Conversely, the Constitution gives to the States no role in that sphere of governmental authority. When that constitutional allocation of sovereignty is respected, the system of governance established by the Constitution works, as intended. But, that happens only if both sovereigns respect the lines drawn by the Constitution. In this instance, that principle necessitates that Virginia must respect the Constitutionally-assigned role of the federal government in the enforcement of the nation's immigration laws. That, however, does not mean that a State is without recourse

to advance its view that the federal enforcement process and methods are wrong.

If a State considers that the conduct of the federal authorities offends the Constitution or violates federal law, the State can bring that to the attention of its federal legislators, and through them, seek to have Congress change the way federal law is being enforced. And, indeed, even today, there is underway in the federal legislature, activity to examine federal immigration law and its enforcement, including looking into the very matters that took place in other states that, according to Virginia's own briefs in this case, prompted Virginia to enact the package of laws, including the Virginia 287(g) Law, intended to control the way that the federal government was enforcing the federal immigration laws.

Alternatively, the State has recourse to the federal courts to challenge the enforcement of immigration law. And, indeed, federal courts all over the country are entertaining suits, filed by individuals and governments to challenge the conduct of federal enforcement of the federal immigration laws.

However, States are not entitled to themselves control or regulate the federal enforcement of the laws, no matter how strongly (or rightly) they disagree with the means the federal government uses to enforce federal law. The intergovernmental

immunity doctrine prohibits that. Nor can States impair the contract rights that the federal government has under the § 287(g) agreements that existed when the Virginia 287(g) Law was enacted. The Contracts Clause prohibits that.

Virginia's choice to undertake the role of regulating federal enforcement of immigration law has potentially severe constitutional consequences. On that point, we might pause to think what likely result would follow if next Virginia decides that the methods by which the FBI, DEA, or ATF conduct searches or surveillance, or handle undercover operations, or make arrests are not to Virginia's liking and passed laws to regulate that enforcement conduct. Or, what if, Virginia decided to impose Section C-like contract requirements on those federal agencies with whom Virginia's local law enforcement entities have agreements under the broad authorization given localities under 15.2-1726? What then, if other States either followed suit or imposed even different conditions in the enforcement conduct of those vital federal agencies? Where would the Balkanization stop?

In other words, what would become of our dual system of sovereignty if States were free to do as Virginia has done here? No doubt, it would endure, but, without doubt, it would be altered. It would no longer be the governmental operating structure settled upon by the Founders. To prevent that result when a State chooses

a Constitutionally indefensible course, the errant choice must be set at naught. And, where, as here, there is a strong likelihood that the State's course is not permitted by the Constitution, the remedy is to forestall that course pending resolution of the Constitutional claim.

For the foregoing reasons, the PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 8) was granted as to the Virginia 287(g) Law except to the extent that the law prohibits the entering of new § 287(g) agreements. See ORDER OF PRELIMINARY INJUNCTION (ECF No. 100).

It is so ORDERED.

/s/ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: September 3, 2026